UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CASE No. 1:20-CV-11889-MLW

| | | |
|---|---|---|
| Dr. SHIVA AYYADURAI | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM FRANCIS GALVIN, | ) | |
| MICHELLE K. TASSINARI, | ) | |
| DEBRA O'MALLEY, | ) | JURY DEMANDED |
| AMY COHEN, | ) | |
| NATIONAL ASSOCIATION OF | ) | |
| STATE ELECTION DIRECTORS, | ) | |
| all in their individual capacities, and | ) | |
| WILLIAM FRANCIS GALVIN, | ) | |
| in his official capacity as Secretary | ) | |
| of State for Massachusetts, | ) | |
| Defendants. | ) | |

**AMENDED VERIFIED COMPLAINT**

CONCISE STATEMENT OF CLAIM PER FRCP RULE 8

Defendants have already admitted under oath that they coordinated an effort to strongly

encourage Twitter to delete tweets that specifically referenced emails from Defendant Galvin's

Office, and aimed to get Twitter to suspend Dr. Shiva repeatedly such that he was unable to send

out any tweets during the last month of his campaign run. Those emails, which revealed that

ballot images from election machines have all been deleted, substantiated Dr. Shiva's claim that

Federal law had been violated by Defendant Galvin. Defendants acted in concert with the

common purpose of abusing their official influence to suppress Dr. Shiva's political speech.

Defendants violated Dr. Shiva's First Amendment right under the color of law, thus giving rise

to this § 1983 claim. Defendant Galvin is sued in both official and individual capacities because

of the need to invoke the *Ex parte Young* exception. *Ex parte Young*, 209 U.S. 123 (1908)

## PARTIES

Plaintiff Dr. Shiva Ayyadurai ("**Dr. Shiva**") lives and works in this District. He holds

four (4) degrees from the Massachusetts Institute of Technology including his PhD in Biological

Engineering, where he collaborated on research with Professor Noam Chomsky, a noted linguist;

and with Professor Robert Langer, a world-renowned engineer.  Dr. Shiva founded and runs

multiple technology companies in Cambridge, MA at 701 Concord Avenue, and has now

campaigned for Federal office three times, including presently for U.S. Senate. He started his

account on Twitter in August 2011 and since then has worked assiduously to grow his presence.

His Verified Twitter account is followed by a quarter of a million people, giving him significant

presence on the nation's social media landscape.

Defendant William **Galvin** is a career politician, presently the Secretary of State for the

Commonwealth of Massachusetts, and the person responsible for ensuring that Federal law is

complied with during the conduct of elections for Federal office. He resides at 46 Lake Street,

Brighton, MA 02135

Defendant Michelle **Tassinari** is Defendant Galvin's legal counsel and Elections

Director of the Massachusetts Elections Division and the person required to ensure Galvin's

office complies with Federal law. Tassinari is also the President-elect of Defendant National

Association of State Election Directors, and a member on the Standards Board of the U.S.

Election Assistance Commission (www.eac.gov). Tassinari resides at 5A Lee St, Wilmington,

MA 01887.

Defendant Debra **O'Malley** is Defendant Galvin's spokesperson and also handles the

Election Division's official Verified Twitter account (@VotinginMass).

Defendant Amy **Cohen** is the Executive Director for Defendant NASED.

Defendant National Association of State Election Directors ("**NASED**") is a 501(c)(3) professional organization headquartered at 1200 G Street NW, Suite 800, Washington, DC 20005.  Its members are the Elections Directors in the fifty (50) states. In 2018, Democracy Works, which is funded by certain known foundations, took over the management of NASED. NASED does not make prominent that it is an entity "within" Democracy Works, Inc. The screenshot below from Democracy Works' web page provides a partial list of their funders.



Amy Cohen went from Pew to Democracy Works to NASED. Democracy Works Inc.'s 2018 Form 990 declares that NASED operates "within" Democracy Works, Inc. Screenshot below:

**SCHEDULE O**
(Form 990 or 990-EZ)

Department of the Treasury
Internal Revenue Service

# Supplemental Information to Form 990 or 990-EZ

Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.
▶ Attach to Form 990 or 990-EZ.
▶ Go to www.irs.gov/Form990 for the latest information.

OMB No. 1545-0047

**2018**

Open to Public
Inspection

| Name of the organization | Employer identification number |
|---|---|
| DEMOCRACY WORKS, INC. | 27-2460359 |

FORM 990, PART I, LINE 1, DESCRIPTION OF ORGANIZATION MISSION:

ELECTION ADMINISTRATORS.


FORM 990, PART III, LINE 4A, PROGRAM SERVICE ACCOMPLISHMENTS:

DEMOCRACY WORKS LABS IS OUR IN-HOUSE INNOVATION ARM THAT AIMS TO

IMPROVE THE QUALITY OF VOTER ENGAGEMENT TOOLS AND THUS BUILD A

FOUNDATION TO STRENGTHEN THE ENTIRE FIELD OF VOTER ENGAGEMENT

TECHNOLOGY. IN 2018, LABS LAUNCHED HOW TO VOTE, WHICH IS BUILT ON THE

DEMOCRACY WORKS API AND HELPS VOTERS ACCESS ACCURATE INFORMATION ABOUT

VOTING AND REGISTRATION ACROSS ALL 50 STATES AND DC.


FORM 990, PART III, LINE 4B, PROGRAM SERVICE ACCOMPLISHMENTS:

WITHIN DEMOCRACY WORKS, NASED PROMOTES ACCESSIBLE, ACCURATE, AND

TRANSPARENT ELECTIONS IN THE UNITED STATES AND U.S. TERRITORIES. NASED

MEMBERS ARE ELECTION DIRECTORS FROM ACROSS THE COUNTRY AND ARE

RESPONSIBLE FOR IMPLEMENTING ELECTION LAWS AND POLICIES, MAINTAINING

THE VOTER REGISTRATION DATABASES, WORKING WITH LOCAL ELECTION OFFICIALS

TO ENSURE A SUCCESSFUL VOTING EXPERIENCE FOR ALL VOTERS, AND MORE.


## VENUE

Venue is proper because the Defendants violated Dr. Shiva's rights in this district. In addition, Dr. Shiva lives and works in this District as do three of the Defendants.


## JURISDICTION

This court has jurisdiction over this case because the complaint involves violation of a right guaranteed by the United States Constitution by persons under the color of law, as well as

racketeering to obstruct justice and conspiracy.  28 U.S.C. § 1331, 28 U.S.C. § 1343, 42 U.S.C. § 1983, 18 U.S.C. § 1961(3), 18 U.S.C. § 1962(c), 18 U.S.C. § 1962(d) and 42 U.S.C. § 1985. In addition, there is diversity between the parties: two of the Defendants, Cohen and NASED, are based in different Districts. This court has jurisdiction under *Ex parte Young*, 209 U.S. 123 (1908) over Secretary Galvin in his official capacity as the relief sought is prospective and injunctive.

## LIABILITY

Pursuant to the Court's ruling in *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), Galvin, O'Malley and Tassinari may be sued in their individual capacities for monetary damages caused by their intentional torts, which in this case include violation of Dr. Shiva's First Amendment rights under color of law through abuse of their official positions. An *ipso facto* immunity defense is impermissible.

Sworn testimony elicited from the Defendants during an emergency hearing for a Temporary Restraining Order implicated Defendants Cohen and NASED in the intentional violation of Dr. Shiva's First Amendment rights.

The U.S. District Court for Massachusetts has already ruled that Dr. Shiva has met the threshold of likelihood of being able to prevail on his claim that Twitter's action was State action and due solely to the actions of these Defendants. See *Blum v. Yaretski*, 547 U.S. 991 (1982). On October 30, 2020, Judge Mark L. Wolf thus ordered (#20) that Galvin, his agents, employees, and other persons in active concert with any of them shall not report or complain to Twitter concerning Dr. Shiva's tweets and that Galvin shall ask NASED to not report or complain to Twitter as well. Defendants Galvin agreed to this while on notice that Dr. Shiva intended to seek monetary damages.

## THIS AMENDED COMPLAINT IS APPROPRIATE

Defendant Galvin, who had been sued in the original complaint solely in his official

capacity, averred that service had not been perfected by the time of the emergency hearing on

Dr. Shiva's motion for a Temporary Restraining Order.  Galvin's attorney, Adam Hornstine,

filed an appearance in order to oppose the motion as Defendant Galvin had full and substantive

notice of the accusation and issues regarding the motion and complaint. Galvin's opposition also

presented affirmative defenses against claims in the complaint that were not related to the

motion for a TRO.  Dr. Shiva's previous counsel has thus far been either unable or unwilling to

produce proof of service such as a Certified Mail receipt.  Dr. Shiva represented himself *pro se*

at the emergency hearing and committed to serving the complaint upon the Defendants. As the

Defendants in this action were not served the original complaint in a manner compliant with

Rule 4, and no Answer was filed, Dr. Shiva files this amended complaint as a matter of right.

### GALVIN MAY BE SUED IN BOTH INDIVIDUAL AND OFFICIAL CAPACITIES

Each of a person's different legal capacities constitutes a separate 'party.'

"Under well-established rules of res judicata, recognized in Maine, an action
brought against an individual in one capacity does not bar a later action brought against
the same individual in a different capacity. See also Restatement (Second) of Judgments
§ 36; 1B Moore's Federal Practice ¶ 0.411[3] (2d ed. 1982). We therefore hold that res
judicata does not bar the present action as against the individual Defendants but does bar
it against the city." *Roy v. City of Augusta, Maine*, 712 F. 2d 1517 (1st Circuit 1983).

Also *Kentucky v. Graham, 473 U.S. 159, 165-66 (1985)*, *Unimex, Inc. v. United States
Dep't of Hous. & Urban Dev.*, 594 F.2d 1060, 1061 n. 3 (5th Cir. 1979), *Headley v.
Bacon*, 828 F.2d 1272, 1279-80 (8th Cir. 1987), *Andrews v. Daw*, 201 F.3d 521 (4th Cir.
2000), *Leftridge v. Matthews*, 1:11-cv-03499-ELH (Dist. MD. 2012), *Favors v. Cuomo*,
11-cv-5632 (E.D.N.Y. Oct. 29, 2013)("each of a person's different legal capacities
constitutes a separate 'party'"), *McCarthy v. Wood*, 219 Mass. 566 (1914), *Duffee v.
Boston Elev. Rlwy*, 191 Mass 563 (1906), *Sturbridge v. Franklin,* 160 Mass. 149 (1893),
*Anderson v. Phoenix*, 387 Mass. 444 (1982), *Campbell v. Ashler*, 320 Mass. 475 (1946)

Galvin is thus sued in his individual capacity, for monetary damages, and in his official

capacity, in order to avail of the *Ex parte Young* exception and obtain prospective injunctive relief in the form of a permanent injunction that bars him, as Secretary of State, from abusing his office again to suppress constitutionally-protected political speech, whether it concerns speech from Dr. Shiva or any other candidate for political office. This court must enforce the writ of the United States Constitution upon a recalcitrant Commonwealth of Massachusetts that even claims the Secretary's decision to delete ballot images supersedes Federal law regarding the preservation of records generated during Federal elections.

## ORAL HEARINGS

Dr. Shiva respectfully requests oral hearings prior to resolution of any substantive motion, such as a motion by Defendants to delay filing a pleading or a motion to dismiss.

## FACTS OF THIS CASE

Dr. Shiva was born in India in 1963 into India's oppressive caste system as a low-caste untouchable. The oppressive conditions and the corrupt system of socialist governance in India motivated his parents to immigrate to the United States in 1970 to seek greater liberty and respect for individual rights, including the U.S. Constitution's iron-clad protection for freedom of speech, as well as opportunities for themselves and their children.

Dr. Shiva earned four (4) degrees from the Massachusetts Institute of Technology: a bachelor's in Electrical Engineering and Computer Science, masters degrees in both Mechanical Engineering and Visual Studies, as well as a doctoral degree in Biological Engineering.

Dr. Shiva is a Fulbright Scholar, a Westinghouse Honors Award recipient, a member of multiple research and engineering academic honor societies including Eta Kappa Nu, Sigma Xi, and Tau Beta Pi, a Lemelson-MIT Awards Finalist, and was nominated for the National Medal of Technology and Innovation bestowed by the President of the United States.

As an educator, Dr. Shiva has developed new curricula and taught at both undergraduate and graduate levels at MIT and has presented invited lectures at leading academic institutions across the world.

In addition Dr. Shiva is responsible for seven (7) start-up technology companies and presently runs a biotechnology company, CytoSolve; an educational institute, Systems Health; an artificial intelligence company, EchoMail; and, a not-for-profit research center, International Center for Integrative Systems.   Justia's list of Dr. Shiva's patents is at

https://patents.justia.com/inventor/v-a-shiva-ayyadurai

In August of 2011, Dr. Shiva opened his Twitter account, **@va_shiva**, to build an independent base and reach local, national and global audiences to support his activism in various scientific, social and governance causes. This Twitter account also served as his primary platform to communicate with potential voters during his runs for political office. It is vital for this court to note that as a private citizen, this Twitter account represents the speech of a private individual even during a run for political office.

Between August 2011 and August 2020, Dr. Shiva had grown his Twitter audience from zero to a quarter of a million people who regularly heard what he had to say on diverse topics important to him, and interacted with him online.

In February 2017, Dr. Shiva first ran for Federal office for the U.S. Senate as an Independent candidate, challenging incumbent Senator Elizabeth Warren, and conducted a dynamic campaign both on the ground across cities and towns in Massachusetts,  and on Twitter with the slogan "Only A REAL Indian Can Defeat A FAKE Indian!"  That election took place in November 2018.  There were no troubles regarding his Twitter account throughout 2017-2018 campaign, though "election misinformation" was a prominent topic in the daily news.  The City

of Cambridge, however did retaliate against Dr. Shiva, by using a disparate reading of zoning law, to demand Dr. Shiva remove the large banner on his campaign bus with slogan exposing Elizabeth Warren's lack of integrity.  Dr. Shiva filed a lawsuit *Ayyadurai v. Cambridge*, 1:18-CV-10772-RWZ, and prevailed in defending his First Amendment rights.

In January 2019, Dr. Shiva began his run for U.S. Senate against incumbent Senator Edward Markey as a Republican candidate. For this, he participated in a primary election within the Republican Party, and met the challenge with a ground organization of approximately 3,100 volunteers, distributed approximately 10,000 lawn signs, received donations from about 20,000 people that funded billboards at prominent spots on highways, advertisements on social media, radio and television, and made "Dr. Shiva" a recognized household name across all 351 cities and towns in Massachusetts.  In addition, Dr. Shiva personally crisscrossed the state and held rallies to reach a diversity of demographics.  It is vital to note that his campaign always met or exceeded all regulatory requirements set by the Elections Division at the Office of the Secretary of State.

In February 2020, one year after Dr. Shiva began his campaign, Kevin O'Connor, in his first run for political office, entered the Republican primary race. O'Connor was however endorsed by Massachusetts Governor Charles Baker, who held fundraisers for him.

On September 1, 2020, the Massachusetts Republican primary for U.S. Senate was held. Dr. Shiva's internal polls had shown him leading in all counties. The announced results showed he had won in Franklin County by nearly ten-percent (10%) over his opponent, but had lost in all other counties by a consistent ratio of approximately 60% to 40%, to an opponent with little visibility, only a handful of volunteers, and no real campaign organization.  His opponent, who was endorsed and supported by Charlie Baker and the Massachusetts GOP, had won.

Dr. Shiva investigated and discovered that Franklin County was the only county where approximately seventy-percent (70%) of the towns counted the paper ballots by hand. The rest of the counties primarily used electronic systems that generated ballot images, which were then analyzed by a computer program to tabulate vote counts.

Dr. Shiva's campaign filed Public Records Requests to the various counties, under MGL ch. 66, for (a) the list of participating voters – those who actually voted in the election, and (b) the counts of the actual numbers of votes cast.  Seven (7) of the fourteen towns/cities provided the records.  In all seven (7) towns/cities, the number of tabulated votes was larger than the number of participating voters.  Boston had approximately 4,100 more votes than participating voters; and, Newton had approximately 1,700 more votes than participating voters.  Accessing and analyzing the ballot images – which are in the chain of custody of tabulating votes – therefore became critical to understanding the root cause of the discrepancy between Franklin County and the other counties.

On September 9, Dr. Shiva personally went to Secretary Galvin's office to deliver a Public Records Request to the Secretary, under MGL ch. 66, to determine whether or not the Secretary of State stored all ballot images, as it is these digital records generated in the course of a federal election, that are used to tabulate votes when ballots are electronically processed.  It is important to note that in all counties, other than Franklin County, the majority of paper ballots were simply collected and stored. In those counties, which primarily use electronic systems for tabulating votes, the ballot images ___are___ the ballots, since the ballot images are the objects upon which tabulation takes place.  The electronic systems employ various computer algorithms during the tabulation process, including Weighted Race techniques, which affords the capability to multiply a candidate's vote counts by a decimal factor.  For example, if candidate A received

1,000 votes and candidate B received 1,000, the Weighted Race technique can multiply

candidate A's votes by a factor such as 2.5 and candidate B's by a factor of 0.8 to result in final

tabulated vote counts for candidate A of 2,500 votes and candidate B of 800 votes, respectively.

Pursuant to Federal law, Galvin is required to securely store or retain for twenty-two (22)

months any and all records generated in connection with an election for a Federal office, such as

U.S. Senate.  U.S. Code provides:

> CHAPTER 207 - FEDERAL ELECTION RECORDS
> 52 USC 20701: Retention and preservation of records and papers by officers of elections;
> deposit with custodian; penalty for violation
>
> Every officer of election shall retain and preserve, for a period of twenty-two months
> from the date of any general, special, or primary election of which candidates for the
> office of President, Vice President, presidential elector, Member of the Senate, Member
> of the House of Representatives, or Resident Commissioner from the Commonwealth of
> Puerto Rico are voted for, all records and papers which come into his possession relating
> to any application, registration, payment of poll tax, or other act requisite to voting in
> such election, except that, when required by law, such records and papers may be
> delivered to another officer of election and except that, if a State or the Commonwealth
> of Puerto Rico designates a custodian to retain and preserve these records and papers at a
> specified place, then such records and papers may be deposited with such custodian, and
> the duty to retain and preserve any record or paper so deposited shall devolve upon such
> custodian. Any officer of election or custodian who willfully fails to comply with this
> section shall be fined not more than $1,000 or imprisoned not more than one year, or
> both. ( Pub. L. 86–449, title III, §301, May 6, 1960, 74 Stat. 88 .)
>
> 52 U.S.C. § 20702 - Theft, destruction, concealment, mutilation, or alteration of records
> or papers; penalties
> Any person, whether or not an officer of election or custodian, who willfully steals,
> destroys, conceals, mutilates, or alters any record or paper required by section 20701 of
> this title to be retained and preserved shall be fined not more than $1,000 or imprisoned
> not more than one year, or both.

On that same day - September 9, 2020 - William Rosenberry, an Elections Division

official in Defendant Secretary Galvin's office, was publicly documented on video at the

Secretary's office declaring to Dr. Shiva that the Secretary possessed "no ballot images" as the

Secretary's office "turned that feature off" so as to not save the ballot images, which were

generated by the ballot scanners.  It should be noted that the default – factory setting – on the electronic machines is to save all ballot images so as to be compliant with Federal law. Rosenberry informed Dr. Shiva that he would send him an email documenting Secretary Galvin's position on the matter.

On Monday, September 21, 2020, Dr. Shiva returned in person back to Secretary Galvin's office to follow up on the Public Record Request. Dr. Shiva came with storage devices to collect the ballot images. He also documented, in writing, Rosenberry's earlier statement of the deletion of ballot images and further requested, in writing, what information the Secretary's office would be delivering him.   Defendant Tassinari was also present at this meeting, and Tassinari informed Dr. Shiva in the presence of Rosenberry that the Secretary's office did not have to respond for ten (10) business days, and told Dr. Shiva that she would respond by the end of the day on Wednesday, September 23, 2020 by email.

On September 24, 2020, at approximately 9:00AM, Dr. Shiva contacted the Secretary's office via telephone and asked where the response to his Public Records request was as it was due on September 23, 2020.  Rosenberry was recalcitrant and after Dr. Shiva informed him that he was in violation of Federal law for not delivering him his records within the ten (10) business days, Rosenberry responded and said, "No, I'm in violation of State law."  At the end of the conversation, Rosenberry assured Dr. Shiva that he would deliver it by 5:00PM that day.  Dr. Shiva documented this phone conversation in the email below, in which he specifically memorialized Rosenberry's admission to having violated Massachusetts State Law:


September 24, 2020

William Rosenberry
Elections Division

RE: Second Follow Up on Public Records Request

Dear William:

On my Monday, September 21, 2020, at approximately 4:45PM, my colleagues and I followed up with your office, in person, concerning my records request made on September 9, 2020.  I provided you written communication of my office visit and request at that time.   You and your attorney - all of which is documented - assured me that I would receive a formal written response to my September 9th records request, via email to vashiva@vashiva.com, which would have been yesterday, September 23, 2020.

You and your attorney, at the time of the Monday meeting, stated that the response was to be sent in "10 business days, not 10 calendar days" therefore, you and your attorney said you were obligated and required to send the response on September 23, 2020, not September 21st, by Massachusetts State Law.

Yesterday, September 23, 2020, I did not receive the response to my records request via email, as you and your attorney had promised and reassured me September 21, 2020. In fact, I do not have the response as of the time of the writing of this email.

This morning, September 24, 2020 at 9:32 AM, I called your office to reach you, as a follow up to see if you had responded to my records request, and if so, to the right address.  Upon trying to reach you, I was put on hold by your assistant "Logan,"  and was told that you told Logan I should put anything else I wanted in writing.  I told Logan that this made no sense, and I knew you were on site, and I wanted to speak to you.

Finally, I was transferred to you, and upon speaking with you, you said that I would receive the response to my records request "no later than 5PM today [September 24, 2020]."  You acknowledged that you had violated Massachusetts State Law by not delivering the response yesterday.


Dr. Shiva Ayyadurai
U.S. Senate Candidate


Within less than thirty (30) minutes of Dr. Shiva's transmitting the above email to

Rosenberry that documented Rosenberry's violation of State Law, Tassinari responded to Dr.

Shiva's request:


On Thu, Sep 24, 2020 at 10:47 AM Tassinari, Michelle (SEC)
<michelle.tassinari@state.ma.us> wrote:

Good Morning-

I am writing to acknowledge receipt of your request for records. Please     note, that this Office does not maintain voter tabulation software, firmware or hardware.  While this office certifies voting equipment, as required by law, we do not purchase or lease equipment.  Once

equipment is approved by this Office, cities and towns can purchase or lease such equipment.  Accordingly, this Office has no records responsive to your request.

Further, to the extent you request the same information from local election officials, please note that the approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images.

Michelle K. Tassinari

Director and Legal Counsel

Elections Division

One Ashburton Place, Room 1705

Boston, MA 02108

617-727-2828

---------------------------

Tassinari's last sentence, coming as it did from the Secretary's own legal counsel and Director of the Election Division, struck Dr. Shiva as beyond bizarre given the supremacy of Federal law. It was remarkable and required clarification.  Therefore, Dr. Shiva emailed back:

**From:** Shiva Ayyadurai <vashiva@vashiva.com>

**Sent:** Thursday, September 24, 2020 11:22 AM

**To:** Tassinari, Michelle (SEC) <Michelle.Tassinari@sec.state.ma.us>

**Subject:** Re: Records Request

CAUTION: This email originated from a sender outside of the Commonwealth of  Massachusetts mail system.  Do not click on links or open attachments unless     you recognize the sender and know the content is safe.

Michelle,

Kindly refer me to the statute or law, in which the "...approval of digital    scan equipment in Massachusetts specifically prohibits the capturing of  ballot images."

Thank you in advance.

Warmest regards,

Dr. Shiva Ayyadurai

US Senate Candidate.

-------------------------------

In response to Dr. Shiva's email requesting the specific Massachusetts law or regulation

that apparently authorizes the Secretary to *prohibit* "*capturing of ballot images"* in

Massachusetts, Tassinari did not cite any law in her September 25, 2020 email response:

> On Sep 25, 2020, at 11:45 AM, Tassinari, Michelle (SEC)
> <michelle.tassinari@state.ma.us> wrote:
>
> Shiva-
>
> Attached please find the certification of two different types of digital scan      equipment in Massachusetts.
>
> Please note that while the ballot images are not stored, the actual ballots voted on at any federal election are secured and stored for 22 months in accordance with federal law. However, under state law, those ballots must remain sealed until such time as they can be destroyed.
>
> Michelle K. Tassinari
>
> Director and Legal Counsel
>
> Elections Division
>
> -------------------------------------

That email from Tassinari generated the following email response from Dr. Shiva:

From: Shiva Ayyadurai <vashiva@vashiva.com>

Date: September 25, 2020 at 10:33:09 PM EDT
To: "Tassinari, Michelle (SEC)" <michelle.tassinari@state.ma.us>
Cc: John R Brakey <johnbrakey@gmail.com>, Venu Julapalli     <vrjula@protonmail.com>, Ralph Lopez <ralphlopez2008@gmail.com>,     benniejsmith@gmail.com, Jude Joffe-Block <JJoffe-Block@ap.org>
        Subject: Destroying Ballots is Illegal. The Ballot Images ARE the Ballots. You     DESTROYED Them. Period.

Subject:  Destroying Ballots is Illegal. The Ballot Images ARE the Ballots.        You DESTROYED The Ballots. Period.

Michelle
First, you have NOT answered my question, from my previous email.  I repeat     it below. PLEASE answer the question.

Kindly refer me to the statute or law, in which the "...approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images."

Second, neither the people of Massachusetts nor I are stupid. I presume you       must be under incredible pressure from Bill Galvin and Charlie Baker to deflect  this issue to hope it disappears.

However, the fact is the State has illegally destroyed ballots. The electronic         equipment used to tally and count the vote MUST first CREATE an image - the          ballot image - in order for the vote to be processed and COUNTED by the          machine.   When that image is created, that image becomes THE BALLOT, as it     is THE entity used to count the vote.  If no image was created, no vote count    could exist. You are required by Federal Law to store,preserve, archive those       ballots for 22 months.  If those ballot images DO NOT exist, they were                 DESTROYED. This        destruction is illegal, and therefore, the election is null and       void.

Once again, please answer my question, above.

Warmest regards,

Dr.SHIVA Ayyadurai
US Senate Candidate
-------------------------------


Tassinari never replied to this email and did not cite the statute or law that allowed

Massachusetts to destroy the ballot images that were generated in connection with a Federal

election.  In addition, Tassinari consciously omitted this fourth email from her affidavit (#15-2)

filed in court, a decision that can be construed only as aiming to conceal evidence from this

court, given that the fourth email had been posted on Twitter and was one of the four (4) tweets

specifically deleted by Twitter on behalf of the Defendants.

The ballot scanning machines scan the paper ballots and generate a ballot image, which

is then used to tabulate the votes in a Federal election, while the paper ballot is merely physically

retained.  It is fundamental statutory interpretation that the ballot image is a **record** and that,

pursuant to 52 USC 20701, Secretary Galvin is required to store **all** records and papers which are

generated in connection with Federal election.  *Owasso Independent School Dist. No. I-011 v. Falvo*, 534 U.S. 426 (2002), *Kasten v. Saint-Gobain Performance* Plastics Corp., 563 U.S. 1 (2011), *Dolan v. Postal Service*, 546 U.S. 481 (2006), *People v. Aleynikov*, 2018 NY Slip Op 03174 [31 NY3d 383]

It is important to note that when the Weighted Race feature is enabled, the number of votes tabulated will likely not match the number of ballot images.  Therefore, access to ballot images, in the chain of custody, is essential in verifying the integrity of an election.

It is an undeniable fact that the electronic systems for counting votes do generate the ballot images. That is how they work. Tassinari is incorrect in her use of the term "capturing" when it comes to these generated images. The images are created, and if they are not captured, that is merely a euphemism for destroyed.  If she meant that the records are "not stored" after they are generated, which is what Defendant O'Malley also stated, that is a written admission of a Federal violation. And that indeed is exactly what Tassinari meant: "the ballot images are not stored[.]"

Tassinari's email conversation with Dr. Shiva intended to downplay the critical importance of ballot images in the tabulation process of votes, and to create a false impression of the preeminence of paper ballots.  Elections officials across the country are aware of lawsuits filed by election integrity activists, such as John Robert Brakey (YouTube video: https://www.youtube.com/watch?v=PESVW--fpOI ), seeking transparency in the handling of ballot images by State Elections Directors.   The only possible conclusion is that Tassinari, a practicing attorney, chose the word *capture* to mislead and misdirect Dr. Shiva and give the false impression that in Massachusetts ballot images never exist, at all, at any time. This is supported by the effort expended by both Tassinari and O'Malley to falsely claim, including in press

statements, that the paper ballots are saved and so Federal law has been satisfied, as if paper

ballots are used to tabulate the vote when electronic machines are used. Repeat, the votes, when

electronically handled, are tabulated exclusively using the ballot images.

On September 24, 2020, Dr. Shiva posted on Twitter that Massachusetts destroys ballot

images.  This is 100% factually correct as the scanners generate the image records and the

Secretary's Election Division ensures that these records are destroyed – "not stored." Also, thus

far the Secretary has been unable to cite any legal authority to support the  Secretary's

"requirement" that ballot scanners certified for use in Massachusetts must delete all the ballot

images after they are used to tabulate the vote. Dr. Shiva also posted that in seven (7)

Massachusetts cities/towns there were more votes counted than are participating voters, and

appended the Twitter hashtag #ElectionFraud to his tweets. This tweet went viral and generated

much commentary.



Twitter did **not** delete this tweet.

O'Malley, as the official spokesperson for Galvin, Tassinari and the Elections Division,

released statements to the Associated Press, Reuters and Leadstories.com that this tweet

constituted "Election Misinformation" and that no (paper) ballot was destroyed in violation of

Federal law.

Dr. Shiva continued to tweet on this point:

> **Dr.SHIVA Ayyadur...** ✔ · Sep 24   ◦◦◦
> "[A]ppropriate state or local authority
> MUST PRESERVE ALL RECORDS to
> detection & prosecution of election
> crimes for 22-month federal retention
> period, if records were generated in
> connection w election that was held
> in whole or in part to select federal
> candidates."
> -USC Title 42

> **Dr.SHIVA Ayyadur...** ✔ · Sep 25   ◦◦◦
> IProtest #ElectionFraud and stealing
> of a US Senate Federal Election by
> the Massachusetts SWAMP.
>
> TODAY - 12.30PM. Secretary of State
> Office.
> 1 Ashburton Place, Boston, MA.
>
> Just the beginning.
>
> WRITE IN #Shiva4Senate on or by
> November 3rd.
> Victory for #TruthFreedomHealth

The Associated Press, Reuters and Leadstories.com ran "FACT CHECK" stories, which

uniformly claimed that because Dr. Shiva had been contradicted by a government official,

O'Malley, naturally Dr. Shiva's claim was FALSE.  In fact, Dr. Shiva's attorney sent a letter to

Leadstories.com conveying the facts about ballot images, and asked them to correct their fake "FACT CHECK." They never corrected their "FACT CHECK," rather accepting the word of government official O'Malley as the ultimate "fact."

These "FACT CHECK" stories were circulated worldwide and appear as the top result on search engine pages whenever one searches for Dr. Shiva.  One sees these "FACT CHECK" articles, before one reads Dr. Shiva's position as shown in the screenshot below.  This exemplifies the result of "free press" partnering with the government to "combat" "election misinformation."



On September 25, 2020, Dr. Shiva followed his 'Massachusetts destroyed ballots' tweet with a thread of four (4) tweets that revealed, via screenshots, the email conversation with Tassinari that has been pasted above, which was written confirmation from the Secretary's own office that records generated during a Federal election – the ballot images - the very records used for tabulation -  were destroyed – "not stored."  Below is the threaded-tweet comprised  offour

(4) tweets and the associated four (4) screenshots of the Tassinari email conversation that Dr.

Shiva posted:

<u>Threaded-Tweet – First of 4 Tweets</u>

 **Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email**
@va_shiva

BREAKING: Legal Counsel of Massachusetts FURTHER confirms #CharlieBaker Sec. of State DESTROYED 1 Million+ Ballots - images used to COUNT votes on electronic equipment. She evades answering what statute allows MA to DESTROY ballots &amp; evade Federal Law. Email exchange below: https://t.co/gcygVK1wiC

10:49 PM - 25 Sep 2020

 Shiva Ayyadurai <vashiva@vashiva.com>                    10:33 PM (9 minutes ago)   ☆   ↩   ⋮
to Michelle, John, Venu, Ralph, benniejsmith, Jude  ▾

Subject:  Destroying Ballots is Illegal. The Ballot Images ARE the Ballots. You DESTROYED The Ballots. Period.

Michelle

First, you have NOT answered my question, from my previous email. I repeat it below. PLEASE answer the question.

    Kindly refer me to the statute or law, in which the "...approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images."

Second, neither the people of Massachusetts nor I are stupid. I presume you must be under incredible pressure from Bill Galvin and Charlie Baker to deflect this issue to hope it disappears.

However, the fact is the State has illegally destroyed ballots. The electronic equipment used to tally and count the vote MUST first CREATE an image - the ballot image - in order for the vote to be processed and COUNTED by the machine.   When that image is created, that image becomes THE BALLOT, as it is THE entity used to count the vote. If no image was created, no vote count could exist. You are required by Federal Law to store, preserve, archive those ballots for 22 months. If those ballot images DO NOT exist, they were DESTROYED. This destruction is illegal, and therefore, the election is null and void.

Once again, please answer my question, above.

Warmest regards,

Dr.SHIVA Ayyadurai
US Senate Candidate

<u>Threaded-Tweet – Second of 4 Tweets</u>

 **Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email**
@va_shiva

Email response from Massachusetts Legal Counsel to #Shiva4Senate confirming ballot images were DESTROYED. - September 25, 2020. 11:45AM. https://t.co/OPNvqdThvK

Sep 25, 2020, 10:49 PM

**Tassinari, Michelle (SEC)**
to me ▾

11:45 AM (10 hours ago)   ☆   ↰   ⋮ 

Shiva-

Attached please find the certification of two different types of digital scan equipment in Massachusetts.

Please note that while the ballot images are not stored, the actual ballots voted on at any federal election are secured and stored for 22 months in accordance with federal law. However, under state law, those ballots must remain sealed until such time as they can be destroyed.

Michelle K. Tassinari
Director and Legal Counsel
Elections Division
One Ashburton Place, Room 1705
Boston, MA 02108
617-727-2828

## Threaded-Tweet – Third of 4 Tweets

 **Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email**
@va_shiva

Email response from Dr. SHIVA Ayyadurai to Massachusetts Legal Counsel request the statute or Law that allows Massachusetts to violate Federal Law - September 24, 2020. 11:22AM. https://t.co/LkGLoUFhRn

Sep 25, 2020, 10:49 PM

**From:** Shiva Ayyadurai <vashiva@vashiva.com>
**Sent:** Thursday, September 24, 2020 11:22 AM
**To:** Tassinari, Michelle (SEC) <Michelle.Tassinari@sec.state.ma.us>
**Subject:** Re: Records Request

CAUTION: This email originated from a sender outside of the Commonwealth of Massachusetts mail system.  Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Michelle,

Kindly refer me to the statute or law, in which the "...approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images."

Thank you in advance.

Warmest regards,

Dr. Shiva Ayyadurai
US Senate Candidate.

<u>Threaded-Tweet – Fourth of 4 Tweets</u>

 **Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email**
@va_shiva

Email response from Massachusetts Legal Counsel to #Shiva4Senate request for ballot images. - September 24, 2020. 10:47AM. https://t.co/oDKf8my3pf

Sep 25, 2020, 10:49 PM

On Thu, Sep 24, 2020 at 10:47 AM Tassinari, Michelle (SEC) <michelle.tassinari@state.ma.us> wrote:

Good Morning-

I am writing to acknowledge receipt of your request for records. Please note, that this Office does not maintain voter tabulation software, firmware or hardware.  While this office certifies voting equipment, as required by law, we do not purchase or lease equipment.  Once equipment is approved by this Office, cities and towns can purchase or lease such equipment.  Accordingly, this Office has no records responsive to your request.

Further, to the extent you request the same information from local election officials, please note that the approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images.

Michelle K. Tassinari
Director and Legal Counsel
Elections Division
One Ashburton Place, Room 1705
Boston, MA 02108
617-727-2828

------------

Tassinari and O'Malley testified under oath at the October 30, 2020 emergency hearing that they had received one or two emails and one or two phone calls from the public about these tweets, which then prompted them to go on Twitter and read the tweets themselves, and Tassinari became upset because it was "Election Misinformation." Tassinari testified, she then decided that the tweet should be reported by O'Malley to Twitter for sanctions because this tweet would cause voter suppression. See Exhibit 1 - Transcript of TRO Hearing

O'Malley testified she is the point person in Galvin's office who manages the Election Division's official Verified Twitter account.



O'Malley testified that she reported the one tweet from September 24 in the complaint that she filed with Twitter via Twitter's online form and identified the complainant as the official Verified Twitter account of the Massachusetts Elections Division.

> Q.   And what brief description did you provide in this report?
> A.   To the best of my recollection, I explained that the statements regarding the destruction of ballots were false and that the statements attributed to the Massachusetts election attorney were a misrepresentation of what Attorney Tassinari had said.

O'Malley also revealed that Cohen-NASED had reported more of Dr. Shiva's tweets, and mentioned that she also reported the tweet to National Association of Secretaries of State (NASS).  Discovery shall reveal the role played by NASS in conjunction with the Defendants in the silencing of Dr. Shiva's political speech.

```
            THE COURT:  Well, do you know of anybody who reported
        any other of Dr. Shiva's tweets?
            THE WITNESS:  I believe someone from the National
        Association of State Elections Directors may have reported some
        other tweets.
            THE COURT:  Why do you think that?
            THE WITNESS:  We were in communication with the
        National Association of State Elections Directors because they
        assist us in figuring out how to report these tweets.
            THE COURT:  So Ms. Tassinari asked you to report Dr.
        Shiva's one tweet; is that right?
            THE WITNESS:  Yes.
```

During direct testimony at the emergency hearing, Tassinari revealed that she, the President-Elect at NASED, contacted Cohen at NASED to also report Dr. Shiva's tweet.

```
            THE COURT:  And when you communicated with Ms. Cohen,
        the Executive Director of the National Association, was it your
        hope that the National Association also would report the
        matter?
            THE WITNESS:  Yes.  She is -- the National Association
        of State Election Directors is also a Twitter partner, and they
        often coordinate communications between the social media
        companies and state election directors generally.
```

Assistant Attorney General Adam Hornstine repeatedly asserted to Judge Mark Wolf that the Defendant had not complained to Twitter about the threaded tweets that displayed four (4) screenshots of the Tassinari emails that were the ones that Twitter repeatedly forced Dr. Shiva to delete. He did not reveal that this task had been ***outsourced*** to Cohen and NASED in order to maintain plausible deniability.

In response to questioning by Judge Mark Wolf, Tassinari testified that she had been personally upset by Dr. Shiva posting the screenshots of her emails on Twitter and him declaring

that because Massachusetts destroyed the ballot images used to tabulate votes, it constituted election fraud. Tassinari also revealed under questioning that she is the President-Elect of NASED, that she coordinated with Cohen at NASED to amplify pressure on Twitter to punish Dr. Shiva for his tweets about her emails, and hoped his account would get suspended such that he could not tweet at all during his election campaign for the official reason of "Election Misinformation," and that Cohen had telephoned her back to inform her that Cohen had done so. None of this was in Tassinari's affidavit (#15-2).

```
            THE WITNESS:  I think the goal was generally to ensure
     that misinformation wasn't being spread, and so whatever
     actions that we could take to make sure that the tweet was
     labeled as inaccurate or taken down, we were willing to pursue.
            THE COURT:  But did you think -- you had filed a
     report.  Did you want to do everything possible to try to
     assure that Twitter would take it seriously and either remove
     the tweet or label it inaccurate?
            THE WITNESS:  Yes.
            THE COURT:  And were you pleased when they deleted the
     tweet?
            THE WITNESS:  I believe I saw that it had been
     removed.  I was, yes, I was relieved.
```

The tweet that Tassinari was "relieved" to see removed was the September 25th threaded tweet containing the four screenshots of Tassinari's email conversation with Dr. Shiva, which exposed that Secretary Galvin was violating Federal law by destroying ballot images, even though Tassinari gave the court the impression that it was about the one election fraud tweet cited in her affidavit.  To reiterate, Twitter never removed Dr. Shiva's September 24th tweet that Tassinari initially claimed had been removed.

On October 30, 2020, during the emergency hearing for a TRO, O'Malley testified that Massachusetts' Elections Division is a "Twitter Partner," meaning a respected, trusted partner in the fight against "Election Misinformation," as is NASED and every state's Elections Division. O'Malley testified that NASED had arranged for Twitter to provide a response to complaints from these "Twitter Partners" as a matter of priority and without necessarily independently checking the veracity of their complaints, as they come from a State office that is a "Twitter Partner." ***One may visualize the difference between ordinary users - private citizens - and "Twitter Partners" as the difference between a credit union debit card and Amex Black***. A complaint to Twitter from Elections Directors carries with it the full force of the government and receives ***high priority*** processing and response. None of these facts may be found in O'Malley's affidavit to this court (#15-1).

> Q.   And you mentioned a few moments ago in response to a
> question from the judge that the Elections Division is a
> Twitter partner; is that correct?
> A.   Yes, yes.
> Q.   And when you say that, what does that mean?
> A.   My understanding is that we are able to select certain
> reasons for reporting a tweet that may not be available to
> everyone and that they will -- that the people who review the
> tweets at Twitter, when complaints are made, will try to act
> quickly on the ones we report.

This sworn testimony directly contradicted Galvin's assertions to Judge Mark Wolf via AAG Adam Hornstine that a complaint to Twitter from Galvin's Office is just the same as and no different at all from a complaint from any ordinary civilian, even though he knew that the

Elections Division is a Twitter Partner and has access to complaint types that are not visible to ordinary users on Twitter.

While eliciting testimony from Dr. Shiva, Galvin's attorney, AAG Adam Hornstine, took pains to emphasize the point that Dr. Shiva could have been forced by Twitter to delete the Tassinari email tweets due to a report from just about anybody with a Twitter account. This was proven false, given the special relationship afforded to the Defendants, as was revealed during the testimony of Tassinari and O'Malley.

On September 26, 2020, in direct response to concerted, coordinated action by the Secretary of State, the state election director, the state Twitter liaison and spokesperson via the official Elections Division Verified Twitter account, and the National Association of State Election Directors, Twitter immediately forced Dr. Shiva to delete the thread of four tweets that revealed the Tassinari emails. Though he agreed to delete the thread with the four emails, Twitter suspended his Twitter account for a week, blocking him from speaking to his quarter-million followers and any potential voters during his Write-In election campaign.

Dr. Shiva continued to physically run his campaign. At the end of the week his access to Twitter was restored. Dr. Shiva posted tweets about the rallies he had held, his objections to election fraud and the destruction of ballot images. Those tweets remain public. When Dr. Shiva then again posted any tweets referencing Tassinari's emails exposing the Defendants violation of Federal law, immediately Twitter again forced him to delete those specific tweets and again suspended him for another week. This was during the last month of campaigning before Election Day, where as a Write-In candidate, Dr. Shiva needed as much public exposure as he could get.

Dr. Shiva was disappeared from Twitter for nearly all of the final month of campaigning!

During their sworn testimony at the October 30, 2020, emergency hearing, and in their affidavits, O'Malley and Tassinari took pains to claim that they complained about Dr. Shiva because his tweets constituted "Election Misinformation" and that they were relieved and pleased that Twitter deleted the tweet that they had reported. Neither Defendant chose to reveal in their affidavit that they asked Cohen and NASED to make Twitter delete the tweets about the Tassinari emails and that they were relieved and pleased that Twitter did so.

Dr. Shiva then testified that the tweet the Defendants testified to have reported and then verified as having been deleted is still public, and that Twitter had not forced him to delete it, but did force him, every single time, to delete tweets that referenced the Tassinari emails that documented violation of Federal law by Defendants.

```
Q.   Ms. Tassinari, are you aware that the four tweets that I
shared with our email interaction were deleted from Twitter?
A.   Yes.

Q.   Okay.  You have stated to the court that the main tweet
that I put up, which was exposing in fact ballot images were
destroyed, was deleted.  Are you aware that that tweet was
never deleted; it's still up?

A.   I do not know what action Twitter took.  I thought it had
```

```
-- I know tweets had been removed.  I don't follow every single
one of your tweets.
Q.  But did you not just assert to the court that this tweet
was removed?
A.  I thought it had been.
Q.  Okay.  But you do know that the four tweets that I shared
with you and I interacting about the ballot images were
removed; is that right?
A.  Yes.
```

After Dr. Shiva's testimony, Judge Wolf questioned Tassinari about her earlier testimony that she had checked Twitter and was happy that the reported tweet had been deleted. Tassinari claimed now that she may have been mistaken.

It is vital to note that Galvin, O'Malley and Tassinari had claimed under oath that they were duty-bound to protect the reputation and integrity of the election process in Massachusetts and prevent suppression of the people's vote, when they identified Dr. Shiva's election fraud tweet as "Election Misinformation" and merely reported the tweet to Twitter just as would any other user.

Assistant Attorney General Adam Hornstine from AG Maura Healey's Government Bureau even declared that Twitter deleted the tweets and suspended Dr. Shiva because he could have violated Twitter's Terms of Use and other internal policies and that the suspension could easily have been because of complaints from any ordinary random user.

After the emergency hearing revealed the special position held by "Twitter Partners" and the coordinated nature of the attack on Dr. Shiva's political speech, and the undeniable fact that

the Tassinari emails were the sole focus of the deletions, the Defendants immediately claimed the opposite of what they swore to in their opposition, affidavits and initial testimony.

Their brand new narrative, minted during the emergency hearing, and akin to Big Brother *increasing* chocolate rations, now involved claiming that because Twitter had not deleted the tweet that they had classified as "Election Misinformation," the same tweet they had just sworn had been well-deservedly deleted to keep the country safe, the Defendants were not responsible for the suspension caused each time by Dr. Shiva posting the Tassinari email tweets, that Twitter had not even responded to their complaint and that for some reason unknown to the Defendants, Twitter by itself found only the Tassinari email tweets objectionable.

By the time discovery is complete, the Defendants' narrative may totally flip yet again.

It is impossible to overstate the fact that until the Defendants' coordinated attack, Twitter did not and still has not forced Dr. Shiva to delete many tweets on diverse topics that could be considered controversial or contrarian, the pandemic, BLM, face mask mandates, genetically modified foods, mandatory vaccinations etc. - 30,000 tweets over nine years.  Here is a sample of such recent tweets:





**Dr.SHIVA Ayyadur...** ✔ · Sep 26    ooo

Too little too late.

> **Jade** @jadescipioni · Sep 26
>
> Dr. Fauci says to take vitamin D if you're deficient — here's how to know cnb.cx/3mXbxzE

💬 97     ⟲ 443     ♡ 1.2K     ⤳



**Dr.SHIVA Ayyadur...** ✔ · Sep 24    ooo

Pushing #Vaccines - MANDATED one-size-fits-all Medicine - is a very profitable market opportunity - growing at 17.9% per year since 2011.   During this same period #BigPharma has been bleeding money on the drug front. #BigPharma NEEDS #ForcedVaccinations.



💬 11     ⟲ 214     ♡ 260     ⤳



In addition, during the period from September 1, 2020 to September 25, 2020, Dr. Shiva

posted a series of tweets specifically on election fraud in Massachusetts, and on destruction of

ballots. Twitter neither did ban Dr. Shiva's access to his Twitter account for such tweets nor did

Twitter force Dr. Shiva to remove these tweets:





**Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email** ✔
@va_shiva

Just received a call from the @AP concerning #ElectionFraud in the Massachusetts U.S. Senate Primary Elections. I asked her to put her questions in writing. Here are my answers.  I share this for full transparency.

Question/Answer 1

On Sep 25, 2020, at 5:15 PM, Joffe-Block, Jude <JJoffe-Block@ap.org> wrote:

What is your basis for saying the state has destroyed more than one million ballots? (Election officials say these ballots are preserved under seal).

Let's be clear when electronic equipment is used, the  tally - count of vote - is performed on Athens ballot image.  Pursuant to chain of custody, the ballot image IS the ballot, and destroying these ballots is illegal by Federal Law.

6:07 PM · Sep 25, 2020 · Twitter for iPhone



**Dr.SHIVA Ayyadur...** ✔ · Sep 25   ००॰

Dear @TheJusticeDept
Massachusetts SWAMP is violating
Federal Law. They have a long history
of DESTROYING BALLOTS - the ballot
images used for counting votes from
electronic machines.  Those ballot
images are to be saved for 22
months by Federal Law.

Lock up #CharlieBaker.

💬 17     ↺ 258     ♡ 417     ⤚



Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email ✓
@va_shiva

IProtest #ElectionFraud and stealing of a US Senate Federal Election by the Massachusetts SWAMP.

TODAY - 12.30PM. Secretary of State Office.
1 Ashburton Place, Boston, MA.

Just the beginning.

WRITE IN #Shiva4Senate on or by November 3rd.
Victory for #TruthFreedomHealth

11:42 AM · Sep 25, 2020 · Twitter Web App



Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email ✓
@va_shiva

Thank you @realDonaldTrump for hitting hard RINO #CharlieBaker & his goons at MASS GOP who did MASSIVE  #ElectionFraud to STEAL #Shiva4Senate's landslide victory for the American Worker to keep THEIR Democrat globalist FRIEND @EdMarkey in power.

Not ONE INCH to #ElectionFraud!

Donald J. Trump ✓ @realDonaldTrump · Sep 25
RINO Governor Charlie Baker of Massachusetts is unsuccessfully trying to defend Mail In Ballots, when there is fraud being found all over the place. Just look at some of the recent races, or the Trump Ballots in Pennsylvania that were thrown into the garbage. Wrong Charlie!

⚠ Learn how voting by mail is safe and secure

10:52 AM · Sep 25, 2020 · Twitter Web App















**Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email** ✔
@va_shiva

Why did Verizon rep at store say, "both your iPhones hacked," "never seen this error before," & then said, "I can't help you."

Coincidence – both iPhones Verizon cellular service stopped working, among other things, after I began speaking up about #ElectionFraud?

BlackBerry?

2:06 PM · Sep 11, 2020 · Twitter for iPhone



**Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email** ✔
@va_shiva

Why did Verizon rep at store say, "both your iPhones hacked," "never seen this error before," & then said, "I can't help you."

Coincidence – both iPhones Verizon cellular service stopped working, among other things, after I began speaking up about #ElectionFraud?

BlackBerry?

2:06 PM · Sep 11, 2020 · Twitter for iPhone









**Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email** ✓
@va_shiva

The Establishment is ONE. #DeepState no longer hides its crimes. They do it openly - #ElectionFraud or #ForcedVaccinations.

They bank on your apathy.

BUT, the movement for #TruthFreedomHealth has inspired you to act. THAT is THEIR biggest fear.

VOTE #Shiva4Senate Nov. 3

8:58 AM · Sep 8, 2020 · Twitter for iPhone



**Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email** ✓
@va_shiva

Voting is the most important element of a Democracy. The integrity of Voting demands the output from that Voting process is EVIDENCE of reality.  When ALL Americans realize such EVIDENCE is NOT EVIDENCE, we will HAVE a necessary and well-deserved REVOLUTION, Beyond Left & Right!

1:04 PM · Sep 6, 2020 · Twitter Web App







Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email ✓
@va_shiva

When YOU see the REALITY of how ANY election can be manipulated in seconds, YOU'll realize how THEY can make ANY doofus a "winner." This is what happened on SEPT 1, US SENATE MA Primary. I've been programming all my life – video explanation coming!

#Shiva4Senate Nov. 3 WRITE IN!

10:10 PM · Sep 5, 2020 · Twitter for iPhone



Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email ✓
@va_shiva

What would you say if I told you that your ONE vote was not ONE vote?

That your 1 vote could be multiplied by a weight – a factor – say 0.5 or 1.5 – to become a 1/2 vote or 1 1/2 votes?

Impossible?

All modern voting systems allow for such a feature.

Why?

9:07 PM · Sep 4, 2020 · Twitter for iPhone



**Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email** ✅
@va_shiva

Dear @TheJusticeDept,
In science, anomalous observations are THE most intriguing leading to big discoveries. On 9/1/20, in MA US Senate Primary, tens of thousands observed a GROSS anomaly.  My investigation - grounded in 40+ years of training in math & software engineering leads

6:45 AM · Sep 4, 2020 · Twitter for iPhone

View Tweet activity

**179** Retweets   **6** Quote Tweets   **428** Likes

**Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email** ✅ @... · Sep 4
Replying to @va_shiva
to an unequivocal & unfortunate result - Systemic #ElectionFraud embedded in voting systems invokable at will to manipulate ANY election.

Until this is addressed, everything we aspire & cherish as Americans is an absolute illusion & the American working people ARE indeed slaves.

26      153      401



109      998      1.8K

**Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email** ✅
@va_shiva

Replying to @va_shiva

There's a REASON there's no voter ID and you don't receive any receipt of your actual vote - perfect recipe for total fraud.

11:39 PM · Sep 3, 2020 · Twitter for iPhone











To reiterate, Dr. Shiva was not forced to remove even one of the above tweets concerning election fraud.  The only possible conclusion is that Twitter by itself did not find that Dr. Shiva's tweets constituted "Election Misinformation" or violative of any internal policy or Terms of Use.

When Dr. Shiva posted the four (4) screenshots of the Tassinari email conversation in one threaded-tweet, which cited violation of Federal law, Twitter forced Dr. Shiva to delete that tweet, and began banning him repeatedly for most of the time left before election day. Here are the screenshots of Twitter forcing the deletion of Tassinari threaded-tweet:





Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email
@va_shiva

Email response from Massachusetts Legal Counsel to #Shiva4Senate request for ballot images. - September 24, 2020. 10:47AM. https://t.co/oDKf8my3pf

Sep 25, 2020, 10:49 PM

Remove



Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email
@va_shiva

BREAKING: Legal Counsel of Massachusetts FURTHER confirms #CharlieBaker Sec. of State DESTROYED 1 Million+ Ballots - images used to COUNT votes on electronic equipment. She evades answering what statute allows MA to DESTROY ballots &amp; evade Federal Law. Email exchange below: https://t.co/gcygVK1wiC

10:49 PM - 25 Sep 2020

As a result, we've temporarily limited some of your account features. While in this state, you can still browse Twitter, but you're limited to only sending Direct Messages to your followers — no Tweets, Retweets, follows, or likes. Learn more. Your account will be restored to full functionality in: 7 days and 0 hours.

It beggars belief to think that Twitter independently found only the Tassinari email tweets to constitute "Election Misinformation" to such a dangerous degree that it warranted blocking a political candidate's speech during his run for Federal office as a Write-In candidate and prevent him all access to his account and quarter million followers for half of the time left before Election Day, and that Tassinari herself had nothing to do with it.

It is crucial for this court to note that the Defendants realized that the Tassinari emails exposed them to prosecution for violation of Federal law, as well as civil action by Dr. Shiva over the loss of his primary election to Kevin O'Connor. They acted swiftly and powerfully to conceal this evidence, to suppress Dr. Shiva's political speech entirely, and actively distributed through the "free press" their consciously false narrative that ballot images are not records covered by the storage requirements of Federal law and that Dr. Shiva's claim is false.

Their coordinated action, the enterprise, was intended to obstruct justice.

It is also a legal fact that the Defendants were prohibited by the Massachusetts Supreme Judicial Court from acting officially in any way against Dr. Shiva during his political campaign based on any claim that his speech was false.  The SJC ruled that per the First Amendment, which guarantees special protection for political speech, the Commonwealth could not criminalize or in any way retaliate against a Massachusetts candidate for the content of his political speech during an election campaign. *Commonwealth v. Melissa Lucas*, 472 Mass. 387 (2015).  It was already known to the Defendants that their action against Dr. Shiva's tweet, even under the convenient pretext of shutting down false speech, was specifically outlawed. Even if ordinary civilians report such speech to Twitter, these government officials were explicitly prohibited from using their privileged priority status and networks to shut down a candidate's political speech.

So, both the pretext and the ulterior motive were already known to be unlawful. The Defendants put their enterprise into action anyway, in order to obstruct justice and try to keep concealed the official admission that Galvin violated Federal law.

Even though the Defendants are fully aware of the SJC's prohibition, Galvin claimed to Judge Wolf that he should not be restrained from shutting down Dr. Shiva's political speech as taking steps to silence a candidate during his campaign was permissible "Government Speech."

> "As the elected state official charged with ensuring free and fair elections in the Commonwealth, Secretary Galvin exercised his free speech rights and spoke on behalf of the government to ensure that the public had access to accurate information. The Secretary reported Plaintiff's misinformation to Twitter, just as any person could have done. Allegedly as a result, Twitter – not the Secretary –temporarily suspended Plaintiff's ability to post new information to his Twitter account. Plaintiff now contends that the Secretary should be unable to report false election claims to Twitter in the future. The Court should not entertain this request but should instead deny Plaintiff's effort to restrain future government speech."
>
> *Galvin's opposition to the motion for a TRO in this case* (#15)

The fact remains that it is the Constitution, and the SJC, not the Plaintiff, that contends that the Secretary should be unable to report false election claims to Twitter. Galvin's protestation is breathtaking here in the United States, though it may be normal in foreign countries without protection for political speech.

On October 20, 2020, Dr. Shiva had a private attorney file a complaint and a motion for a Temporary Restraining Order to stop Galvin from continuing to cause Twitter to silence his political speech during the few days left before Election Day. Despite being a licensed member of the Massachusetts Bar, the attorney filed for monetary damages in Federal court against a state official sued in his official capacity, which, as all lawyers are required to know, has been barred for a hundred years by the Eleventh Amendment. However, this allowed an emergency hearing to be held under the *Ex parte Young* exception as the TRO motion sought prospective

injunctive relief, namely restraint on Galvin again silencing Dr. Shiva's political speech on Twitter between then and Election Day.

On October 30, 2020, Judge Mark Wolf held a four-hour long emergency hearing via Zoom with the participation of Dr. Shiva, Galvin via counsel Adam Hornstine from the AGO, O'Malley and Tassinari. AAG Adam Hornstine opposed the TRO hearing on 11th Amendment Immunity grounds. This action, knowing that Dr. Shiva was in his first ever hearing *pro se*, was egregious and Judge Mark Wolf placed that in the record.

```
        THE COURT:  It's clearly barred, but that's not what
you're discussing here.  You're making a different argument
here.
        MR. HORNSTINE:  I agree, but it primarily proceeds
from the damages piece, and I'm happy to move on.
        THE COURT:  It doesn't say that.  You're happy to move
on.  Frankly, I'm not.  You represent the government.  You
should always be accurately describing the law.  But here
you've got a pro se litigant on the other side.  And, you know,
we're talking about the nuances of constitutional law, and the
case is going very quickly.
        And, you know, this is not the only case I have.  I've
been dealing for the last couple of days with an MS-13 murder
case.  But this is consequential.  We're talking about
fundamental constitutional law a couple of days before an
election.  So I expect that if the Attorney General is going to
give me a brief, I'm going to take it seriously.  But I was
surprised to see this argument because it's not an argument
that your bureau of your office has made to me before as
recently as in the last two months in another suit against a
cabinet secretary and the governor.  And I've been spending
time trying to think if I've misunderstood Will.  I don't think
I did.
```

Because the motion and facts within the complaint, in conjunction with fresh facts elicited during the hearing from O'Malley and Tassinari, were sufficient to show that Dr. Shiva satisfied the *Blum* standard and was likely to prevail on his claim that Twitter's action was indeed state action, Judge Wolf declared that there was enough justification for issuance of the TRO. However, Judge Wolf informed Galvin that if Galvin agreed on his own to not complain again to Twitter about Dr. Shiva's tweets between then and November 4th, 2020, and requested NASED to also desist, then Judge Wolf would accept such an Agreement and declare the motion to be moot.

Galvin agreed and an Order (#20) issued. This amended complaint follows.

THIS COMPLAINT MEETS THE *BLUM* STANDARD TO SHOW STATE ACTION

For four years now all social media companies have been under tremendous pressure to act against "election disinformation." This pressure has been unrelenting and from all sides: Congress, state politicians, DOJ, the press and public opinion. It never let up after the previous 2016 elections. In October 2020, Massachusetts U.S. Senator Edward Markey demanded in the Senate that FaceBook and other social media companies actively shut down voices that he deemed to be peddling 'election misinformation.'

https://www.boston.com/news/politics/2020/10/28/mark-zuckerberg-ed-markey-facebook-respond-donald-trump-election-posts

Twitter, a publicly traded corporation, is not immune from these strong pressures. And here it received a strong complaint from the Secretary that claimed Dr. Shiva's tweets were "Election Misinformation," a strong complaint that was further amplified by the Election Directors of all fifty (50) states in the Republic.

The fact of a coordinated complaint by "Twitter Partners" was confirmed during the emergency hearing.

In the current climate one can imagine fewer dog whistles more potent than "Election Misinformation." It was inevitable and entirely predictable that Twitter would not ignore an official complaint from the Massachusetts Secretary of State and related "Twitter Partners" that claimed Dr. Shiva's Twitter feed spread "Election Misinformation." The last thing any public corporation needs is a press statement from the Commonwealth of Massachusetts that it is aiding and abetting "Election Misinformation." And Twitter would have been left to hang by itself given that the "FACT CHECK" by large media sources such as Reuters and the AP simply peddle whatever government officials' position is and appear at the top of searches on both Google and Bing. Given the checkered history of shareholder lawsuits, no public company can tolerate that risk.

The evidence included within the four corners of this complaint is overwhelming that Twitter acted to delete specifically the Tassinari email tweets and silence Dr. Shiva's political speech during his run for Federal office ***solely and exclusively*** because of the Defendants' coordinated complaint to Twitter. Twitter got mobbed, by State actors. It was documentary evidence of violation of Federal law in those emails that was the ***motive*** for Galvin's action. For Galvin to deny all responsibility for this sequence of events is consciously dishonest. He knew full well that as the Elections Officer for Massachusetts his complaint would carry enormous weight and it did carry enormous weight. Twitter's response was immediate and specific.

The key sentence in the *Blum* ruling is:

"A State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991 (1982)

The evidence is overwhelming that the "Twitter Partners" and State Officials - Galvin, Tassinari and O'Malley - in concert with Cohen and NASED, ***provided such significant***

***encouragement that the choice must in law be deemed that of the State***. At the emergency hearing, Judge Wolf ruled that Dr. Shiva is likely to prevail on his claim that Galvin was responsible for Twitter deleting only the Tassinari email tweets and silencing Dr. Shiva's political speech in the midst of his campaign:

> The testimony I heard, which I believe is candid and credible, was also helpful because it amplifies the affidavits which say there was a report.  The closest issue in my mind, and it's closer than it was based solely on the papers, is whether what I'll call the *Blum* test for converting Twitter's action into state action is met, or, to be more precise, whether it will probably be proven.  Because now we do know that Twitter gives high priority to reviewing reports or complaints from election officials and acts on them quickly, and they acted on Dr. Shiva's account, as I understand it, quickly after getting the report from the Secretary here and also from the National Association.

> So it may be probable that he will ultimately prove that state action is involved here.  If state action is involved here, then it appears to me probable that he will prove that his First Amendment rights have been violated.

Galvin's Cat's Paw defense that it wasn't him and that Twitter acted all by itself, has already failed. Discovery, including sworn depositions from Cohen, can only produce more evidence in support of Dr. Shiva's claim.

THIS COMPLAINT MEETS THE TWOMBLY / IQBAL PLAUSIBILITY STANDARD

This complaint pleads chronological facts included within the four corners and contains no conclusory statements whatsoever. It also follows the emergence of additional facts during a hearing for a TRO. Thus this complaint exceeds the plausibility standard required by the Court to survive a motion to dismiss under Rule 12. *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), *Rodi v. Southern NESL*, 389 F.3d 5 (1st Cir. 2004)

Furthermore, *pro se* complaints are to be liberally construed. *Estelle et al v. Gamble*, 29 U.S. 97 (1976), *Haines v. Kerner*, 404 U.S. 519 (1972), *Alston v. Parker*, 363 F.3d 229 (3d Cir. 2004), *Vartanian v. Monsanto Co*., 14 F.3d 697 (1st Cir. 1994),  *Hart v. Mazur*, 903 F.Supp. 277 (D.R.I. 1995)

And at this stage the plaintiff's facts must be construed as true and the court may not dismiss on the basis of facts not ascertainable within the four corners of the complaint. Galvin, Tassinari and O'Malley have already been shown to have unclean hands. *Hazel-Atlas Glass Co. v. Hartford-Empire Co*., 322 U.S. 238 (1944) Even their sworn affidavits and testimony are unreliable.

**PRAYER FOR RELIEF**

<u>COUNT ONE</u>

MONETARY DAMAGES UNDER 42 U.S.C. § 1983 FOR VIOLATION OF A
CONSTITUTIONAL RIGHT UNDER THE COLOR OF LAW

Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

Galvin, Tassinari and O'Malley are state actors. Cohen and NASED acted as agents for

state actors. NASED is an association for and of state actors actually in office. NASED is

inextricably linked with state actors and exists for the sole purpose of amplifying the voice of

state actors. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001)

All Defendants are bound by the very same conspiracy and goal: suppress dissemination of

tweets that reveal official emails that confirm violation of Federal law. All Defendants

coordinated their attack on Dr. Shiva's political speech in conscious, willful, contemptuous

violation of his First Amendment right to the highest protections for his political speech.

> "While some means of communication may be less effective than others at influencing
> the public in different contexts, any effort by the Judiciary to decide which means of
> communications are to be preferred for the particular type of message and speaker would
> raise questions as to the courts' own lawful authority. Substantial questions would arise if
> courts were to begin saying what means of speech should be preferred or disfavored. And
> in all events, those differentiations might soon prove to be irrelevant or outdated by
> technologies that are in rapid flux. See *Turner Broadcasting System, Inc. v. FCC*, 512
> U.S. 622, 639 (1994). Courts, too, are bound by the First Amendment. We must decline
> to draw, and then redraw, constitutional lines based on the particular media or technology
> used to disseminate political speech from a particular speaker." "The Government may
> not render a ban on political speech constitutional by carving out a limited exemption
> through an amorphous regulatory interpretation." "First Amendment standards, however,
> "must give the benefit of any doubt to protecting rather than stifling speech." *WRTL*, 551
> U. S., at 469 (opinion of ROBERTS, C. J.) (citing *New York Times Co. v. Sullivan*, 376
> U. S. 254, 269–270 (1964))." "As the foregoing analysis confirms, the Court cannot
> resolve this case on a narrower ground without chilling political speech, speech that is
> central to the meaning and purpose of the First Amendment. See *Morse v. Frederick*,551
> U. S. 393, 403 (2007)."

*Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010)

Here it is undisputed that the Defendants stifled the Plaintiff political candidate's

political speech during an election campaign based solely on the content of Plaintiff's speech,

which exposed an official email that supported his contention that Galvin violated Federal law

when he destroyed records (ballot images) generated in the course of a Federal election, a matter

of great public concern.

This was *per se* unconstitutional. *Commonwealth v. Melissa Lucas*, 472 Mass. 387 (2015)  "It is speech on "matters of public concern"' that is "at the heart of the First Amendment's protection." *First National Bank of Boston v. Bellotti*, 435 U. S. 765, 435 U. S. 776 (1978), citing *Thornhill v. Alabama*, 310 U. S. 88, 310 U. S. 101 (1940)

The suppression of Dr. Shiva's political speech, as well as ***all*** of his speech on Twitter for half of the last month prior to Election Day, November 3, 2020, caused massive irreparable harm to him as he was running for Federal office as a Write-In candidate who needed as much visibility as he could get, so voters could learn that he was still a candidate whose name they would have to write in themselves if they chose. Dr. Shiva had built up a following of a quarter of a million followers on Twitter and via Twitter had a reach that did not require additional expense, compared to advertising on television. The Defendants willfully made his voice disappear at a crucial time.

Galvin and the other Defendants, through their conscious, defiant, contempt for and violation of bedrock American principles enshrined in the Constitution via the First Amendment, deliberately caused immense harm to this candidate Plaintiff solely to block the candidate from raising public awareness of Galvin's violation of Federal law and the way Galvin counts votes, which is as content-based as a restriction on speech by a government actor can get.

> "The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U. S. 476, 354 U. S. 484 (1957); New York Times Co. v. Sullivan, 376 U. S. 254, 376 U. S. 269 (1964). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison v. Louisiana, 379 U. S. 64, 379 U. S. 74-75 (1964). Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the "highest rung of the hierarchy of First Amendment values,'" and is entitled to special protection. NAACP v. Claiborne Hardware Co., 458 U. S. 886, 458 U. S. 913 (1982); Carey v. Brown, 447 U. S. 455, 447 U. S. 467 (1980)."
>
> *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985)

Given their deliberate contempt for both the U.S. Constitution and the right of voters to have free and fair elections without government interference, it is the height of cynicism and hypocrisy for the Defendants to portray themselves as the defenders of democracy.

Judge Wolf's questioning of Tassinari revealed that the Defendants did not for one moment have any intention of respecting Dr. Shiva's right under the First Amendment to the Constitution, where the sole constitutional response to so-called bad speech is good speech. He asked Tassinari why she did not simply issue a tweet from the Election Division's official Twitter account that debunked Dr. Shiva's tweet rather than coordinating an effort to delete his tweet and have him suspended in the midst of his election campaign.

Tassinari had no explanation for why she and the other Defendants did not do this.

The reason Tassinari was unable to explain her choice to Judge Wolf is that Tassinari and the other Defendants did not act in response to bad speech, they acted to conceal official evidence of the violation of Federal law by Galvin. This fact precludes their action from availing of the defense of qualified immunity.

The Court has ruled that suit for monetary damages from state actors for violations of Constitutional rights, an intentional tort, is permitted if they are sued in their individual capacities by U.S. Citizens and there is no demand on the public purse. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), *Butz v. Economou*, 438 U.S. 478 (1978), *Davis v. Passman*, 442 U.S. 228 (1979), *Ziglar v. Abbasi*, 582 U.S. ___ (2017)

Naturally this also means that Massachusetts Defendants must pay privately for their defense prospectively and the expense must not be dumped on the taxpayer. "The Legislature, by excluding intentional torts from the waiver of governmental immunity, sought to insulate the government from liability for intentional conduct which it had not authorized." *Doe v. Town of*

*Blandford*, 402 Mass. 831 (1988), MGL ch. 258 § 10(c). While the Defendants chose to violate

Dr. Shiva's First Amendment rights through abuse of office, and abuse of networks available

only to state officials, such as the cooperation of NASED and "Twitter Partner" status, this abuse

was not authorized by the Commonwealth itself.

The complaint lays out with particularity all the actions the Defendants took under the

color of law to repeatedly and pointedly violate Dr. Shiva's right to special protection under the

First Amendment for his political speech and to be free of unlawful retaliation by state actors for

the content of his speech. The Defendants also took conscious steps to conceal their actions from

this court and consciously misrepresented facts in a continuing effort to obstruct justice.

Galvin obstructed justice, *United States v. Dunnigan,* 507 U.S. 87 (1993), and committed

a crime which violated his oath and 'laws applicable to his office or position.' *State Retirement*

*Board v. Bulger*, 446 Mass. 169 (2006), *In the Matter of Robert A. Griffith*, 440 Mass. 500

(2003) And AAG Adam Hornstine, a lawyer, fully knew that his statements on the record at the

hearing were materially false and "could not have been calculated to assist the Court in the

administration of justice, but only to win an advantage." *Tesco Corp. v. Weatherford Int'l, Inc.*,

No. H-08-2531, 2014 WL 4244215 (S.D. Tex. 2014)

Under established case law, members of a conspiracy are substantively liable for the

foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v. United States*,

328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)

The Defendants have engaged in the malicious, willful, and consciously fraudulent

commission of wrongful acts, and because of the outrageous and reprehensible nature of their

acts, Dr. Shiva is entitled to and must be awarded punitive damages against each of the

Defendants. The Defendants must be held liable for damages to Dr. Shiva with an initial demand

of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and fees and pre- and post-judgment interest from the Defendants.

<u>COUNT 2</u>

CONSPIRACY TO VIOLATE CIVIL RIGHTS - 42 U.S. CODE § 1985

Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

The "**Ku Klux Klan Act**," enacted as part of the Civil Rights Act of 1871, and now codified as 42 U.S.C. § 1985, provides Dr. Shiva with a private cause of action to seek monetary damages from the Defendants for participating in a conspiracy to violate his First and Fourteenth Amendment rights under the color of law. The Court provided the binding interpretation of this law in *Griffin v. Breckenridge*, 403 U.S. 88 (1971). The reach of this Ku Klux Klan Act encompasses the deprivation of Dr. Shiva's constitutional rights by all the Massachusetts Defendants, and also those state actors and agents of state actors, such as NASED and Cohen who predictably will claim to be wholly private individuals, even though the very existence of NASED and its actions, via its salaried Executive Director Cohen on behalf of Tassinari, O'Malley and Galvin, are inextricably linked with state action. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001) Even when Cohen and NASED claim that they are private persons, they shall not escape the reach of 42 U.S.C. § 1985. ***Congress passed the* Ku Klux Klan Act *to hold liable precisely persons like them, for monetary damages***.

All of the Defendants are bound by the very same conspiracy and goal: suppress dissemination of tweets that reveal official emails that confirm violation of Federal law. All Defendants coordinated their attack on Dr. Shiva's political speech in conscious, willful, contemptuous violation of his First Amendment right to the highest protections for his political speech and his Fourteenth Amendment right to equal protection under the law.

"While some means of communication may be less effective than others at influencing the public in different contexts, any effort by the Judiciary to decide which means of communications are to be preferred for the particular type of message and speaker would raise questions as to the courts' own lawful authority. Substantial questions would arise if courts were to begin saying what means of speech should be preferred or disfavored. And in all events, those differentiations might soon prove to be irrelevant or outdated by technologies that are in rapid flux. See *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 639 (1994). Courts, too, are bound by the First Amendment. We must decline to draw, and then redraw, constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker." "The Government may not render a ban on political speech constitutional by carving out a limited exemption through an amorphous regulatory interpretation." "First Amendment standards, however, "must give the benefit of any doubt to protecting rather than stifling speech." *WRTL*, 551 U. S., at 469 (opinion of ROBERTS, C. J.) (citing *New York Times Co. v. Sullivan*, 376 U. S. 254, 269–270 (1964))." "As the foregoing analysis confirms, the Court cannot resolve this case on a narrower ground without chilling political speech, speech that is central to the meaning and purpose of the First Amendment. See *Morse v. Frederick*,551 U. S. 393, 403 (2007)."

*Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010)

Here it is undisputed that the Defendants stifled the Plaintiff political candidate's

political speech during an election campaign based solely on the content of Plaintiff's speech,

which exposed an official email that supported his contention that Galvin violated Federal law

when he destroyed records (ballot images) generated in the course of a Federal election, a matter

of great public concern. This was *per se* unconstitutional. *Commonwealth v. Melissa Lucas*, 472

Mass. 387 (2015)

"It is speech on "matters of public concern'" that is "at the heart of the First

Amendment's protection." *First National Bank of Boston v. Bellotti*, 435 U. S. 765, 435 U. S.

776 (1978), citing *Thornhill v. Alabama*, 310 U. S. 88, 310 U. S. 101 (1940)

The suppression of Dr. Shiva's political speech, as well as ***all*** of his speech on Twitter

for half of the last month prior to Election Day, November 3, 2020, caused massive irreparable

harm to him as he was running for Federal office as a Write-In candidate who needed as much

visibility as he could get, so voters could learn that he was still a candidate whose name they

would have to write in themselves if they chose. Dr. Shiva had built up a following of a quarter of a million followers on Twitter and via Twitter had a reach that did not require additional expense, compared to advertising on television. The Defendants willfully made his voice disappear at a crucial time in order to obstruct justice and conceal official evidence.

Galvin and the other Defendants, through their conscious, defiant, contempt for and violation of bedrock American principles enshrined in the Constitution via the First Amendment, deliberately caused immense harm to this candidate Plaintiff solely to block the candidate from raising public awareness of Galvin's violation of Federal law and irregularities with the way Galvin counts votes, which is as content-based as a restriction on speech by a government actor can get.

> "The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U. S. 476, 354 U. S. 484 (1957); New York Times Co. v. Sullivan, 376 U. S. 254, 376 U. S. 269 (1964). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison v. Louisiana, 379 U. S. 64, 379 U. S. 74-75 (1964). Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the "highest rung of the hierarchy of First Amendment values,'" and is entitled to special protection. NAACP v. Claiborne Hardware Co., 458 U. S. 886, 458 U. S. 913 (1982); Carey v. Brown, 447 U. S. 455, 447 U. S. 467 (1980)."
>
> *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985)

Given their deliberate contempt for both the U.S. Constitution and the right of voters to have free and fair elections without government interference, it is the height of cynicism and hypocrisy for the Defendants to portray themselves as the defenders of democracy.

Judge Wolf's questioning of Tassinari revealed that the Defendants did not for one moment have any intention of respecting Dr. Shiva's right under the First Amendment to the Constitution, where the sole constitutional response to so-called bad speech is good speech. He asked Tassinari why she did not simply issue a tweet from the Election Division's official Twitter account that debunked Dr. Shiva's tweet rather than coordinating an effort to delete his

tweet and have him suspended in the midst of his election campaign. Tassinari had no explanation for why she and the other Defendants did not do this.

The reason Tassinari was unable to explain her choice to Judge Wolf is that Tassinari and the other Defendants did not act in response to bad speech, they acted to conceal official evidence of the violation of Federal law by Galvin. This fact precludes their action from availing of the defense of qualified immunity.

The Court has ruled that suit for monetary damages from state actors for violations of Constitutional rights, an intentional tort, is permitted if they are sued in their individual capacities by U.S. Citizens and there is no demand on the public purse. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), *Butz v. Economou*, 438 U.S. 478 (1978), *Davis v. Passman*, 442 U.S. 228 (1979), *Ziglar v. Abbasi*, 582 U.S. ___ (2017)

Naturally this also means that Massachusetts Defendants must pay privately for their defense prospectively and the expense must not be dumped on the taxpayer. "The Legislature, by excluding intentional torts from the waiver of governmental immunity, sought to insulate the government from liability for intentional conduct which it had not authorized." *Doe v. Town of Blandford*, 402 Mass. 831 (1988), MGL ch. 258 § 10(c). While the Defendants chose to violate Dr. Shiva's First Amendment rights through abuse of office, and abuse of networks available only to state officials, such as the cooperation of NASED and "Twitter Partner" status, this abuse was not authorized by the Commonwealth itself.

The complaint lays out with particularity, with the benefit of revelations from sworn testimony, all the actions the Defendants took under the color of law to repeatedly and pointedly violate Dr. Shiva's right to special protection under the First Amendment for his political speech and to be free of unlawful retaliation by state actors for the content of his speech. The

Defendants also took conscious steps to actively conceal their actions from this court and consciously misrepresented facts under oath in a continuing effort at obstructing justice. Galvin obstructed justice, *United States v. Dunnigan,* 507 U.S. 87 (1993), and committed a crime which violated his oath and 'laws applicable to his office or position.' *State Retirement Board v. Bulger*, 446 Mass. 169 (2006), *In the Matter of Robert A. Griffith*, 440 Mass. 500 (2003) And AAG Adam Hornstine, a lawyer, fully knew that his statements on the record at the hearing were materially false and "could not have been calculated to assist the Court in the administration of justice, but only to win an advantage." *Tesco Corp. v. Weatherford Int'l, Inc.*, No. H-08-2531, 2014 WL 4244215 (S.D. Tex. 2014)

Under established case law, members of a conspiracy are substantively liable for the foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946)

The Defendants have engaged in the malicious, willful, and consciously fraudulent commission of wrongful acts, and because of the outrageous and reprehensible nature of their acts, Dr. Shiva is entitled to and must be awarded punitive damages against each of the Defendants. The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and fees and pre- and post-judgment interest from the Defendants.

## COUNT 3

## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)

Dr. Shiva re-alleges and incorporates by reference each and every foregoing paragraph of this complaint as if set forth in full herein.

At all relevant times each Defendant as well as Dr. Shiva is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c). The Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the "enterprise." Each of the Defendants participated in the operation or management of the enterprise.

The Defendants and their co-conspirators (Leadstories.com, Reuters, AP et al) are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, the obstruction of justice, as described in the foregoing paragraphs of this complaint: the Defendants realized that the Tassinari emails exposed them to prosecution for violation of Federal law, as well as civil action by Dr. Shiva over the loss of his primary election to Kevin O'Connor. They acted swiftly and powerfully to conceal this evidence, to suppress Dr. Shiva's political speech entirely, and actively distributed through the "free press" their false narrative that ballot images are not covered by the storage requirements of Federal law and that Dr. Shiva's claim is false. The Defendants' false narrative now appears whenever anyone uses a search engine to read about Dr. Shiva and his claim, and appears more prominently such that one's eyes catch the Defendants' narrative before one gets to read Dr. Shiva's evidence. This is intentional.



Their coordinated action, the enterprise, was intended to obstruct justice in violation of 18 U.S.C. § 1503. The enterprise has been structured to operate as a unit in order to accomplish the goals of their scheme. All Defendants are in agreement that they needed to suppress the Tassinari email tweets, and acted to do so through their enhanced, priority, partner relationship with Twitter, and to conceal their doing so, and to claim that Twitter acted all on its own to delete them and suppress Dr. Shiva's political speech about a matter of great public concern.

The enterprise also included intentional, conscious factual misrepresentations to this court under oath, to paraphrase:

*We simply filled out Twitter's online complaint form just as any ordinary civilian, the tweet that we reported was a clear case of "Election Misinformation" that threatened the integrity of the elections and would have suppressed the vote, the tweet that we reported for "Election Misinformation" was deservedly deleted and we were very pleased when we looked a few days later and learned that Twitter had indeed responded to our complaint and deleted it, oh we believed Your Honor that tweet was deleted but we may have been mistaken when we testified under oath about that just now Your Honor after declaring just that in our sworn affidavits prepared before this hearing that contain certain verbatim paragraphs in common, oh well as that tweet was never deleted by Twitter surely we did not harm Dr. Shiva over his political speech or cause him to be suspended by Twitter during his Write-In political campaign, we have no idea why Twitter solely and exclusively deleted only those tweets that revealed the Tassinari emails, it is entirely possible that Twitter deleted the Tassinari tweets and suspended Dr. Shiva each time he tweeted them as a result of a complaint from any ordinary civilian but it wasn't us.*

It is notable that Galvin, O'Malley and Tassinari chose to not present this court, via affidavit, screenshots or printouts of the text of the complaint submitted by them to Twitter. Discovery shall clear this up.

The Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c). First they identified Dr. Shiva's dissemination of the Tassinari emails as a threat that could lead to indictments for violation of Federal election law, then they acted in concert through abuse of official powers and relationships to conceal the Tassinari emails, then they acted in concert to ensure Dr. Shiva was slandered and libeled internationally for stating that Massachusetts destroyed ballots, then they ensured his own voice disappeared entirely - for weeks at a time - in retaliation for each time he tried to publicly expose the content of the Tassinari emails, and that Dr. Shiva was hobbled in the midst of his political campaign where he needed as much visibility and exposure so potential voters would learn that he was a Write-In candidate. In sum, the Defendants consciously operated a racketeering enterprise whose main goal was the obstruction of justice and suppression of a credible witness. And the cover story for the enterprise was 'combating election misinformation' (*we care passionately about voter suppression, you see, it was our duty to save the country!*).

As a direct and proximate result of the predicate acts of racketeering by the enterprise, including but not limited to using their "Twitter Partner" status, abusing the huge influence of the office of the Massachusetts Secretary of State, the amplification provided by NASED, the communications from Cohen and NASED to Twitter - which the conspirators know are not easily discoverable public records and which Galvin, O'Malley and Tassinari chose to conceal

from this court in both their opposition and their affidavits, and other acts in furtherance of their continuing effort to obstruct justice, yet to be revealed by court-ordered discovery, Dr. Shiva has been massively and irreparably damaged, and his injury includes but is not limited to being cheated out of a free and fair election, global loss of reputation and goodwill, and severe emotional distress due to the real fear that any mention of the Tassinari emails would lead to swift and severe retribution from the enterprise.

Given that Dr. Shiva's family chose to live in the United States and sacrificed greatly to rebuild their lives in a new country, and fully believed that in this country freedom of speech would be protected by state officials, Dr. Shiva has been severely shocked that Galvin, O'Malley, Tassinari, Cohen, and all the Elections Directors that comprise NASED, share the very same contempt for freedom of speech and the rights of the individual as state officials back in the Socialist British Commonwealth of India. The Defendants have no red line within themselves regarding this great nation's founding and defining principles that they would not cross. This knowledge has been extremely disheartening and demoralizing.

Further, these injuries to Dr. Shiva were a direct, proximate, reasonably foreseeable and intentional result of the violations of 18 U.S.C. § 1962. Dr. Shiva is the ultimate victim of the Defendants' unlawful enterprise. Galvin obstructed justice, *United States v. Dunnigan,* 507 U.S. 87 (1993), and committed a crime which violated his oath and 'laws applicable to his office or position.' *State Retirement Board v. Bulger*, 446 Mass. 169 (2006), *In the Matter of Robert A. Griffith*, 440 Mass. 500 (2003) And AAG Adam Hornstine, a lawyer, fully knew that his statements on the record at the hearing were materially false and "could not have been calculated to assist the Court in the administration of justice, but only to win an advantage." *Tesco Corp. v. Weatherford Int'l, Inc.*, No. H-08-2531, 2014 WL 4244215 (S.D. Tex. 2014)

Under established case law, members of a conspiracy are substantively liable for the foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640 (1946) The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and fees and pre- and post-judgment interest from the Defendants.

Pursuant to 18 U.S.C. § 1964(c), Dr. Shiva is entitled to recover treble damages plus costs and attorneys fees from the Defendants.

<u>COUNT 4</u>

CONSPIRACY TO VIOLATE RICO, VIOLATION OF 18 U.S.C. § 1962(d)

Dr. Shiva re-alleges and incorporates by reference each and every foregoing paragraph of this complaint as if set forth in full herein.

At all relevant times each RICO Defendant as well as Dr. Shiva is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c). The Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the "enterprise." Each of the Defendants participated in the operation or management of the enterprise.

The Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) and 18 U.S.C. § 1503, as described above, in violation of 18 U.S.C. § 1962(d).

As documented with particularity in this complaint, with the benefit of revelations from sworn testimony, the Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and knew the predicate acts were part of such racketeering activity, and the

participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

Even the limited testimony and pleadings filed by the Defendants thus far demonstrate the existence of this conspiracy and their common understanding of the need to disseminate their false narrative that they did not act in concert to conceal tweets regarding the Tassinari emails.

As a direct and proximate result of the Defendants' conspiracy, the acts of racketeering activity of the enterprise, the overt acts taken in furtherance of that conspiracy, including but not limited to using their "Twitter Partner" status, abusing the huge influence of the office of the Massachusetts Secretary of State, the amplification provided by NASED, the communications from Cohen and NASED to Twitter - which the conspirators know are not easily discoverable public records and which Galvin, O'Malley and Tassinari chose to conceal from this court in both their opposition and their affidavits in furtherance of their continuing effort to obstruct justice, and other acts yet to be revealed by court-ordered discovery, Dr. Shiva has been massively and irreparably damaged, and his injury includes, but is not limited to, being cheated out of a free and fair election, global loss of reputation and goodwill, and severe emotional distress due to the real fear that any mention of the Tassinari emails would lead to swift and severe retribution from the enterprise, including consciously misleading press statements that ricochet across the Internet and are prioritized by search engines.

Given that Dr. Shiva's family chose to live in the United States for the sake of liberty and individual rights, and sacrificed greatly to rebuild their lives in a new country, and fully believed that in this country freedom of speech would be protected by state officials, Dr. Shiva has been severely shocked that Galvin, O'Malley, Tassinari, Cohen, and all the Elections Directors that

comprise NASED, share the very same contempt for freedom of speech and the rights of the individual as state officials back in the Socialist British Commonwealth of India.

The Defendants have absolutely no regard for this great nation's founding and defining principles. The conclusion that such individuals exist in government has been extremely disheartening and demoralizing.

Further, these injuries to Dr. Shiva were a direct, proximate, reasonably foreseeable and intentional result of the violations of 18 U.S.C. § 1962. Dr. Shiva is the ultimate victim of the Defendants' unlawful enterprise. Galvin obstructed justice, *United States v. Dunnigan,* 507 U.S. 87 (1993), and committed a crime which violated his oath and 'laws applicable to his office or position.' *State Retirement Board v. Bulger*, 446 Mass. 169 (2006), *In the Matter of Robert A. Griffith*, 440 Mass. 500 (2003) And AAG Adam Hornstine, a lawyer, fully knew that his statements on the record at the hearing were materially false and "could not have been calculated to assist the Court in the administration of justice, but only to win an advantage." *Tesco Corp. v. Weatherford Int'l, Inc.*, No. H-08-2531, 2014 WL 4244215 (S.D. Tex. 2014)

Under established case law, members of a conspiracy are substantively liable for the foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640 (1946) The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and fees and pre- and post-judgment interest from the Defendants.

Pursuant to 18 U.S.C. § 1964(c), Dr. Shiva is entitled to recover treble damages plus costs and attorneys fees from the Defendants.

<u>COUNT 5</u>

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

Due exclusively to the Defendants' enterprise, Dr. Shiva was made to live in fear that his speech regarding the official evidence contained in the Tassinari emails would inevitably and swiftly lead to his silencing on social media, during his political campaign for U.S. Senate.

This is *per se* intolerable in a country founded for the specific purpose of being the exact opposite of Her Britannic Majesty's United Kingdom in terms of protections for political speech, and which on paper at least provides "special protection" for political speech on matters of great public concern. "As the foregoing analysis confirms, the Court cannot resolve this case on a narrower ground without chilling political speech, speech that is central to the meaning and purpose of the First Amendment. See *Morse v. Frederick*,551 U. S. 393, 403 (2007).*" Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) Accordingly, the Court has frequently reaffirmed that speech on  public issues occupies the "highest rung of the hierarchy of First Amendment values,'" and is entitled to special protection. <u>NAACP v. Claiborne Hardware Co</u>., 458 U. S. 886, 458 U. S. 913 (1982); <u>Carey v. Brown</u>, 447 U. S. 455, 447 U. S. 467 (1980)." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc*., 472 U.S. 749 (1985) "It is speech on "matters of public concern'" that is "at the heart of the First Amendment's protection."" *First National Bank of Boston v. Bellotti*, 435 U. S. 765, 435 U. S. 776 (1978), citing *Thornhill v. Alabama*, 310 U. S. 88, 310 U. S. 101 (1940)

That Dr. Shiva was not provided this special protection during his political campaign for U.S. Senate may not be denied. In fact, the Defendants themselves do not deny it and initially justified it on the basis of combating "election misinformation" even though they knew that, per

the U.S. Constitution, political speech is allowed to be inaccurate or even deliberately false and state actors are explicitly prohibited from suppressing it.

This was extremely shocking to Dr. Shiva and has shaken him to his core. The rug has been pulled out from under his feet. It is as if he is on the other side of the looking glass, something he never anticipated, a stranger in a land that he no longer recognizes. Dr. Shiva finds this experience extremely distressing and most unwelcome. The Defendants' actions have gutted his lifelong beliefs in the American system and is now dependent on this court for relief.

To prevail on his claim for intentional infliction of emotional distress, Dr. Shiva must establish "(1) that the Defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (2) that the Defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the Defendant were the cause of the plaintiff's distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it." *Payton v. Abbott Labs*, 386 Mass. 540, 555 (1982), citing *Agis v. Howard Johnson Co.*, 371 Mass. 140, 145 (1976)

All four factors have already been pleaded with particularity in this complaint, with the benefit of revelations from sworn testimony.

The Defendants' cold, heartless, intentional, infliction of extreme anguish on Dr. Shiva in order to corruptly extort suppression of an official email that confirmed the violation of Federal law, silence him totally on Twitter, and label him a fabulist and baseless conspiracy theorist, is beyond the bounds of human decency. *Commonwealth v. Adams*, 416 Mass. 558 (1993)('the officers, in the phrase of the day, `don't get it,' and they do not understand how unacceptably they acted thereafter'). Dr. Shiva is entitled to substantial remedy from this court.

The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and fees and pre- and post-judgment interest from the Defendants.

Dr. Shiva requests such other and further relief as this court may deem just and proper.

## COUNT 6

### ISSUANCE OF A PERMANENT INJUNCTION ENJOINING **SECRETARY GALVIN** AND **NASED** FROM VIOLATING Dr. SHIVA'S OR ANYONE'S POLITICAL SPEECH

Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

Secretary William Francis Galvin has been sued in his official capacity in order to obtain from Federal court a permanent injunction that enjoins him from suppressing political speech and silencing a candidate wholesale during the candidate's election campaign, be it for Federal, state or local office. This is permissible under the exception carved out by the Court for prospective injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908) NASED is comprised entirely of state actors.

The court must weigh four factors when deciding whether to grant injunctive relief: (1) The likelihood of success on the merits; (2) The potential for the movant to be irreparably harmed by denial of the relief; (3) The balance of the movant's hardship if relief is denied versus the nonmovant's hardship if relief is granted; and (4) The effect that granting relief will have on the public interest. *Phillip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir., 1998), *Monsanto v. Geertson*, 561 U.S. 139 (2010), *Trump v. Hawaii*, 585 U.S. ___ (2018), *Arborjet, Inc. v. Rainbow Treecare*, 794 F.3d 168 (1st Cir. 2015), *Planned Parenthood League v. Bellotti*, 641 F.2d 1006 (1st Cir. 1981)  These factors are easily met in this action.

1        Likelihood of success on the merits favors the Plaintiff

The facts of this case demonstrate that the Plaintiff here has a great likelihood of success

on the merits because it is beyond dispute that Defendant Galvin, in collusion with NASED, in

order to maintain plausible deniability if discovered, violated an explicit prohibition on any

government official imposing content-based restrictions on speech. There are few cases where

the required result is as open and shut as enjoining a government official from continuing to

abuse his official power to censor speech and make a candidate's voice disappear.

> "While some means of communication may be less effective than others at influencing
> the public in different contexts, any effort by the Judiciary to decide which means of
> communications are to be preferred for the particular type of message and speaker would
> raise questions as to the courts' own lawful authority. Substantial questions would arise
> if courts were to begin saying what means of speech should be preferred or disfavored.
> And in all events, those differentiations might soon prove to be irrelevant or outdated by
> technologies that are in rapid flux. See *Turner Broadcasting System, Inc. v. FCC*, 512
> U.S. 622, 639 (1994). Courts, too, are bound by the First Amendment. We must decline
> to draw, and then redraw, constitutional lines based on the particular media or
> technology used to disseminate political speech from a particular speaker." "The
> Government may not render a ban on political speech constitutional by carving out a
> limited exemption through an amorphous regulatory interpretation." "First Amendment
> standards, however, "must give the benefit of any doubt to protecting rather than stifling
> speech." *WRTL*, 551 U. S., at 469 (opinion of ROBERTS, C. J.) (citing *New York Times
> Co. v. Sullivan*, 376 U. S. 254, 269–270 (1964))." "As the foregoing analysis confirms,
> the Court cannot resolve this case on a narrower ground without chilling political speech,
> speech that is central to the meaning and purpose of the First Amendment. See *Morse v.
> Frederick*, 551 U.S. 393, 403 (2007)."
> *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010)

Here it is undisputed that Galvin and NASED together stifled the plaintiff political

candidate's political speech during an election campaign based solely on the content of

plaintiff's speech, which exposed irregularities in the way Galvin conducted and influenced the

counting of votes during the recent Republican primary elections, and exposed an official email

that confirmed that Galvin violated Federal law, a matter of great public concern. This was

unconstitutional *per se*. No court should require voluminous briefing on this point. Galvin has

already agreed to desist from doing so until November 4, 2020. Count 6 seeks to make this a permanent injunction upon both Galvin and NASED. A court order is necessary because these Defendants have already proved their intrinsic contempt for the Constitution. External control is mandatory.

"It is speech on "matters of public concern'" that is "at the heart of the First Amendment's protection." *First National Bank of Boston v. Bellotti*, 435 U. S. 765, 435 U. S. 776 (1978), citing *Thornhill v. Alabama*, 310 U. S. 88, 310 U. S. 101 (1940)

The Plaintiff, the candidate who has been consciously and willfully harmed in a most un-American fashion by both NASED, through abuse of its status of being the voice for fifty (50) State Elections Directors, and Secretary Galvin, through abuse of his official status and powers, is assured of succeeding on the merits of his claim. His claim also meets the required plausibility standard. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Iannacchino v. Ford Motor*, 451 Mass. 623 (2008).


2      This political candidate has already been irreparably harmed

Defendants Galvin and NASED had Dr. Shiva banned from Twitter for most of the last month of campaigning left prior to Election Day 2020. This caused massive harm to a Write-In candidate who needed as much public recognition as possible so voters could learn that he was still a candidate whose name they would have to write in themselves if they chose. NASED and Galvin, through their conscious defiant violation of bedrock American principles enshrined in the Constitution via the First Amendment, deliberately caused immense harm to this candidate by making him disappear from a platform that he had been dependent on for political outreach and political speech. Galvin and NASED did this solely to block the candidate from exposing an

official email that confirmed Dr. Shiva's contention that Galvin violated Federal law by deleting

ballot images, which is as content-based as a restriction on speech by the government can get.

> "The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U. S. 476, 354 U. S. 484 (1957); New York Times Co. v. Sullivan, 376 U. S. 254, 376 U. S. 269 (1964). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison v. Louisiana, 379 U. S. 64, 379 U. S. 74-75 (1964). Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the "highest rung of the hierarchy of First Amendment values,'" and is entitled to special protection. NAACP v. Claiborne Hardware Co., 458 U. S. 886, 458 U. S. 913 (1982); Carey v. Brown, 447 U. S. 455, 447 U. S. 467 (1980)."

> *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc*., 472 U.S. 749 (1985)

"Entitled" means this court is duty-bound to immediately enjoin Galvin and NASED

from further willful violations of the Constitution including causing Dr. Shiva's political speech

to be silenced on Twitter. Galvin and NASED have actively cheated Dr. Shiva out of a free and

fair election in 2020, and must be enjoined by this court from doing it again in the future, a

prospect that is very likely to recur. *Already v. Nike*, 568 U.S. 85 (2013).


3      Defendants Galvin and NASED faces no harm from an injunction

Galvin faces no harm whatsoever from being required by this court to further refrain

from abusing his office to violate the candidate plaintiff's free speech rights and to be enjoined

from stifling political speech on a matter of public concern. NASED faces no harm from being

required by this court to comply with the U.S. Constitution and refrain from using its clout to

help State Election Directors nationwide silence political speech. Again, no voluminous briefing

is required for this court to follow hornbook law. "Strong medicine is required to cure the

Defendant's disrespect for the law." *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996),

*Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70 (1st Cir. 2000) The injunction must issue.

4       The requested injunction is in the public interest

It is in the public interest to uphold the rule of law and require elected officials to stop

abusing their office to impose content-based restraints on political speech in the closing days of

an election campaign in order to actively sabotage a candidate's prospects and throw the

election.  It is in the public interest to comply with 100 years of Supreme Court rulings that

require courts to strongly support and protect First Amendment rights. *Dun & Bradstreet, Inc.,*

supra, *Snyder v. Phelps*, 562 U. S. 443 (2011)

In summary, the permanent injunction must be issued.

## COUNT 7

### DECLARATORY INJUNCTION THAT MASSACHUSETTS DEFENDANTS MUST PAY PRIVATELY FOR THEIR DEFENSE

Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

The Court has ruled that suit for monetary damages from state actors for violations of

Constitutional rights, an intentional tort, is permitted if they are sued in their individual

capacities and there is no demand on the public purse. *Bivens v. Six Unknown Named Agents*,

403 U.S. 388 (1971), *Butz v. Economou*, 438 U.S. 478 (1978), *Davis v. Passman*, 442 U.S. 228

(1979), *Ziglar v. Abbasi*, 582 U.S. ___ (2017)

Naturally this also means that Massachusetts Defendants must pay privately for their

defense prospectively and the expense must not be dumped on the taxpayer. "The Legislature, by

excluding intentional torts from the waiver of governmental immunity, sought to insulate the

government from liability for intentional conduct which it had not authorized." *Doe v. Town of*

*Blandford*, 402 Mass. 831 (1988), MGL ch. 258 § 10(c). While the Massachusetts Defendants

chose to violate Dr. Shiva's First Amendment rights through abuse of office, and abuse of

networks available only to state officials, such as the cooperation of NASED and "Twitter Partner" status, this abuse was not authorized by the Commonwealth itself.

Governments are prohibited from authorizing the violation of the U.S. Constitution and other laws.

This court must issue an Order that the Commonwealth must be insulated from all costs of litigating the Defendants' defense of the individual capacity claims in this complaint and that the Massachusetts Defendants must retain private attorneys at their personal expense during the course of this litigation.

## JOINT AND SEVERAL LIABILITY

Massachusetts Defendants are jointly and severally liable. *O'Connor v. Raymark*, 401 Mass. 586 (1986) Particularly in this case they are liable because they acted in concert and caused harm at the same time in the same action.

## CONCLUSION

Based on the facts and points of law within the four corners of this complaint, the court must immediately grant the two preliminary injunctions and allow the remaining claims to be considered by a jury after discovery.

Respectfully submitted under the pains and penalties of perjury,

/s/ Dr. Shiva Ayyadurai

**Dr. Shiva Ayyadurai**
Plaintiff, *pro se*
701 Concord Ave,
Cambridge, MA 02138
Phone: 617-631-6874
Email: vashiva@vashiva.com