UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
DR. SHIVA AYYADURAI,            )
                                )
                                )         Civil Action
         Plaintiff,             )         No. 20-11889-MLW
                                )
v.                              )
                                )
WILLIAM FRANCIS GALVIN, in his  )
official capacity as the        )
Secretary of the Commonwealth   )
Of Massachusetts,               )
                                )
         Defendant.             )
                                )
```

BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE

MOTION HEARING

October 30, 2020
10:25 a.m.

John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    Counsel on behalf of Plaintiff:
      Pro Se
 3    Shiva Ayyadurai
      701 Concord Avenue
 4    Cambridge, MA 02101
      vashiva@vashiva.com
 5
      Counsel on behalf of Defendant:
 6    Adam Hornstine
      Anne L. Sterman
 7    Attorney General's Office
      18th Floor
 8    One Ashburton Place
      Boston, MA 02108
 9    617-963-2048
      adam.hornstine@mass.gov
10    anne.sterman@mass.gov

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1

2                               <u>INDEX</u>

3

4    WITNESS                                                    PAGE

5

     SHIVA AYYADURAI
6
         Examination By Mr. Hornstine                            32
7

8
     MICHELLE TASSINARI
9
         Examination By Ms. Sterman                              50
10       Examination By Mr. Ayyadurai                            58

11
     DEBRA O'MALLEY
12
         Examination By Ms. Sterman                              59
13       Examination By Mr. Ayyadurai                            74

14
     FURTHER EXAMINATION OF MICHELLE TASSINARI
15
         Examination By Mr. Ayyadurai                            76
16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S
 2            THE COURT:  Would the clerk please call the case.
 3            COURTROOM CLERK:  This is civil matter number
 4    20-11889, Dr. Shiva Ayyadurai v. William Francis Galvin.
 5            THE COURT:  Good morning.  Would the plaintiff and
 6    counsel for the defendant please identify themselves for the
 7    record.
 8            MR. AYYADURAI:  Yes, good morning, Your Honor.  This
 9    is Dr. Shiva Ayyadurai, also known as Dr. Shiva.  I'm the
10    plaintiff.
11            THE COURT:  Thank you.
12            MR. HORNSTINE:  Good morning, Your Honor.  Assistant
13    Attorney General Adam Hornstine on behalf of the defendant.
14            MS. STERMAN:  Good morning, Your Honor.  Assistant
15    Attorney General Anne Sterman, also on behalf of the defendant.
16            THE COURT:  And what bureau of the Attorney General's
17    Office are you in?
18            MR. HORNSTINE:  We are both from the government
19    bureau, Your Honor.
20            THE COURT:  The same bureau that represented the
21    defendants in the recent Baptiste case concerning the eviction
22    moratorium?
23            MR. HORNSTINE:  I believe so, yes, Your Honor.
24            THE COURT:  Is Ms. Greaney and Mr. Cray in the
25    government bureau?
```

```
 1              MR. HORNSTINE:  Yes, Your Honor.

 2              THE COURT:  And is Ms. O'Malley on the videoconference

 3    as ordered?

 4              MR. HORNSTINE:  Yes, Your Honor.  We have two

 5    representatives from the Secretary's Office here today.  Debra

 6    O'Malley and Michelle Tassinari.

 7              THE COURT:  Okay.  Thank you.

 8              Okay.  I apologize for starting now almost 30 minutes

 9    late, but this is a motion for a temporary restraining order.

10:27 10    There's particular urgency to it because it relates to the

11    election on November 3, several days from now.  And it is my

12    goal to decide this motion today, so I wanted to try to

13    organize my thoughts and questions.  And like many things, it

14    took me longer than I hoped.

15              I think at the outset it would be valuable to get some

16    clarification on the relief that's being sought because the

17    defendant's memo in opposition to the temporary restraining

18    order characterizes it differently than I understood it from

19    reading the plaintiff's memorandum.

10:28 20              Dr. Shiva, what relief are you seeking immediately and

21    eventually?  And more specifically, is it -- well, what relief

22    are you seeking?

23              MR. AYYADURAI:  Your Honor, I'm seeking relief to

24    enjoin Secretary Galvin from continuing to contact Twitter to

25    have me banned.  And I wanted to lay out a couple of points
```

1    here.

2         THE COURT:  Well, right now I just -- excuse me.

3    Everybody except the people who intend to speak for the parties

4    should be on mute.  So say that again, please, Doctor.

5         MR. AYYADURAI:  Yes, Your Honor.  I'm sorry.  My goal,

6    the intent of the restraining order is to enjoin Secretary

7    Galvin from contacting Twitter between now and the end of the

8    election, which is November 4th, to have them have me delete --

9    have them force to have me delete tweets and to ban me.

10:29 10        THE COURT:  Okay.  And this is what prompted the

11   question.  That's the way the defendant characterized the

12   relief you're seeking.  And the question I'm actually asking is

13   a little broader.  Are you seeking a permanent ban -- a

14   permanent injunction against the Secretary of State contacting

15   Twitter essentially about you, or are you just seeking an

16   injunction that would prohibit them from doing that until after

17   the election?

18        MR. AYYADURAI:  Until after the election, which is

19   November 4th, yes.  It's a temporary restraining order between

10:30 20   now and that period.  I'm not seeking something permanent

21   against them.

22        THE COURT:  Okay.  But in the case, as opposed to the

23   motion, are you seeking a permanent ban?  Because whether or

24   not -- well, are you seeking a permanent ban or essentially one

25   way or another will this case be over next week?

```
 1          MR. AYYADURAI:  Well, there is the injunction, Your
 2   Honor, which is for injunctive relief, which I'm coming here.
 3   The larger case is for the irreparable harm I've suffered
 4   during the time that I was banned by the Secretary of State's
 5   actions.
 6          THE COURT:  Well, there may be a bit of a problem with
 7   you representing yourself.  I understand you're an MIT
 8   professor, but do you have any legal training?
 9          MR. AYYADURAI:  No, Your Honor, I do not.  I'm
10   representing myself pro se, so I look to your guidance.
11          THE COURT:  Well, I'm not permitted to be your lawyer,
12   but I'm trying at this point to understand the questions.
13          Here is the point.  One, as I said in my order of I
14   think October 20, the Eleventh Amendment to the Constitution of
15   the Supreme Court has said, "bars suits for money damages
16   against state officials in Federal Court."  If you wanted money
17   damages, you might or might not be able to maintain a case in
18   Massachusetts courts but not in United States courts.
19          So I could make that ruling formal.  But are you
20   asking -- your complaint asks for money damages, I think $1.2
21   billion.  Are you still asking for money damages in the overall
22   case?
23          MR. AYYADURAI:  Your Honor, right now I believe we're
24   here for the temporary restraining order.
25          THE COURT:  But actually, you're here to answer my
```

10:31  (line 10)
10:32  (line 20)

1    questions.

2              MR. AYYADURAI:  Oh, okay.

3              THE COURT:  That won't get decided today.  We can put

4    it aside.  But I can tell you that I would be compelled to

5    decide against you in saying that you can't get money damages

6    in this case.

7              The question that will have importance after I rule on

8    the temporary restraining order is whether -- well, if I grant

9    the temporary restraining order, it can only run for 14 days,

10:33 10   and then in certain circumstances it may be extended.  But it

11   can't run for months or years while the case is being fully

12   developed and proceeds to trial.

13             So that's why I asked the question of whether, in this

14   case, not in the motion for temporary restraining order, the

15   overall case, you're seeking a permanent injunction which would

16   usually be proceeded by an effort to get a preliminary

17   injunction that would prohibit the Secretary of State from

18   communicating about you with Twitter beyond next week.

19             MR. AYYADURAI:  Are you asking me a question, Your

10:34 20   Honor?

21             THE COURT:  Yes.  I'm trying to understand what the

22   case is about.

23             MR. AYYADURAI:  Right.  So Your Honor, my focus has

24   been given what's going on between now and November 4th for the

25   temporary restraining order.  So for me, that is really the

 1    focus right now.

 2            Now, there's the larger case, which is about, you

 3    know, the irreparable harm that was done.  I had not sought

 4    beyond that, beyond the temporary restraining order to go get,

 5    you know, permanent injunction for the Secretary of State ever

 6    contacting Twitter again in the future.

 7            THE COURT:  All right.  Because this has some

 8    implications.  Okay.  That's helpful.  And we will go I guess

 9    one step at a time.

10:35  10            So this is a motion for a temporary restraining order.

11    Generally the parties recognize the standards.  They're the

12    same as the standards that apply for a preliminary injunction.

13    The plaintiff has to prove that he's entitled to a temporary

14    restraining order.  There are generally four elements.  The

15    most important, the essential element is the plaintiff has to

16    show a reasonable likelihood of succeeding on the merits of his

17    claim.  Then if he does that, he also has to show essentially

18    that there's an imminent threat of irreparable harm if the

19    request for the temporary restraining order is denied.

10:36  20            And the defendant doesn't address this at all in its

21    memoranda.  Perhaps that's because with regard to, when the

22    claim is a violation of the First Amendment, the Supreme Court

23    has found that a violation of the First Amendment even for a

24    minimal period of time unquestionably constitutes irreparable

25    harm or injury.  That's *Elrod v. Burns*, 427 U.S. 347, 373.

1           Then I would be required to consider the balance of

2     the hardships and whether an injunction would serve the public

3     interest.  But in addition, a temporary restraining order is an

4     equitable remedy, so I could consider if there was any

5     inequitable conduct in deciding whether to grant a remedy even

6     if the four conventional factors weighed in favor of granting

7     it.

8           So that's the framework I intend to employ in deciding

9     this issue.  But do the parties want to be heard on whether

10:38 10    those are the right questions?

11          MR. HORNSTINE:  No, Your Honor.

12          MR. AYYADURAI:  Same here, Judge.

13          THE COURT:  Okay.  All right.  Well, in a footnote to

14    the defendant's memorandum, the question is raised as to

15    whether service has been properly accomplished and whether the

16    court even has jurisdiction to decide the temporary restraining

17    order.  That argument was not developed in the memorandum.  As

18    the First Circuit, District Courts in Massachusetts, including

19    district judges in Massachusetts, including me, have found,

10:39 20    arguments raised in a perfunctory way are not -- are usually

21    deemed waived.  But this has had to go very fast.

22          Is it the defendant's position that the court doesn't

23    have jurisdiction to grant a temporary restraining order?

24          MR. HORNSTINE:  Yes, Your Honor, both because of the

25    Eleventh Amendment issue which is briefed and also the mootness

1    issue.  And plaintiff's recitation today as to what the precise

2    nature of the equitable relief he seeks may also create an

3    additional mootness problem, which is -- and perhaps the court

4    can clarify this through questions to the plaintiff.  It

5    appears as if he may be under a new Twitter suspension.  I

6    don't know how long that Twitter suspension would be lasting.

7    I may well be mistaken in this regard.

8           THE COURT:  Let me pause you for a moment.

9           MR. HORNSTINE:  I apologize.

10:40 10           THE COURT:  You don't have to apologize for this.  My

11    question may have been too general.  Do you argue that the

12    court lacks jurisdiction to grant a temporary restraining order

13    because service hasn't been accomplished in the way required by

14    Rule 4?

15           MR. HORNSTINE:  I apologize, Your Honor.  I was

16    jumping ahead.  The defendant's position is that the Secretary

17    has not been properly served in this case.  But inasmuch as the

18    court has ordered the defendant to appear and counsel to

19    appear, it has done so to address the motion.  My client has

10:41 20    not authorized me to accept service, although I had discussed

21    the matter briefly as indicated in our affidavit that was filed

22    yesterday.

23         So to the extent the court wants to talk about the

24    merits of the motion today, we can certainly do so and are

25    prepared to do so, but the defendant wants to make clear that

1   service of a summons within the meaning of Rule 4 has not yet

2   been accomplished.

3          THE COURT:  All right.  And we will go to the merits,

4   and I may expand on this when I decide the motion.  But for the

5   purposes of a temporary restraining order at least, but not

6   necessarily for a preliminary injunction, I believe that

7   service of process does not have to be properly accomplished.

8          Rule 65(b)(1), for example, allows a temporary

9   restraining order to be issued without any notice to the

10:42 10   defendant in limited circumstances, which implies that service

11   doesn't have to be accomplished properly for the court to have

12   the authority to grant a temporary restraining order, given the

13   urgent nature of such motions.  And there are a number of cases

14   to that effect I might cite later.

15          So I will hear the parties on the merits.  But Dr.

16   Shiva, you need to understand that if this case is going to go

17   on beyond the motion for temporary restraining order, you're

18   going to have to accomplish service in a way that is consistent

19   with Rule 4(j), which I pointed -- Federal Rule of Civil

10:43 20   Procedure 4(j), which I pointed out in my order to you.  Do you

21   understand that?

22          MR. AYYADURAI:  Yes.  Thank you, Your Honor.  I

23   understand.

24          THE COURT:  All right.  So I would like to hear the

25   plaintiff's argument, and I have a number of questions and a

1    number of questions for the defendant.

2         But as I understand it from the submissions, you

3    allege that Twitter ordered you to remove seven tweets and

4    suspended your account for 14 days, I thought it was several

5    weeks ago.  I don't know if the suspension is continuing.  And

6    this is something that the defendant is honing in on.

7    Defendant says the harm is not continuing, so either the case

8    is moot, there's no real controversy, or even that I lack

9    jurisdiction because of that.

10:44 10        So I'm curious to know, interested in knowing what

11   happened.  Is Twitter doing something to restrict your speech

12   on Twitter now?  Did they give you any explanation?  And

13   ordinarily I might ask you whether you swear some of these

14   things are true if you tell me something relevant.  But did

15   they give you any explanation for why they were removing your

16   tweets or suspending your account?  Did they offer any

17   alternatives?

18        Then I directed you -- and you don't have to start

19   with this, but to me -- and the government didn't raise the

10:45 20   point, I think missed the major case of significance in this, a

21   very important case, the First Amendment only bars the

22   government from restricting freedom of speech.

23        So it appears that Twitter ordinarily is a private

24   entity.  Unless there's a sufficient connection between what

25   the government did and what Twitter did, there can't be a First

1    Amendment violation.  And *Blum* is one case.  There are a number

2    of other cases that discuss what is a sufficiently close

3    connection.

4         So someplace in your presentation you want to tell me

5    what you allege and what you're prepared to testify under oath

6    the Secretary of State did, you know, what Twitter did and what

7    if anything Twitter told you about why they did what they did.

8    Go ahead.

9         MR. AYYADURAI:  Sure.  Thank you, Your Honor.

10:46  10        Your Honor, I believe we're here because I claim that

11   the Secretary of State is responsible, they're the primary

12   mover for Twitter's action.  And I want to thank Your Honor for

13   drawing our attention to *Blum v. Yaretsky*.  *Blum v. Yaretsky* is

14   most appropriate because the plaintiff -- there the plaintiff

15   sued the nursing home because he asserted that the nursing

16   home's action was state action.

17        In my case I have overwhelming evidence that Twitter's

18   action was directly Secretary Galvin's action, therefore

19   Secretary Galvin is the correct person to sue.  I'm not suing

10:47  20   Twitter.

21        In my case I've relied exactly on the same court

22   ruling, and I'm able to show that I can meet the standard that

23   the government encouraged the private actor to act.  Meaning

24   Twitter was a proxy for Secretary Galvin.  Twitter's action was

25   the government's action.  So the action of the private actor

1    became the action of the government.  Here, Your Honor, I would

2    wish to provide you some background of why Twitter acted as

3    Secretary Galvin's proxy.

4         THE COURT:  And what you're about to tell me -- here,

5    I have to decide the case based on evidence.  So if we weren't

6    going so fast, I would tell you you've got to put this in an

7    affidavit and be prepared to be cross-examined on it.  But do

8    you swear that what you're about to tell me is the truth, the

9    whole truth and nothing but the truth so help you God, as you

10:48 10   understand it?

11        MR. AYYADURAI:  Yes, Your Honor, as I understand it,

12   what I'm about to tell you is the truth and nothing but the

13   truth, swear to God.

14        THE COURT:  Go ahead.

15        MR. AYYADURAI:  Okay.  To give you some background,

16   Your Honor, for four years now all social media companies have

17   been under tremendous pressure to act against, quote-unquote,

18   "election misinformation."  This pressure has been unrelenting

19   from all sides, congress, states, politicians, Department of

10:48 20   Justice, the public and the press and public opinion.  In fact,

21   it never let up after the previous 2016 election.

22        In fact, just this week Massachusetts U.S. Senator

23   Markey demanded in the senate that Facebook and other social

24   media companies actively shut down voices that he deemed to be

25   pedaling, quote-unquote, "election misinformation."  Twitter, a

1  publicly traded corporation, is not immune from these strong

2  pressures.  And here in this case it received a strong

3  complaint from Secretary Galvin that claimed my tweets were,

4  quote-unquote, "election misinformation."

5        THE COURT:  Do you know what the words of the

6  communication were from Secretary Galvin's office to Twitter?

7  Because I didn't --

8        MR. AYYADURAI:  As I know, Your Honor, there was a --

9  when I tweeted out the tweets, which were banned, there was an

10:49 10  organization, there was a fact-checking organization which

11  contacted Ms. O'Malley, and that organization reported that she

12  had told them that I was putting out election misinformation.

13  And that's in one of the footnotes.  And that is a fact that

14  his office has confirmed by affidavit.

15        In fact, in the current climate one can imagine fewer

16  dog whistles more potent than the words "election

17  misinformation," which is what they used.  It was inevitable

18  and entirely predictable that Twitter would not ignore an

19  official complaint from the Massachusetts Secretary of State

10:50 20  that my Twitter feed spread, quote-unquote, "election

21  misinformation."  In my view, the evidence is overwhelming.

22        THE COURT:  Well, why is it -- I mean, if this case

23  goes on beyond the temporary restraining order, this is

24  information that's going to be highly relevant.  In other

25  words, does Twitter always sanction a speaker if a government

```
 1    agency says that the speaker is disseminating false information

 2    about an election, and is that known, what Twitter's practice

 3    is?

 4              MR. AYYADURAI:  Well, I think the -- what I'm

 5    asserting here, Your Honor, given the conditions, because of

 6    the immense pressure that Twitter is under, and this has been

 7    going on since 2016, on this area of election misinformation,

 8    especially the gravitas of the Office of the Secretary of State

 9    putting that forward, sending that to them is going to have

10    immense pressure on a publicly traded company.

11              THE COURT:  Do you know how -- and Ms. O'Malley is on

12    the call, and I intend to ask her these questions.  Do you know

13    how she communicated with Twitter?

14              MR. AYYADURAI:  I believe per her affidavit she

15    communicated to them electronically.

16              THE COURT:  But I wonder whether there's an email or a

17    post on a website.

18              MR. AYYADURAI:  Twitter has a form, Your Honor, where

19    you submit your complaint electronically to them.  I'm not

20    aware of her communicating through email but electronically

21    through the means that they provide.

22              THE COURT:  And do you know whether or not she

23    identified herself as somebody who works for the Secretary of

24    State in Massachusetts?

25              MR. AYYADURAI:  I believe she did, Your Honor.
```

1          THE COURT:  Okay.  She'll know.

2          MR. AYYADURAI:  Yes.  So to give you background, I've

3    been on Twitter for close to ten years.  And in my view the

4    evidence is overwhelming because I've been on Twitter for ten

5    years, and I've tweeted many controversial opinions on hot

6    button issues like election fraud, the pandemic mandatory mask

7    rules, mandatory vaccinations, and Twitter has allowed me to

8    exercise my freedom of expression without hindrance in those

9    ten years.

10:52 10          In fact, through most of September 2020, I did tweet

11   about election fraud in Massachusetts, between September 1

12   through September 25 in fact.  And Twitter had no objection.

13   All of those tweets are still public.  In fact, my specific

14   tweet on Massachusetts destroying ballot images is still

15   public.  It is vital to note that this tweet went viral all

16   over the world, and Twitter took no action to delete it or to

17   ban me for posting that tweet.

18          So which tweet did Twitter force me to delete for the

19   first time in ten years and then resulting in my banning for

10:53 20   multiple weeks?  There were four tweets that relate to

21   screenshots of an email conversation with Counsel Tassinari in

22   Secretary Galvin's office which documented that the Secretary's

23   Office claimed reliance on some as yet unspecified state law

24   justifying their office deleting ballot images that were

25   generated during a federal election.

1         The emails confirmed that the ballot images had indeed

2    been destroyed in violation of federal law.  This is why

3    Secretary Galvin moved to shut me down on Twitter and have

4    those tweets deleted.

5         As long as I made allegations and I was regarded in

6    their mind as, quote-unquote, "some loose cannon," Secretary

7    Galvin was least bothered about, quote-unquote, "election

8    misinformation" from my Twitter account.  It was the

9    documentary evidence in violation of federal law in those

10:54 10   emails that is the motive for Secretary Galvin's action.  This

11   is a central point of my argument, Your Honor.

12        Now, Your Honor, I referred to the main sentence in

13   *Blum v. Yaretsky* that you kindly quoted in your order which

14   says, quote, "A state normally can be held for a private

15   decision only when it has exercised coercive power or has

16   provided such significant encouragement that the choice must in

17   law be deemed to be that of the state," end quote.

18        In my case here the evidence is clear that Twitter's

19   actions were the Secretary's actions.  The specific deleted

10:54 20   tweets are intimately linked to violation of federal law by

21   Secretary Galvin and nothing else.  Election misinformation --

22        THE COURT:  Let me pause you for a moment.

23        MR. AYYADURAI:  Yes, Your Honor.

24        THE COURT:  As I pointed out to you, the fact that

25   you're representing yourself means I have to liberally construe

1   your allegations but not relieve you of the obligations of the

2   rules.  So where in the record -- perhaps it's in the verified

3   complaint -- do I find these four tweets?

4         MR. AYYADURAI:  I do not believe they're in the

5   verified complaint, Your Honor.

6         THE COURT:  Are they in evidence before me?  Have they

7   been submitted to the court?

8         MR. AYYADURAI:  I'm sorry.  I think they are -- I'm

9   sorry.  The actual tweets aren't there, but the description of

10:55 10  those tweets are there in the verified complaint.  Where I

11   shared that, I shared the email conversation between myself and

12   Counsel Tassinari.

13         THE COURT:  Hold on a second.

14         MR. AYYADURAI:  Yes, there are four email screenshots.

15         THE COURT:  I know, I've seen them in the materials

16   I've been reading.  I don't see it in the complaint.  Is at

17   least one of them in the defendant's memo, Mr. Hornstine?

18         MR. HORNSTINE:  That's correct, Your Honor.  If the

19   court wishes, there is a screenshot of not four tweets but a

10:57 20  singular tweet that the Secretary reported to Twitter.  It is

21   contained in I think both of the witnesses' affidavits.  I'm

22   double-checking to see if it's in our memorandum as well.

23         THE COURT:  It doesn't matter.  I've got the

24   affidavit.  Thank you.  Let me get it.

25         MR. HORNSTINE:  If you're looking at Ms. Tassinari's

1    affidavit, it appears in paragraph 8.  If you're looking at

2    Ms. O'Malley's, it is paragraph 3.

3         THE COURT:  So this is paragraph 8 of docket 15-2.

4    Paragraph 8 says, Ms. Tassinari's affidavit, "On September 24,

5    2020, Ayyadurai tweeted this false claim," then it has a

6    screenshot of a tweet.  "Breaking:  Massachusetts destroys over

7    one million ballots in U.S. senate primary race, committing

8    #ElectionFraud.  Mass. elections attorney confirms to

9    #Shiva4Senate ballot images - used for counting votes - that

10:58 10  must be saved by federal law for 22 months are nowhere to be

11   found!"

12        So the evidence I have, Doctor, is that -- and you'll

13   get a chance to test this if the case goes on -- that there was

14   a complaint about this tweet.  I think that's the defendant's

15   position.  But anyway, why don't you go ahead.  So you say

16   there were four?

17        MR. AYYADURAI:  Yes, Your Honor.  The defendant has

18   left out -- there are a series of four emails, and she has left

19   out -- the defendant, Counsel Tassinari, has left out the

10:59 20  fourth email where I write back to her saying, you know, please

21   show me the statute again, and you've actually violated federal

22   law.  We have them.  We can submit them.  But there were four

23   emails.

24        Those four screenshots were said in what's called a

25   threaded tweet, and it is that tweet that Twitter had me delete

1    and resulted in my banning.  In fact, what's interesting is

2    they did not --

3              THE COURT:  Here, stop for just a moment.

4              MR. AYYADURAI:  Sure.

5              THE COURT:  And I don't tweet, so you should not

6    assume that I understand what everybody else understands.  I

7    have an account and I get some tweets.  I don't often read

8    them, and I've never sent a tweet.

9              What did you say, "threaded tweets"?

11:00 10         MR. AYYADURAI:  Yes.  Basically it's a tweet where you

11   can have multiple tweets together.  So if you're talking about

12   a subject, you can connect them.  So it's essentially four

13   tweets, but they're under -- they're one after the other.

14             THE COURT:  So it's like a chain of emails?

15             MR. AYYADURAI:  Yes, exactly, like a chain of emails,

16   but they're considered four independent tweets interconnected.

17             THE COURT:  And what is the fourth one?

18             MR. AYYADURAI:  The fourth tweet is the one that I

19   sent back.  So the first tweet that Ms. Tassinari sent me was,

11:00 20   We are prohibited from saving ballot images.  That's

21   paraphrasing it.  I wrote back, What is the Massachusetts

22   statute or law?  Then she writes back, if you see the one that

23   she gave, that, Again, we don't have to save -- ballot images

24   are not stored.  We only save the paper.

25             And then the fourth email I sent back to them is, You

1    violated federal law, that you have to save these ballot

2    images, and that tweet is missing.  Those four screenshots I

3    shared on Twitter.

4         Those were the screenshots, those were the four tweets

5    that Twitter had me delete.  They did not have me delete the

6    one that you're seeing right there.  That's what's important.

7    That was sent on the 24th, 25th I believe.  It was only these

8    tweets where I'm exposing the Secretary of State violating

9    federal law.  That's what Secretary Galvin had deleted, and the

11:01 10   specific deleted tweets are intimately linked to violation of

11   federal law by the Secretary of State.

12        And election misinformation in my view is a dog

13   whistle that the Secretary used to significantly induce Twitter

14   in the present political climate to do his bidding.  And this

15   is why, unlike *Blum*, I correctly identified Secretary Galvin as

16   a sole defendant.  Because for Secretary Galvin to deny all

17   responsibility for a sequence of events that have taken place

18   is consciously dishonest.

19        He knew full well that as the elections officer for

11:02 20   the State of Massachusetts, while we are in a heated election

21   cycle, his complaint would carry enormous weight, and it did

22   carry enormous weight.  Twitter's response was immediate.  They

23   forced me to delete those four tweets of that email

24   conversation with Ms. Tassinari.

25        They didn't force me to delete that other tweet.  And

1   they banned me for weeks in the midst of my campaign and forced

2   me to delete any tweets specifically referring to that email

3   conversation.

4        So Secretary Galvin's attempt to deny responsibility

5   also violates U.S. Supreme Court's doctrine of cat's paw

6   liability, which I understand was accepted by the Supreme Court

7   in *Staub v. Proctor*, where one person can be responsible for

8   another person's action.

9        Now, the defendant may assert that cat's paw is

11:03 10   applied mainly in the employment context, but it perfectly

11   describes this action here.  Secretary of State Galvin induced

12   Twitter using the infamatur of his office which neither affiant

13   denies to be his cat's paw.

14        Secretary Galvin is consciously making a cat's paw

15   defense by essentially saying, It wasn't me; it was Twitter

16   that blocked the candidate in the midst of his campaign.

17   Twitter had never and would never have suspended plaintiff for

18   a Secretary of State making an official complaint.  In fact,

19   Twitter has no interest in blocking public access to one

11:03 20   particular email conversation.

21        Finally, the official spokesperson and legal counsel

22   represent the official view of the office of -- meaning

23   Secretary Galvin was actively involved in that decision, and as

24   the saying goes, the buck stops at his desk.  So that's one of

25   the first points I want to make in my argument.

1          The second point I would like to address is Secretary

2     Galvin has claimed he engaged in government speech when he

3     complained to Twitter.  In the United States, government speech

4     does not trump political speech during an election campaign.

5          Both affiants swear that they indeed did inform

6     Twitter about plaintiff's tweets were inaccurate, even though

7     the Supreme Judicial Court has ruled that a candidate's speech

8     is allowed to be inaccurate.  Whether they are accurate or

9     inaccurate is irrelevant.  Punishing candidates for inaccurate

11:04 10   claims during a campaign is what is unconstitutional.

11          As I understand, I'm not a lawyer, but from my

12    reading, there's no difference between the defendant's action

13    and charging a candidate under the law that the Supreme

14    Judicial Court invalidated in *Commonwealth v. Melissa Lucas*.

15          THE COURT:  Well, stop.  Your claims, as I've

16    understood the complaint, are under the United States

17    Constitution, not under the Massachusetts Constitution.  So

18    this needs to be analyzed as a matter of First Amendment

19    jurisprudence.

11:05 20        But if you're reasonably likely to succeed on the *Blum*

21    point that Twitter's action and the facts likely to be proven

22    in this case were state action, then your speech was political

23    speech.  It's protected by the First Amendment and -- I believe

24    the defendants will address this -- subject to strict scrutiny.

25    The government would have to show it had a compelling interest

1    and that this was narrowly tailored, basically the only way to

2    satisfy that interest.  That's why I pointed to *Blum,* there's a

3    line of cases deriving from *Blum,* because I do think that's the

4    heart of the issue at the moment.

5         And then the question also, I'll be discussing this

6    with Mr. Hornstine, there's a question of mootness, although I

7    think the government is mistaken as to who has the burden of

8    proof that this won't recur and evade review, which is why I

9    pointed out *Already* to you.  So anyway, you can keep going.

11:07 10      MR. AYYADURAI:  Yes.  Finalizing on this point, Your

11   Honor, I believe interfering in a candidate's ability to

12   campaign in retaliation for the content of his tweet is

13   specifically prohibited by the U.S. Constitution.

14        THE COURT:  Are you being restricted in any way now?

15   Are you under any suspension now?

16        MR. AYYADURAI:  Well, Your Honor, what happened was

17   any time -- so I got off suspension.  Any time I referred to

18   those emails, the Tassinari emails, anything related to that I

19   got suspended again.  And that is why I'm concerned --

11:07 20      THE COURT:  Suspended or deleted?

21        MR. AYYADURAI:  Forced to delete, forced to delete

22   them and suspended.

23        THE COURT:  Okay.  Now, I see your email says you

24   invented the internet.  I didn't.

25        MR. AYYADURAI:  I invented the first email system.

```
 1          THE COURT:  I didn't.  So I'm trying to understand the
 2    distinction between being required to delete a tweet and being
 3    suspended.  I thought, perhaps mistakenly, that you were
 4    ordered to delete -- I thought it was seven tweets, according
 5    to your complaint, and that you were suspended for 14 days, and
 6    I thought that meant you couldn't send any tweets for 14 days.
 7    Did I understand that right?
 8          MR. AYYADURAI:  Yes.  The distinction is Twitter -- if
 9    there's a tweet, the tweets that they have, you have to remove
10    them, and they give you a suspension for a certain number of
11    days.  They do both, Your Honor.  So they force you to remove
12    them and they suspend you.
13          THE COURT:  Then you can't -- if you're suspended, is
14    it your position that you're not permitted to send any tweet?
15          MR. AYYADURAI:  Any tweets at all.
16          THE COURT:  So you couldn't tweet, "I'm really
17    disappointed the Patriots lost last weekend."
18          MR. AYYADURAI:  Anything.  And there was only 39 days,
19    when this occurred, left in the election, and I use Twitter as
20    my main medium.  And I have a quarter of a million followers.
21    My prospective voters are on it.  People from Massachusetts
22    watch my tweets.  So this has been very, very hampering.  And
23    I've been tweeting for ten years.  I've built my audience very,
24    very carefully.
25          THE COURT:  All right.  But are you today suspended
```

1    from tweeting?

2              MR. AYYADURAI:  Yes.

3              THE COURT:  Okay, so you are.

4              MR. AYYADURAI:  Yes.  And it just happened, because I

5    was unsuspended, and then we had various rallies which I was

6    tweeting.  Then right when I referred to that email

7    conversation, again I was suspended.  So this is ongoing.

8              THE COURT:  For how long are you suspended now?

9              MR. AYYADURAI:  I believe it's for another two days.

11:10 10   But none of the other tweets got flagged or removed.  It's only

11   when I refer to those email conversations, Your Honor.

12             THE COURT:  So it's your contention under oath that

13   it's only when you refer to your criticism of the Secretary of

14   State for allegedly acting illegally that Twitter requires that

15   you delete that tweet and then suspends you for some period of

16   time?

17             MR. AYYADURAI:  Yes.

18             THE COURT:  You say there were two more days left on

19   the current suspension.  When did that one start?

11:10 20             MR. AYYADURAI:  About three days ago.

21             THE COURT:  So this is a five-day suspension?

22             MR. AYYADURAI:  Yeah, I believe that to be true, yeah.

23             THE COURT:  How long was the first one?

24             MR. AYYADURAI:  Well, the first one they did was seven

25   days and another seven days.  So about 14 days, a little bit

1     over 14 days.  14.5 hours -- 14.5 days, to be exact.

2              THE COURT:  It was seven days, and then did something

3     cause them to add another seven days?

4              MR. AYYADURAI:  Yes.  So the first time I did it was

5     for the four tweets.  Then when I got off Twitter I again

6     referred to those emails, and I was talking about the violation

7     of federal law, and again, bam, I was banned again.  So it's

8     reference to those emails, reference to the violation of

9     federal law by the Secretary of State.  This is ten years,

11:11 10   30,000 tweets, I've never been thrown off Twitter but by this.

11             So getting back to the issue of government speech,

12    government official being blocked from interfering in a

13    campaign simply because he claims a candidate made an

14    inaccurate statement is not, quote-unquote, "stifling

15    government speech," as the defendant has asserted in their

16    opposition.

17             And as I understand, people are allowed to make

18    inaccurate and even completely false statements during a

19    political campaign as one of many in a marketplace of ideas.

11:12 20   And a government official cannot be refereeing what is accurate

21    or inaccurate political speech of a candidate.  As I understand

22    it, it's simply against the law.

23             And this is in addition to the fact that the tweets

24    that Secretary Galvin claimed were a threat to voters displayed

25    emails from Counsel Tassinari that documented the office's

 1    conscious violation of federal law.  Quote-unquote, "government

 2    speech" may not serve as a convenient pretext for shutting down

 3    political speech on matters of great public concern.

 4    Furthermore, no amount of support from the, quote-unquote,

 5    "intelligence community" that the opposition refers to can

 6    overcome this point of law.

 7            And the third point I would like to make is the

 8    opposition declaring Eleventh Amendment immunity bars all of my

 9    claims.  This case falls squarely under the *Ex Parte Young*

11:13 10   exception to Eleventh Amendment immunity.  And I'd like to

11    explain this.  This emergency motion for prospective injunctive

12    relief, meaning in the future, names a state official in his

13    official capacity.  The relief sought here is for protection

14    from specific actions in the future by a state official.  The

15    defendant's opposition is absolutely incorrect and

16    mischaracterizing the motion for TRO as dealing only with past

17    action.

18            Eleventh Amendment immunity does not apply to this

19    motion, and it is properly within the jurisdiction of this

11:13 20   court.  It is a live controversy, as Election Day is still a

21    week away from now, and it must not be dismissed as moot, which

22    distinguishes from the *Already v. Nike* case.

23            Your Honor, after the initial suspension of 14 days,

24    Twitter allowed me to post election fraud, no problem, but the

25    minute I again mention the emails from Galvin's office, bam,

1    again I was forced to delete that tweet again.

2            It is assured, Your Honor, that between now and

3    November 3 that Secretary Galvin will have Twitter silence my

4    speech, specifically, I repeat, specifically regarding emails

5    from his office that document his violation of federal law.

6            So yes, his behavior is both ongoing and assured to

7    reoccur.  And given the election is not over, the future is

8    still in play.  Defendant Galvin can still call Twitter and

9    have me muted until Election Day.  That's why the TRO must be

11:14 10   issued today.  I've already suffered irreparable harm during

11   this election campaign.  I should not be forced to suffer

12   further harm from Secretary Galvin's unconstitutional action

13   and will cause him absolutely no harm.

14            THE COURT:  Okay.

15            MR. AYYADURAI:  I'm sorry, Your Honor.

16            THE COURT:  That's okay.  Go ahead.  Why don't you

17   finish.  And I'm going to give Mr. Hornstine an opportunity to

18   question you, cross-examine you if he wants.  He doesn't have

19   to.  But there may be some questions that I didn't think to ask

11:15 20   that the defendant thinks will be helpful.  Go ahead.

21            MR. AYYADURAI:  So on this matter, Eleventh Amendment

22   immunity, I respectfully submit that Secretary Galvin has

23   deliberately chosen to muddy the picture by dragging in the

24   monetary claims.  The court must not be distracted from this in

25   making its decision on the TRO.

1          And I have a minor -- and the last point I want to

2     make, Your Honor, in closing, is the evidence is overwhelming

3     that Secretary Galvin strongly encouraged Twitter to mute me

4     solely because I revealed official email documents from his own

5     legal counsel that showed his office violated federal law.

6     This was not, quote-unquote, "election misinformation" or

7     hyperbole or fiction.  The evidence is clear he will do it

8     again if the court does not stop him.

9          I strongly urge the court to issue this injunction

11:16 10     today.  And furthermore, there's zero harm to Secretary Galvin

11     being enjoined from muting my speech on Twitter for a total now

12     of a remaining four days.  Thank you, Your Honor.  I'm

13     available for any clarifications.

14          THE COURT:  All right.  And Mr. Hornstine, are there

15     any questions relating to some of these factual assertions that

16     you would like to ask Dr. Shiva about?

17          MR. HORNSTINE:  If it pleases the court, yes, I would

18     like to ask a few follow-up questions.

19          THE COURT:  Go ahead.

11:16 20               EXAMINATION OF SHIVA AYYADURAI

21     EXAMINATION BY MR. HORNSTINE:

22     Q.   So let me begin by asking this:  Have you ever looked at

23     Twitter's Terms of Use Agreement?

24     A.   Not their entire one, but I've looked at parts of it.

25     Q.   Are you aware that Twitter requires users to agree to

certain terms of use and to abide by certain policies as a

condition of participating on that social media platform?

A.    Yes.

Q.    Are you aware that as part of these terms of use that

Twitter, the company, has a specific policy on civic integrity,

as they call it?

A.    Something in there, but I'm not exactly aware of the exact

term.

Q.    So you've never read the civic integrity policy of

11:17 10  Twitter, have you?

A.    I may have seen it, but I don't remember it exactly.

Q.    Are you aware whether or not the policy provides that

users cannot use Twitter's services for the purpose of

manipulating or interfering in elections or other civic

processes?

A.    That may be true.

        THE COURT:  We may want -- actually, I'll let you do

this.  Go ahead.

        MR. HORNSTINE:  Okay.  Very well.  Thank you, Your

11:18 20  Honor.  I'll try to keep this brief at least.

        THE COURT:  If I think you're wasting time, I'll tell

you.

        MR. HORNSTINE:  Thank you, Your Honor.

BY MR. HORNSTINE:

Q.    Are you aware that as part of its civil -- as part of its

1   civic integrity policy and also as its general terms of use

2   that Twitter reserves the right to discipline users, for lack

3   of a better word, for violating these terms of use?

4   A.   That may be true.

5   Q.   Okay.  Are you aware that Twitter can delete tweets that

6   it deems in violation of its terms of use?

7   A.   I wasn't sure about that.  I didn't know about that.

8   Q.   Are you aware that Twitter can suspend users for violation

9   of policies or terms of use?

11:18 10   A.   That's possible.

11   Q.   And are you aware that Twitter can also label tweets as

12   false or misleading for violations of terms of use or its civic

13   integrity policy?

14   A.   That may be possible.

15   Q.   And you understand that the sanctions are imposed by

16   Twitter itself, correct?

17   A.   This was induced by the Secretary of State.

18   Q.   That's not what I'm asking, sir.  What I'm asking is this.

19   Are you aware that any sanctions imposed by Twitter, that that

11:19 20   is Twitter's decision to make, not anyone else's decision to

21   make?

22   A.   Well, that's not completely true.

23   Q.   So you disagree with that assessment?

24   A.   Yes.

25   Q.   And what do you base that disagreement on, sir?

A.   Well, as I shared in my presentation on the merits, that
in this situation, there's an enormous -- Twitter is a publicly
traded company.  A publicly traded company's stock prices
affect them significantly in the stock market.

So given the preponderance of pressure on Twitter to watch
out for election information, the gravitas of the Secretary of
State contacting them is what induced them to do this.

Q.   Have you personally observed any communication between the
Secretary's Office and Twitter concerning its decision to
suspend or sanction you?

A.   I would -- no, I have not, except what has been reported.

Q.   Have you ever witnessed anyone from the Secretary's Office
coerce Twitter to suspend or sanction you from your use of
Twitter?

A.   We have reports as is reported in that article and
multiply in the A.P. and Reuters that the Secretary of State's
Office contacted Twitter.

Q.   That's not what I'm asking.  Let me ask a more clear
question.  I'm not asking what news reports you've read.  I'm
asking have you personally ever witnessed anyone from the
Secretary's Office coerce Twitter to suspend or otherwise
sanction you?

A.   Can you define "witnessed"?  I don't understand what you
mean "witnessed."

Q.   That you observed with your own five senses, that you

                1   personally saw.  Not someone else's report.  Your own.

                2   A.    I don't know how I would witness that.  I'm not in the

                3   Secretary of State's physical office.

                4   Q.    So then you have not witnessed that.  Is that fair to say?

                5   A.    The report said they did it.

                6   Q.    So what you are basing your complaint on is then reports,

                7   not personal observations; is that correct?

                8   A.    It was confirmed in the affidavit that was submitted that

                9   they did contact Twitter.

    11:21   10   Q.    Okay.  So you have no idea personally what the content of

               11   the report that the Secretary's Office made to Twitter was.  Is

               12   that fair to say?

               13   A.    No.  We do have information.  They describe my tweets as,

               14   unquote-unquote, "election misinformation."

               15   Q.    Have you ever seen the report that the Secretary made to

               16   Twitter --

               17   A.    No.

               18   Q.    -- about your September 24 tweet?

               19   A.    Have I ever actually seen their communication?  Is that

    11:22   20   what you're asking me?

               21   Q.    That's correct.

               22   A.    No.  We have reports of it, though.

               23   Q.    Have you ever seen it?

               24   A.    Well, I've seen the affidavit that they just submitted,

               25   which they confirm that they contacted Twitter.

1          THE COURT:  Here.  This is getting a little

2     repetitious.  The affidavit -- and I intend to ask about

3     this -- doesn't provide the content of what was communicated.

4          I'm looking at Ms. O'Malley's affidavit, and she says

5     in Paragraph 5, "Attorney Tassinari asked me to report Mr.

6     Ayyadurai's tweet as false using the mechanism within Twitter

7     for reporting tweets that violate the terms and conditions of

8     that platform."

9          Paragraph 6.  "Per Attorney Tassinari's request, I

11:22 10   submitted a report of Ayyadurai's false tweet online through

11    the Twitter platform."

12         Paragraph 7.  "In response I received what appeared to

13    be an automated email response informing me that Twitter would

14    investigate my report and contact me if they needed additional

15    information."

16         Paragraph 8.  "I received no further communication

17    from Twitter."

18         So this tells us there's a report.  Is there another

19    document that you believe indicates what the content of that

11:23 20   report was?

21         MR. AYYADURAI:  I'm not sure how discovery works and

22    I'm not a lawyer, but literally within moments, it was

23    immediate and swift that I was asked to remove the four

24    particular email screenshots, tweets of my communication with

25    Ms. Tassinari where I exposed that the Secretary of State was

1    violating federal law.  That was the immediate result.  And

2    I've never been banned, to the best of my knowledge.

3              THE COURT:  I don't want to hear the argument.

4    Mr. Hornstine, why don't you resume if you want.

5              MR. HORNSTINE:  Thank you, Your Honor.

6    BY MR. HORNSTINE:

7    Q.    As a frequent Twitter user, are you aware that any Twitter

8    user can make a complaint about any other tweet on the social

9    media platform?

11:24 10   A.    That's -- yes, that's possible, yeah.

11   Q.    So is it possible then that people other than the

12   Secretary's Office lodged complaints about your tweets?

13   A.    That could be possible.

14   Q.    Okay.  Let me ask about the chronology for suspensions.

15   So you were initially suspended on September 26 of 2020; is

16   that correct?

17   A.    It may have been in the morning, because when I woke up is

18   when I saw it, I think around 8:00 or 9:00 a.m.

19   Q.    So we can say on or about September 26 is when you were

11:25 20   initially suspended by Twitter; is that correct?

21   A.    Yes.

22   Q.    And this first suspension you claim was a direct result of

23   the Secretary's report to Twitter.  Is that your contention?

24   A.    It was not a claim.  It is a fact because that's the four

25   tweets that came up to be removed.  It's not a contention.

1   It's fact.

2   Q.   Okay.  But you just said that other people may have lodged

3   complaints with Twitter about your tweets; is that correct?

4   A.   Well, you said that.

5   Q.   You agreed that it was possible, did you not?

6   A.   Not in reference to this.

7   Q.   Okay.  But you have since been suspended additional times

8   by Twitter; is that correct?

9   A.   It was right after that that it was -- the actual state of

11:25 10  events was that after those four tweets, immediately after

11   that, when I tried to log in, then another three tweets

12   referring to those emails were also suspended for seven days.

13   It was contiguous.

14   Q.   Let me ask a clarifying question.  So you were initially

15   suspended around September 26; is that correct?

16   A.   Yes.

17   Q.   And then when did your second suspension begin?

18   A.   So that was for a half a day.  And immediately when I

19   logged in, they then suspended me for another three tweets

11:26 20  which are in reference to these emails where I was talking

21   about the Secretary of State violating federal law.

22   Q.   You're only familiar with one complaint that the Secretary

23   made to Twitter; is that correct?

24   A.   Well, that one complaint has to do with those four emails,

25   and the other three tweets are related to those four emails.

```
 1    Q.   So your initial suspension -- excuse me.  Let me strike
 2    that question.  Looking at your Twitter account, I see no
 3    tweets that you made between September 26 and September 3; is
 4    that correct?
 5    A.   September 3?  That's going backward in time.
 6    Q.   October 3.  I apologize, sir.
 7    A.   Yeah.  So that's when I was suspended for about seven
 8    days.
 9    Q.   Then you were suspended again -- or excuse me.  I see no
11:27 10  tweets on your account between October 6 and October 15; is
11    that correct?
12    A.   Exactly.  That was the second suspension.
13    Q.   Okay.  And are you aware of any second instance in which
14    the Secretary's Office made a complaint relating to your
15    tweets?
16    A.   Well, this is all related to any time the reference is
17    made to Secretary of State and those email conversations.
18    Because when I started --
19    Q.   Sir, that's not my question --
11:27 20       THE COURT:  I think the answer -- I'll give you a
21    chance later perhaps to argue this.  But do you -- the question
22    is are you aware that the Secretary of State communicated with
23    Twitter a second time about you, or is it your contention that
24    the first one has enduring effect?
25            MR. AYYADURAI:  That is my contention, Your Honor.
```

1   Because of the gravitas of the office, given the pressure that

2   Twitter is under, if the Secretary of State with bare gravitas

3   calls them and uses a dog whistle of election misinformation,

4   this is basically branding you.  And that's what the Secretary

5   of State did with their office's gravitas.  This is no light

6   matter.  I've been on Twitter for ten years.

7          THE COURT:  I understand.  I have that point.  That's

8   not the question.  Listen to the questions, listen to the

9   questions, say what's necessary to answer the question fully.

11:28 10   Don't add anything at this point.

11          MR. AYYADURAI:  Thank you, Your Honor.

12          THE COURT:  Go ahead, Mr. Hornstine, if you have more.

13          MR. HORNSTINE:  Thank you, Your Honor.  So just a few

14   more questions about the chronology.

15   BY MR. HORNSTINE:

16   Q.   So again, to tie it back, you had another suspension which

17   ended around October 15; is that correct?

18   A.   Yes.

19   Q.   And I see that your last tweet on Twitter was on or about

11:28 20   October 25; is that correct?

21   A.   That's correct, yes.

22   Q.   Okay.  And you have not tweeted since then; is that

23   correct?

24   A.   Yes.

25   Q.   And you believe that you are currently under a new

```
 1    suspension for Twitter, and my math may be wrong here, so
 2    correct me if I'm wrong, that would lapse on or about Election
 3    Day; is that correct?
 4    A.   From my understanding, it should be around Saturday or
 5    Sunday.
 6    Q.   Saturday or Sunday?
 7    A.   Yes.
 8    Q.   Okay.  And are you aware whether or not, one way or the
 9    other, the Secretary's Office has made additional complaints
11:29 10    about any of your tweets during the month of October?
11    A.   I am not aware, but the two tweets that resulted in the
12    second suspension again referred back to those emails.
13              MR. HORNSTINE:  If I may just have one moment, Your
14    Honor.  Let me look through my notes.  I think Your Honor
15    covered most of the rest of it.
16              THE COURT:  Thank you.
17              MR. HORNSTINE:  I think I have nothing further, Your
18    Honor.  Thank you for the opportunity.
19              THE COURT:  Okay.  Why don't we turn to the
11:30 20    defendant's argument then.  You raised a threshold issue in
21    your memorandum claiming that -- it's on page 10, "Plaintiff's
22    section 1983 claim is barred because the Secretary is not a
23    person who may be sued under 1983."  You cite, among other
24    things, footnote 10 of *Will*, 491 U.S. 58, 71, note 10.  Is that
25    one of your contentions?  Did I read it right?
```

```
 1            MR. HORNSTINE:  I'm pulling up the motion.  But yes,
 2    it is correct to -- this largely dovetails with the Eleventh
 3    Amendment piece.  And again, perhaps Your Honor's question at
 4    the outset about what relief is being sought is clarifying.
 5    Since there are limitations on the ability, as Your Honor is
 6    well aware, of plaintiff to sue an elected official in his
 7    official capacity --
 8            THE COURT:  Well, I am aware of Will, and this is part
 9    of the reason I asked whether you were in the government
11:31 10    bureau, because I think you've argued Will exactly wrong.
11            I'll listen to you.  But footnote -- I mean, I just
12    finished two months of litigation and wrote a 102-page decision
13    in Baptiste v. the Governor and Secretary of Housing and
14    Economic Affairs.
15            The government bureau didn't take the position that
16    there couldn't be a suit for prospective injunctive relief
17    because it was barred by Will.  I don't think that was an
18    oversight.  You can argue about whether there's any ongoing
19    harm, whether it's going to recur, whether the declaratory
11:32 20    judgment would be sufficient and I shouldn't issue an
21    injunction.  But I'm just reading this, it's a one-paragraph
22    argument, but it's the substantive argument you made before the
23    others.  If you're right, we can go home pretty soon, but I
24    don't think you're right.  So why don't you tell me why you
25    wrote that.
```

```
          1              MR. HORNSTINE:  Yes, Your Honor.  Does the court wish
          2     that I should address the Eleventh Amendment issue separately?
          3              THE COURT:  Not -- you'll get a chance to do that
          4     separately.  But I don't see a reference here -- well, there is
          5     the Eleventh Amendment in the last sentence.  But I mean, Will
          6     states in footnote 10 -- the question is whether -- so section
          7     93 provides a remedy, it doesn't provide any rights, you
          8     explain that, and a remedy against a person who violates the
          9     statutes or laws of the United States.
11:33    10              And footnote 10 says, "Of course a state official in
         11     his or her official capacity, when sued for injunctive relief,
         12     would be a person under 1983 because official capacity actions
         13     for prospective relief are not treated as actions against the
         14     state, not barred by the Eleventh Amendment."  So I don't
         15     understand why I got this argument in this case and didn't get
         16     it in Baptiste, except that it's not right.
         17              MR. HORNSTINE:  I understand, Your Honor.  Again, as I
         18     said a moment ago, I think Your Honor's question about the
         19     precise relief being sought is clarifying to this argument.
11:34    20     And I'm happy to step away from this argument.  Again, it was
         21     again clear -- or unclear at least at the outset as to whether
         22     or not the plaintiff, who again is proceeding pro se, is
         23     attempting to seek damages against defendant in his official
         24     capacity.
         25              THE COURT:  But that's a different issue.  I cited you
```

        1    the case October 20, *Quern*.

        2              MR. HORNSTINE:  Correct, the *Quern* case.

        3              THE COURT:  It's clearly barred, but that's not what

        4    you're discussing here.  You're making a different argument

        5    here.

        6              MR. HORNSTINE:  I agree, but it primarily proceeds

        7    from the damages piece, and I'm happy to move on.

        8              THE COURT:  It doesn't say that.  You're happy to move

        9    on.  Frankly, I'm not.  You represent the government.  You

11:35  10    should always be accurately describing the law.  But here

       11    you've got a pro se litigant on the other side.  And, you know,

       12    we're talking about the nuances of constitutional law, and the

       13    case is going very quickly.

       14              And, you know, this is not the only case I have.  I've

       15    been dealing for the last couple of days with an MS-13 murder

       16    case.  But this is consequential.  We're talking about

       17    fundamental constitutional law a couple of days before an

       18    election.  So I expect that if the Attorney General is going to

       19    give me a brief, I'm going to take it seriously.  But I was

11:36  20    surprised to see this argument because it's not an argument

       21    that your bureau of your office has made to me before as

       22    recently as in the last two months in another suit against a

       23    cabinet secretary and the governor.  And I've been spending

       24    time trying to think if I've misunderstood *Will*.  I don't think

       25    I did.

1       But, anyway.  Because I mean, you also didn't deal

2   with the fundamental -- what to me, I pointed out to you, is

3   the fundamental issue in this case.  Of course private conduct

4   is not governed by the First Amendment, but the question is

5   whether what Twitter did can fairly be -- was most

6   appropriately characterized probably at the outcome of this

7   case as government conduct.  That's the *Blum* line of cases.

8   Were you aware of *Blum* before I cited it to you yesterday?

9       MR. HORNSTINE:  I'm aware of the line of cases, yes,

11:37 10   Your Honor.  And we attempted to address it again, with

11   apologies for perhaps moving too quickly and too inartfully,

12   the idea that plaintiff overlooked the critical fact that the

13   Secretary could not indeed, is not empowered to suspend anybody

14   under Twitter.  And I'd be happy to more directly address the

15   *Blum* case and to talk about what the --

16       THE COURT:  I want you to.  That's why I pointed it

17   out in my order yesterday.  But you didn't address at all in

18   this memorandum the circumstances in which conduct by a private

19   party is state action for, in this case, First Amendment

11:38 20   purposes.

21       So I know we're on a motion for a temporary

22   restraining order.  We're all going fast.  But on October 20, I

23   issued an order saying that the defendant should be prepared to

24   respond promptly once service is effected.  So it's not like

25   you had one day to do this.  More like you had ten days to do

1    it almost, eight days.  Anyway, go ahead.

2            MR. HORNSTINE:  Yes, Your Honor.  I'd be happy to do

3    this.  And I believe, again, there's some discussion of this as

4    it relates specifically to social media in the *Morgan* case, the

5    Kentucky case involving Governor Bevin in that state.

6            But to address *Blum* more directly, as I understand

7    Blum, the state can't be held liable for a public -- or excuse

8    me -- from a private actor's decision unless there is some

9    significant coercion by the government or some coercive power

11:39 10   that the government holds over the private actor.

11           And in this case, Your Honor, all plaintiff points to

12   is political climate; that there is a lot of pressure on social

13   media networks like Twitter, like Facebook, to act a certain

14   way.

15           I believe the court will, after the presentation, ask

16   of Ms. O'Malley and Ms. Tassinari what happened here.  And I

17   believe that you will hear them say, as they do in their

18   affidavits, that Ms. O'Malley completed an online form and

19   received a form email back from Twitter saying they would

11:39 20   investigate the matter.  And as plaintiff's subsequent

21   suspensions from Twitter make clear, other Twitter users can do

22   this, too.  It's not just the Secretary.  Any user of Twitter

23   can lodge a complaint.

24           THE COURT:  But at that point, that strikes me at the

25   moment as speculative.  You know, if we get to discovery,

1    you'll be able to find out if other people complained.

2              MR. HORNSTINE:  Maybe or maybe not.  I don't know that

3    we will, but I guess it's conceivable we can ask Twitter.

4              THE COURT:  But right now there's no evidence that

5    anybody else complained.

6              MR. HORNSTINE:  Correct.

7              THE COURT:  And I have to draw reasonable inferences

8    from facts.  The Secretary complained.  I'm told the suspension

9    immediately followed.  And the plaintiff keeps getting

11:40 10   suspended again each time he refers to the emails with

11   Ms. Tassinari that triggered the first suspension.

12             MR. HORNSTINE:  To be clear, I think we may be talking

13   about different things, plaintiffs and my clients or my

14   clients' witnesses here.  They lodged a complaint about a

15   single tweet, not certain emails that were threaded.

16             THE COURT:  And I want to -- explain that to me, and

17   then I think I will have some questions.

18             MR. HORNSTINE:  I will do my level best to do so.  My

19   understanding -- and again, please do follow up with the

11:41 20   clients' witnesses here -- is, again, they submitted a

21   complaint with Twitter, received a form email back saying

22   Twitter would investigate.  That was the only communication

23   that the Secretary's Office had with Twitter.

24             THE COURT:  Did the complaint identify that it was

25   coming from the Secretary's Office?

1          MR. HORNSTINE:  A good question for Ms. O'Malley.  But

2    my understanding is that the complaint was submitted through

3    the Mass. Elections Twitter account.  That is a worthwhile

4    follow-up.  Don't take my word for it.  You can address it with

5    Ms. O'Malley.

6          And at that point there was no expectation or further

7    expectation that anything necessarily would be done by Twitter.

8          THE COURT:  Here.  Why don't we do this.  Because I

9    think you're being helpfully careful.  Why don't we ask

11:42 10   Ms. O'Malley -- why don't I ask Ms. O'Malley these questions,

11   and then you can ask some questions.

12          MR. HORNSTINE:  It may be valuable, if you wish to

13   start with Ms. O'Malley, that may be useful, but inasmuch as

14   Ms. O'Malley was taking instructions from Ms. Tassinari, it may

15   be chronologically helpful to start with her, but proceed

16   however the court wishes, obviously.

17          THE COURT:  Why don't we do it this way.  I'll let you

18   question them in the order you prefer.

19          MR. HORNSTINE:  If that is the case, I will defer to

11:42 20   my colleague, Ms. Sterman, to do the questioning.

21          THE COURT:  All right.  Doctor, do you understand that

22   I'm going to hear this evidence?  I have some questions, but

23   you'll get a chance to ask questions, too.  Okay?

24          All right.  Ms. Sterman, who would you like to call

25   first?

```
 1              MS. STERMAN:  Thank you, Your Honor.  We'll start with
 2    Ms. Tassinari, if that's agreeable to the court.
 3              THE COURT:  Ms. Tassinari, do you swear that the
 4    testimony you're about to give will be the truth, the whole
 5    truth and nothing but the truth so help you God?
 6              MS. TASSINARI:  Yes.
 7              THE COURT:  Okay.  Try to keep this focused and
 8    efficient, please.
 9                    EXAMINATION OF MICHELLE TASSINARI
11:43 10   EXAMINATION BY MS. STERMAN:
11    Q.    Ms. Tassinari, where do you work?
12    A.    Secretary of State's Elections Division.
13    Q.    What's your position there?
14    A.    I'm the director and legal counsel.
15    Q.    And can you just briefly describe to us what your
16    responsibilities are in those capacities.
17    A.    In the Elections Division we oversee the administration of
18    state and federal elections, including the nomination papers,
19    ballot printing, ballot access.
11:44 20   Q.    Are you familiar with the plaintiff in this case?
21    A.    I am.
22    Q.    How so?
23    A.    He has been a candidate for office in the past and was a
24    candidate for U.S. Senate in the republican primary -- for the
25    September 1 primary.
```

1    Q.    Following that September 1 primary, did you receive any

2    correspondence from him?

3    A.    I did, yes.

4    Q.    What was the nature of that correspondence?

5    A.    He submitted a public records request to our office.

6    Q.    And what was he looking for in that public records

7    request?

8    A.    The public records request was seeking electronic

9    documents relative to voting equipment used in Massachusetts.

11:44 10    Q.    Did you respond to that request?

11    A.    I did.

12    Q.    At some point after this correspondence with the plaintiff

13    regarding his public records request, did you become aware of

14    social media posts that he was making regarding the exchange?

15    A.    I did.

16    Q.    How so?

17    A.    We had one of our local election officials who had

18    forwarded us an email they received from a voter in their town

19    that indicated that Shiva was claiming election fraud, which

11:45 20    prompted us to look at -- to simply Google and look for any

21    materials regarding this.

22    Q.    Was that the only contact you received regarding his

23    social media post?

24    A.    No.  We had received I believe at least one or two emails

25    into our Elections Division email inquiries as well as some

1    telephone calls.

2    Q.   And did you -- were you able to locate that tweet?

3    A.   Yes.

4    Q.   And can you describe the content of the tweet.

5    A.   The tweet had indicated that over a million ballots had

6    been destroyed in violation of federal law.

7    Q.   Was that an accurate statement in your view?

8    A.   No.

9    Q.   Why not?

11:46 10   A.   Because every single paper ballot that was cast in the

11   September state primary is being -- it has been secured and

12   sealed and will remain preserved for 22 months, which is what

13   the federal law requires.

14   Q.   And I don't know if you have your affidavit handy,

15   Ms. Tassinari.

16          THE COURT:  Well, she hasn't shown she needs her

17   recollection refreshed on anything.  What's the question?

18          MS. STERMAN:  I was merely going to confirm that the

19   tweet pictured under Paragraph 8 is the same tweet we're

11:46 20   talking about, just to make sure we're all on the same page.

21          THE COURT:  Thank you.  That's fine.

22   Q.   I'm sorry.  Ms. Tassinari, that is the tweet you're

23   referring to?

24   A.   Yes.

25          THE COURT:  Is this the one, it's in paragraph 8 of

1    docket number 15.2, Ms. Tassinari's affidavit, correct?

2              MS. STERMAN:  That's right, Your Honor.

3              THE WITNESS:  Yes.

4    BY MS. STERMAN:

5    Q.   Did you take any action in response to that tweet after

6    you viewed it?

7    A.   Yes.  I asked Deb O'Malley to use our Twitter platform to

8    report that.

9    Q.   Where did you do that?

11:47 10   A.   I thought it was inaccurate and was providing false

11   information about the election which may lead voters to either

12   question the election process or perhaps not even participate

13   in the upcoming election.

14   Q.   Did you instruct Ms. O'Malley to report any other tweets

15   aside from the one pictured in paragraph 8 to your affidavit to

16   Twitter?

17   A.   No.

18   Q.   Did you hear a little earlier this morning the plaintiff

19   referred to a thread of four tweets that screenshoted his email

11:48 20   exchange with you?  Did you hear that testimony?

21   A.   I did.

22   Q.   Have you ever seen those tweets?

23   A.   I believe I did see those.

24   Q.   Did you report those tweets to Twitter?

25   A.   No.

1   Q.   Did you ask Ms. O'Malley to report those tweets to

2   Twitter?

3   A.   No.

4   Q.   Did you do anything else to cause that series of four

5   tweets to be reported to Twitter?

6   A.   No.

7   Q.   Aside from the single tweet that you requested

8   Ms. O'Malley report to Twitter, have you or your office, to

9   your knowledge, had any other interaction with Twitter about

11:48 10   the plaintiff or any of his tweets?

11   A.   No.

12   Q.   Have you asked your staff to report any other tweets by

13   the plaintiff?

14   A.   No.

15        MS. STERMAN:  Your Honor, I think that sets forth the

16   basic groundwork, unless you have additional questions that

17   you're wanting from Ms. Tassinari.

18        THE COURT:  I do.

19        Ms. Tassinari, is Dr. Shiva the only person the

11:49 20   Secretary of State's Office has reported to Twitter about?

21        THE WITNESS:  No.

22        THE COURT:  About how many others?

23        THE WITNESS:  I can only recall one previous, one

24   previous time in which a tweet was reported which had incorrect

25   deadlines.

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   | THE COURT:  And what happened as a result of that, if        |
| 2   | anything?                                                    |
| 3   | THE WITNESS:  I believe that Twitter also removed the        |
| 4   | incorrect information from that tweet.                       |
| 5   | THE COURT:  And I think you said -- well, have you           |
| 6   | ever communicated with Twitter about its policy with regard to |
| 7   | tweets that relate to elections?                             |
| 8   | THE WITNESS:  No.                                            |
| 9   | THE COURT:  Have you ever -- have you read anything          |
| 10  | about their policies and practices with regard to what they do |
| 11  | with regard to such tweets if there's a report?             |
| 12  | THE WITNESS:  I believe I have been presented with --       |
| 13  | I have seen an email from Twitter in the past or from an    |
| 14  | organization providing us information about Twitter's policy |
| 15  | use and how to report misinformation generally as an election |
| 16  | office.                                                      |
| 17  | THE COURT:  Did you get that from Twitter, or did you       |
| 18  | get that from some other organization?                       |
| 19  | THE WITNESS:  I believe it came through the National        |
| 20  | Association of Secretaries of State, disbursed it for Twitter. |
| 21  | THE COURT:  I'm sorry, it came from the National            |
| 22  | Association of Secretaries of State -- and I didn't hear the |
| 23  | end of your answer.                                          |
| 24  | THE WITNESS:  Disbursed by them for Twitter.                |
| 25  | THE COURT:  Okay.  And what did it say?                     |

11:50  (line 10)

11:51  (line 20)

```
 1              THE WITNESS:  It provided a platform if you believe
 2    there was misinformation, disinformation regarding elections
 3    and how to report that to Twitter.
 4              THE COURT:  Did it say what Twitter's practice or
 5    policy would be if it received such reports from a Secretary of
 6    State?
 7              THE WITNESS:  I do not recall that.
 8              THE COURT:  Have you spoken to colleagues in other
 9    Secretary of States' offices or government offices about
11:52 10    whether they've made reports to Twitter?
11              THE WITNESS:  I have not.
12              THE COURT:  I think you said that you asked
13    Ms. O'Malley to make the report on the Election Division's
14    Twitter account; is that correct?
15              THE WITNESS:  Yes.
16              THE COURT:  And would that have identified the report
17    as coming from the Secretary of State's Election Division?
18              THE WITNESS:  Yes.
19              THE COURT:  I know I'm repeating this, but you say you
11:53 20    believe that your office has only reported on one other tweet
21    to Twitter because it had incorrect dates concerning an
22    election.
23              THE WITNESS:  Yes.
24              THE COURT:  And it's your understanding that Twitter
25    removed that?
```

```
 1            THE WITNESS:  Yes.
 2            THE COURT:  Are you aware that before -- he just
 3    testified to this, and I think you said you saw the string.
 4    But what caused you to request or report or cause a report to
 5    be made with regard to the tweet that's in paragraph 8 of your
 6    affidavit but not any of the other of Dr. Shiva's tweets?
 7            THE WITNESS:  We had made the report of the original
 8    tweet.  I don't believe we had seen the other tweets at that
 9    time.  And the original tweet was certainly alarming and
11:54 10   casting doubt on the election process and the integrity of the
11    process in Massachusetts.
12            THE COURT:  Is there a reason that you didn't -- so
13    the Election Division has a Twitter account, right?
14            THE WITNESS:  Correct.
15            THE COURT:  And did you tweet out that Dr. Shiva's
16    wrong; the Secretary of State is in compliance with federal
17    law; we maintain all the paper ballots for 22 months as it
18    requires?
19            THE WITNESS:  We did not tweet that, no.
11:55 20        THE COURT:  Why not?
21            THE WITNESS:  I don't know.  Hadn't occurred to us.
22    We did respond to multiple emails and telephone inquiries about
23    it.
24            THE COURT:  Dr. Shiva, do my questions suggest any
25    further questions to you?
```

1          MR. AYYADURAI:  Yes, Your Honor.  I have at least one

2     or two questions, if I may, please.

3          THE COURT:  Go ahead.

4          MR. AYYADURAI:  It's a question to Ms. Tassinari.

5     EXAMINATION BY MR. AYYADURAI:

6     Q.   Ms. Tassinari, is the Mass. Elections Twitter account a

7     verified account or a not verified account?

8     A.   Verified account.

9          THE COURT:  What is a verified account?

11:56 10         MR. AYYADURAI:  Your Honor, there are two types of

11    Twitter accounts.  Those that are sort of people who could be

12    anyone, sort of your average public citizen or average public,

13    and there are verified accounts, which you have to go through a

14    due diligence process with Twitter, and you get a little blue

15    checkmark next to your Twitter account.  That means, it

16    essentially adds more gravitas to who you are and that Twitter

17    has actually acknowledged that you are who you say you are.  I

18    believe when I did it, for example, I --

19         THE COURT:  That's okay.  That's enough.  What's your

11:56 20    next question?

21    BY MR. AYYADURAI:

22    Q.   The next question is, the other individual that reported

23    an issue with election, quote-unquote, "misinformation," was

24    that person a candidate running for office?

25    A.   I don't recall.  I believe it was an organization.

1    Q.   Okay.  And I just want to clarify.  So in response to my

2    email, there was no tweets I could see that your office did, is

3    that true, to refute what I was saying?

4    A.   I did not -- I do not do any of the tweets, so I do not

5    know.

6              MR. AYYADURAI:  Thank you.

7              THE COURT:  To your knowledge, there were none,

8    though; is that right?

9              THE WITNESS:  I don't believe so.

11:57 10         THE COURT:  Who does the tweets?

11             THE WITNESS:  Ms. O'Malley.

12             THE COURT:  So I think she's the next witness.  Hold

13   on a second.  Let me just check and see if I have any other

14   questions.  I don't think so.

15             Ms. O'Malley, do you swear that the testimony you're

16   about to give will be the truth, the whole truth and nothing

17   but the truth so help you God?

18             MS. O'MALLEY:  I do.

19             EXAMINATION OF DEBRA O'MALLEY

11:58 20         THE COURT:  Ms. Sterman, go ahead.

21             MS. STERMAN:  Thank you, Your Honor.

22   EXAMINATION BY MS. STERMAN:

23   Q.   Ms. O'Malley, why don't we pick up where Ms. Tassinari

24   left off.  Did you hear her testimony that she asked you to

25   report a September 24 tweet by the plaintiff in this case to

1    Twitter?

2    A.    Yes, I did.

3    Q.    And did she in fact ask you to report that tweet?

4    A.    Yes, she did.

5    Q.    And what action did you take to report the tweet?

6    A.    I logged into the Elections Division Twitter account and

7    accessed the web form and reported the tweet to Twitter.

8    Q.    And when you say you reported the tweet to Twitter, for

9    those of us who haven't seen that web form and don't know what

11:59 10    it looks like, could you describe for us what sort of

11    information you had to enter in order to effectuate that

12    report?

13    A.    I had to provide my name, email address and a brief

14    description of the reason that I was reporting it and a link to

15    the tweet itself.

16    Q.    And what brief description did you provide in this report?

17    A.    To the best of my recollection, I explained that the

18    statements regarding the destruction of ballots were false and

19    that the statements attributed to the Massachusetts election

11:59 20    attorney were a misrepresentation of what Attorney Tassinari

21    had said.

22    Q.    And then you mentioned you -- I think you said that you

23    provided a link to the tweet that you were reporting; is that

24    right?

25    A.    Yes.

```
 1   Q.   In your affidavit, paragraph 3, there is a screenshot of
 2   the tweet.  Can you confirm whether or not that is the tweet
 3   that you linked to in your report to Twitter?
 4   A.   Yes, it is.
 5            MS. STERMAN:  I'm sorry, Your Honor.
 6            THE COURT:  You said you used the Department of
 7   Election's Twitter account; is that right?
 8            THE WITNESS:  Yes.
 9            THE COURT:  I may not be using the right term.  How
10   does somebody know -- would somebody know that the
11   communication came from the Secretary of State's Division of
12   Elections by reading the tweet -- by reading the -- yes,
13   something that came from that account?
14            THE WITNESS:  Yes.
15            THE COURT:  How would one know that?
16            THE WITNESS:  Well, it identifies it as from the
17   Massachusetts Elections Division, and we have also been
18   on-boarded by Twitter to be considered a Twitter partner for
19   reporting this type of information.
20            THE COURT:  What's a Twitter partner?
21            THE WITNESS:  It's -- Twitter has our contact
22   information and is aware of our accounts as an election office,
23   so that if we report anything through that portal, then they
24   will take a look at it quickly.
25            THE COURT:  So is it a special portal, as you
```

12:00 (line 10)
12:01 (line 20)

1   understand it, for election offices?

2        THE WITNESS:  No.  It's the same portal that everyone

3   else uses.  They are just aware of which accounts are election

4   official accounts.

5        THE COURT:  I see.  And did you say -- when it comes

6   from one of these -- when Twitter sees it comes from an

7   election official, you understand they act on it quickly?

8        THE WITNESS:  That is my understanding of what they

9   have said they will do.

12:02 10      THE COURT:  And what's that understanding based on?

11        THE WITNESS:  Communications from the National

12   Association of Secretaries of State.

13        THE COURT:  And did you learn that in some written

14   communication from the National Association or some oral

15   discussion or both?

16        THE WITNESS:  I believe it was by email.

17        THE COURT:  Do you remember what the email said?

18        THE WITNESS:  Well, it provided a presentation

19   regarding how to report the information, how to log in and how

12:03 20   to send the reports.

21        THE COURT:  But you said that something caused you to

22   understand that if the Election Division in some way that

23   identified it made a report, you understood Twitter would act

24   on it quickly.

25        THE WITNESS:  Yes.  I believe at some point in the

1    emails it explained the point of this was so that Twitter could

2    act quickly on election matters.

3              THE COURT:  On election matters from election

4    divisions like yours?

5              THE WITNESS:  Election officials, yes.

6              THE COURT:  And actually -- and this may also be for

7    Ms. Tassinari again.  Did you talk to Ms. Tassinari about why

8    she wanted you to send the report?

9              THE WITNESS:  I don't recall the entire conversation,

12:04 10   but I believe she had asked me to send it because it was

11   obviously false.

12             THE COURT:  And did you have any discussion about what

13   Ms. Tassinari or you hoped Twitter would do upon receiving the

14   report?

15             THE WITNESS:  No, we didn't.

16             THE COURT:  What did you hope Twitter would do upon

17   receiving the report?

18             THE WITNESS:  I was hoping that they would remove the

19   single tweet that had misinformation.

12:05 20           THE COURT:  And did you expect they would do that?

21             THE WITNESS:  I wasn't sure.

22             THE COURT:  Did you send that earlier report that

23   Ms. Tassinari referred to?

24             THE WITNESS:  Yes, I did.

25             THE COURT:  And did you know that Twitter removed that

 1    tweet?

 2              THE WITNESS:  Yes, they informed me later.

 3              THE COURT:  And did you expect that Twitter would

 4    remove this tweet, too?

 5              THE WITNESS:  I honestly wasn't sure.

 6              THE COURT:  Why were you unsure?

 7              THE WITNESS:  Because Twitter was going to have to

 8    review it and make their own judgment, and I wasn't sure if

 9    they would choose to remove it based on their judgment.

12:06 10          THE COURT:  Is it your understanding that they remove

11    false information, clearly false information from -- they

12    remove tweets that contain information that is factually false,

13    demonstrably false, concerning elections if they receive

14    reports from election officials?

15              THE WITNESS:  I only have the experience of the one

16    other report, so I really wasn't sure.

17              THE COURT:  Okay.  I may go back and ask Ms. Tassinari

18    that same line of questions, but Dr. Shiva -- do you

19    remember -- what did you type -- you typed the report?

12:07 20          THE WITNESS:  Yes.

21              THE COURT:  And what words did you type?

22              THE WITNESS:  I don't remember my exact words, but I

23    do remember that I explained that it was false; that we had not

24    destroyed ballots and that the statements he was attributing to

25    Michelle Tassinari were also false.

1        THE COURT:  What statement was that?

2        THE WITNESS:  I believe the tweet said that a

3   Massachusetts election attorney confirms that the ballots are

4   nowhere to be found.

5        THE COURT:  Did you say anything to Ms. Tassinari to

6   the effect of, Why don't we issue our own tweet saying that no

7   ballots had been destroyed and we are in compliance with

8   federal law; we're keeping the paper ballots for 22 months?

9        THE WITNESS:  No, I didn't.

12:08 10        THE COURT:  Why not?

11        THE WITNESS:  Because I don't want to amplify election

12   misinformation.

13        THE COURT:  Okay.  Dr. Shiva, do you have any

14   questions for Ms. O'Malley?

15        MS. STERMAN:  I'm sorry to interrupt, but I do have

16   additional follow-up.

17        THE COURT:  I'm sorry, I didn't remember that I had

18   interrupted you.  You want to follow up on mine.  Go ahead, go

19   ahead.

12:09 20   BY MS. STERMAN:

21   Q.   Ms. O'Malley, once you submitted the report that we've

22   just talked about, did you receive any response from Twitter?

23   A.   I received an automated response that they would review

24   it, yes.

25   Q.   Did you ever receive any further response or communication

         1    from Twitter concerning this report?

         2    A.    No.

         3    Q.    As you sit here today, do you know what action, if any,

         4    Twitter took as the result of your particular report of the

         5    plaintiff's tweet?

         6    A.    No.

         7    Q.    And you mentioned a few moments ago in response to a

         8    question from the judge that the Elections Division is a

         9    Twitter partner; is that correct?

12:10   10    A.    Yes, yes.

        11    Q.    And when you say that, what does that mean?

        12    A.    My understanding is that we are able to select certain

        13    reasons for reporting a tweet that may not be available to

        14    everyone and that they will -- that the people who review the

        15    tweets at Twitter, when complaints are made, will try to act

        16    quickly on the ones we report.

        17    Q.    Does being a Twitter partner afford you or the Elections

        18    Division any enhanced access to communications with Twitter

        19    about reports that you make?

12:10   20    A.    No.

        21    Q.    Does being a Twitter partner afford you any control or

        22    input into action that they take based on your reports?

        23    A.    No.

        24    Q.    Aside from the September 24 tweet that you've testified

        25    that you reported, have you reported any other of plaintiff's

```
 1   tweets?

 2   A.   No.

 3   Q.   Have you -- I'm sorry.  Have you reported -- well, let me

 4   back up.  A little bit ago the plaintiff talked about I think a

 5   thread of four tweets that he sent that had displayed somehow

 6   emails between himself and Ms. Tassinari.  Did you hear that?

 7   A.   Yes.

 8   Q.   Did you report any tweets meeting that description?

 9   A.   No.

12:11 10        MS. STERMAN:  Thank you.

11        THE COURT:  Let me clarify something.  You were

12   asked -- you testified that you didn't know what Twitter did

13   "as a result of my tweet."  Is that what you said?

14        THE WITNESS:  Correct.

15        THE COURT:  Did you know that Twitter removed Dr.

16   Shiva's tweet, the one you complained about?

17        THE WITNESS:  I know that they eventually did.

18        THE COURT:  When did you learn they removed it?

19        THE WITNESS:  I think a few days later.

12:12 20        THE COURT:  How did you learn it?

21        THE WITNESS:  I believe Michelle Tassinari may have

22   told me.

23        THE COURT:  And do you know of anybody else who

24   complained about Dr. Shiva's tweet, anybody else who reported

25   it?
```

```
 1              THE WITNESS:  That specific tweet, I don't know.
 2              THE COURT:  Well, do you know of anybody who reported
 3     any other of Dr. Shiva's tweets?
 4              THE WITNESS:  I believe someone from the National
 5     Association of State Elections Directors may have reported some
 6     other tweets.
 7              THE COURT:  Why do you think that?
 8              THE WITNESS:  We were in communication with the
 9     National Association of State Elections Directors because they
12:13 10    assist us in figuring out how to report these tweets.
11              THE COURT:  So Ms. Tassinari asked you to report Dr.
12     Shiva's one tweet; is that right?
13              THE WITNESS:  Yes.
14              THE COURT:  And did you communicate with anybody else
15     before you made the report?
16              THE WITNESS:  I don't think I did before I made the
17     report, no.
18              THE COURT:  Did you communicate with anybody else
19     after you made the report?
12:13 20             THE WITNESS:  I'm not certain if I did, but I believe
21     we alerted NASS and NASED, the National Association of
22     Secretaries of State and the National Association of State
23     Election Directors.
24              THE COURT:  Did you do that; did Ms. Tassinari do
25     that?
```

```
 1              THE WITNESS:  I don't believe I did.

 2              THE COURT:  And what was the communication to the

 3   National Association, as you understand it?

 4              THE WITNESS:  I believe, to the best of my

 5   recollection, I believe Michelle emailed, Michelle Tassinari

 6   emailed the executive director of the National Association of

 7   State Election Directors to let them know that we had reported

 8   it because they are our liaison.

 9              THE COURT:  And you said you believe they may have

10   reported other tweets of Dr. Shiva.  Why do you say that?

11              THE WITNESS:  I believe it's possible they -- I don't

12   recall entirely, but they may have told -- Michelle Tassinari

13   may have told me.  I'm not certain.

14              THE COURT:  So Ms. Sterman, let me pick this up with

15   Ms. Tassinari.  Can you go off mute, please, Ms. Tassinari.

16              Did you communicate with anybody other than

17   Ms. O'Malley about Dr. Shiva's tweet?

18              THE WITNESS:  Yes.

19              THE COURT:  With whom?

20              THE WITNESS:  I communicated with Amy Cohen, the

21   Executive Director of the National Association of State

22   Election Directors.

23              THE COURT:  And did you communicate with her once or

24   more than once about Dr. Shiva?

25              THE WITNESS:  I communicated to her that we were
```

```
 1   reporting that tweet.
 2           THE COURT:  Did you do that in writing, orally or
 3   both?
 4           THE WITNESS:  In writing.
 5           THE COURT:  Once or more than once?
 6           THE WITNESS:  Once.
 7           THE COURT:  And what did the writing say?
 8           THE WITNESS:  We are reporting this to Twitter as
 9   election misinformation, with the link to the tweet.
10           THE DEFENDANT:  And did you receive a response from
11   her?
12           THE WITNESS:  I don't believe so.  I did.  I
13   apologize.
14           THE COURT:  And are you looking at your emails, which
15   is permissible?
16           THE WITNESS:  I am looking at my email.  She replied
17   to me later, at 7:22 p.m., to acknowledge that the tweet was
18   still up and said, "Have you reported it?  I can report it,
19   too."
20           THE COURT:  And did you respond to that?
21           THE WITNESS:  I said Deb had reported it.
22           THE COURT:  That's all?
23           THE WITNESS:  Deb had reported it.  I never got to
24   sending an email, too.
25           THE COURT:  I'm sorry, I couldn't hear the second part
```

12:16 (line 10)
12:17 (line 20)

1  of that.

2          THE WITNESS:  I never got to send a separate email to

3  Twitter, just that we had reported it.  Because sometimes you

4  can email it to them, a report as well.  We did not do that.

5  We only used the Twitter platform.

6          THE COURT:  And did Ms. Cohen communicate with you

7  further about this, or did you communicate with her?

8          THE WITNESS:  I believe orally we had a conversation,

9  and she said she had reported it as well.

12:18 10          THE COURT:  And what did you say in response to that?

11          THE WITNESS:  Okay.

12          THE COURT:  You just said okay?

13          THE WITNESS:  I acknowledged that -- I probably said

14  thank you.

15          THE COURT:  I see.  Well, when you asked Ms. O'Malley

16  to file a report with Twitter, what did you hope would happen

17  as a result of that?

18          THE WITNESS:  That either the tweet would be removed

19  or labeled as inaccurate.

12:18 20          THE COURT:  Excuse me if I asked you this before.  But

21  the tweet that -- well, did you ever confirm -- just a second.

22          The tweet that was reported says, "Mass. Election

23  attorney confirms to Shiva4senate ballot images used for

24  counting votes must be saved by federal law for 22 months are

25  nowhere to be found!"  Did you ever say that to Dr. Shiva?

1          THE WITNESS:  That would imply that I acknowledged
2     that they have to be kept for 22 months or that they ever
3     existed, and the answer to that is no.
4          THE COURT:  All right.  And was it disturbing to you
5     that he attributed statements to you that you hadn't made?
6          THE WITNESS:  Yes.
7          THE COURT:  Why is that?
8          THE WITNESS:  I take my job as an election
9     administrator and an attorney very seriously, and for someone
12:20 10   to suggest that we knowingly violated a federal law relating to
11    elections is not something I take lightly.
12         THE COURT:  And is that why you reported this
13    particular tweet and not other related tweets?
14         THE WITNESS:  We had only reported this tweet.  At the
15    time it was the only one we were aware of.
16         THE COURT:  And when you communicated with Ms. Cohen,
17    the Executive Director of the National Association, was it your
18    hope that the National Association also would report the
19    matter?
12:21 20   THE WITNESS:  Yes.  She is -- the National Association
21    of State Election Directors is also a Twitter partner, and they
22    often coordinate communications between the social media
23    companies and state election directors generally.
24         THE COURT:  And was it your hope that a report from
25    the National Association as well as from your office would

1    increase the likelihood that Twitter would either delete the

2    tweet or label it inaccurate?

3            THE WITNESS:  I think the goal was generally to ensure

4    that misinformation wasn't being spread, and so whatever

5    actions that we could take to make sure that the tweet was

6    labeled as inaccurate or taken down, we were willing to pursue.

7            THE COURT:  But did you think -- you had filed a

8    report.  Did you want to do everything possible to try to

9    assure that Twitter would take it seriously and either remove

12:22 10   the tweet or label it inaccurate?

11           THE WITNESS:  Yes.

12           THE COURT:  And were you pleased when they deleted the

13   tweet?

14           THE WITNESS:  I believe I saw that it had been

15   removed.  I was, yes, I was relieved.

16           THE COURT:  Relieved.  How did you learn it had been

17   removed?

18           THE WITNESS:  I believe the following, later in that

19   weekend I looked and it had been removed.

12:23 20          THE COURT:  And why were you relieved?

21           THE WITNESS:  Because the spread of misinformation and

22   disinformation relating to the election is a very big concern

23   for myself as well as everyone in this office.

24           THE COURT:  And were you relieved because something

25   disparaging for you was no longer on Twitter?

 1          THE WITNESS:  It didn't mention me by name, so no one

 2     would have known it was me personally, so that part is not --

 3     that was not my goal.  It was actually because of the

 4     misinformation about ballots being destroyed and the integrity

 5     on the election process.

 6          THE COURT:  Dr. Shiva, do you have some questions for

 7     Ms. O'Malley or as a follow-up to those that I just asked of

 8     Ms. Tassinari?

 9          MR. AYYADURAI:  Yes.  Should I -- Your Honor, to not

12:24 10   violate process, should I ask Ms. O'Malley first and then

11     Ms. Tassinari?

12          THE COURT:  Which way would you prefer?

13          MR. AYYADURAI:  I'd like to ask Ms. O'Malley and then

14     Ms. Tassinari.

15          THE COURT:  Okay.

16     EXAMINATION BY MR. AYYADURAI:

17     Q.   Ms. O'Malley, one of the questions I have is, can you ask

18     why you mention Ms. Tassinari's emails in your complaint but

19     you claimed it was all about that first tweet, that one tweet

12:24 20   only?

21     A.   I'm sorry, I don't understand your question.

22     Q.   Well, you stated to the court that it was about that one

23     tweet, but in the complaint you've actually mentioned

24     Ms. Michelle Tassinari's emails, the four email interactions.

25     A.   I'm sorry, I still don't know what the question is.

1    Q.   You just shared with the court that it was all about that

2    one tweet concerning the ballot images being destroyed.

3    However, in your complaint you refer to Ms. Tassinari's emails,

4    the email interactions that I had with Ms. Tassinari, the

5    tweets I put up about those.

6            THE COURT:  Maybe I can help.  In what complaint?

7            MR. AYYADURAI:  In her affidavit.

8            THE COURT:  In her affidavit.

9            MR. AYYADURAI:  In her affidavit.

12:25  10            THE COURT:  Do you understand the question?

11            THE WITNESS:  I'm not certain what the question is.

12    BY MR. AYYADURAI:

13    Q.   In the complaint to Twitter, the form that you filled out,

14    in the form that you filled out, you said that you only were

15    speaking about that one tweet; is that right?

16    A.   Yes.

17    Q.   However, in your -- but you also mentioned Ms. Tassinari's

18    emails, is that not right?

19    A.   In what?

12:26  20    Q.   In your affidavit.

21            THE COURT:  Here, you're going to have to do this --

22    Q.   Are you familiar with Ms. Tassinari's emails, the email

23    interaction she and I had?

24    A.   Yes.

25    Q.   Are you familiar with the fact that I shared those emails

```
 1    on Twitter?
 2    A.   I believe I learned about it later.
 3    Q.   But you handled Twitter for the Secretary of State, right,
 4    for the elections; you're the Twitter person, right?
 5    A.   Yes.
 6    Q.   So, given this issue, were you not watching what I was
 7    posting on Twitter?
 8    A.   No, I was not.
 9    Q.   Okay.  But you are aware of those tweets that I posted of
10    my email interactions, sharing the email interactions I had
11    with Ms. Tassinari?
12    A.   I believe so.
13    Q.   Okay.  So you are aware of the tweets that I posted
14    sharing me and Ms. Tassinari's email conversation; you are
15    aware of those tweets?
16         MS. STERMAN:  Objection.  I think we've been through
17    this a few times now.
18         THE COURT:  Yes.
19         MR. AYYADURAI:  All right.  I just want to bring up
20    the point of fact, if I can ask Ms. Tassinari, Your Honor?
21         THE COURT:  Okay.
22             FURTHER EXAMINATION OF MICHELLE TASSINARI
23    EXAMINATION BY MR. AYYADURAI:
24    Q.   Ms. Tassinari, are you aware that the four tweets that I
25    shared with our email interaction were deleted from Twitter?
```

A.    Yes.

Q.    Okay.  You have stated to the court that the main tweet
that I put up, which was exposing in fact ballot images were
destroyed, was deleted.  Are you aware that that tweet was
never deleted; it's still up?

A.    I do not know what action Twitter took.  I thought it had
-- I know tweets had been removed.  I don't follow every single
one of your tweets.

Q.    But did you not just assert to the court that this tweet
was removed?

A.    I thought it had been.

Q.    Okay.  But you do know that the four tweets that I shared
with you and I interacting about the ballot images were
removed; is that right?

A.    Yes.

        MR. AYYADURAI:  Okay.

        THE COURT:  Let me ask this.  Was the tweet that's
copied in the affidavits, paragraph 3 of Ms. O'Malley, was that
one removed?

        MR. AYYADURAI:  No, it wasn't, Your Honor.  I'm sorry.
That question was to me?

        THE COURT:  Well, Ms. Tassinari, what's your
understanding?  This is the one that's in paragraph 8 of your
affidavit.  That's the one that you asked Ms. O'Malley to
report on?

1          THE WITNESS:  Yes.

2          THE COURT:  And when you checked on that Sunday, was

3     that one removed, as you understand it?

4          THE WITNESS:  I thought it was, but when I just

5     clicked on the link to it, it is certainly still up.

6          THE COURT:  All right.  So Dr. Shiva, now I'm asking

7     you for testimony.

8          Are you saying that there were four others that were

9     removed?

12:29 10          MR. AYYADURAI:  Yes, Your Honor.  So after that tweet,

11     I put up four tweets, which were the email interactions

12     substantiating my position that Michelle Tassinari's office or

13     the Secretary of State's Office was violating federal law,

14     which was the email interaction between myself and Michelle

15     Tassinari, which was the screenshots.  Those were the ones that

16     were removed because those emails exposed Secretary of State

17     Galvin as violating federal law.

18          THE COURT:  Do I have those in evidence before me?

19          MR. AYYADURAI:  I don't -- I don't have the tweets,

12:30 20     but I explained them in the verified complaint.

21          THE COURT:  All right.  I'll have to ponder the

22     implications of that.  Okay.  Are there any more questions for

23     these two witnesses?

24          All right.  Now, Mr. Hornstine -- no, there are not.

25     It's now 12:30, but I'd like to get through this argument if we

1    can.  And the stenographer should tell me if she would like a

2    break.  She's okay.  She runs marathons.

3              MR. HORNSTINE:  Unless she was pointing her thumb up

4    to say she did need a break.

5              THE COURT:  No, she wasn't.

6              MR. HORNSTINE:  Okay.  Very good, Your Honor.  We'll

7    keep going.

8              THE COURT:  Okay.  So that testimony is relevant to

9    what I'll call the *Blum* issue.  But why don't you resume your

12:31 10   argument, please.

11             MR. HORNSTINE:  Why don't we jump right in with the

12   *Blum* issue then.  I know that plaintiff here contends that the

13   gravitas of the Secretary's Office caused Twitter to act here,

14   but what this testimony we've just revealed is it's quite the

15   opposite.

16             The Secretary's Office complained about a single

17   tweet.  Twitter forced plaintiff to delete four other tweets

18   that the Secretary's Office did not complain about.  So it

19   certainly undercuts the argument that the Secretary's voice was

12:32 20   so coercive or so significant to Twitter that Twitter acted at

21   its behest in deleting the four tweets that are not in the

22   record but that plaintiff characterizes in his complaint.

23             This certainly buttresses the Secretary's position

24   that this isn't an instance where it can be held to account for

25   the private decision of a private actor operating under its own

```
 1    terms of use, under its own civic policies.  And where, as
 2    here, it is crystal clear that the Secretary didn't complain
 3    about the four tweets that were deleted and that apparently
 4    resulted in his suspension, Blum might not even be the actual
 5    inquiry.  It may be just a simple matter of causation here,
 6    Your Honor.
 7              THE COURT:  Well, again, I have to draw reasonable
 8    inferences.  I now know that not only did Secretary Galvin's
 9    office report this complaint about it, but it was through an
12:33 10    account that they and their colleagues around the country had
11    been assured would get priority attention and that the
12    executive director of the national organization, as Secretary
13    Galvin hoped, also filed a report, and the hope was that the
14    tweet would be deleted.
15              MR. HORNSTINE:  Which it wasn't.
16              THE COURT:  Four others were, and there's no evidence
17    that there's any other reason the others were deleted.  Dr.
18    Shiva was apparently put on Twitter's radar screen, and they
19    removed four of his tweets.  This --
12:34 20              MR. HORNSTINE:  Which again is -- go ahead.
21              THE COURT:  No, go ahead.
22              MR. HORNSTINE:  I was just going to say, which is
23    Twitter's prerogative to do under its terms of service, which
24    makes clear that any discipline Twitter metes out is Twitter's
25    decision and Twitter's alone to make.
```

1          THE COURT:  When you say it makes it very clear, my

2     law clerks, I tell them, "Don't ever say 'clearly' this,"

3     because it usually obscures this.  Twitter can say its

4     Twitter's own decision, but in certain circumstances it

5     constitutes state action.  I mean, there are just certain

6     circumstances where it's not treated as a matter of law as

7     Twitter's decision alone.  There's a factual element to that.

8          MR. HORNSTINE:  And I appreciate that legal

9     distinction, Your Honor, and I will resist the temptation to

12:35 10   use the adjectives "very" and "clear."

11          But the terms of use again are posted online that

12     every user agrees to, and I think again the Kentucky decision

13     talks about this, the concept that there is no free speech on

14     Twitter; it's whatever Twitter lets you do.  Because as a user,

15     you agree as a contractual matter to be bound by certain terms

16     of use, and if you violate those terms of use -- and again,

17     let's keep in mind that any citizen can lodge a complaint, or

18     any Twitter user I should say can lodge a complaint with

19     Twitter and Twitter can investigate it.

12:35 20        Even if the Secretary's Office has some special status

21     that will get its complaint's attention, the fact remains that

22     the tweet the Secretary's Office complained about as election

23     misinformation was not deleted and, again, apparently was not

24     the source of the Twitter suspension here.  I don't hear any

25     evidence --

1           THE COURT:  When you talk about the Kentucky decision,

2     is that *Morgan v. Bevin*?

3           MR. HORNSTINE:  Correct.  The decision involving

4     Governor Bevin.  In that case, the case involved an issue in

5     which the governor was muting people on his social media

6     account.  So in other words, users could post comments to his

7     Facebook post, to his tweets.  I forget which social media

8     platform it was, I apologize.  And the governor didn't like

9     certain comments that were being posted on his page, so he

12:36  10     blocked people from posting on Twitter, posting on his social

11     media account.

12           THE COURT:  On his page.  And this relates to what I

13     wrote about in *Baptiste* and also the *St. Patrick's Day Parade*

14     case.  It's compelled speech.  I confess I haven't read this

15     yet.  But the idea, if it's his page, you know, one can control

16     the messages on your page, but that can be different than

17     deleting it from the Twitter universe.

18           MR. HORNSTINE:  Well, let's be clear here.  There's

19     actually a split of authority, if you will.  In the Kentucky

12:37  20     case, *Morgan v. Bevin* case, it essentially comes out where Your

21     Honor was headed.  But there's a case from the Second Circuit,

22     *Knight v. Trump,* where the prison was doing the same thing,

23     muting things posted to his page.

24           There's a Fourth Circuit case, *Davison*, again banning

25     someone from the interactive portions of a government social

1    media page.  And in those two latter cases, the Fourth Circuit

2    decision and the Second Circuit decision, the courts held that

3    political leaders couldn't do that, but both of those decisions

4    made clear that any posts that the government made, so the

5    Presidents' tweets, the governor's tweets or Facebook posts,

6    were indisputably government speech.

7         THE COURT:  Hold on just a second.  What's the Fourth

8    Circuit case?

9         MR. HORNSTINE:  It is *Davison*.  I apologize, Your

12:38 10   Honor.  I can pull up --

11        THE COURT:  I have it.  What I don't have is my law

12   clerk.

13        MR. HORNSTINE:  Yes.

14        THE COURT:  Anyway.

15        MR. HORNSTINE:  And the other case I would call the

16   court's attention to is the First Circuit's *Sutliffe* decision,

17   in which the government refused to put certain hyperlinks that

18   the government's opponents wanted to appear on a particular

19   website.

12:39 20        And in all of those cases, what they make clear is

21   that the government speech -- and again, I've given or at least

22   cases give examples of what constitutes government's speech --

23   is not subject to First Amendment regulation.  I know the court

24   has asked the question --

25        THE COURT:  I know that.  That's *Rosenberger*.  It was

1    implicated in a case you cited of mine, *Griswold v. Driscoll.*

2         MR. HORNSTINE:  Yes.

3         THE COURT:  But there are certain governments -- when

4    you're in the area involving *Blum*, in effect speech can become

5    action.  And this really goes to it.  And we're in a new world.

6    I'm sitting here under a portrait of Louie Brandeis.  The

7    seminal views of Holmes and Brandeis were the bedrock principle

8    of the First Amendment, at least used to be.  The answer to bad

9    speech is better speech.

12:39 10         And it's striking to me, and I'll have to think --

11   although I don't have much time to think about it.

12   Ms. Tassinari said it never occurred to me to just tweet out

13   what Dr. Shiva is saying is false.  I mean, if there's state

14   action here, that, in my current conception, would be a

15   narrowly tailored way of advancing the compelling interests.

16         And there's a whole line of cases.  Political speech

17   deserves the most protection.  The man is a candidate for

18   public office.  And just by saying it's false -- we wouldn't be

19   here if the response had been a tweet that said, you know,

12:40 20   whatever the statute is, X U.S. Code, Section Y says you have

21   to keep paper ballots for 22 years.  We have them.  It's false.

22         And then people thinking about whether they should

23   vote for Dr. Shiva would say, Wait a minute, he's not a

24   credible person; I don't want to vote for him.  But instead

25   of -- the First Amendment, except in limited categories, like

 1   for defamation, protects false speech as well as speech that

 2   describes things accurately.  This is basic First Amendment

 3   jurisprudence in a new age.  Anyway, interesting.

 4        MR. HORNSTINE:  I agree that it's very interesting,

 5   and I think some of the newer cases -- again, I've given you a

 6   few of them, the *Morgan* case, the *Sutliffe* case, the *Davison*

 7   case, there's an Eastern District of California case, *Faison*

 8   case -- deal with sort of how to address speech in the modern

 9   age.

12:42 10        THE COURT:  Which of these cases doesn't involve

11   somebody's own web page?  I mean, this is what I just wrote in

12   *Baptiste*.  I found that the Commonwealth's regulation requiring

13   landlords to inform tenants of adversary groups that would

14   oppose landlords was probably unconstitutional.  It was a

15   preliminary injunction.

16        That, I get.  And I don't have a Facebook a page, but

17   if somebody makes a Facebook page, they should be able to

18   control what's on it because it's their message, it's their

19   page.  And there are other avenues.  Somebody else can have

12:42 20   their own Facebook page.  So, I get that.

21        But here, you know, Twitter is like -- I don't know --

22   like a megaphone.  It amplifies, broadcasts somebody's message,

23   but it's his message.  And my current conception is that the

24   government couldn't censor that.  And the fundamental issue is

25   is he reasonably likely to prove that there was a sufficient

1    connection between what the Secretary did in Twitter's conduct

2    to make Twitter's conduct state action under that *Blum* line of

3    cases.

4         MR. HORNSTINE:  And if that is the fundamental

5    question here, I think it's critical that we realize that

6    Twitter didn't do what the Secretary's Office asked it to do.

7    That tweet, as we just heard, that the Secretary's Office

8    complained about is still on plaintiff's Twitter page.

9         So again, all due respect to the gravitas of my

12:44 10   client, I'm not sure that the Secretary coerced Twitter into

11   doing its bidding here, as he contends.  Quite the opposite.

12   He may well have been suspended.  He may well have been forced

13   to delete certain tweets, but not the one that the Secretary's

14   Office complained about, Your Honor.

15        THE COURT:  Well, suspension is another form of

16   serious First Amendment concern.  A suspension is a prior

17   restraint.  If I understand it, the way Dr. Shiva explained it

18   to me, and tell me if I'm wrong, as a matter of fact, anybody

19   much younger than me would know.  He said he was suspended,

12:46 20   that he wasn't allowed to tweet anything for seven days.

21        So let's say he wanted to tweet, "I'm a republican

22   candidate, and I support Donald Trump," or, "I'm a republican

23   candidate and I support Joseph Biden."  It's political speech.

24   He was prohibited from saying that on Twitter, right; is that

25   right?

1          MR. HORNSTINE:  That is what he alleged.  He alleges

2     that he was suspended.  But again, these are all good questions

3     to be asking.  Again, we have one instance in which the

4     Secretary's Office lodged a complaint with Twitter, a private

5     organization, and he alleges that he has been suspended.

6          THE COURT:  Well, there are two, they did it one other

7     time.

8          MR. HORNSTINE:  That was with respect to another

9     incident.

12:46 10          THE COURT:  Another person.

11          MR. HORNSTINE:  Another person, correct.  I'm just

12     talking about this plaintiff here.  I apologize.  And he was

13     then unsuspended and then since that time has been suspended

14     two other times.

15          THE COURT:  Because he keeps putting up tweets that

16     the defendant finds offensive.

17          MR. HORNSTINE:  No, no.  The four tweets that the

18     Secretary's Office did not complain about -- again, but that's

19     what he -- we're making a lot of assumptions here on this thin

12:46 20     record, right?

21          He has claimed, as I understand it, and plaintiff can

22     correct me if I'm wrong, that every time he reposts the four

23     tweets that he deleted or that he was required to delete by

24     Twitter, again four that the Secretary's Office did not

25     complain about, his suspension kicks back into effect.

1         So again, how that is chargeable to the Secretary for

2    tweets it did not complain about seems to stretch it a little

3    too thin, even if we are required to make certain inferences in

4    his favor at this preliminary stage.

5         THE COURT:  And what do we understand those tweets

6    say, his emails back and forth with Ms. Tassinari?

7         MR. HORNSTINE:  The four tweets that he claims he was

8    required to delete are not in the record.  He characterizes

9    them in his complaint in here as emails between himself and

12:47 10   Ms. Tassinari.  I believe -- I don't know -- this is again

11   something that he can clarify.  We have attached to

12   Ms. Tassinari's email some of the email traffic between

13   plaintiff and Ms. Tassinari.  The substance of those emails is

14   in the record.

15        THE COURT:  Hold on just a second.  So these are part

16   of docket number 15-2, Ms. Tassinari's --

17        MR. HORNSTINE:  There should be two emails with some

18   attachments.

19        THE COURT:  I see the two, I do.  Let me ask Dr.

12:48 20   Shiva, are these the emails you say you tweeted?

21        MR. AYYADURAI:  That affidavit is missing the fourth

22   email, Your Honor.  It's those three plus a fourth one, which

23   is missing.

24        THE COURT:  Okay.  Three of the four are in the

25   record.

             1              MR. AYYADURAI:  Three of the four emails.  And I would

             2     just like to, if this is appropriate, Your Honor --

             3              THE COURT:  Not yet, not yet.  You'll get your chance.

             4              MR. AYYADURAI:  Okay.  Thank you.

             5              THE COURT:  Although we're going to have to take a

             6     break pretty soon.  Why don't you continue, Mr. Hornstine.

             7              MR. HORNSTINE:  I don't know where we had left off.

             8     The only thing I was going to say is, again, those four tweets

             9     are not in the record.  We do have, at least according to

    12:49   10     plaintiff's telling, three out of the four emails appended to

            11     Ms. Tassinari's affidavit.

            12              But again, the point remains, Your Honor, that the

            13     Secretary's Office didn't complain about that.  I'm not sure

            14     how it is chargeable for a suspension that apparently resulted

            15     from something they didn't do.

            16              THE COURT:  All right.  I understand that argument.

            17              MR. HORNSTINE:  Very good.  Again, I'm mindful that we

            18     don't want to torture the court reporter, but unless the court

            19     has any other questions on this issue, I'm happy to turn to

    12:49   20     Eleventh Amendment or mootness.

            21              THE COURT:  Go ahead.

            22              MR. HORNSTINE:  Very well.  I'll start with mootness,

            23     since I know the court's order from yesterday wanted to talk

            24     about voluntary cessation.

            25              Again, we have testimony here today that the

1    Secretary's Office lodged a single complaint more than a month

2    ago and that it has not reported plaintiff's tweets to Twitter

3    since then.  And we started with this question, or Your Honor

4    started with this question about what is the relief that is

5    being sought, which is an injunction essentially between now

6    and next Tuesday to prevent the Secretary's Office from making

7    additional reports to Twitter.

8         And we know from plaintiff's testimony that at least

9    several of those days he is under Twitter suspension, so he

12:50  10   cannot be posting additional tweets to Twitter, true, false,

11   misleading or otherwise.  It seems that this may be a case that

12   is potentially moot.  And, you know, the --

13        THE COURT:  Let me ask you -- I'm sorry.

14        MR. HORNSTINE:  Please.

15        THE COURT:  Because this could cut through some of

16   this.  Although Twitter is not a party, if I were to find for

17   present purposes -- and anything I find now is preliminary --

18   that what Twitter did is likely state action, if I issued a

19   TRO, it would run to anybody acting in concert with the

12:51  20   Secretary.  That would include Twitter.

21        And this again came up in *Baptiste*, and I wrote about

22   it there, and I've written about it before.  If I'm told, one,

23   if I were to say, in effect, I'll issue a TRO if necessary to

24   say there shall be no more reports of Dr. Shiva before November

25   4th --

```
 1              MR. HORNSTINE:  November 3rd, Your Honor.

 2              THE COURT:  November 3rd is the election.  That's why

 3         I picked the 4th.  I know he was saying the 4th.

 4              MR. HORNSTINE:  I understand.

 5              THE COURT:  You can point that out.  See, he's a

 6         candidate.  He doesn't even know what day is Election Day.

 7         This is the marketplace of ideas.  So I'd say the 4th because

 8         people can be voting until 8:00 or something on the 3rd.

 9              Then if I was told today, soon, we agree to that, we

10         won't do this again, and then this all can get -- you know,

11         either the case will be over or it will be moot.  And the only

12         question might be whether I should issue a TRO that might

13         require Twitter to unsuspend him.

14              But I mean, that's something -- finish, but this is

15         it.  I mean, these are questions of comity.  This is Federal

16         Court.  This was an issue right up front in *Baptiste*.  I asked

17         them at the first hearing, you know, if I issue a declaratory

18         judgment on preliminary injunction, will you follow it or will

19         I need to issue an injunction?  And they said, We'll follow it,

20         and they did.  Even though it was just a ruling on a

21         preliminary injunction, the regulation was changed, amended to

22         remove the offense in part.

23              So, anyway.  On the other hand, I think it's

24         foreseeable -- he's suspended, but at some point between now

25         and Tuesday he may well tweet about this hearing and maybe
```

```
 1    he'll characterize it falsely.  Maybe he'll mischaracterize

 2    what I have said so far or what I say in any decision I render.

 3            And then, you know, if there's the threat that he'll

 4    get reported again, he'll get suspended again for that, and

 5    there won't be the opportunity to litigate this, to spend

 6    another couple of days on this issue before the election date

 7    that's very important to him, then I would think you haven't

 8    demonstrated the case as moot because in your memo you say he

 9    hasn't proven it's going to recur, but the Supreme Court says

12:54 10    the burden is on the defendant here to show it's not likely to

11    recur.

12            MR. HORNSTINE:  If we're talking about mootness, I

13    agree on the burden issue.  On the Eleventh Amendment issue, I

14    do believe it is his burden to show some likelihood of future

15    violations that can be enjoined.  Although the issue is

16    similar, I think the burden is different.

17            THE COURT:  Why do you -- I need to understand your

18    Eleventh Amendment argument on this a little better.

19            MR. HORNSTINE:  Okay.  So I think we've already talked

12:55 20    about Pennhurst, no state law claims, Quern, no damages.  I

21    think the only real issue is whether or not this court has the

22    ability under the Eleventh Amendment to issue a prospective Ex

23    Parte Young type injunction on a forward-going basis for

24    something that has occurred in the past.

25            And the First Circuit's decision in Hootstein, which
```

```
 1   we cite which --

 2           THE COURT:  Which case is that?

 3           MR. HORNSTINE:  Hootstein.  H-o-o-t-s-t-e-i-n, I

 4   believe is the spelling, Your Honor.  It was a case involving

 5   DCF and child custody.

 6           THE COURT:  Hold on just a second.

 7           MR. HORNSTINE:  Of course.

 8           THE COURT:  What is the citation, please?

 9           MR. HORNSTINE:  I'm pulling that up, if you'll give me

10   just one moment, Your Honor.  Excuse me, I may have said it's a

11   First Circuit case.  I apologize.  It's a D. Mass. case.  The

12   citation is 670 Federal Supplement 2d 110, Hootstein v.

13   Collins.

14           THE COURT:  All right.  My law clerks in the other

15   room when we break will -- I don't have it.

16           MR. HORNSTINE:  That case in turn, Your Honor may have

17   it.  It's a Supreme Court case from 1986.  It's Papasan,

18   P-a-p-a-s-a-n, which citation is 478 U.S. 265.

19           THE COURT:  I do have that.  Just a minute.  What's

20   the pertinent page?

21           MR. HORNSTINE:  The pertinent pin site from Papasan is

22   277-278.  And the quote, I'll read it --

23           THE COURT:  Let me get it.

24           MR. HORNSTINE:  I apologize.  I'm ahead of you.  I

25   apologize.  We talk about this at pages 8 and 9 of the
```

12:56 (line 10)
12:57 (line 20)

1    defendant's brief.

2         THE COURT:  What is the pertinent quote?

3         MR. HORNSTINE:  The pertinent quote from the *Papasan*

4    case is, "*Young* has been focused on cases in which a violation

5    of federal law by a state official is ongoing as opposed to

6    cases in which federal law has been violated at one time or

7    over a period of time in the past."

8         The *Hootstein* case, which I know Your Honor doesn't

9    have, the pertinent quote from it -- this is again on page 9 of

12:58 10   our brief.  "The *Ex Parte Young* doctrine then only allows

11   federal courts to exercise jurisdiction over a suit in which

12   the plaintiff alleges ongoing violations of federal law.  Suits

13   that seek redress of past wrongs are still barred by the

14   Eleventh Amendment."

15        THE COURT:  All right.  So actually it seems to me

16   that that goes to a point I was just raising and may affect

17   what I just said off the top of my head.  I said I could issue

18   an order, a TRO, to the Secretary and all acting in concert

19   with him that would require Twitter to unsuspend the defendant.

12:59 20   However, maybe I can't do that under this doctrine.

21        If I'm concerned -- if the requirements are met, I

22   might not find this is moot because I don't have an assurance

23   that between now and next Wednesday Dr. Shiva won't be reported

24   again or reported again without coming to me.

25        MR. HORNSTINE:  Reported again by whom, let me ask you

```
 1    that, Your Honor.
 2              THE COURT:  Well, by the Secretary.
 3              MR. HORNSTINE:  As Your Honor well knows, we can't
 4    tell Twitter to do much of anything.
 5              THE COURT:  No.  Okay.  But it won't be reported again
 6    by the Secretary at least.  If I had that assurance and the
 7    Secretary -- if he says something that the Secretary thinks is
 8    false and you think is harmful to the integrity of the election
 9    process and public confidence in it, you say, That's false.  We
10    didn't destroy any ballots.  Federal law doesn't require us to
11    make images of this.
12              I mean, that would have been the answer a number of
13    years ago.  But, okay.  So I'm going to have to focus on this a
14    little bit.
15              MR. HORNSTINE:  Your Honor, again, I'm mindful of the
16    hour.  If it is worthwhile -- and again, this gets back to a
17    point from our affidavits yesterday, we've never really met and
18    conferred on this motion.  If the court wants me to, and the
19    court asked us to have somebody with authority appear on this
20    call --
21              THE COURT:  Who is that?
22              MR. HORNSTINE:  Ms. Tassinari.
23              THE COURT:  So she has authority --
24              MR. HORNSTINE:  I'm happy to talk with my client
25    offline, and we can address this if the court wants after the
```

01:00  (line 10)

01:01  (line 20)

```
 1    break.  Would that be a useful use of our time?
 2          THE COURT:  Yes, yes.  And you can also talk to Dr.
 3    Shiva.  I mean, I kind of skipped over that.  The meet and
 4    confer is very important.
 5          If this case goes on, Dr. Shiva, you have to follow
 6    the rules, and I'm not surprised you're an intelligent person,
 7    given your employment at MIT, among other things.  But, you
 8    know, you've got a reasonable understanding of certain
 9    principles, and you're entitled to represent yourself.  I think
10    you're doing a good job.  But you're going to have to read the
11    rules and follow them because some of these issues, when
12    lawyers talk at least, you know, they reach an accommodation
13    and they don't have to be litigated this intensely.
14          So I think this is a good idea.  It's 1:00.  I think
15    that the defendants should talk.  Mr. Hornstine, talk to your
16    client, see if there's some kind of representation you want
17    to --
18          MR. HORNSTINE:  Yes, Your Honor.
19          THE COURT:  And Dr. Shiva, do you object to giving
20    them your phone number, or maybe they have your email address.
21    You can email it to them.
22          MR. HORNSTINE:  I have plaintiff's email address, Your
23    Honor.
24          THE COURT:  It may be they'll want to talk to you
25    before this is over, before about 1:45.  But what they might
```

1    want to talk to you about is -- I think you understand me, but

2    let me just tell you all my tentative thinking to be as

3    transparent as possible because your interest, Dr. Shiva, as I

4    understand it, is being able to tweet before the election at

5    least without interference, as you would call it, from the

6    Secretary of State; is that right?

7         MR. AYYADURAI:  Yes, Your Honor.  And also, if I could

8    add one thing.  I've come to find out today that the Secretary

9    of State has special privilege in communicating with Twitter,

01:04 10   particularly through the National Association of Secretaries of

11   State, which is frankly a little bit alarming to me.  And I

12   also want to make one point.  In Ms. O'Malley's comments she

13   said in her complaint she also referred to those emails.  I

14   just want to make a point of fact for my notes.

15        THE COURT:  But here, your interest is getting back on

16   Twitter as soon as possible before the election, correct?

17        MR. AYYADURAI:  Yes, yes, Your Honor, it is my

18   platform.

19        THE COURT:  And your understanding is that you're

01:04 20   suspended until tomorrow or maybe Sunday, right?

21        MR. AYYADURAI:  Yes, yes.

22        THE COURT:  And this is good, too, Mr. Hornstine,

23   because if the Secretary of State is going to make certain

24   representations, you'd have to tell the National Association --

25   you know, if you tell me, We're not going to report him, you'll

```
 1    you probably need to tell me also you'll ask the National

 2    Association not to report him.

 3            MR. HORNSTINE:  I will address the issues with my

 4    client during the break.  If it pleases the court, not only are

 5    we mindful about plaintiff's candidacy, but both Ms. Tassinari

 6    and Ms. O'Malley also have to run a general election for the

 7    state.  Does the court need them to appear this afternoon?

 8            THE COURT:  Yes.

 9            MR. HORNSTINE:  If so --

10            THE COURT:  But it won't be that long.  Well, they'll

11    need to hear my decision, because I'm going to hear from you,

12    and I'm going to give you a decision this afternoon.  But let

13    me tell you what my present thoughts are.

14            MR. HORNSTINE:  Thank you, Your Honor.

15            THE COURT:  Because this may obviate it, the need to

16    decide.  So here are my thoughts.  Even though service hasn't

17    been perfected, the defendant has had notice.  And I have the

18    authority to issue a temporary restraining order.  It could

19    have been done in certain circumstances without notice under

20    Rule 65.  The import of *Will* is when the issue is prospective

21    injunctive relief, section 1983 provides a remedy for

22    violations of constitutional rights, including First Amendment

23    rights in cases against a state official acting in his official

24    capacity.  So that authority exists under footnote 10 of *Will*

25    and a number of other cases.
```

01:05  (line 10)
01:06  (line 20)

1        The testimony I heard, which I believe is candid and

2    credible, was also helpful because it amplifies the affidavits

3    which say there was a report.  The closest issue in my mind,

4    and it's closer than it was based solely on the papers, is

5    whether what I'll call the *Blum* test for converting Twitter's

6    action into state action is met, or, to be more precise,

7    whether it will probably be proven.  Because now we do know

8    that Twitter gives high priority to reviewing reports or

9    complaints from election officials and acts on them quickly,

01:08 10   and they acted on Dr. Shiva's account, as I understand it,

11   quickly after getting the report from the Secretary here and

12   also from the National Association.

13        So it may be probable that he will ultimately prove

14   that state action is involved here.  If state action is

15   involved here, then it appears to me probable that he will

16   prove that his First Amendment rights have been violated.

17        I understand that the government can control its own

18   speech under *Rosenberger*, but I think that doesn't mean it can,

19   in concert with somebody else, censor speech, particularly

01:09 20   political speech.  This would be a content-based regulation

21   subject to strict scrutiny, which requires the government to

22   demonstrate a compelling interest in narrow tailoring to

23   achieve its interests, as the First Circuit said in *Rideout*,

24   837 F.3d 65, 71.

25        And there would be a particular problem here because

1    Dr. Shiva's account was suspended, which arguably is a form of

2    a prior restraint on his ability to speak.  And prior

3    restraints, it's the Pentagon papers case, *New York Times v.*

4    *United States*, et cetera, you know, prior restraints are almost

5    always invalid.

6           So then there would be a question, though, as to

7    whether there is a continuing violation.  And I understand the

8    argument better now.  But this is going to depend a little bit.

9    But this also merges with the *Already* doctrine that I discussed

01:11 10   with you.

11          Even if there's not a continuing violation, is there a

12   sufficient likelihood that the issue will arise again and not

13   be capable of being litigated and resolved in a timely way.

14   And that may be, and I'd have to think about the interaction of

15   those two doctrines.

16          But again, if the Secretary of State is prepared to

17   represent that it won't file any more reports at least until

18   after the election and that it will ask the National

19   Association not to file reports, and that if it believes Dr.

01:11 20   Shiva has said something false, it will use its own Twitter

21   account in a non-defamatory way to answer false speech with

22   true speech and expect that it will prevail in the marketplace

23   of ideas, which perhaps is an antique notion, but it's one I've

24   believed in deeply.

25          So that's my present thinking.  And Dr. Shiva, if they

do make that kind of representation and then you can get back

to Twitter on Sunday, whenever it will be, after tomorrow, I

will either find -- and you might agree to this.  You should

see -- if they offer you that and you're agreeable, then you

can go back to campaigning.  Because, unfortunately, you want

to be campaigning.  They want to be preparing for this very

consequential and challenging election.  And then after the

election, you all will confer and tell me whether the case is

over or whether in some deliberate fashion it can be litigated.

Okay?  Do you think you understand that?

MR. AYYADURAI:  Yes, Your Honor.  May I just repeat

what you just shared?

THE COURT:  Not all of it.

MR. AYYADURAI:  Just the three points.  The three

points you said was that, if the Secretary of State can make a

representation they will no more file reports with Twitter;

two, they will also ask the National Association not to

interfere; and they will also use their own Twitter account if

they differ with me in the marketplace of ideas.

THE COURT:  That's what I'm suggesting.

MR. AYYADURAI:  I can agree to that.  Obviously there

has to be written assurances.  I'm fine with that.

THE COURT:  Well, now you know -- let's do this before

I faint with hunger.  Do you want to take a few minutes with

your clients?  It may be that we can resolve this soon, and

```
 1   they can get back to their important work.
 2           MR. HORNSTINE:  I think that would be very useful.
 3   I'm mindful that my client's witnesses have a 2:30 election
 4   security call with some federal officials.
 5           THE COURT:  Here.  It's 1:15.  We can put you all in a
 6   breakout room.
 7           MR. HORNSTINE:  As long as it is a secure breakout
 8   room.
 9           THE COURT:  It's secure.  It will be entirely
10   privileged conversations.
11           MR. HORNSTINE:  Very good.
12           THE COURT:  You'll tell Ms. Loret when you're ready to
13   come back.
14           MR. HORNSTINE:  And how is the best way for me to
15   contact Ms. Loret?
16           COURTROOM CLERK:  You can just send me an email.
17           MR. HORNSTINE:  Very good.  I have your email address.
18           THE COURT:  Then I'd like you, please, Ms. Loret, to
19   put my staff and me and the court reporter in another breakout
20   room.  But set up theirs first, please.
21           COURTROOM CLERK:  Yes.
22           MR. HORNSTINE:  Thank you, Your Honor.  We will revert
23   and hopefully you can get a snack while we do that.
24           THE COURT:  I'm going to be talking to my clerks, but
25   thank you.
```

```
 1              MR. AYYADURAI:  Your Honor, do I just stay here?
 2              THE COURT:  Yes.
 3              MR. AYYADURAI:  Okay.
 4              (Recess taken 1:15 p.m. - 1:32 p.m.)
 5              THE COURT:  Okay.  Let's see.  There's Dr. Shiva.  I
 6     don't see him, but he appears to be there.  Dr. Shiva, are you
 7     on?
 8              COURTROOM CLERK:  He's on the call.
 9              THE COURT:  He's on mute and I can't see him, so he
10     may not be available.
11              COURTROOM CLERK:  Let me try to get in touch with him.
12              MR. AYYADURAI:  I'm sorry, Your Honor.
13              THE COURT:  Okay.  Mr. Hornstine, what do you have to
14     report?
15              MR. HORNSTINE:  Yes, Your Honor.  First of all, thank
16     you for the opportunity to speak with the representatives from
17     the Secretary's Office.  They will agree as follows:
18              That, first, that they will or that the Secretary's
19     Office will not make any reports to Twitter concerning
20     plaintiff's Twitter accounts between now, and just to put a
21     time on it specifically, 9:00 a.m. the day after Election Day,
22     so that would be Wednesday, November 4th; that we will, upon
23     conclusion of today's proceedings, email NASED, National
24     Association of State Election Directors, and instruct them not
25     to do the same for the same period of time.
```

1          And if the court wishes to set a status conference for

2     sometime after Election Day, we would be happy to do that.

3          THE COURT:  Couple of things.

4          MR. HORNSTINE:  And on that basis, Your Honor, we

5     believe that the motion should be denied without prejudice as

6     moot.

7          THE COURT:  Okay.  Dr. Shiva, is that still

8     acceptable?

9          MR. AYYADURAI:  Your Honor, if I can just review, I

01:34 10  believe there's one point that's missing and one clarification,

11    if I may?

12         THE COURT:  Yes.

13         MR. AYYADURAI:  It is -- the first one is fine, which

14    is that they represent that they will no longer report me to

15    Twitter until 9:00 a.m. November 4th.

16         The second is, it's not only the National Association

17    of Election Directors but it's also the National Association of

18    Secretaries of State.  There are two organizations that are

19    involved here.  So I just want to clarify that.

01:35 20       And the third point I believe you made was that they

21    will, if they have a difference with me on this matter, that

22    they will raise the objections on Twitter.  They will not as a

23    part of --

24         THE COURT:  They will not what?

25         MR. AYYADURAI:  They will raise their objections of

1    anything that I tweet out on Twitter, on social media.

2              THE COURT:  That they can?

3              MR. AYYADURAI:  They can, yeah.  I'm not here to

4    restrict their speech, but if they have a difference, I believe

5    you stated that they should go to --

6              THE COURT:  Well, here.  Let me ask the following.

7    You said you would email NASED.  Does Ms. Tassinari hold an

8    office in that organization?

9              MR. HORNSTINE:  She can answer that question.  I'll

01:35 10    let her speak for herself.

11             MS. TASSINARI:  I'm the president-elect of the

12   National Association of State Election Directors.

13             THE COURT:  Then the executive director will be under

14   you.

15             MS. TASSINARI:  Typically she's reporting to the

16   president of the association, but I can certainly send an email

17   that will include the president on that.

18             THE COURT:  I think it would be prudent so we don't

19   end up back here as a result of any misunderstandings, if you

01:36 20   talk to them as well.  Send them an email promptly.  You've got

21   other things to do.

22             MS. TASSINARI:  I certainly can.  The president of the

23   National Association of State Election Directors is in

24   Washington State, so it's a three-hour difference.  Again, we

25   are all preparing for a huge election, so I don't know that

```
 1    I'll be able to communicate with them.

 2            THE COURT:  I had in mind you would call the executive

 3    director.  I just think it's prudent.  But you'll communicate

 4    with them.

 5            MR. HORNSTINE:  And Your Honor, just one

 6    clarification.  I know plaintiff was asking about the National

 7    Association of Secretaries of State.  My client had no contact

 8    with NASS about plaintiff's tweets, is my understanding, so

 9    there would be nothing for us to instruct them not to do, or

01:37 10   there would be nothing for us to undo vis-à-vis NASS.

11            THE COURT:  Dr. Shiva, is that agreeable?

12            MR. AYYADURAI:  That's fine.  I was under the

13    understanding, I heard National Association of Secretaries of

14    State and --

15            THE COURT:  Here is what I'm going to do.  I'm going

16    to issue an order that says, "In connection with the hearing on

17    the motion for temporary restraining order, the parties have

18    agreed, one, that the Secretary, the defendant, Secretary of

19    State will not report any tweets or complain about any tweets

01:38 20   by Dr. Shiva again before 9:00 a.m. on November 4th.

21            "Two, the Secretary of State will" -- Ms. Tassinari

22    said "direct," if that word is okay, I'll say "direct."  I

23    might say "ask" -- "ask the National Association of" -- what's

24    the name of it?  National Association of Election Directors?

25            MR. AYYADURAI:  We can't hear you, Adam.
```

1          THE COURT:  National Association of what?

2          MS. TASSINARI:  State Election Directors.

3          THE COURT:  -- "not to report to Twitter any tweets

4    before 9:00 a.m., that the defendant is free to respond to any

5    tweets by Dr. Shiva by Twitter if it chooses to do so.  As

6    agreed by the parties, the motion for temporary restraining

7    order is therefore moot.  This case is stayed."

8          And I would say, you know, catch your breath.  I'll

9    give you a date like November 10th or 11th or 12th to confer

01:39 10   and tell me whether the plaintiff wishes to dismiss the case

11   and, if not, how each side proposes it proceed.  I don't think

12   I'd want to do a motion for preliminary injunction.  I'd

13   probably want expedited discovery and consolidate the trial on

14   the merits with a hearing on preliminary injunction.

15         But it sounds to me, particularly going back to the

16   very first thing that Dr. Shiva said in response to my question

17   of what relief, that maybe this case will be over after the

18   election.  Okay?

19         And I think this is a constructive resolution, and

01:40 20   it's good that you could reach an agreement, and the

21   representatives of the Secretary of State can get back to their

22   important work, and Dr. Shiva can get back to the role he's

23   playing in our democracy.

24         Is there anything further in this matter for today?

25         MR. AYYADURAI:  No, Your Honor.  Thank you.

1          THE COURT:  All right.  You may want to -- you can

2     decide whether you want to order the transcript of this

3     hearing.  If there are going to be further proceedings in this

4     case, it will be necessary for you to order the transcript.

5     Otherwise, it's up to you.  Okay?

6          MR. AYYADURAI:  Thank you, Your Honor.

7          MR. HORNSTINE:  Thank you, Your Honor.

8          THE COURT:  Thank you very much.  Good luck to all.

9     We will be in recess.

10          (Adjourned, 1:41 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3             I, Kelly Mortellite, Registered Merit Reporter

4    and Certified Realtime Reporter, in and for the United States

5    District Court for the District of Massachusetts, do hereby

6    certify that the foregoing transcript is a true and correct

7    transcript of the stenographically reported proceedings held in

8    the above-entitled matter to the best of my skill and ability.

9                         Dated this 4th day of November, 2020.

10

11                       /s/ Kelly Mortellite

12                       _____

13                       Kelly Mortellite, RMR, CRR

14                       Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25