UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DR. SHIVA AYYADURAI,<br><br>                    Plaintiff,<br><br>          v.<br><br>WILLIAM FRANCIS GALVIN, in his official capacity as the Secretary of the Commonwealth of Massachusetts and his individual capacity, MICHELLE TASSINARI, in her individual capacity, DEBRA O'MALLEY, in her individual capacity, AMY COHEN, in her individual capacity, and NATIONAL ASSOCIATION OF STATE ELECTION DIRECTORS<br><br>                    Defendant. | CIVIL ACTION<br>NO. 1:20-cv-11889-MLW<br><br><br>Leave to file excess pages granted on December 7, 2020 |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS BY WILLIAM FRANCIS GALVIN, MICHELLE TASSINARI, AND DEBRA O'MALLEY**

MAURA HEALEY
ATTORNEY GENERAL

Anne Sterman (BBO No. 650426)
Adam Hornstine (BBO No. 666296)
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
617-963-2048
Anne.Sterman@mass.gov
Adam.Hornstine@mass.gov

Dated: December 9, 2020

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

FACTUAL ALLEGATIONS ................................................................................................2

ARGUMENT ........................................................................................................................4

I.      STANDARDS OF REVIEW. ....................................................................................5

II.     PLAINTIFF'S FEDERAL STATUTORY CLAIMS (COUNTS 1-4) AGAINST THE
        DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES MUST BE DISMISSED. .........6

        A.      Plaintiff Fails to State a Plausible Claim Against the Defendants for Violation
                of Federal Statutes in Their Individual Capacities. .......................................... 7

                1.      The Court Should Dismiss Plaintiff's Section 1983 Claim. ................................ 7

                        a.      Plaintiff's Section 1983 claim fails because Twitter's decision to
                                sanction Plaintiff under its Terms of Use is not state action....................... 7

                        b.      Plaintiff fails to plead a plausible causal nexus between
                                Defendants' complaint to Twitter about a single Tweet and
                                Twitter's private decision to sanction Plaintiff for four different
                                Tweets. ...................................................................................................... 12

                        c.      Even if Twitter's decision to sanction Plaintiff could be considered
                                as state action, Defendants' report to Twitter is not subject to First
                                Amendment regulation because it reflects the government's own
                                speech......................................................................................................... 14

                        d.      Plaintiff fails to plead a supervisory liability claim against the
                                Secretary. ................................................................................................... 17

                2.      The Court Should Dismiss Plaintiff's Section 1985 Claim. ............................. 19

                3.      The Court Should Dismiss Plaintiff's RICO Claims. ...................................... 21

        B.      Plaintiff's Federal Statutory Claims Against the Defendants in Their
                Individual Capacities Are Barred by the Doctrine of Qualified Immunity. ............... 23

                1.      Plaintiff's Allegations Fail to Make Out a Violation of a First
                        Amendment Right...................................................................................................... 24

                2.      Plaintiff's Alleged First Amendment Rights were not Clearly
                        Established. ....................................................................................................... 24

III.    PLAINTIFF'S STATE LAW CLAIM FOR INTENTIONAL INFLICTION OF
        EMOTIONAL DISTRESS (COUNT 5) MUST BE DISMISSED.....................................27

IV.   PLAINTIFF'S CLAIM FOR PERMANENT INJUNCTIVE RELIEF AGAINST THE
      SECRETARY (COUNT 6) MUST BE DISMISSED. ........................................................28

            A.      Plaintiff's Claim, Despite Being Framed as a Claim for Prospective
                    Injunctive Relief, is Barred by the Eleventh Amendment. ....................... 28

            B.      Plaintiff's Requested Injunction is Moot, as He Suffers from No
                    Ongoing Harm. ....................................................................................... 31

            C.      Plaintiff Fails to State a Claim Against the Secretary in his Official
                    Capacity ................................................................................................. 33

V.    PLAINTIFF'S CLAIM FOR DECLARATORY RELIEF PRECLUDING THE
      ATTORNEY GENERAL'S OFFICE FROM REPRESENTING THE INDIVIDUAL
      DEFENDANTS (COUNT 7) MUST BE DISMISSED. ......................................................34

            A.      The Court May Not Enjoin State Officials' Compliance with State
                    Law Requirements. ................................................................................. 34

            B.      Plaintiff's Request Misapprehends State Law. ......................................... 35

      CONCLUSION...................................................................................................... 35

## INTRODUCTION

Plaintiff Shiva Ayyadurai, a former candidate for public office, attempts to bring a wholly novel and unsupportable claim for money damages and permanent injunctive relief against an elected state official, Secretary of the Commonwealth William Francis Galvin, and two of his employees, Michelle Tassinari, the Director and Legal Counsel to the Elections Division of the Secretary's Office, and Debra O'Malley, the Secretary's Communications Director, based on the fact that Plaintiff posted election misinformation to his Twitter account and Twitter decided to sanction him. His claim fails as a matter of law.

On September 24, 2020, Plaintiff baselessly accused the Commonwealth on Twitter of having destroyed 1 million ballots from the September 1, 2020 primary that Plaintiff lost. Plaintiff alleges that Ms. Tassinari and Ms. O'Malley reported this Tweet to Twitter, contending that it was election misinformation and a violation of Twitter's own civic integrity policy. Twitter, however, imposed no sanction with respect to the reported Tweet, which remains on Plaintiff's Twitter feed to this very day. Instead, Twitter – a private, for-profit social media company – deleted four other Tweets posted by Plaintiff on September 25, 2020 and then suspended him from the Twitter platform on three separate occasions for violations of Twitter's Terms of Use.

Plaintiff casts blame for Twitter's private decision to suspend him on the Secretary and his employees. He alleges that the report they filed with Twitter – which apparently did not cause Twitter to act, because the offending Tweet is still visible on Plaintiff's account – violated his First Amendment rights on the theory that the coercive effect of the Secretary's Office's report caused Twitter to act as an arm of the state in sanctioning Plaintiff by deleting his Tweets

1

and temporarily suspending his account.  Courts, however, have broadly rejected arguments that social media companies like Twitter act as state agents for purposes of the First Amendment.  In his sprawling Complaint, Plaintiff also alleges that the Defendants violated Section 1985(3) and RICO.  None of these allegations, however, states a plausible money damages claim, and in any event, these claims are barred under the doctrine of qualified immunity and should be dismissed.  Plaintiff also brings a threadbare claim for intentional infliction of emotional distress against these Defendants, but that claim too should be dismissed as deficient.

In addition to these money damages claims, Plaintiff brings claims against the Secretary in his official capacity for injunctive relief to prevent the Secretary from reporting Plaintiff to Twitter ever again and to bar the Attorney General's Office from representing the individual Defendants.  These claims should likewise be dismissed.  Plaintiff's claim for injunctive relief is barred by the Eleventh Amendment and is moot, because one isolated incident of alleged wrongdoing does not constitute an ongoing practice that can be enjoined.  Moreover, Plaintiff's attempt to prevent the Attorney General's Office from representing the individual Defendants pursuant to state law is barred and, in any event, misapprehends state law.

For these reasons, the Defendants ask this Court to dismiss this suit with prejudice.

## FACTUAL ALLEGATIONS

The below factual recitation is taken as true, as it must be, only for purposes of this motion, and these allegations are taken from the Complaint, the documents referenced in it, and other public records.  See Freeman v. Town of Hudson, 714 F.3d 29, 37 (1st Cir. 2013).

Plaintiff Shiva Ayyadurai ran for the Republican party's nomination for U.S. Senate in 2020.  Am. Compl. at 9.  He lost his primary election by approximately twenty points.  Am. Compl. at 9.  Following his loss during the September 1 primary election, on September 9, 2020, Plaintiff delivered a public records request to the Office of the Secretary of the Commonwealth.

Am. Compl. at 10.  This request sought scanned digital ballot images from all jurisdictions in Massachusetts pertaining to the September 1, 2020 primary election.  Am. Compl. at 10.

Defendant Michelle Tassinari, the director and legal counsel to the Elections Division of the Secretary's Office, responded to Plaintiff's public records request, informing him that it had no records responsive to his request, because the Secretary's Office "does not maintain voter tabulation software, firmware or hardware."  Am. Compl. at 13-14.  Ms. Tassinari explained that "the approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images."  Am. Compl. at 14.  When Plaintiff questioned this, she clarified that "while the ballot images are not stored, the actual ballots voted on at any federal election are secured and stored for 22 months in accordance with federal law.  However, under state law, those ballots must remain sealed until such time as they can be destroyed."  Am. Compl. at 15.

On September 24, 2020, Plaintiff posted to his Twitter account (@va_shiva):



Am. Compl. at 18.  Ms. Tassinari believed that this Tweet was false and constituted election misinformation.  Am. Compl. at 23.  She then directed Defendant Debra O'Malley, who is the Communications Director for the Office of the Secretary of the Commonwealth and who runs the Election Division's official Twitter account (@VotingInMass), which Twitter considers a "trusted partner" account, to lodge a complaint with Twitter about Plaintiff's Tweet.  Am. Compl. at 24.  She did so by filling out a publicly available online form, reporting Plaintiff's

Tweet as election misinformation and an alleged violation of Twitter's Terms of Use agreement. Am. Compl. at 24. Ms. O'Malley and Ms. Tassinari also reported Plaintiff's Tweet to the National Association of State Election Directors, a nonpartisan professional organization that disseminates election administration best practices and information across the states, in hopes that it would also complain to Twitter about Plaintiff's misleading Tweet. Am. Compl. at 24-25. In response to the report from the Secretary's Office about this single Tweet, though, Twitter appears to have done nothing. As Plaintiff admits, the misleading Tweet that the Secretary's Office complained about was never deleted from Twitter. Am. Compl. at 18.

On September 25, 2020, Plaintiff published four additional Tweets to his account. Am. Compl. at 20-21. These four tweets alleged that the Commonwealth destroyed a million ballots from the September primary election and included screenshots of Plaintiff's correspondence with Ms. Tassinari. Am. Compl. at 21-23. Nowhere does Plaintiff allege that anyone from the Secretary's Office complained to Twitter about these four Tweets from September 25, 2020. Twitter, however, deleted these Tweets and temporarily suspended Plaintiff's access to his Twitter account pursuant to the company's Terms of Use. Am. Compl. at 28. After this initial suspension ended, Twitter twice more suspended Plaintiff for separate infractions. Am. Compl. at 52; Am. Compl. Exhibit A at 26, 40-42.

## ARGUMENT

Plaintiff seeks money damages from Secretary Galvin, Ms. Tassinari, and Ms. O'Malley in their personal capacities for alleged violations of 42 U.S.C. §§ 1983, 1985 (Counts 1-2) and RICO (Counts 3-4) and under state law for intentional infliction of emotional distress (Count 5) (collectively, the "individual capacity claims"). Plaintiff also seeks a permanent injunction against the Secretary in his official capacity (Count 6), prohibiting the Secretary's Office from complaining to Twitter about alleged misinformation on Plaintiff's Twitter account. Plaintiff

additionally seeks a declaration that the three Defendants in their individual capacities are not entitled to representation by the Attorney General's Office and must instead fund their own defense (Count 7).  All of these counts should be dismissed.

The individual capacity claims (Counts 1-5) should be dismissed for several reasons. First, Plaintiff fails to state a plausible claim against the Defendants under any of these theories of recovery.  Second, the federal claims are barred by qualified immunity.  The official capacity claim against the Secretary for injunctive relief (Count 6) should be dismissed because it is barred by the Eleventh Amendment and is moot.  Finally, the claim for a declaration that would prohibit the Attorney General's Office from representing the three individual Defendants (Count 7) should also be dismissed because Plaintiff's request is barred under Pennhurst and is, in any event, contrary to state law regarding representation of public employees.

## I.      STANDARDS OF REVIEW.

To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege facts sufficient "to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The grounds of entitlement to relief set forth in the complaint must constitute "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 555.  In evaluating this motion to dismiss, the Court must assume the truth of "all well-plead[ed] facts" and consider documents referenced in the complaint, but conclusory allegations or "naked assertion[s]" devoid of "further factual enhancement" should be disregarded, as should legal conclusions. Ashcroft v. Iqbal, 556 U.S. 662, 678-86 (2009).  Thus, Plaintiff must do more than demonstrate "a sheer possibility that a defendant has acted unlawfully." Id. at 678 (internal quotations omitted).  Dismissal is appropriate if a plaintiff's well-pleaded facts do not "possess enough heft to show that plaintiff is entitled to relief." Ruiz Rivera v. Pfizer Pharm., LLC, 521 F.3d 76, 84 (1st Cir. 2008) (internal

quotation marks and original alterations omitted).

Inasmuch as the Secretary argues that the claims against him in his official capacity are barred by the Eleventh Amendment, he does so under Rule 12(b)(1). Valentin v. Hosp. Bella Vista, 254 F. 3d 358, 362 (1st Cir. 2001) ("[t]he proper vehicle for challenging a court's subject-matter jurisdiction is Federal Rule of Civil Procedure 12(b)(1)"). But "[a] motion to dismiss brought under Rule 12(b)(1) is subject to a similar standard of review as a motion brought pursuant to Rule 12(b)(6)." Fed. Deposit Ins. Corp. v. Caban-Muniz (D.P.R. 2016). Moreover, to the extent that he argues that the claims against him in his official capacity are moot, this argument too is brought as a facial attack to subject matter jurisdiction under Rule 12(b)(1). See Valentín, 254 F.3d at 362-63. In a facial challenge, the moving party challenges jurisdiction based on the allegations in the complaint. See id. at 363. A facial attack only requires a court to examine the complaint and determine whether the plaintiff "has sufficiently alleged a basis of subject matter jurisdiction." Torres–Negrón v. J & N Records, LLC, 504 F.3d 151, 162 (1st Cir. 2007). Just as with motions under Rule 12(b)(6), the Court "must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor." Merlonghi v. United States, 620 F.3d 50, 54 (1st Cir. 2010).

## II. PLAINTIFF'S FEDERAL STATUTORY CLAIMS (COUNTS 1-4) AGAINST THE DEFENDANTS IN THEIR INDIVIDUAL CAPACITIES MUST BE DISMISSED.

Plaintiff asserts several federal statutory claims against the Defendants in their individual capacities: a claim under Section 1983 for an alleged violation of Plaintiff's First Amendment rights, a claim under Section 1985(3) for an alleged conspiracy to violate Plaintiff's rights to free political speech, and a claim under RICO for an alleged racketeering conspiracy to obstruct justice. These claims are all defective and must be dismissed. First, the Section 1983 claims fail because (i) Plaintiff cannot demonstrate a plausible violation of his First Amendment rights, both

because Twitter's decision to suspend Plaintiff under its private contractual Terms of Use is not

state action and because the speech of the government itself – here, the report by Defendants to

Twitter – is not subject to First Amendment regulation, (ii) Plaintiff cannot plausibly show that

the Defendants, who complained to Twitter about one of Plaintiff's Tweets, caused Plaintiff's

suspension from Twitter when Twitter evidently decided to sanction him for four different

Tweets, and (iii) Plaintiff fails to plead a supervisory liability claim against the Secretary.

Second, the Section 1985(3) claim should be dismissed because Plaintiff fails to plead, as he

must, that Defendants acted as conspirators and with the requisite conspiratorial purpose for an

action under this statute, namely that there was "some racial, or perhaps otherwise class-based,

invidiously discriminatory animus behind" the Defendants' actions.  Finally, the Court should

reject the RICO claim against the Defendants because Defendants' report to Twitter is not

"racketeering activity."  As an additional reason, the Court should also dismiss all three federal

statutory claims because they are barred by the doctrine of qualified immunity.

A.   **Plaintiff Fails to State a Plausible Claim Against the Defendants for Violation of Federal Statutes in Their Individual Capacities.**

1.   **The Court Should Dismiss Plaintiff's Section 1983 Claim.**

a.   **Plaintiff's Section 1983 claim fails because Twitter's decision to sanction Plaintiff under its Terms of Use is not state action.**

Plaintiff's Section 1983 claim first fails because Twitter's decision to reprimand Plaintiff

pursuant to its Terms of Use was a private act to which the First Amendment does not apply and

there is nothing in the Complaint that would plausibly demonstrate that Twitter's decision can be

construed as state action.  Twitter's private decision to suspend Plaintiff from its platform and to

delete certain of his Tweets for violating Twitter's Terms of Use is not a government act to

which the First Amendment applies, and the Defendants cannot be held liable for it.  It is

axiomatic that "the constitutional guarantee of free speech is a guarantee only against

abridgement by government, federal or state." Hudgens v. NLRB, 424 U.S. 507, 513 (1976).  In

other words, to "trigger First Amendment protection, the infringement upon speech must have

arisen from state action of some kind." Bronner v. Duggan, 249 F. Supp. 3d 27, 41 (D.D.C.

2017) (citing Blum v. Yaretsky, 457 U.S. 991, 1002-03 (1982)).  Here, Plaintiff has asserted that

Defendants violated his constitutional rights by causing Twitter, a private party, to sanction him.

A private party can only be characterized as a state actor under limited circumstances.

See Mead v. Indep. Ass'n, 684 F.3d 226, 231 (1st Cir. 2012) (describing as "rare" the instances

in which the Court will consider private party's acts as state action).  As the Supreme Court

recently emphasized, the First Amendment only rarely applies to the conduct of a private entity.

See Manhattan Cmty. Access Corp. v. Halleck, 139 S.Ct. 1921, 1928, 1933 (2019) (deciding that

cable television network was "not subject to First Amendment constraints on how it exercises its

editorial discretion with respect to the public access channels," and explaining that "a private

entity can qualify as a state actor in a few limited circumstances").  Indeed, Courts have

expressed wariness about applying the First Amendment to actions taken by private businesses

because doing so "could eviscerate certain private entities' rights to exercise editorial control

over speech and speakers on their properties or platforms." Id. at 1932.

Plaintiff in this case asserts that Twitter became a private actor under the so-called "state

compulsion" doctrine such that the Defendants are liable for their report to Twitter (and Twitter's

subsequent decision to sanction Plaintiff).[1]  Under this doctrine, a private act is considered a

government act only when "the state 'has exercised coercive power or has provided such

significant encouragement, either overt or covert, that the [challenged conduct] must in law be

---

[1]     In addition, a private actor can become a public one under two other legal theories not
presented in the Complaint: the "public function" test and the "joint action/nexus" test.  See
Alberto San, Inc. v. Consejo De Titulares Del Condominio San Alberto (1st Cir. 2008) (outlining
the three means by which a private act can be considered a government act).

deemed to be that of the State.'"  Estades-Negroni v. CPC Hosp. San Juan Capestrano, 412 F.3d

1, 5 (1st Cir. 2005) (quoting Blum, 457 U.S. at 1004).  Plaintiff bears the burden of plausibly

pleading and ultimately proving that Defendants used this coercive power in a way that

transforms Twitter's decision into a public one.  See Mead, 684 F.3d at 231.

    The Supreme Court and the First Circuit have repeatedly rejected attempts by plaintiffs to

use Section 1983 to sweep alleged private misconduct into the domain of public misconduct,

even where – unlike here – the private actor has substantial financial ties with the government,[2]

or the government directly regulates the private actor.[3]  And indeed, no government coercion can

be found where the private actor retains ultimate authority to make the decision later challenged

by a plaintiff.  See Logiodice v. Trustees of Me. Cent. Inst., 296 F.3d 22, 28 (1st Cir. 2002)

(finding that a private school under contract to educate school district's secondary students was

not a state actor for purposes of disciplinary decision where school retained the "sole right to

promulgate, administer and enforce all rules and regulations pertaining to student behavior,

discipline, and use of the buildings and grounds."); Rodriguez-Garcia v. Davila, 904 F.2d 90, 97

(1st Cir. 1990) (finding no state action with respect to private entity's employment decision even

though "management contract and the sales agreement grant [state entity] significant control over

---

[2]    See Rendell–Baker v. Kohn, 457 U.S. 830, 840–43 (1982) (a private school, which taught
special needs children and received 90 percent of its funds from the government and was
extensively regulated, was not a state actor within the meaning of § 1983); Gerena v. Puerto Rico
Legal Servs., Inc., 697 F.2d 447, 450 (1st Cir. 1983) (rejecting claim that private entity was a
state actor where it was "almost entirely funded by the federal government").

[3]    See Halleck, 139 S.Ct. at 1932 ("Put simply, being regulated by the State does not make
one a state actor."); see also Denver Area Telecomm. Consortium, Inc. v. Federal
Communications Comm'n, 518 U.S. 727, 737 (1996) ("We recognize that the First Amendment,
the terms of which apply to governmental action, ordinarily does not itself throw into
constitutional doubt the decisions of private citizens to permit, or to restrict, speech—and this is
so ordinarily even where those decisions take place within the framework of a regulatory
regime....").

the operations of [private entity]" because private entity was ultimately "accorded freedom to make the initial selections" on employment matters).

In the First Amendment context, this rule for evaluating private conduct is no different. The First Circuit has maintained that no state-compelled censorship will be found where – as here – the challenged decision rested in the hands of private actors, not government employees. In Yeo v. Town of Lexington, the First Circuit confronted a case where the editorial judgment of students working on a school newspaper could be charged to the government. There, the students decided not to print advertisements promoting sexual abstinence in the school's newspaper. Even though the decision took place "in a public school setting," the government partially funded the newspaper's publication, and public school employees "act[ed] as advisors," the Court found that there was no state action because the final editorial judgment on running the ad was given to the students themselves. See Yeo v. Town of Lexington, 131 F.3d 241, 254–55 (1st Cir. 1997) (en banc). Ultimately, where there were "First Amendment interests on both sides of the case," the Court observed that the "analysis of whether there is state action must proceed with care and caution," and it decided that the dispositive factor was that student editors maintained the final judgment over whether to publish the advertisement. Id. Here, too, there is no plausible allegation that the final judgment whether to suspend plaintiff's account belonged to anyone other than Twitter.

Indeed, Courts have recognized time and again that privately held internet companies or social media platforms, including Twitter, are emphatically not subject to the First Amendment (under any of the tests that could transform private conduct into public conduct) precisely because these businesses are private actors and make their own decisions with respect to their users. See, e.g., Prager Univ. v. Google LLC, 951 F.3d 991, 995 (9th Cir. 2020) ("Despite YouTube's ubiquity and its role as a public-facing platform, it remains a private forum, not a

public forum subject to judicial scrutiny under the First Amendment."); Howard v. Am. Online, Inc., 208 F.3d 741, 754 (9th Cir. 2000) (concluding that internet company was not private actor because it was not "an instrument or agent of the government"); Freedom Watch, Inc. v. Google, Inc., 368 F. Supp. 3d 30, 40 (D.D.C. 2019) ("Facebook and Twitter ... are private businesses that do not become 'state actors' based solely on the provision of their social media networks to the public."), appeal filed, No. 19-7030 (D.C. Cir. 2019); Green v. YouTube, LLC, 2019 WL 1428890, at *4 (D.N.H. Mar. 13, 2019) (there is no "state action giving rise to the alleged violations of [the plaintiff's] First Amendment rights" by YouTube and other platforms that are "all private companies"); Nyabwa v. FaceBook, 2018 WL 585467, at *1 (S.D. Tex. Jan. 26, 2018) ("Because the First Amendment governs only governmental restrictions on speech, [the plaintiff] has not stated a cause of action against FaceBook."); Shulman v. Facebook.com, 2017 WL 5129885, at *4 (D.N.J. Nov. 6, 2017) (Facebook is not a state actor); Forbes v. Facebook, Inc., 2016 WL 676396, at *2 (E.D.N.Y. Feb. 18, 2016) ("Facebook is a private corporation" whose actions may not "be fairly attributable to the state"); Doe v. Cuomo, 2013 WL 1213174, at *9 (N.D.N.Y. Feb. 25, 2013) (Facebook is not a state actor under the joint action test).[4]  This rule remains true even when the private actors sometimes work alongside government entities. See Langdon v. Google, Inc., 474 F. Supp. 2d 622, 631–32 (D. Del. 2007) (rejecting as "specious" the allegation that Google was subject to the First Amendment when it worked with public entities).

Here, Plaintiff cannot plausibly allege that Defendants compelled Twitter to suspend Plaintiff's account.  See Mead, 684 F.3d at 232 (affirming dismissal where plaintiff failed to

---

[4]     One Court has observed that "[a]t least one academic argues that '[t]here's no right to free speech on Twitter.  The only rule is that Twitter Inc. gets to decide who speaks and listens– which is its right under the First Amendment.'"  Morgan v. Bevin, 298 F. Supp. 3d 1003, 1012 & n.4 (E.D. Ky. 2018).

plausibly demonstrate that the government "compelled" a private entity to fire her).  As an initial

matter, Plaintiff does not plausibly allege that Defendants have any jurisdiction to compel

Twitter to do anything—nor could he, as they do not.[5]  Instead, Twitter, which retains authority

to discipline its users pursuant to its contractual Terms of Use, made the decision to delete four

of Plaintiff's <u>other</u> Tweets and to suspend him on three separate occasions.  Where, as here,

Twitter maintains final decision-making authority over the discipline of its users, state action

cannot be found.   <u>See</u> <u>Yeo</u>, 131 F.3d at 254–55 (rejecting suit where students, not public school

teachers, retained final editorial control over school newspaper); <u>Logiodice</u>, 296 F.3d at 28

(rejecting suit where private school, not the public school district, retained the right to discipline

students); <u>Mead</u>, 684 F.3d at 231-32 (rejecting suit where non-profit organization that operated

state-licensed residential care facilities, not the state agency regulator, had final say over firing

decision).  These allegations fail to state a plausible claim that Defendants <u>compelled</u> Twitter to

act to punish Plaintiff; at most, they demonstrate only that the Defendants <u>reported</u> one of

Plaintiff's misleading Tweets for an alleged violation of Twitter's civic integrity policy, just like

any other Twitter use can do by clicking "Report Tweet."[6]  These allegations are not enough to

show that the Defendants are liable under the First Amendment for Twitter's private decision.

> **b.**    **Plaintiff fails to plead a plausible causal nexus between Defendants' complaint to Twitter about a single Tweet and Twitter's private decision to sanction Plaintiff for four different Tweets.**

Plaintiff's Section 1983 claim also must be dismissed because he fails to plausibly allege

that the Defendants caused his supposed harm.  To succeed in his Section 1983 action, Plaintiff

---

[5]     Indeed, the form that Defendants used to report Plaintiff's Tweet to Twitter does not permit Defendants to ask Twitter to take any specific action.  <u>See</u> Compl. Ex. A at 60 (describing form submitted to Twitter).

[6]     <u>See</u> https://help.twitter.com/en/safety-and-security/report-a-tweet.

12

must "show that the defendants' conduct was the cause in fact of the alleged deprivation" of his

First Amendment rights.  See Rodriguez–Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir. 1997); see

also Maldonado Santiago v. Velazquez Garcia, 821 F.2d 822, 831 (1st Cir. 1987) ( "Section 1983

imposes a causation requirement similar to that of ordinary tort law."); Martinez v. California,

444 U.S. 277, 285 (1980) (holding that Section 1983 imposes a proximate cause requirement on

claims under that statute).  This causation requirement limits Section 1983 liability "to those

whose conduct, beyond falling within the infinite causal web leading to an injury, was a legally

significant cause."  Rodriguez-Cirilo, 115 F.3d at 52.  The Court must reject the claim, therefore,

if Plaintiff fails to show that the Defendants' conduct caused the alleged constitutional

deprivation, namely Twitter's decision to sanction Plaintiff.

That is precisely the case here.  The Complaint alleges that the Defendants reported one

of Plaintiff's Tweets to Twitter.  Am. Compl. at 24-25.  That Tweet remains on Plaintiff's

Twitter feed; it has never been deleted by Twitter and it has never been the basis of Twitter's

decision to suspend Plaintiff.  Am. Compl. at 18.  Instead, Twitter, acting pursuant to a Terms of

Use agreement, deleted four different Tweets and appears to have used those four Tweets as the

basis for suspending Plaintiff from Twitter's service on three separate occasions.  Am. Compl. at

28, 52; Am. Compl. Exhibit A at 26, 40-42.  Plaintiff has no plausible factual basis – apart from

speculation insufficient to survive a motion to dismiss – that Twitter acted at the Defendants'

behest.  Indeed, Plaintiff's allegations themselves defeat causation because they make plain that

there is no causal link between the Tweet about which Defendants complained (as to which

Twitter took no action) and Plaintiff's eventual suspensions from Twitter.

Even if the Defendants had reported the Tweets that ultimately led to Plaintiff's

suspension, he still could not plausibly allege causation.  This is because the Defendants did not

– indeed, cannot – suspend a Twitter user's account, let alone ask Twitter to do so.  Twitter is a

private, for-profit corporation, and its users, like Plaintiff, are subject to certain terms of use and service, including terms of use and service that prohibit making false or misleading statements about elections.[7]  See Morgan v. Bevin, 298 F. Supp. 3d 1003, 1006, & n.4 (E.D. Ky. 2018) ("Twitter is a privately owned social networking site ….").

While the Defendants, like any other Twitter user, can report alleged misinformation to Twitter,[8] they (again like other Twitter users) are powerless to suspend a Twitter user for violating Twitter's own terms of use; that power belongs to Twitter and Twitter alone.[9]  For that reason, Twitter's decision pursuant to its Terms of Use breaks any causal chain.  Because Plaintiff presents no well-pleaded facts plausibly tying the Defendants' actions to Plaintiff's suspension, his claim should be dismissed.

> **c.** **Even if Twitter's decision to sanction Plaintiff could be considered as state action, Defendants' report to Twitter is not subject to First Amendment regulation because it reflects the government's own speech.**

Even if the Court finds that the Defendants' report and Twitter's subsequent decision to sanction Plaintiff was state action caused by Defendants, Plaintiff's Section 1983 claim still fails

---

[7]    Twitter has a "Terms of Use" agreement that all users must sign to use Twitter.  See https://twitter.com/en/tos.  All users are bound by the terms of this agreement and Twitter's policies.  These policies make clear that Twitter (and only Twitter) has the right to remove material from the platform for violation of these Terms of Use or any of Twitter's policies.  As relevant here, Twitter has a "Civic Integrity Policy" that its users agree to obey.  See https://help.twitter.com/en/rules-and-policies/election-integrity-policy.  This policy prohibits users from using "Twitter's services for the purpose of manipulating or interfering in elections or other civic processes," including by making "disputed claims that could undermine faith in the [civic] process itself, such as unverified information about election rigging, ballot tampering, vote tallying, or certification of election results" and making "misleading claims about the results or outcome of a civic process which calls for or could lead to interference with the implementation of the results of the process."  Twitter encourages users, including government officials, to report violations of this policy.  Twitter's policy makes clear that sanctions for violating this policy are Twitter's to make and may include "Tweet deletion," profile "modifications," "labeling," or "suspension."

[8]    See https://help.twitter.com/en/safety-and-security/report-a-tweet.

[9]    See generally https://help.twitter.com/en/rules-and-policies/enforcement-options.

because the government's speech – here, an affirmative report to Twitter that Plaintiff was

making misrepresentations about the election – is not subject to First Amendment regulation.  As

the official charged with administering fair elections in the Commonwealth, the Secretary and

the Elections Division have a solemn responsibility to prevent the spread of election

misinformation and voter suppression.  This task is their job, and they are entitled to speak out to

counteract such speech in the marketplace of ideas.  The First Amendment permits them to do so.

      The First Amendment prohibits Congress and other government entities and actors from

"abridging the freedom of speech."  It "does not say that Congress and other government entities

must abridge their own ability to speak freely."  Matal v. Tam, 137 S.Ct. 1744, 1757 (2017).

The First Amendment, the Supreme Court has made clear, "does not regulate government

speech."  Pleasant Grove City v. Summum, 555 U.S. 460, 467 (2009); Johanns v. Livestock

Marketing Assn., 544 U.S. 550, 553 (2005) ("[T]he Government's own speech ... is exempt from

First Amendment scrutiny").  Indeed, the Supreme Court has observed that government could

not "function" if it were subject to the restrictions that the First Amendment imposes on private

speech.  Summum, 555 U.S. at 468; see also Walker v. Texas Div., Sons of Confederate

Veterans, Inc., 576 U.S. 200, 215 (2015) ("First Amendment strictures that attend the various

types of government-established forums do not apply" to government speech.).  "When a

government entity embarks on a course of action, it necessarily takes a particular viewpoint and

rejects others.  The Free Speech Clause does not require government to maintain viewpoint

neutrality when its officers and employees speak about that venture."  Matal, 137 S.Ct. at 1757.

"When the government speaks, for instance to promote its own policies or to advance a particular

idea, it is, in the end, accountable to the electorate and the political process for its advocacy.  If

the citizenry objects, newly elected officials later could espouse some different or contrary

position."  Bd. of Regents of Univ. of Wis. Sys. v. Southworth, 529 U.S. 217, 235 (2000).

Here, the employees of Secretary's office, which is charged with ensuring free and fair elections in the Commonwealth, reported Plaintiff's misleading Tweet about an election he lost. The government can permissibly do so under the First Amendment because these statements are government speech.  See Sutliffe v. Epping School Dist., 584 F.3d 314, 329–30 (1st Cir. 2009) (holding that municipality's refusal to place hyperlink on municipal website to website of group opposed to municipal budget constituted government speech); Page v. Lexington Cty. School Dist. One, 531 F.3d 275, 283–85 (4th Cir. 2008) (holding that School District's refusal to place hyperlink on its website to website of group that opposed School District's position on pending legislation constituted government speech because, in part, "the links to other websites were selected by the School District alone as ones that supported its own message").

The Secretary's staff used his official social media accounts to make a report to Twitter alleging that the Plaintiff made false statements about an election.  That is, these government officials entered the marketplace of ideas and told Twitter of their belief that Plaintiff's speech was election misinformation.  This act does not run afoul of the First Amendment.  See Davison v. Randall, 912 F.3d 666, 686 (4th Cir. 2019) (government official's "references on the Chair's Facebook Page to other Pages, personal profiles, and websites amount to governmental speech" that is not subject to First Amendment regulation); Shurtleff v. City of Boston, No. 18-CV-11417-DJC, 2020 WL 555248, at *4 (D. Mass. Feb. 4, 2020) (concluding that city's decision to fly third-party flags on government property was government speech); Griswold v. Driscoll, 625 F. Supp. 2d 49, 54 (D. Mass. 2009), aff'd on other grounds, 616 F.3d 53 (1st Cir. 2010) ("Public officials have the right to recommend, or even require, the curriculum that will be taught in public school classrooms.  Doing so is a form of government speech, which is not generally subject to First Amendment scrutiny.  There is no requirement that such government speech be balanced or viewpoint neutral.").  Accordingly, the Defendants' communication of information

16

to Twitter, which reflected the government's own protected speech, could not have violated Plaintiff's alleged rights.

Social media platforms like Twitter can serve as "powerful mechanisms available to a private citizen to make his or her voice heard" and can be used for "a wide array of protected First Amendment activity." Packingham v. North Carolina, 137 S.Ct. 1730, 1737-38 (2017). But this case is nothing like those where the government directly "muted" a user from posting comments on a government-sponsored social media account,[10] criminalized speech appearing on privately-owned social media,[11] or otherwise directly deleted Plaintiff's speech.[12]  Rather, the government spoke out to contradict Plaintiff's misinformation, as it is permitted to do.  Thus, the First Amendment does not apply here; Defendants, as government officials, are entitled to express their views to Twitter, just as Plaintiff is allowed to express his views on Twitter (subject, of course, to Twitter's own Terms of Use).

> **d.  Plaintiff fails to plead a supervisory liability claim against the Secretary.**

The Section 1983 claim against Secretary Galvin in his personal capacity should also be dismissed because it fails to plead any facts that show he is responsible as a supervisor for the alleged misconduct of his employees.  The mere fact that the Secretary was in a supervisory position is not enough to create Section 1983 liability for him.  It is well-settled that a supervisor's liability

---

[10]    See Knight First Amendment Inst. at Columbia Univ. v. Trump, 928 F.3d 226, 239 (2d Cir. 2019) (concluding that although "the President's tweets can accurately be described as government speech," the President "violated the First Amendment when he used the blocking function to exclude the Individual Plaintiffs because of their disfavored speech" from being able to post on the President's social media account).

[11]    See Rideout v. Gardner, 838 F.3d 65 (1st Cir. 2016) (striking down a New Hampshire law prohibiting people from photographing their marked ballots and publicizing the photographs on social media).

[12]    See Faison v. Jones, 440 F. Supp. 3d 1123, 1129 (E.D. Cal. 2020) (allowing injunction where government deleted posts from plaintiff and then precluded them from posting on the government's social media accounts).

for a Section 1983 claim cannot be predicated simply upon the theory of *respondeat superior*.  See
Ramirez-Lluveras v. Rivera-Merced, 759 F.3d 10, 19 (1st Cir. 2014) ("[T]he tort theory of
*respondeat superior* does not allow imposition of supervisory liability under § 1983.").  A
supervisor, or one acting in a supervisory capacity, "may be found liable only on the basis of her
own acts or omissions."  Figueroa v. Aponte Roque, 864 F.2d 947, 953 (1st Cir. 1989).  These acts
or omissions must constitute not "mere negligence" but rather must "amount to a reckless or callous
indifference to the constitutional rights of others."  Snell v. DeMello, 44 F. Supp. 2d 386, 390 (D.
Mass. 1999) (quoting Febus–Rodriguez v. Betancourt–Lebron, 14 F.3d 87, 92 (1st Cir. 1994).  In
addition, there must be an "affirmative link" between the employee's misconduct and the action, or
inaction, of the supervisor.  Feliciano–Hernández v. Pereira–Castillo, 663 F.3d 527, 533 (1st Cir.
2011).  Courts have consistently found that this showing of causation must be a strong one, as that
requirement "contemplates proof that the supervisor's conduct led inexorably to the constitutional
violation."  Hegarty v. Somerset Cnty., 53 F.3d 1367, 1380 (1st Cir. 1995).

Plaintiff's allegations against the Secretary fail to satisfy these strict standards for several
reasons, particularly where the Complaint fails to plead any facts that the Secretary personally took
any action in connection with – or was even aware of – the report to Twitter by Ms. Tassinari and
Ms. O'Malley.  This failure to identify any role that the Secretary had in the report to Twitter – apart
from the fact that as an elected official, he supervises the other two Defendants – is fatal to
Plaintiff's claim against him, which must be dismissed.

## 2.    The Court Should Dismiss Plaintiff's Section 1985 Claim.

Plaintiff's claim under Section 1985(3) must be dismissed because it fails to state a claim.[13] The First Circuit has explained that a Plaintiff proceeding under Section 1985(3) must plausible allege four things: (i) the plaintiff must allege a conspiracy; (ii) he must allege a conspiratorial purpose to deprive the plaintiff of the equal protection of the laws; (iii) he must identify an overt act in furtherance of the conspiracy; and (iv) he must show either injury to person or property, or a deprivation of a constitutionally protected right.  See Aulson v. Blanchard, 83 F.3d 1, 3 (1st Cir. 1996).  Plaintiff's claim fails to state a plausible claim under three of Section 1985(3)'s prongs.

First, Plaintiff cannot satisfy the second element, because he cannot plead the requisite conspiratorial purpose, namely there was "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." Griffin v. Breckenridge, 403 U.S. 88, 102 (1971); Aulson, 83 F.3d at 3 (explaining that the Supreme Court construed Section 1985(3) to clarify that a plaintiff may recover only when the alleged conspiracy "is propelled by 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus.'").  Here, the Complaint makes no allegation that Defendants reported Plaintiff to Twitter because of his race or some other protected characteristic.  Construed liberally, the Complaint at most alleges that Defendants complained to Twitter because they disliked his political beliefs and disagreed with his statements about the counting of ballots after the primary election.  But the First Circuit has held that Section 1985(3) "provides no remedy for animus on the basis of political beliefs." Perez-Sanchez v. Pub. Bldg. Auth., 531 F.3d 104, 109 (1st Cir. 2008); Uphoff Figueroa v. Alejandro, 597 F.3d 423, 432

---

[13]    Although the Complaint does not specify which of Section 1985's provisions the Defendants allegedly violated, neither subsection 1 (dealing with preventing officers from performing their duties) nor subsection 2 (dealing with obstruction of justice) of Section 1985 have any applicability here.

(1st Cir. 2010) ("political discrimination ... is not actionable under § 1985(3)").  Plaintiff's claim

under Section 1985(3) is foreclosed by this binding authority.

Second, Plaintiff does not plausibly plead the requisite conspiracy element under Section

1985(3).  As the First Circuit recently determined, "[p]leading a section 1985(3) conspiracy 'requires

at least minimum factual support of the existence of a conspiracy.'"  Parker v. Landry, 935 F.3d 9,

18 (1st Cir. 2019) (citation omitted).  Of course, "not every agreement is sufficient to ground a

section 1985(3) conspiracy."  Id.  To survive a motion to dismiss, "the plaintiff needed to allege facts

that would permit" the Court "plausibly to infer an agreement among the defendants, motivated by

some discriminatory animus."  Id.  Plaintiff fails to do so.  At most, the Complaint can be construed

to allege that Ms. Tassinari instructed Ms. O'Malley and NASED to complain about Plaintiff's

Tweets to Twitter.  Apart from boilerplate assertions that these Defendants acted in concert, this

conclusory allegation does not specify that the Defendants entered a conspiracy, let alone one that

was motivated by a discriminatory animus directed at protected class.  These type of "vague and

conclusory allegations of a conspiracy fail[] to state a plausible claim under section 1985(3)."  Id.

Plaintiff also cannot allege a conspiracy within the meaning of Section 1985(3) for another

reason: a lack of sufficient state involvement in the alleged conspiracy that caused Plaintiff's

supposed harm under the First Amendment.  A conspiracy to infringe upon First Amendment rights

is actionable under the terms of Section 1985(3) only if it is demonstrated that a state actor is

involved in the allegedly harmful acts or the conspiracy is directed at influencing the "activity of the

State."  United Brotherhood of Carpenters & Joiners of Am. Local 610 v. Scott, 463 U.S. 825, 830

(1983).  Tangential state involvement in a First Amendment conspiracy is not enough to recover

under Section 1985(3).  Rodriguez-Garcia, 904 F.2d at 100 (rejecting Section 1985(3) claim where

"state involvement, if any, was not sufficient to sustain a conspiracy claim").  Critically, Plaintiff

does not allege that the Defendants conspired with Twitter; it alleges that they conspired with one

another.  Am. Compl. at 66-67.  But as discussed supra at Section II.A.1.a, Twitter was a private

actor, and its decision to reprimand Plaintiff was Twitter's to make under its Terms of Use.  Where,

as here, the alleged harm was not caused by the alleged co-conspirators but by a private party,

Plaintiff cannot recover under Section 1985(3) for an alleged conspiracy to deprive him of his First

Amendment rights.

 Finally, Plaintiff fails in his attempt to allege that he satisfies the fourth prong by showing a

deprivation of a constitutionally protected right.  This is because he cannot plausibly show – as he

attempts to do – that his First Amendment rights were violated.  See supra at Section II.A.1.

### 3. The Court Should Dismiss Plaintiff's RICO Claims.

 The claims against the Defendants in their individual capacities under RICO should also be

dismissed because Plaintiff fails to state a plausible claim.  To plead a viable civil RICO claim, "a

plaintiff must allege: (1) conduct, (2) of an enterprise, (3) through [either] a pattern … of

racketeering activity, or a single collection of an unlawful debt."  Home Orthopedics Corp. v.

Rodriguez, 781 F.3d 521, 527 (1st Cir. 2015) (internal citations and quotation marks omitted).

"Racketeering activity" is defined at 18 U.S.C. § 1961(1) to mean: (1) any act involving murder,

kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter or dealing in

controlled substances that is a felony under state law; or (2) any one of several enumerated federal

crimes.  Apart from a handful of vague and conclusory allegations that the Defendants somehow

obstructed justice in violation of 18 U.S.C. § 1503 by reporting Plaintiff's election misinformation to

Twitter, Plaintiff fails to plead any facts suggesting that the Defendants have engaged in racketeering

activity.  See Harihar v. U.S. Bank Nat'l Ass'n, No. 15-CV-11880-ADB, 2017 WL 1227924, at *13

(D. Mass. Mar. 31, 2017) (dismissing RICO claim based on "wholly conclusory" allegation that a

wrongful foreclosure could "qualify as a predicate act of 'racketeering'").

Nor can he do so, because nothing that the Defendants are alleged to have done fits within the statutory definition of racketeering.  Filling out a form on Twitter is not a criminal act, no matter how much Plaintiff strains to describe it as such.  Although Plaintiff struggles to characterize the government's report to Twitter as "obstruction of justice" within the meaning of 18 U.S.C. § 1503, this argument finds no support.  This statute makes it a crime to:

> corruptly, or by threats or force, or by any threatening letter or communication, endeavor[] to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injure[] any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injure[] any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influence[], obstruct[], or impede[], or endeavor[] to influence, obstruct, or impede, the due administration of justice…

The Defendants' report to Twitter does not remotely fit into any of these categories, particularly where there is no allegation that there is an ongoing federal judicial proceeding relating to any supposed criminal misconduct that Plaintiff imagines the Defendants have committed, let alone any corrupt intent to influence any proceeding.  United States v. LeMoure, 474 F.3d 37, 43 (1st Cir. 2007) (explaining that "section 1503 as read by the Supreme Court requires an attempt to obstruct a pending judicial proceeding"); United States v. Byrne, 435 F.3d 16, 23 (1st Cir. 2006) ("under § 1503, 'if the defendant lacks knowledge that his actions are likely to affect the judicial proceeding, he lacks the requisite intent to obstruct.'") (citation omitted).  Where, as here "the facts [Plaintiff] asserted either failed to show conduct that would constitute obstruction of justice, or failed to describe conduct that would be indictable under 18 U.S.C. § 1503," dismissal is appropriate. Michaud v. Delkner, 2 F. App'x 51, 52 (1st Cir. 2001) (citing O'Malley v. New York City Transit Authority, 896 F.2d 704, 708 (2d Cir. 1990) (rejecting RICO claim predicated on obstruction of justice under 18 U.S.C. § 1503 where alleged obstruction occurred in state and not federal courts)).

**B.**    **Plaintiff's Federal Statutory Claims Against the Defendants in Their Individual Capacities Are Barred by the Doctrine of Qualified Immunity.**

The federal statutory claims against the Defendants are also barred by the doctrine of qualified immunity.[14]  "Qualified immunity provides defendant public officials 'an immunity from suit rather than a mere defense to liability.'"  Penate v. Hanchett, 944 F.3d 358, 365 (1st Cir. 2019) (citation omitted).  This doctrine shields state officials from suit when their conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Pearson v. Callahan, 555 U.S. 223, 231 (2009); Dist. of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (qualified immunity applies unless defendants "violated a federal statutory or constitutional right, and … the unlawfulness of their conduct was 'clearly established at the time'").  The doctrine "protects all but the plainly incompetent or those who knowingly violate the law," Diaz-Bigio v. Santini, 652 F.3d 45, 50 (1st Cir. 2011) (citation omitted), and questions of qualified immunity must be resolved at the earliest possible stage in litigation, Haley v. City of Boston, 657 F.3d 39, 47 (1st Cir. 2011).  Courts follow a two-step inquiry in assessing a claim of qualified immunity, considering: "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the

---

[14]    Qualified immunity can bar claims brought under Section 1983, see Penate v. Hanchett, 944 F.3d 358, 365 (1st Cir. 2019) (dismissing Section 1983 claim under qualified immunity), Section 1985, see Ziglar v. Abbasi, 137 S.Ct. 1843, 1867 (2017) (dismissing claim under Section 1985 under qualified immunity), and RICO, see Gonzalez v. Lee County Housing, 161 F.3d 1290, 1300 (11th Cir. 1998) ("this court and others have held that public officials are entitled to assert the defense of qualified immunity when sued under a federal statute other than section 1983," noting that other courts have applied the defense to claims arising under eight other separate federal statutes, including RICO); Cullinan v. Abramson, 128 F.3d 301, 312 (6th Cir. 1997) (finding qualified immunity barred RICO claims against city officials); Trugreen Landcare v. City of Dallas, 512 F. Supp. 2d 613, 622 (N.D. Tex. 2007), (finding defendant to be entitled to qualified immunity against RICO claims); Brown v. Nationsbank Corp., 188 F.3d 579, 588 (5th Cir. 1999) (holding that individual defendants were entitled to qualified immunity from suit alleging RICO claim because rights that served as basis of claim were not clearly established at the time of defendants' alleged acts).

right was 'clearly established' at the time of the defendant's alleged violation."  Rocket

Learning, Inc. v. Rivera-Sanchez, 715 F.3d 1, 8 (1st Cir. 2013) (citation omitted).  Plaintiff must

satisfy "both prongs" of this test "to overcome a qualified immunity defense," Raiche v.

Pietroski, 623 F.3d 30, 35 (1st Cir. 2010), and courts need not address both prongs if plaintiff

fails to satisfy one.  See, e.g., Eves v. LePage, 927 F.3d 575, 584 (1st Cir. 2019) (en banc).

### 1.   Plaintiff's Allegations Fail to Make Out a Violation of a First Amendment Right.

As explained above in Section II.A, Plaintiff fails to plausibly allege that the Defendants

violated any constitutional right.  Accordingly, Defendants are entitled to qualified immunity

from the federal statutory claims under the first prong of the qualified immunity defense.

### 2.   Plaintiff's Alleged First Amendment Rights were not Clearly Established.

Even if this Court were to find that Plaintiff stated a plausible claim against the

Defendants in their individual capacities, these federal claims must still fail under the second

prong of the qualified immunity analysis, because there is no clearly established law that would

demonstrate that government officials violate the First Amendment – or other rights secured by

Section 1985(3) or RICO – by reporting election misinformation to a private social media

platform like Twitter.  In evaluating this prong of the qualified immunity test, the Court must

ascertain "(a) the clarity of the law in general at the time of the alleged violation; and (b) the

clarity of the law as applied to the case—in other words, whether a reasonable person in the

defendant's shoes 'would have understood that his conduct violated the Plaintiff's constitutional

rights.'"  Raiche, 623 F.3d at 36 (citation omitted); see also Brosseau, 543 U.S. at 198 ("clearly

established" inquiry "must be undertaken in light of the specific context of the case, not as a

broad general proposition") (internal quotation marks omitted).  The "salient question" is

"whether the state of the law at the time of the violation gave the defendant fair warning that his

particular conduct was unconstitutional." Drumgold v. Callahan, 707 F.3d 28, 42 (1st Cir.

2013).  Absent this fair-notice requirement, courts would subject officials to liability that was too

"broad[]," thus "disrupt[ing] the balance" between "the interests in vindication of citizens'

constitutional rights and in public officials' effective performance of their duties."  Ziglar v.

Abbasi, 137 S. Ct. 1843, 1867 (2017) (citations omitted).[15]

The Supreme Court has repeatedly emphasized that "clearly established law" cannot be

defined "at a high level of generality," al-Kidd, 563 U.S. at 742, but rather must be

"particularized" to the facts of the case.  Anderson v. Creighton, 483 U.S. 635, 640 (1987); see

also Hunt v. Massi, 773 F.3d 361, 367-68 (1st Cir. 2014) ("relevant question is not whether the

Fourth Amendment generally prohibited excessive force" but "whether, in 2011, [plaintiff] had a

clearly established right to be handcuffed with his hands in front of him when it would not be

obvious to a reasonable officer that [plaintiff's] abdominal scar would prevent him from putting

his hands behind his back"); Eves, 927 F.3d at 583 (emphasizing need for law to be

"particularized" to facts of the case as part of qualified immunity analysis).  Otherwise,

"[p]laintiffs would be able to convert the rule of qualified immunity … into a rule of virtually

unqualified liability simply by alleging violation of extremely abstract rights."  Anderson, 483

U.S. at 639.

Here, there is no controlling Supreme Court or First Circuit case law clearly establishing

that state election officials (or their elected supervisors) are forbidden from complaining to a

privately-owned social media company about election misinformation posted by a user to the

---

[15]     With respect to the supervisory claim against the Secretary, the standard is heightened.
In these circumstances, the clearly-established prong of the qualified immunity inquiry is
satisfied as to a supervisor like the Secretary only when both "(1) the subordinate's actions
violated a clearly established constitutional right, and (2) it was clearly established that a
supervisor would be liable for constitutional violations perpetrated by his subordinates in that
context."  Camilo-Robles v. Hoyos, 151 F.3d 1, 6 (1st Cir. 1998).

social media platform.  Indeed, Defendants are not aware of a single case in any jurisdiction in

which the government was held liable under the First Amendment for either lodging a complaint

with a social media provider or for a social media provider's subsequent decision to discipline a

user according to its own terms of service.  And when there is neither controlling case law in the

jurisdiction, nor "a consensus of cases of persuasive authority," qualified immunity applies.  See

Wilson v. Layne, 526 U.S. 603, 617 (2014) (applying qualified immunity where plaintiffs did not

identify "any cases of controlling authority in their jurisdiction at the time of the incident which

clearly established the rule on which they seek to rely, nor have they identified a consensus of

cases of persuasive authority such that a reasonable officer could not have believed that his

actions were lawful"); Eves, 927 F.3d at 584 ("There was no 'controlling authority' or even a

'consensus of cases of persuasive authority,' that would lead to the conclusion that Governor

LePage can be denied immunity.") (citation omitted); id. at 586 (looking to Supreme Court and

First Circuit case law as "controlling authority"); Pabon v. Wright, 459 F.3d 241, 255 (2d Cir.

2006) ("When neither the Supreme Court nor this court has recognized a right, the law of our

sister circuits and the holdings of district courts cannot act to render that right clearly established

within the Second Circuit.").

To the contrary, the predominant authority suggests otherwise.  Courts have broadly

concluded that privately-owned social media platforms are not public actors subject to First

Amendment regulation.  See supra at 10-11.  These cases reflect no robust, controlling body of

law applying Blum and the other state actor tests to find state action where a social media

platform sanctions its users after a state election official complains about election misinformation

posted to that website, much less under the specific factual circumstances alleged here.  They

certainly do not put the constitutional question "beyond debate" such that Defendants should

face the specter of personal liability here.  Eves, 927 F.3d at 583 (quoting al-Kidd, 563 U.S. at 741).

## III.   PLAINTIFF'S STATE LAW CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (COUNT 5) MUST BE DISMISSED.

Plaintiff fails to meet the "very high" standard to allege a plausible claim for intentional infliction of emotional distress.  Polay v. McMahon, 468 Mass. 379, 385 (2014).  To succeed, the complaint must demonstrate:

> (1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, ... (2) that the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the defendant were the cause of the plaintiff's distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.

Tetrault v. Mahoney, Hawkes & Goldings, 425 Mass. 456, 466 (1997).  This high bar requires "targeted and malicious" conduct directed towards the plaintiff.  Rua v. Glodis, 52 F. Supp. 3d 84, 100 (D. Mass. 2014).

Plaintiff has not plausibly alleged any of these elements.  Plaintiff does not specify any actions taken by the Defendants that intentionally caused any alleged emotional distress.  At most, they reported Plaintiff's election misinformation to Twitter, and Twitter later sanctioned Plaintiff under its Terms of Use.  This is a far cry from intending to cause Plaintiff himself emotional distress.  Similarly, there are no alleged acts by the Defendants that remotely qualify as extreme and outrageous.  See Roman v. Trustees of Tufts Coll., 461 Mass. 707, 718 (2012) (finding no "extreme and outrageous" conduct when plaintiff was precluded from participating in a public lecture); Beecy v. Pucciarelli, 387 Mass. 589, 596 (1982) (claim alleging intentional infliction of emotional distress properly dismissed where defendant's conduct cannot be characterized as extreme and outrageous).  At most, Defendants are alleged to have complained to Twitter about one of Plaintiff's Tweets.  That is not extreme and outrageous conduct.  Nor has

27

Plaintiff pleaded specific facts that he endured severe distress caused by Defendants, just that he was generally upset after Twitter suspended him.  Again, this is insufficient to state a claim. Polay, 468 Mass. at 388 (rejecting as insufficient conclusory assertions of emotional distress).

Alternatively, if the Court dismisses the federal statutory claims against the Defendants, it should decline to exercise jurisdiction over this tort claim and dismiss it on that basis instead. See Meuse v. Freeh, 421 F. Supp. 2d 365, 371 (D. Mass. 2006).

## IV.   PLAINTIFF'S CLAIM FOR PERMANENT INJUNCTIVE RELIEF AGAINST THE SECRETARY (COUNT 6) MUST BE DISMISSED.

Count 6, in which Plaintiff seeks permanent injunctive relief barring the Secretary's office from reporting his Tweets to Twitter, is barred by the Eleventh Amendment and fails to state a claim on which relief may be granted.  Despite his framing of the relief sought as prospective injunctive relief permitted under Ex parte Young, 209 U.S. 123, 159-160 (1908), it is inescapable that Plaintiff seeks relief not from an ongoing harm or government policy, but in response to an alleged prior harm that has now ceased – the one-time report of a single Tweet concerning an election that occurred months ago.  As a result, the relief he seeks is not one that may be ordered against a state official in his official capacity.  Equally fundamental is Plaintiff's inability to state a claim for a First Amendment violation where, as here, the Secretary's office engaged in its own First Amendment speech – alleging that Plaintiff's Tweet was election misinformation – and the private actor with sole ability to remove Plaintiff's Tweets or suspend his account was not under the Secretary's control and, apparently, did not find the Secretary's allegation to warrant taking action against the complained-of Tweet.

### A.   Plaintiff's Claim, Despite Being Framed as a Claim for Prospective Injunctive Relief, is Barred by the Eleventh Amendment.

The Eleventh Amendment provides that federal jurisdiction "shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by

Citizens of another state."  U.S. Const. amend. XI.  The Supreme Court has held that "[t]he

ultimate guarantee of the Eleventh Amendment is that non-consenting States may not be sued by

private individuals in federal court."  Bd. of Trs. of Univ. of Ala. v. Garrett, 531 U.S. 356, 363

(2001); see also Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984) ("It is

clear ... that in the absence of consent a suit in which the State or one of its agencies or

departments is named as the defendant is proscribed by the Eleventh Amendment.... [T]his

jurisdictional bar applies regardless of the nature of the relief sought").  The Eleventh

Amendment also extends to bar suits against state agencies and their instrumentalities.

Maysonet–Robles v. Cabrero, 323 F.3d 43, 48–49 (1st Cir.2003) (citation omitted).[16]

This Eleventh Amendment proscription is subject to a narrow exception recognized more

than a century ago in Ex parte Young, 209 U.S. 123, 159–160 (1908).  Under Ex parte Young,

federal courts can prospectively enjoin state officials from continuing to violate the U.S.

Constitution or other federal law, "notwithstanding the absence of consent, waiver or evidence of

congressional assertion of national hegemony."  Rosie D. ex rel. John D. v. Swift, 310 F.3d 230,

234 (1st Cir. 2002) (citation omitted).  But "the theory of Young has not been provided an

expansive interpretation."  Pennhurst, 465 U.S. at 102.

In determining whether a suit falls within the narrow exception carved out in Ex parte

Young, it is "the substance, rather than … the form of the relief sought" that matters.  Papasan v.

Allain, 478 U.S. 265, 278-79 (1986).  The Ex parte Young doctrine only allows federal courts to

exercise jurisdiction over a suit in which the private plaintiff alleges ongoing violations of

---

[16]    It is well-established that the Office of the Secretary of the Commonwealth is a state agency for purposes of the Eleventh Amendment.  See Noonan v. Galvin, No. 17-CV-11273-LTS, 2018 WL 813377, at *1 (D. Mass. Feb. 9, 2018) (concluding that where plaintiff sues "Secretary [Galvin] in his official capacity, the Commonwealth's sovereign immunity recognized by the Eleventh Amendment bars the claim.").

federal law; suits that seek redress for <u>past</u> wrongs are still barred by the Eleventh Amendment. <u>See</u> <u>id.</u> at 277–78 (noting that "<u>Young</u> has been focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past."); <u>Seminole Tribe of Fla. v. Fla.</u>, 517 U.S. 44, 73 (1996) (stating that <u>Ex parte Young</u> permits suit against a state official to go forward where it seeks "only prospective injunctive relief in order to "end a <u>continuing violation</u> of federal law.") (emphasis added). Thus, in "determining whether the doctrine of <u>Ex parte Young</u> avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" <u>Verizon Md., Inc. v. Pub. Serv. Comm'n</u>, 535 U.S. 635, 645 (2002) (quoting <u>Idaho v. Coeur d'Alene Tribe of Idaho</u>, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring)). And even where the requested relief has only future impact on the state defendant, "[t]he pivotal question is whether the relief 'serves directly to bring to an end a present violation of federal law.'" <u>Whalen v. Mass. Trial Court</u>, 397 F.3d 19, 29 (1st Cir. 2005) (citation omitted).

This Court lacks jurisdiction over Plaintiff's injunctive claims against the Secretary in his official capacity because nowhere does Plaintiff allege that the Secretary has engaged in an ongoing course of conduct that would continue to deprive Plaintiff of his federally protected constitutional rights; his claim is purely retrospective in nature and concerns past speech relating to a now-concluded election, and thus the <u>Ex parte Young</u> doctrine does not apply. <u>See</u> <u>Hootstein v. Collins</u>, 670 F. Supp. 2d 110, 114 (D. Mass. 2009) ("The <u>Ex parte Young</u> doctrine, then, only allows federal courts to exercise jurisdiction over a suit in which the plaintiff alleges ongoing violations of federal law; suits that seek redress of past wrongs are still barred by the Eleventh Amendment."). At most, Plaintiff alleges that on a single occasion, the Secretary's staff alleged to Twitter that one of Plaintiff's Tweets constituted election misinformation; the

reported Tweet was not subject to removal or other sanction by Twitter; and somehow, this single report – which Twitter evidently found unavailing – compelled Twitter to remove other Tweets by the Plaintiff and to suspend his account, a suspension which has now concluded.  See King v. Whitmer, No. CV 20-13134, 2020 WL 7134198, at *5 (E.D. Mich. Dec. 7, 2020) (concluding Eleventh Amendment barred election-related suit where the alleged harm already occurred and thus there "is no continuing violation to enjoin").  Plaintiff does not allege that that there is any ongoing policy or law that causes him prospective harm and violates his federal rights such that federal supremacy and Ex parte Young are implicated.  This Court thus lacks jurisdiction over this matter, and therefore it cannot grant the injunctive relief Plaintiff seeks.

### B.  Plaintiff's Requested Injunction is Moot, as He Suffers from No Ongoing Harm.

Where, as here, Plaintiff fails to identify an ongoing future threat of alleged governmental misconduct, his request for injunctive relief is moot and should be denied on this basis as well. See Whalen, 397 F.3d at 30 (agreeing that request for injunctive relief against the state that sought remedy for past misconduct and had "no impact on an ongoing violation" was both moot and barred by the Eleventh Amendment).  This Court's jurisdiction under Article III extends only to "Cases" and "Controversies." U.S. Const. Art. III, § 2, cl. 1.  A lawsuit becomes moot— and thus no longer a case or controversy subject to federal court jurisdiction—when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Am. Civil Liberties Union of Mass. v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 52 (1st Cir. 2013) ("ACLU").  "Another way of putting this is that a case is moot when the court cannot give any 'effectual relief' to the potentially prevailing party."  Id.  To remain subject to federal court jurisdiction, "a dispute 'must be extant at all stages of review, not merely at the time the complaint is filed."  United States v. Sanchez-Gomez, 138 S. Ct. 1532, 1537 (2018).  "This

requirement ensures that the Federal Judiciary confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved." Genesis HealthCare Corp. v. Symczyk, 569 U.S. 66, 71 (2013). As described above, Plaintiff alleges no ongoing or current dispute that would require relief from this court; the Tweet that the Secretary's office complained of remains online without any label or caveat, Plaintiff's Twitter-imposed suspension appears to have ended, and Plaintiff alleges no ongoing or even repeated reporting of his Tweets by the Secretary's office.

This case is not one in which a defendant's voluntary cessation of the challenged conduct saves moot claims from dismissal. There was no ongoing policy or conduct that the Secretary has ceased, only a one-time report over the course of Plaintiff's several years as a Twitter user and political candidate. The voluntary cessation doctrine also has no applicability here because the Defendants did not stop reporting Plaintiff's Tweets to Twitter to end this suit; to the contrary, they stopped because the election ended – thus diminishing the Defendant's concerns that these Tweets were suppressing votes and spreading election misinformation. Accordingly, as the cessation occurred not because of the litigation but despite it, there is no "reasonable expectation that the challenged conduct will be repeated following dismissal of the case." Town of Portsmouth v. Lewis, 813 F.3d 54, 59 (1st Cir. 2016).

Similarly inapplicable is the exception to the mootness doctrine for conduct that is capable of repetition but evades review. "The capable-of-repetition doctrine applies only in exceptional situations," City of Los Angeles v. Lyons, 461 U.S. 95, 109 (1983), "where a plaintiff can show that '(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subject to the same action again.'" ACLU, 705 F.3d at 57. Here, the challenged action was not too short to be litigated prior to its cessation. In fact, plaintiff waited

more than a month after the Secretary reported his Tweet to bring suit, and still received interim

relief before the November 3, 2020 election. And where the Secretary's office has only reported

one single Tweet by the Plaintiff in his several years as a political candidate and prolific Twitter

user, he cannot claim to have a "reasonable expectation" of being subject to the same action.  See

See Newspaper Guild of Salem, Local 105 of Newspaper Guild v. Ottaway Newspapers, Inc., 79

F.3d 1273, 1278 (1st Cir. 1996) (one-time occurrence, with nothing more than speculation that it

is likely to recur, is insufficient to avoid a finding of mootness); World Gym, Inc. v. Baker, No.

20-CV-11162-DJC, 2020 WL 4274557, at *2 (D. Mass. July 24, 2020) (noting that speculative

possibility of recurrence does not salvage case from mootness doctrine).  Moreover, now that the

election has passed, Plaintiff is no longer an active candidate for public office with an impending

public vote on his candidacy; any hypothetical report of his Tweets now could not constitute "the

same action" because it could not have any potential effect on an active political campaign.

> **C.**     **Plaintiff Fails to State a Claim Against the Secretary in his Official Capacity**

For the same reasons that he fails to state a viable First Amendment claim against the

individual defendants, Plaintiff fails to state a First Amendment claim against the Secretary in his

official capacity.  As a basic matter of causation, the Tweet about which the Secretary's office

complained was not removed or subjected to any apparent action by Twitter, permitting the

reasonable inference – which Plaintiff cannot rebut with any good-faith allegation – that the

Secretary's report had no effect upon Plaintiff's Twitter account.  See supra at Section II.A.1.b.

Moreover, Twitter's independent decision to sanction the Plaintiff by removing other Tweets and

suspending his account did not constitute state action for purposes of a Section 1983 claim

against a Commonwealth official.  See supra at Section II.A.1.a.   And inasmuch as the

Secretary's office engaged in its own speech by submitting the report to Twitter, that speech is

not subject to First Amendment regulation.  See supra at Section II.A.1.c.  As such, even if it

were not barred by the Eleventh Amendment, Plaintiff's claim against the Secretary in his

official capacity should be dismissed for failure to state a claim upon which relief may be

granted.

**V.     PLAINTIFF'S CLAIM FOR DECLARATORY RELIEF PRECLUDING THE
        ATTORNEY GENERAL'S OFFICE FROM REPRESENTING THE
        INDIVIDUAL DEFENDANTS (COUNT 7) MUST BE DISMISSED.**

In Count 7, Plaintiff seeks – without legal foundation – a declaration that the

"Massachusetts Defendants must pay privately for their defense." Am. Compl. at 83.  This claim,

too, is barred. And even if it were not, there is no legal basis for the claim, which misapprehends

Massachusetts law regarding the authority of the Attorney General and the indemnification of

public officials.  Plaintiff's citation to Bivens v. Six Unknown Named Agents, 403 U.S. 388

(1971) notwithstanding, the eligibility of these defendants – who are state officials, not federal –

to representation by the public attorney is governed by Massachusetts General Laws chapter 258.

**A.     The Court May Not Enjoin State Officials' Compliance with State Law
        Requirements.**

Although Plaintiff styles his requested relief as declaratory relief, he seeks an order

requiring the defendants to obtain private representation and preventing the Attorney General's

Office from providing representation.  However, requests for injunctions seeking to require that

state officials comply with state laws are barred in federal court.  See Pennhurst, 465 U.S. at 106

("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court

instructs state officials on how to conform their conduct to state law.").  That bar is jurisdictional

and precludes this Court from granting the requested relief.  See Hootstein, 670 F. Supp. 2d at

115.  Both the availability of Attorney General representation or public indemnification to public

employees and the power and authority of the Attorney General are matters of state statute.

Mass. Gen. Laws. ch. 12, 258.  The relief sought is plainly barred.

**B.      Plaintiff's Request Misapprehends State Law.**

Even if it were not barred, Plaintiff's request misapprehends the applicable provisions of state law.  Indemnification of public employees for alleged civil rights violations or intentional torts is permitted by the plain language of Mass. Gen. Laws ch. 258, § 9, which provides that "[p]ublic employers may indemnify public employees, and the commonwealth shall indemnify persons holding office under the constitution, from personal financial loss, all damages and expenses, including legal fees and costs, if any" up to $1,000,000 in cases arising out of intentional torts or alleged civil rights violations.  Indeed, both the First Circuit and the Massachusetts Supreme Judicial Court have confirmed that section 9 authorizes such indemnification.  See Davis v. Coakley, 802 F.3d 128, 133 (1st Cir. 2015); Venuti v. Riordan, 702 F.2d 6, 8 (1st Cir. 1983); Triplett v. Town of Oxford, 439 Mass. 720, 791 (2003).  Moreover, the Attorney General retains control over the representation of the Commonwealth and its officials, having been charged with setting "a unified and consistent legal policy for the Commonwealth." Sec'y of Admin. and Finance v. Attorney General, 367 Mass. 154, 163 (1975).  The public employer's indemnification of these defendants – and the Attorney General's decision to provide legal defense pursuant to that indemnification – is permitted by statute and Plaintiff has no basis on which to challenge it.

## CONCLUSION

For the foregoing reasons, Defendants respectfully requests that the Court dismiss all claims in the Complaint against them and enter judgment in their favor.

Respectfully submitted,

Defendants,

WILLIAM FRANCIS GALVIN, in his official and
individual capacities, MICHELLE TASSINARI, in
her individual capacity, and DEBRA O'MALLEY,
in her individual capacity,

By their attorneys,

MAURA HEALEY
ATTORNEY GENERAL

/s/ Adam Hornstine
Anne Sterman (BBO No. 650426)
Adam Hornstine (BBO# 666296)
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
617-963-2048
Anne.Sterman@mass.gov
Adam.Hornstine@mass.gov

Date: December 9, 2020

## CERTIFICATE OF SERVICE

I, Adam Hornstine, Assistant Attorney General, hereby certify that I have this day, December 9, 2020, served the foregoing **Memorandum**, upon all parties, by electronically filing to all ECF registered parties, and paper copies will be sent to those indicated as non-registered ECF participants.

/s/ Adam Hornstine
Adam Hornstine