UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DR. SHIVA AYYADURAI, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>WILLIANS FRANCIS GALVIN, MICHELLE )<br>K. TASSINARI, DEBRA O'MALLEY, AMY )<br>COHEN, NATIONAL ASSOCIATION OF )<br>STATE ELECTION DIRECTORS, allegedly )<br>in their individual capacities, and WILLIAM )<br>FRANCIS GALVIN, in his official capacity as )<br>Secretary of State for Massachusetts. )<br>)<br>Defendants. )<br>) | Civ. No. 1:20-cv-11889-MLW |

**OPPOSITION TO PLAINTIFF'S "EMERGENCY" MOTION
BY THE NATIONAL ASSOCIATION OF STATE ELECTION DIRECTORS
AND AMY COHEN**

The National Association of State Election Directors and Ms. Cohen (together, "NASED")

respectfully submit this Opposition to Plaintiff's ill-conceived "emergency" motion seeking an

injunction compelling NASED to "immediately withdraw keyword 'Tassinari' from Twitter's

algorithm intended to silence speech" (caption).  Plaintiff's Motion jurisdictionally deficient,

substantively frivolous, logically flawed, and factually unsupported.  It should be denied.

I.      **Introduction**

"Twitter suspends accounts which violate the Twitter Rules."[1]  On February 1, 2021,

Twitter did exactly what it said it would when it suspended Plaintiff's account for "repeated

posting of content that may suppress voter participation."  Now, refusing to accept his own

---

[1]      https://twitter.com/va_shiva.  Ms. Cohen reserves and does not waive her challenge to personal jurisdiction.  (Dkt. No. 47.)

responsibility, and without any substantive grounds to challenge Twitter's decision under its Terms, Plaintiff conjures out of thin air the existence of yet another convoluted plot against him in an unavailing effort to blame NASED and the Elections Division for his own willful flouting of Twitter's Rules.

There is no escaping the conclusion, however, that Plaintiff himself caused his suspension by choosing to escalate his false claims in the aftermath of the January 6, 2021 Capitol insurrection, and at a time when Twitter had implemented a more aggressive approach to enforcement of its policies against election misinformation, including a new "strike system" under which repeat offenders are permanently suspended after their fifth violation. Notably, Plaintiff had at least four such "strikes" in January 2021 alone. Indeed, over just the last few weeks, Twitter has banned tens of thousands of accounts for disseminating some of the same false claims and conspiracy theories that Plaintiff espouses, and Plaintiff knows this because many of those accounts belonged to his followers and he baited Twitter about its actions in real time. His attempt here to claim that NASED is somehow legally responsible for his suspension because, months earlier, it submitted a report to Twitter one time accurately flagging one of his tweets (which did not even mention "Tassinari") as misinformation is beyond frivolous and borders on delusional. That Plaintiff imagines a secret algorithm in order to do so is mind boggling.

Notwithstanding the volume of his rhetoric, Plaintiff's claims have no merit. Most obviously, Plaintiff cannot establish Article III jurisdiction over the relief he seeks in his Motion. He fails to present any actual, justiciable controversy with *NASED* arising from his personal contractual dispute with *Twitter*, who is not a party to this case or subject to NASED's control and who independently made the decision to suspend Plaintiff's account under its own policies. Further, the injunction Plaintiff seeks will not effectively remediate his supposed constitutional

injury or result in his reinstatement, because there is no non-speculative basis to conclude it would have any effect.  It is also unconstitutional on its face, because the First Amendment prohibits Plaintiff from compelling Twitter to publish his speech or NASED to make statements or take actions in support of Plaintiff or his views, which are contrary to NASED's core mission. Relatedly, Plaintiff lacks standing because his suspension by Twitter is not a legally-cognizable harm traceable to NASED or capable of being redressed by an order of this Court.

Independently, Plaintiff's Motion has no substantive legal basis or any factual or evidentiary support.  Plaintiff therefore has no hope of success on the merits and does not come close to satisfying the demanding standard for a preliminary injunction.  Plaintiff offers nothing to show that Twitter's decision to suspend him was the proximate result of state action or any other legally-actionable conduct by NASED, a private organization with its own First Amendment rights to criticize Plaintiff's views.  Plaintiff's motion is frivolous and should be rejected.

## Background

### I.    Twitter's Rules And Enforcement Framework

Plaintiff's right to operate his Twitter account was governed by Twitter's Terms of Service, which grant Twitter "sole discretion" to "suspend or terminate" his account "at any time for any or no reason," and incorporate an "evolving" set of content moderation rules, policies, and guidelines (the "Rules") that Twitter develops, publishes, and enforces and Plaintiff agreed to abide.[2]   Most relevant here, Twitter's Civic Integrity Policy generally prohibits the use of its platform to spread election-related misinformation,[3] and its Public Interest Exception Policy provides guidelines for Twitter's exemption of tweets by certain public figures, including political candidates, for Rules violations based on Twitter's balancing of various public interest

---

[2]      https://twitter.com/en/tos.
[3]      https://help.twitter.com/en/rules-and-policies/election-integrity-policy.

considerations.[4]   Twitter makes clear that it "do[es] not consult externally on individual enforcement decisions" under its Rules and "evaluate[s] every case individually."[5]  Thus, although any user may flag a tweet for Twitter's review under its Rules, Twitter alone determines whether a violation has occurred and what sanction, if any, to impose on the offender under its guidelines.[6] Since September 2020m possible sanctions have included labeling or restricting the tweet, granting a public interest exception, requiring the user to delete content, or, for more severe or repeat violations, suspending the user's account on a temporary or permanent basis.[7]  In January 2021, Twitter implemented a new 5-strikes-and-you're-out graduated penalty system for repeat offenders, with permanent suspension the designated penalty for "5 or more strikes" and "severe and repeated violations."[8]

### A.  <u>Plaintiff's Misinformation</u>

In an effort to the proliferation of misinformation on its platform, Twitter took on an increasingly active role in enforcing its misinformation policies in the run-up to the 2020 election. As relevant here, in mid-September 2020, Twitter announced, among other things, that it would more aggressively "label or remove false or misleading information intended to undermine public confidence in an election or other civic process."[9]   About a week later, officials in the Massachusetts Elections Division received inquiries about claims of election fraud and ballot

---

[4]        https://help.twitter.com/en/rules-and-policies/public-interest.
[5]        https://help.twitter.com/en/rules-and-policies/public-interest.
[6]        https://help.twitter.com/en/rules-and-policies/twitter-report-violation.
[7]        https://help.twitter.com/en/rules-and-policies/election-integrity-policy.
[8]        https://help.twitter.com/en/rules-and-policies/election-integrity-policy. Twitter also disclosed after January 6, 2021 that it "deploy[ed] technology to surface potentially harmful Tweets" in an effort "to take action as quickly as possible on violative content," although it made clear that all tweets so identified would be subject to further "human review."   https://blog.twitter.com/en_us/topics/company/2021/protecting--the-conversation-following-the-riots-in-washington--.html.
[9]        https://blog.twtrinc.com/en/2020/expanding-our-policies-to-further-protect-the-civic-conversation.html.

destruction that Plaintiff had published in a September 24, 2020 Tweet (the "September 24th

Tweet"), as follows:



(Ex. A, 51:17-52:1.)[10]   In response, the Elections Division released statements to the Associated

Press, Reuters and Leadstories.com explaining that the statements in Plaintiff's Tweet were false

(AC 19-20), and also flagged Plaintiff's September 24th Tweet for Twitter's review under its Rules,

using a portal Twitter made available.   (Ex. A, 63:7-11).   Through its designated government

account, the Elections Division submitted a form report that that explained why Plaintiff's claims

of election fraud and missing and destroyed ballots were false.   (Ex. A, 61:16-24, 64:22-65:4.)

Although officials in the Elections Division have readily acknowledged that they hoped that

Twitter would either remove or "label[]" the Tweet for violating its Rules, they made clear they

had no "control or input into" Twitter's response, if any.   (Ex. A, 51:17:52:1; 66:21-22.)

The Elections Division, through Ms. Tassinari, also emailed Ms. Cohen at NASED to

advise that it was reporting Plaintiff's September 24th Tweet to Twitter as election misinformation,

and provided a link to that specific Tweet.   (Ex. A, 69:4-8.)   Ms. Cohen responded after 7 p.m. on

September 25, 2020, when "the tweet was still up," to ask whether the Elections Division had

---

[10]      References to Ex. A are to Exhibit A to the Amended Complaint (or "AC").

reported the Tweet and stating, on NASED's behalf, that it could "report it too." (Ex. A, 70:16-71:14.) A few minutes later, Tassinari replied that the Division had reported the Tweet through Twitter's portal, but had not separately emailed Twitter about it. (*Id.*) After 11 pm on September 25, 2020, NASED submitted its separate report through its nongovernment account, which specifically identified Plaintiff's September 24th Tweet. (Ex. A, 71:10-14.)

As Ms. Cohen affirms in her Affidavit ("Aff."), she exercised her own, independent judgment as NASED's Executive Director when she contacted Twitter, after she reviewed had reviewed the Tweet and concluded that she agreed with the Elections Division that it qualified as misinformation under Twitter Rules. (Aff. ¶¶ 10-12.) NASED was not compelled to take any action by Massachusetts, nor did it not hold itself out as speaking or acting for Massachusetts or any state when it submitted its report. (Aff. ¶¶ 11-12, 16.) NASED spoke for itself. NASED did not direct or request Twitter to take any specific action in response to its report about his September 24th Tweet. (Aff. ¶ 16.) Instead, NASED explained why Plaintiff's Tweet about election fraud and ballot destruction was inaccurate and misleading and, in NASED's view, violated Twitter's Rules. (Aff. ¶ 15.) NASED did not ask Twitter to add "Tassinari" or any other keywords to any algorithmic or other monitoring technology, or have any discussions with Twitter or anyone else about ongoing surveillance of Plaintiff or his Tweets. (Aff. ¶¶ 16, 21.)

After submitting the report, NASED received the following confirmation from Twitter:

| From: | Twitter Support <support@twitter.com> |
|---|---|
| Sent: | Friday, September 25, 2020 11:44 PM |
| To: | acohen@nased.org |
| Subject: | Case# 0174372334: partner_election [ref:00DA0000000K0A8.5004A000020MX62:ref] |

Hello,

Thank you for reporting this issue to us. Our goal is to create a safe environment for everyone on Twitter to express themselves freely.

We're investigating the reported material(s) for violations of the Twitter Rules. We'll follow up with you if we need additional information.

Thank you again for reporting this issue to us. Reports like this help us identify issues, making your communities and Twitter better.

Twitter

ref:00DA0000000K0A8.5004A000020MX62:ref

(Aff. ¶ 17.)  Following a brief exchange in which they discussed Plaintiff's suspension, NASED had no substantive communications with the Elections Division about Plaintiff or his tweets until NASED was asked to refrain from reporting them.  (Ex. A, 71:2-14, 72:14-15.)  NASED has not asked or suggested—directly, indirectly, or by intimation—that Twitter take any action against Plaintiff or his tweets since it submitted its form report in September 2020.  (Aff. ¶ 22.)

### B.  Twitter Implements More Aggressive Election Misinformation Policies And A "Strike System" For Repeat Offenders

After September 2020, Twitter's election misinformation policies continued to evolve in response to events, as Twitter took on a more active role in monitoring the dissemination of misinformation through its platform.[11]  Initially, Twitter described its efforts as focused on the labeling of misinformation.  Thus, for example, in mid-October 2020, it announced an increase in "the size and capacity of [its] teams focused" on monitoring and responding to user complaints concerning misleading election claims, and that it had "add[ed] additional warnings and restrictions on Tweets with a misleading information label from US political figures (including

---

[11]     https://blog.twitter.com/en_us/topics/company/2020/2020-election-changes.html

candidates and campaign accounts), US-based accounts with more than 100,000 followers, or that obtain significant engagement."[12]  In the two-week period between October 27 to November 11, 2020, Twitter reported that "[a]pproximately 300,000 Tweets [had been] labeled under [its] Civic Integrity Policy for content that was disputed and potentially misleading," or about "0.2% of all US election-related Tweets sent during this time period."[13]

Twitter took a more aggressive approach to enforcement of its misinformation policies after the election.[14]  After the January 6, 2021 Capitol insurrection and the certification of the Electoral College results, moreover, Twitter adjusted its policies significantly to account for its recognition that "misleading and false information surrounding the 2021 US presidential election has been the basis for incitement to violence around the country."[15]  Twitter announced a period of "strong enforcement action" and "[e]scalated enforcement measures" intended to "protect the conversation on [Twitter's] service from attempts to incite violence, organize attacks, and share deliberately misleading information about the election outcome."[16]  As it explained, "[g]iven the violent events in Washington, DC, and increased risk of harm, [Twitter] began permanently suspending thousands of accounts" in January 2021, starting with accounts "dedicated to the

---

[12]     https://blog.twitter.com/en_us/topics/company/2020/2020-election-changes.html
[13]     https://blog.twitter.com/en_us/topics/company/2020/2020-election-update.html
[14]     *See, e.g.*, Associated Press, *Weeks after election, YouTube cracks down on misinformation* (Dec. 9, 2020) https://apnews.com/article/youtube-election-misinformation-removal-74ca3738e2774c9a4cf8fbd1e977710f   ("But this election was different from past elections and YouTube has been widely criticized for not doing more to prevent misinformation from spreading on its platform. Unlike Twitter and Facebook, which put measures in place — with some success —- YouTube had until Wednesday stood by its decision to allow baseless claims about election fraud to stay up.  There is no evidence of widespread fraud in the 2020 election. Election officials confirmed there were no serious irregularities and the election went well. Attorney General William Barr said last week the Justice Department has not identified voter fraud that would change the presidential election.").
[15]     https://blog.twitter.com/en_us/topics/company/2021/protecting--the-conversation-following-the-riots-in-washington--.html.
[16]     https://blog.twitter.com/en_us/topics/company/2021/protecting--the-conversation-following-the-riots-in-washington--.html.

propagation of [the QAnon] conspiracy theory across the service."[17]   As of January 12, 2021, Twitter reported its suspension of more than 70,000 such accounts and made clear that it would continue to take an active approach to removing potentially-dangerous election misinformation from its platform.   Twitter explained:

> Now that the results of the election have been officially certified by Congress, we updated our Civic Integrity policy on Friday to aggressively increase our enforcement action on these claims. The updated policy provides details about how we enforce against violations of this policy, including repeated sharing of Tweets that receive warning labels. Ultimately, repeated violations of this policy can result in permanent suspension.[18]

Twitter's revised Civic Integrity Policy issued in January 2021 made clear, among other things, that "[t]he consequences for violating [its] civic integrity policy depend on the severity and type of the violation and the accounts' history of previous violations."[19]   For the first time, moreover, it rolled out a "strike system" for repeat violators, under which "[l]abels applied to Tweets accrue 1 strike" while "Tweet deletions accrue 2 strikes."[20]   Under its revised guidelines, sanctions increase with each violation as follows: 1 strike: No account-level action; 2 strikes: 12-hour account lock; 3 strikes: 12-hour account lock; 4 strikes: 7-day account lock.[21]   Permanent suspension is the designated penalty for "5 or more strikes" and "severe and repeated violations."[22]

### C.  Plaintiff Strikes Out

Shortly after his initial warning in September 2020, Plaintiff was suspended by Twitter

---

[17]       https://blog.twitter.com/en_us/topics/company/2021/protecting--the-conversation-following-the-riots-in-washington--.html.

[18]       https://blog.twitter.com/en_us/topics/company/2021/protecting--the-conversation-following-the-riots-in-washington--.html.

[19]       https://help.twitter.com/en/rules-and-policies/election-integrity-policy.

[20]       https://help.twitter.com/en/rules-and-policies/election-integrity-policy.

[21]       https://help.twitter.com/en/rules-and-policies/election-integrity-policy.

[22]       https://help.twitter.com/en/rules-and-policies/election-integrity-policy. Twitter also disclosed after January 6, 2021 that it "deploy[ed] technology to surface potentially harmful Tweets" in an effort "to take action as quickly as possible on violative content," although it made clear that all tweets so identified would be subject to further "human review."   https://blog.twitter.com/en_us/topics/company/2021/protecting--the-conversation-following-the-riots-in-washington--.html.

"again" for a week at least once in October 2020 after posting the same September 25th Tweets that caused his initial suspension, which he alleges Twitter "forced him to delete" "every single time" he reposted them (although it is not clear how many times that occurred).  (AC 28, 31, 53.) By his own admission, however, Plaintiff continued to tweet "scores of times" promoting his claims about rigged elections, secret algorithms in electronic voting machines, the supposed "destruction" of ballot images, and various conspiracy theories.  (Mot. at 2-3.)  Twitter labelled many of his tweets as disputed (although seemingly at random), and after the January 6, 2021 Capitol insurrection also began to restrict some due to concerns over their potential to incite violence.  Examples of Plaintiff's Tweets over this period include the following:







Plaintiff was also well aware of Twitter's efforts to purge large numbers of accounts disseminating unfounded conspiracy theories and election claims like his—because many of those accounts belonged to his followers.[23]  In fact, he baited Twitter about it:



---

[23]    *See,   e.g.*,   https://apnews.com/article/joe-biden-donald-trump-media-elections-presidential-elections-ac34de7cb5844d96589a10ea6e653d50 (Jan. 26, 2021) (reporting that "Twitter has permanently banned My Pillow CEO Mike Lindell's account after he continued to perpetuate the baseless claim that Donald Trump won the 2020 U.S. presidential election" and after "repeated violations" of its civic integrity policy," which "was implemented last September [2020] and is targeted at fighting disinformation"; and that "[f]ollowing the storming of the U.S. Capitol earlier this month, Twitter has banned over 70,000 accounts for sharing misinformation").



Plaintiff continued to use Twitter's platform to spread his false claims about the election up through the date of his suspension on February 1, 2021, including as follows:



On February 1, 2021, Twitter closed Plaintiff's account due to "repeated posting of content that may suppress voter participation." (Plaintiff Aff. p. 2.)[24]  As even the incomplete selection of his tweets above shows, moreover, Plaintiff accrued at least 4 "strikes" in January 2021 under Twitter's Civic Integrity Policy in the form of labels applied by Twitter, and dozens more before that.[25]  After his suspension, Plaintiff does not allege that he appealed Twitter's decision through

---

[24]    https://help.twitter.com/en/rules-and-policies/election-integrity-policy.
[25]    NASED has no information as to when Twitter started to count "strikes" under its new policies or how it treats violations that occurred prior to its publication.

its internal appeal process.

## ARGUMENT

### I.      Plaintiff's Motion Fails For Lack of Subject Matter Jurisdiction

**Plaintiff Has No Article III Controversy with NASED.**  Plaintiff's Motion fails out of the gates because it does not present a justiciable controversy with NASED.  "[T]he threshold question in every federal case, determining the power of the court to entertain" the plaintiff's request for relief is "whether the plaintiff has made out a 'case or controversy' between *himself* and the *defendant*[.]."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (emphasis added); *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) ("No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies." (cleaned up)).

It is well-settled that "[w]here the prospect of effective relief against a defendant depends on the actions of a third party, no justiciable controversy exists against that defendant."  *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 101 (1978) (Rehnquist, J., concurring) (no Article III jurisdiction where "appellees' only conceivable controversy" was with a nonparty); *Warth*, 422 U.S. at 498 (allegation that defendant municipality's allegedly unconstitutional zoning law prevented third-parties from constructing affordable housing and excluded plaintiffs did not present justiciable controversy).  Plaintiff's prospects for reinstatement (and effective remediation of the injury he alleges) here depend entirely on the independent actions and decisions of a non-party, Twitter.  Twitter alone made and carried out the final decision to permanently suspend Plaintiff in February 2021 in accordance with its Terms of Service, and only after it found (reasonably, as the record shows) that Plaintiff had repeatedly violated its Rules and imposed the sanction it deemed appropriate under its guidelines.  Indeed, that Twitter publishes its enforcement

guidelines and philosophy, notifies users for the reasons for its enforcement actions, and makes a process available for users to appeal its judgments, and did so for Plaintiff here (Mot. 8), plainly shows that Twitter's content moderation decisions are ultimately the product of its own independent judgment.   Plaintiff offers nothing to suggest that was not the case with his suspension.   Thus, Twitter's independent control over its own enforcement decisions, including with respect to Plaintiff, means that Plaintiff has no non-speculative prospect of obtaining effective relief (i.e., reinstatement) from NASED or any party to the litigation.   As such, Plaintiff's Motion does not tee up a justiciable dispute for the Court.[26]

Plaintiff cannot effectively obtain effective relief for additional reasons as well.   Plaintiff apparently chose not to appeal Twitter's decision to suspend his account through its internal appeal mechanism, or name Twitter as a party in this case.   Therefore, he has no standing or ability in these proceedings to challenge Twitter's contractual discretion, statutory immunity or constitutional freedom, or the merits of its decision to suspend his account.   Thus, by failing to specifically challenge the conduct of Twitter that proximately caused the injury alleged in his Motion (i.e., his suspension), there is no mechanism in this case by which Plaintiff can achieve reinstatement.   As such, without Twitter as a party, the questions presented in Plaintiff's Motion are academic because he cannot obtain the relief he seeks or effectively remediate the injury supporting his injunctive request. [27]

---

[26]     Twitter's independence in fact forecloses his entire theory of state action in this case. (*See* NASED MTD Br. at 10-12.)

[27]     Plaintiff does not appear to request any order as to Twitter, but Fed. R. Civ. P. 65(d)(2) would prevent him from doing so in any event because it limits the binding effect of an injunction to the parties, their officers, agents, servants, employees, and attorneys; or "other persons who are in active concert or participation" with the foregoing, *id.*, and there is no evidence of record that would bring Twitter within the scope of this Rule.   Moreover, any such claim would defeat Plaintiff's theory of state action.   Twitter has every right to de-platform Plaintiff if it so chooses and would have no need or reason to act "in concert" with anyone to accomplish that end.

Plaintiff's Motion also fails to present an Article III controversy because the injunction he seeks is illegal.  Under the First Amendment, Twitter "cannot be compelled to publish a particular message."  *Am. Freedom Def. Initiative v. Lynch*, 217 F. Supp. 3d 100, 106 (D.D.C. 2016); *see Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 256-58 (1974) (holding unconstitutional a Florida statute requiring newspapers to provide political candidates with free space to reply to attacks on their character); *Mazur v. Szporer*, 2004 WL 1944849, at *8 (D.D.C. June 1, 2004) ("governmental intrusion into the function of newspaper editors in deciding what to publish is a violation of the First Amendment").  Plaintiff's proposed injunction as to NASED is similarly unconstitutional because it seeks to compel it to express opinions about Plaintiff that NASED does not hold, and to make statements and take actions expressing support for Plaintiff and his claims, which are contrary to NASED's core mission.  *See Hurley v. Irish-Am. Gay, Lesbian & Bisexual Group of Boston*, 515 U.S. 557, 573-74 (1995) ("[O]ne important manifestation of the principle of free speech is that one who chooses to speak may also decide what not to say .... [That] rule's benefit [is not] restricted to the press, being enjoyed by business corporations generally ... as well as by professional publishers.").  Thus, in all events, the injunction Plaintiff seeks is a legal nullity and without effect, and therefore the dispute presented in his Motion is hypothetical, not actual and consequential as Article III requires.

**Plaintiff Has No Standing**.  Plaintiff's Motion also fails for lack of standing, another necessary and related component of Article III jurisdiction.  For standing purposes, Plaintiff's must establish an legally-cognizable injury that is "concrete, particularized, and actual or imminent; fairly traceable to the challenged action [of the defendant]; and redressable by a favorable ruling."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).  Plaintiff bears the burden to "clearly and specifically set forth facts sufficient to satisfy these Art. III standing requirements."

*Whitmore v. Arkansas*, 495 U.S. 149, 155-56 (1990) ("A federal court is powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing.").

Plaintiff cannot meet that burden here, because he has not shown the requisite "causal connection between the injury and the conduct complained of," i.e., that his suspension from Twitter's platform is "fairly traceable" to the "challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Ariz. Christian Sch. Tuition Organization v. Winn*, 563 U.S. 125, 131 (2011) (cleaned up); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998) (standing requires "causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant"). The Supreme Court has consistently rejected standing theories that, as here, "rest on speculation about the decisions of independent actors." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013) (emphasizing the Court's reluctance to approve "standing theories that require guesswork as to how independent decisionmakers will exercise their judgment"); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (no standing where relief "depends on" speculation about "the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict"); *see also Dep't of Commerce v. New York*, -- U.S. --, 139 S. Ct. 2551, 2566 (2019) (standing incorporates a "*de facto* causality" standard).

The only non-speculative evidence of record establishes that Plaintiff is responsible for his repeated violations of Twitter's Rules, and that Twitter is responsible for the decision to suspend Plaintiff's account for doing so. Plaintiff's Motion offers nothing but unfounded rhetoric to link NASED to his suspension, which cannot meet his burden. *See, e.g.*, *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 42 (1976) (allegation that IRS "encouraged" hospitals to deny services

16

to indigent plaintiffs insufficient to establish Article III standing, because it is "purely speculative whether the denials of service specified in the complaint fairly can be traced to petitioners' 'encouragement' or instead result from decisions made by the hospitals without regard to the tax implications"); *Ayyadurai v. Univ. of Massachusetts*, 2018 WL 5253210, at *1 (D. Mass. 2018) (plaintiff lacked standing to challenge exclusion from debate because "state action will attach only where the government entity directly participates in the challenged decision or conduct," and he offered no evidence that the State "had any role" in the decision-making (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 840-43 (1982)).

Plaintiff separately lacks standing because he cannot show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61. Where, as here, "the requested relief for the [plaintiff] depends on actions by a third party not before the court," Plaintiff "must demonstrate that a favorable decision would create *a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered*." *Woodhull Freedom Found. v. United States*, 948 F.3d 363, 374 (D.C. Cir. 2020) (emphasis added). Plaintiff makes no such showing. As set forth above, the First Amendment precludes Plaintiff from forcing Twitter to publish his claims or seeking to compel NASED's support, and as such the injunction he seeks is a dead letter. And, even if the First Amendment did not apply, there is no speculative basis to infer that NASED would have any influence on Twitter's content moderation decisions at all. *See, e.g.*, *Rock the Vote v. Trump*, WL 6342927, at *9 (N.D. Cal. 2020) (denying preliminary injunction, and dismissing for lack of standing, First Amendment challenge to Trump Executive Order addressed to allegedly biased content management by online platforms because "plaintiffs have not alleged facts indicating that Twitter, or other platforms, have changed their behavior as a result of the Executive Order or are

likely to increase their moderation and fact-checking of misinformation in the Order's absence"); *See Am. Freedom Def. Initiative v. Lynch*, 217 F. Supp. 3d 100, 106 (D.D.C. 2016) (plaintiffs lacked standing where "Plaintiffs' argument rests on the entirely speculative implication that Facebook, Twitter, and YouTube would voluntarily change course and permit Plaintiffs' censored content to stand were the Attorney General to declare § 230 unconstitutional."), aff'd 697 F. App'x 7 (D.C. Cir. 2017).   Rather, the only evidence of record is that Twitter "do[es] not consult externally on individual enforcement decisions," and took no action in response to NASED's and the Elections Division's only prior report concerning Plaintiff's September 24th Tweet.[28]

## II.   Independently, Plaintiff Has No Right To Injunctive Relief

**Plaintiff's Heavy Burden.**   "A preliminary injunction is an 'extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008).   It is never "awarded as of right" and "should issue only where the intervention of a court of equity is essential in order effectually to protect against otherwise irremediable injuries." *Jobs First Indep. Expenditure Political Action Comm. v. Coakley*, 66 F. Supp. 3d 253, 257 (D. Mass. 2014) (citation omitted).   To benefit from such strong medicine, Plaintiff must show that he is "likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Voice of the Arab World, Inc. v. MDTV Medical News Now, Inc.*, 645 F.3d 26, 32 (1st Cir.2011) (citing *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).   Even assuming, for argument's sake only, that the Court had jurisdiction over Plaintiff's Motion, none of these considerations favor Plaintiff.[29]

**Plaintiff Has No Likelihood of Success.**   Plaintiff has no prospect of succeeding on the claims and allegations in his Motion because they are without any legal or factual support.   Plaintiff

---

[28]     https://help.twitter.com/en/rules-and-policies/public-interest.
[29]     Plaintiff's *pro se* Motion does not identify its procedural basis, the relief it seeks is injunctive in nature.

presents no facts to causally connect Twitter's decision to suspend Plaintiff's account in February 2021 for his repeat violations of its Rules to any conceivable state action of NASED or legally actionable conduct.  (*See* NASED MTD Br. at 8-16.)  Plaintiff's strained attempt to attribute Twitter's termination of his account in February 2021 to a supposed plot by the Elections Division and NASED to cause Twitter to implement a supposed "keyword blacklist that operated in perpetuity" against Plaintiff is a figment of his imagination and lacking in plausible factual support. (*See* Cohen Aff. ¶¶ 16, 20-21; *see* Dkt No. 58, Tassinari Aff. ¶ 7; O'Malley Aff. ¶ 7.)  Plaintiff therefore cannot to meet his heavy burden here to show that NASED played any causal role in his suspension, nor can he overcome the evidence showing that Twitter suspended Plaintiff's account due to Plaintiff's repeated violations of its Rules and failure to heed its many warnings under its revised 5-strikes enforcement policy, and in the context of Twitter's recent initiatives to aggressively enforcement its election misinformation policies.

More generally, Plaintiff presents nothing to show that Massachusetts compelled or encouraged any state action by NASED under any viable legal theory (NASED MTD Br. at 8-14), or show that he is likely to show NASED had any ability to control Twitter's content moderation decisions.  *See, e.g.*, *Logiodice v. Trs. of Me. Cent. Inst.*, 296 F.3d 22, 28 (1st Cir. 2002) (private school's imposition of student discipline not state action because it was run by private trustees with contractual right to administer and enforce discipline); *Yeo v. Town of Lexington*, 131 F.3d 241, 251 (1st Cir. 1997) (no state action where "decisions not to publish were actually made by or controlled by private individuals not state).  Plaintiff also cannot show that Massachusetts exercised managerial control over NASED in any respect, or that NASED held itself out as speaking for Massachusetts or invoked any Massachusetts authority when communicating with Twitter in September 2020.  (NASED MTD Br. at 10-12; Aff. ¶¶ 5, 11-12, 16.)  Indeed, no facts

of record would reasonably support an inference that NASED, using state action, caused Twitter to sanction Plaintiff in any respect, nor can Plaintiff avoid that NASED's communications with Twitter are constitutionally-protected speech  (*See* NASED MTD Br. at 13-14).

**Irreparable Harm**.  Plaintiff also cannot show that he will suffer any irreparable harm as a result of his suspension by Twitter in the absence of an injunction.  Plaintiff's use of Twitter's private commercial platform is contractual and governed by its Terms of Service, which grant Twitter the right to terminate his access to its platform with or without reason.  Indeed, as discussed above, the proposed injunction Plaintiff seeks is illegal and ineffectual.

**The Balance of the Equities And the Public Interest Weigh Against Plaintiff.**  Even if, contrary to fact, there was some basis for attributing his suspension to NASED, the proposed injunction he seeks would deprive each of NASED, the Elections Division, and Twitter of their own constitutional rights and First Amendment freedoms.  Thus, the relief he seeks would ultimately restrict far more speech than it would protect, produce potentially significant chilling effects by blurring the line between state action and permissible advocacy on topics of public importance, and would only inhibit public-private communications on topics of public interest. (*See* NASED MTD Br. at 17-18.)   Moreover, it would do so to protect, on a single commercial platform, Plaintiff's false and borderline seditious claims and to restrict NASED and the Elections Division for their good faith efforts to accurate advocate against the proliferation of election misinformation intended to undermine public trust in U.S. democratic processes and outcomes. Neither the equities of this case nor the public interest favor granting the injunction Plaintiff seeks.

### Conclusion

As set forth above, and for the reasons in its Motion to Dismiss briefing, Plaintiff's motion has no merit and should be denied.

Dated: February 12, 2021                    Respectfully submitted,

                                            *For The National Association of State Election*
                                            *Directors and Amy Cohen*

                                            */s/ Nolan J. Mitchell*
                                            Nolan J. Mitchell (BBO #668145)
                                            nolan.mitchell@nelsonmullins.com
                                            Nelson Mullins Riley & Scarborough LLP
                                            One Financial Center
                                            Boston, MA 02111
                                            Tel. (617) 217-4700
                                            Fax (617) 217-4710


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 12th day of February, 2021, a true and correct copy of this document was served on plaintiff and all registered counsel of record via the Court's ECF system.

                                            */s/Nolan J. Mitchell*
                                            Nolan J. Mitchell