UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CASE No. 1:20-CV-11889-MLW

| | |
|---|---|
| Dr. SHIVA AYYADURAI )<br>Plaintiff, )<br> )<br>v. )<br> )<br>WILLIAM FRANCIS GALVIN, )<br>MICHELLE K. TASSINARI, )<br>DEBRA O'MALLEY, )<br>AMY COHEN, )<br>NATIONAL ASSOCIATION OF )<br>STATE ELECTION DIRECTORS, )<br>TWITTER, INC., )<br>all in their individual capacities, and )<br>WILLIAM FRANCIS GALVIN, )<br>in his official capacity as Secretary )<br>of State for Massachusetts, )<br>Defendants. ) | JURY DEMANDED |

**[PROPOSED] SECOND AMENDED VERIFIED COMPLAINT**

CONCISE STATEMENT OF CLAIM PER FRCP RULE 8

Most people simply assume that Big Tech is independent of and has an adversarial relationship with the government. This case proves that Big Tech is an agent of the government and is in no position to defy or resist government influence in any way. On April 5, 2021, US Supreme Court Justice Clarence Thomas declared in his concurring opinion that because *Biden v. Knight,* 593 U.S. __ (2021) did not allege any threat from the government and did not raise the issue of *Blum v. Yaretsky*, it could not serve as a vehicle to examine the issue of government influence and so certiorari must be denied. This case, in contrast, does credibly allege that Twitter, the government's Trusted Partner, is not an independent, defiant bastion of free speech, and that Twitter is merely an agent of the government that provides the government an end run around

the First Amendment. It is impossible to tell where Twitter ends and where the government begins.

Defendants have already admitted under oath that they coordinated an effort to strongly encourage Twitter, via their Trusted Partnership, to delete tweets that specifically referenced emails from Defendant Galvin's Office, and aimed to get Twitter to suspend Dr. Shiva repeatedly such that he was unable to send out any tweets during the last month of his campaign run. Those emails, which revealed that ballot images from electronic voting machines have all been deleted, substantiated Dr. Shiva's claim that Federal law had been violated by Defendants Galvin and Tassinari. Defendants acted in concert with the common purpose of abusing their official influence to suppress Dr. Shiva's political speech. Defendants violated Dr. Shiva's First Amendment right under the color of law, thus giving rise to this § 1983 claim. Defendant Galvin is sued in both official and individual capacities because of the need to invoke the *Ex parte Young* exception. *Ex parte Young*, 209 U.S. 123 (1908)

PARTIES

Plaintiff Dr. Shiva Ayyadurai ("**Dr. Shiva**") lives and works in this District. He holds four (4) degrees from the Massachusetts Institute of Technology including his PhD in Biological Engineering, where he collaborated on research with Professor Noam Chomsky, a noted linguist; and with Professor Robert Langer, a world-renowned engineer.  Dr. Shiva founded and runs multiple technology companies in Cambridge, MA at 701 Concord Avenue, and has now campaigned for Federal office three times, including presently for U.S. Senate. He started his account on Twitter in August 2011 and since then has worked assiduously to grow his presence. Until he was deplatformed by the Defendants on February 1, 2021, his Verified Twitter account

was followed by 360,000 people, giving him a significant presence on the nation's social media landscape.

Defendant William **Galvin** is a career politician, presently the Secretary of State for the Commonwealth of Massachusetts, and the person responsible for ensuring that Federal law is complied with during the conduct of elections for Federal office. He resides at 46 Lake Street, Brighton, MA 02135

Defendant Michelle **Tassinari** is Defendant Galvin's legal counsel and Elections Director of the Massachusetts Elections Division and the person required to ensure Galvin's office complies with Federal law. Tassinari is also the President-elect of Defendant National Association of State Election Directors, and a member on the Standards Board of the U.S. Election Assistance Commission (www.eac.gov). Tassinari resides at 5A Lee St, Wilmington, MA 01887.

Defendant Debra **O'Malley** is Defendant Galvin's spokesperson and also handles the Election Division's official Verified Twitter account (@VotinginMass).

Defendant **Twitter** is a Delaware corporation headquartered at 1355 Market Street, Suite 900, San Francisco, CA 94103, and registered with the Massachusetts Secretary of State. Its Massachusetts office is located at 141 Portland Street, Cambridge, MA 02139.

Defendant Amy **Cohen** is the Executive Director for Defendant NASED.

Defendant National Association of State Election Directors ("**NASED**") is a 501(c)(3) professional organization headquartered at 1200 G Street NW, Suite 800, Washington, DC 20005.  Its members are the





**FUNDERS**

We're supported by an amazing board of directors and the generosity of many.






Elections Directors in the fifty (50) states. In 2018, Democracy Works, which is funded by

certain known foundations, took over the management of NASED. NASED does not make

prominent that it is an entity "within" Democracy Works, Inc. The screenshot from Democracy

Works' web page provides a partial list of their funders.

Amy Cohen went from Pew to Democracy Works to NASED. Democracy Works Inc.'s

2018 Form 990 declares that NASED operates "within" Democracy Works, Inc. Screenshot

below:

| SCHEDULE O (Form 990 or 990-EZ) Department of the Treasury Internal Revenue Service | Supplemental Information to Form 990 or 990-EZ Complete to provide information for responses to specific questions on Form 990 or 990-EZ or to provide any additional information. ▶ Attach to Form 990 or 990-EZ. ▶ Go to www.irs.gov/Form990 for the latest information. | OMB No. 1545-0047 2018 Open to Public Inspection |
|---|---|---|
| Name of the organization        DEMOCRACY WORKS, INC. | | Employer identification number 27-2460359 |

FORM 990, PART I, LINE 1, DESCRIPTION OF ORGANIZATION MISSION:

ELECTION ADMINISTRATORS.


FORM 990, PART III, LINE 4A, PROGRAM SERVICE ACCOMPLISHMENTS:

DEMOCRACY WORKS LABS IS OUR IN-HOUSE INNOVATION ARM THAT AIMS TO

IMPROVE THE QUALITY OF VOTER ENGAGEMENT TOOLS AND THUS BUILD A

FOUNDATION TO STRENGTHEN THE ENTIRE FIELD OF VOTER ENGAGEMENT

TECHNOLOGY. IN 2018, LABS LAUNCHED HOW TO VOTE, WHICH IS BUILT ON THE

DEMOCRACY WORKS API AND HELPS VOTERS ACCESS ACCURATE INFORMATION ABOUT

VOTING AND REGISTRATION ACROSS ALL 50 STATES AND DC.


FORM 990, PART III, LINE 4B, PROGRAM SERVICE ACCOMPLISHMENTS:

WITHIN DEMOCRACY WORKS, NASED PROMOTES ACCESSIBLE, ACCURATE, AND

TRANSPARENT ELECTIONS IN THE UNITED STATES AND U.S. TERRITORIES. NASED

MEMBERS ARE ELECTION DIRECTORS FROM ACROSS THE COUNTRY AND ARE

RESPONSIBLE FOR IMPLEMENTING ELECTION LAWS AND POLICIES, MAINTAINING

THE VOTER REGISTRATION DATABASES, WORKING WITH LOCAL ELECTION OFFICIALS

TO ENSURE A SUCCESSFUL VOTING EXPERIENCE FOR ALL VOTERS, AND MORE.

## VENUE

Venue is proper because the Defendants violated Dr. Shiva's rights in this district. In addition, Dr. Shiva lives and works in this District as do four of the Defendants.

## JURISDICTION

This court has jurisdiction over this case because the complaint involves violation of a right guaranteed by the United States Constitution by persons under the color of law, as well as racketeering to obstruct justice and conspiracy.  28 U.S.C. § 1331, 28 U.S.C. § 1343, 42 U.S.C. § 1983, 18 U.S.C. § 1961(3), 18 U.S.C. § 1962(c), 18 U.S.C. § 1962(d) and 42 U.S.C. § 1985. In addition, there is diversity between the parties: two of the Defendants, Cohen and NASED, are based in different Districts. This court has jurisdiction under *Ex parte Young*, 209 U.S. 123 (1908) over Secretary Galvin in his official capacity as the relief sought is prospective and injunctive.

## LIABILITY

Pursuant to the Court's ruling in *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), Galvin, O'Malley and Tassinari may be sued in their individual capacities for monetary damages caused by their intentional torts, which in this case include violation of Dr. Shiva's First Amendment rights under color of law through abuse of their official positions. An *ipso facto* immunity defense is impermissible as a matter of law.

Sworn testimony elicited from the Defendants during an emergency hearing for a Temporary Restraining Order implicated Defendants Cohen and NASED in the intentional violation of Dr. Shiva's First Amendment rights.

The U.S. District Court for Massachusetts has already ruled that Dr. Shiva has met the threshold of likelihood of being able to prevail on his claim that Twitter's action was State action

and due solely to the actions of these Defendants. See *Blum v. Yaretski*, 547 U.S. 991 (1982). On

October 30, 2020, Judge Mark L. Wolf thus ordered (#20) that Galvin, his agents, employees,

and other persons in active concert with any of them shall not report or complain to Twitter

concerning Dr. Shiva's tweets and that Galvin shall ask NASED to not report or complain to

Twitter as well.  Defendants Galvin agreed to this while on notice that Dr. Shiva intended to

seek monetary damages.

## THIS SECOND AMENDED COMPLAINT IS APPROPRIATE

Defendant Galvin, who had been sued in the original complaint solely in his official capacity,

averred that service had not been perfected by the time of the emergency hearing on Dr. Shiva's

motion for a Temporary Restraining Order.  Galvin's attorney, Adam Hornstine, filed an

appearance in order to oppose the motion as Defendant Galvin had full and substantive notice of

the accusation and issues regarding the motion and complaint. Galvin's opposition also

presented affirmative defenses against claims in the complaint that were not related to the

motion for a TRO.  Dr. Shiva's previous counsel has thus far been either unable or unwilling to

produce proof of service such as a Certified Mail receipt.  Dr. Shiva represented himself *pro se*

at the emergency hearing and committed to serving the complaint upon the Defendants. As the

Defendants in this action were not served the original complaint in a manner compliant with

Rule 4, and no Answer was filed, Dr. Shiva filed his first amended complaint as a matter of

right.  In response Judge Wolf ruled that Twitter needed to be mandatorily joined as a

Defendant. This second amended complaint follows.

## GALVIN MAY BE SUED IN BOTH INDIVIDUAL AND OFFICIAL CAPACITIES

Each of a person's different legal capacities constitutes a separate 'party.'

"Under well-established rules of res judicata, recognized in Maine, an action brought against an individual in one capacity does not bar a later action brought against the same individual in a different capacity. See also Restatement (Second) of Judgments § 36; 1B Moore's Federal Practice ¶ 0.411[3] (2d ed. 1982). We therefore hold that res judicata does not bar the present action as against the individual Defendants but does bar it against the city." *Roy v. City of Augusta, Maine*, 712 F. 2d 1517 (1st Circuit 1983).

Also *Kentucky v. Graham, 473 U.S. 159, 165-66 (1985)*, *Unimex, Inc. v. United States Dep't of Hous. & Urban Dev*., 594 F.2d 1060, 1061 n. 3 (5th Cir. 1979), *Headley v. Bacon*, 828 F.2d 1272, 1279-80 (8th Cir. 1987), *Andrews v. Daw*, 201 F.3d 521 (4th Cir. 2000), *Leftridge v. Matthews*, 1:11-cv-03499-ELH (Dist. MD. 2012), *Favors v. Cuomo*, 11-cv-5632 (E.D.N.Y. Oct. 29, 2013)("each of a person's different legal capacities constitutes a separate 'party'"), *McCarthy v. Wood*, 219 Mass. 566 (1914), *Duffee v. Boston Elev. Rlwy*, 191 Mass 563 (1906), *Sturbridge v. Franklin,* 160 Mass. 149 (1893), *Anderson v. Phoenix*, 387 Mass. 444 (1982), *Campbell v. Ashler*, 320 Mass. 475 (1946)

Galvin is thus sued in his individual capacity, for monetary damages, and in his official capacity, in order to avail of the *Ex parte Young* exception and obtain prospective injunctive relief in the form of a permanent injunction that bars him, as Secretary of State, from abusing his office again to suppress constitutionally-protected political speech, whether it concerns speech from Dr. Shiva or any other candidate for political office. This court must enforce the writ of the United States Constitution upon a recalcitrant Commonwealth of Massachusetts that even claims the Secretary's decision to delete ballot images supersedes Federal law regarding the preservation of records generated during Federal elections.

ORAL HEARINGS

Dr. Shiva respectfully requests oral hearings prior to resolution of any substantive motion, such as a motion by Defendants to delay filing a pleading or a motion to dismiss.

FACTS OF THIS CASE

Dr. Shiva was born in India in 1963 into India's oppressive caste system as a low-caste untouchable. The oppressive conditions and the corrupt system of socialist governance in India

motivated his parents to immigrate to the United States in 1970 to seek greater liberty and respect for individual rights, including the U.S. Constitution's iron-clad protection for freedom of speech, as well as opportunities for themselves and their children.

Dr. Shiva earned four (4) degrees from the Massachusetts Institute of Technology: a bachelor's in Electrical Engineering and Computer Science, masters degrees in both Mechanical Engineering and Visual Studies, as well as a doctoral degree in Biological Engineering.

Dr. Shiva is a Fulbright Scholar, a Westinghouse Honors Award recipient, a member of multiple research and engineering academic honor societies including Eta Kappa Nu, Sigma Xi, and Tau Beta Pi, a Lemelson-MIT Awards Finalist, and was nominated for the National Medal of Technology and Innovation bestowed by the President of the United States.

As an educator, Dr. Shiva has developed new curricula and taught at both undergraduate and graduate levels at MIT and has presented invited lectures at leading academic institutions across the world.

In addition Dr. Shiva is responsible for seven (7) start-up technology companies and presently runs a biotechnology company, CytoSolve; an educational institute, Systems Health; an artificial intelligence company, EchoMail; and, a not-for-profit research center, International Center for Integrative Systems.   Justia's list of Dr. Shiva's patents is at

https://patents.justia.com/inventor/v-a-shiva-ayyadurai

In August of 2011, Dr. Shiva opened his Twitter account, **@va_shiva**, to build an independent base and reach local, national and global audiences to support his activism in various scientific, social and governance causes. This Twitter account also served as his primary platform to communicate with potential voters during his runs for political office. It is vital for

this court to note that as a private citizen, this Twitter account represents the speech of a private individual even during a run for political office.

Between August 2011 and August 2020, Dr. Shiva had grown his Twitter audience from zero to a quarter of a million people who regularly heard what he had to say on diverse topics important to him, and interacted with him online.

In February 2017, Dr. Shiva first ran for Federal office for the U.S. Senate as an Independent candidate, challenging incumbent Senator Elizabeth Warren, and conducted a dynamic campaign both on the ground across cities and towns in Massachusetts, and on Twitter with the slogan "Only A REAL Indian Can Defeat A FAKE Indian!" That election took place in November 2018. There were no troubles regarding his Twitter account throughout 2017-2018 campaign, though "election misinformation" was a prominent topic in the daily news. The City of Cambridge, however did retaliate against Dr. Shiva, by using a disparate reading of zoning law, to demand Dr. Shiva remove the large banner on his campaign bus with slogan exposing Elizabeth Warren's lack of integrity. Dr. Shiva filed a lawsuit *Ayyadurai v. Cambridge*, 1:18-CV-10772-RWZ, and prevailed in defending his First Amendment rights.

In January 2019, Dr. Shiva began his run for U.S. Senate against incumbent Senator Edward Markey as a Republican candidate. For this, he participated in a primary election within the Republican Party, and met the challenge with a ground organization of approximately 3,100 volunteers, distributed approximately 10,000 lawn signs, received donations from about 20,000 people that funded billboards at prominent spots on highways, advertisements on social media, radio and television, and made "Dr. Shiva" a recognized household name across all 351 cities and towns in Massachusetts. In addition, Dr. Shiva personally crisscrossed the state and held rallies to reach a diversity of demographics. It is vital to note that his campaign always met or

exceeded all regulatory requirements set by the Elections Division at the Office of the Secretary of State.

In February 2020, one year after Dr. Shiva began his campaign, Kevin O'Connor, in his first run for political office, entered the Republican primary race. O'Connor was however endorsed by Massachusetts Governor Charles Baker, who held fundraisers for him.

On September 1, 2020, the Massachusetts Republican primary for U.S. Senate was held. Dr. Shiva's internal polls had shown him leading in all counties. The announced results showed he had won in Franklin County by nearly ten-percent (10%) over his opponent, but had lost in all other counties by a consistent ratio of approximately 60% to 40%, to an opponent with little visibility, only a handful of volunteers, and no real campaign organization.  His opponent, who was endorsed and supported by Charlie Baker and the Massachusetts GOP, had won.

Dr. Shiva investigated and discovered that Franklin County was the only county where approximately seventy-percent (70%) of the towns counted the paper ballots by hand. The rest of the counties primarily used electronic systems that generated ballot images, which were then analyzed by a computer program to tabulate vote counts.

Dr. Shiva's campaign filed Public Records Requests to the various counties, under MGL ch. 66, for (a) the list of participating voters – those who actually voted in the election, and (b) the counts of the actual numbers of votes cast.  Seven (7) of the fourteen towns/cities provided the records.  In all seven (7) towns/cities, the number of tabulated votes was larger than the number of participating voters.  Boston had approximately 4,100 more votes than participating voters; and, Newton had approximately 1,700 more votes than participating voters.  Accessing and analyzing the ballot images – which are in the chain of custody of tabulating votes –

therefore became critical to understanding the root cause of the discrepancy between Franklin County and the other counties.

On September 9, Dr. Shiva personally went to Secretary Galvin's office to deliver a Public Records Request to the Secretary, under MGL ch. 66, to determine whether or not the Secretary of State stored all ballot images, as it is these digital records generated in the course of a federal election, that are used to tabulate votes when ballots are electronically processed.  It is important to note that in all counties, other than Franklin County, the majority of paper ballots were simply collected and stored. In those counties, which primarily use electronic systems for tabulating votes, the ballot images **_are_** the ballots, since the ballot images are the objects upon which tabulation takes place.  The electronic systems employ various computer algorithms during the tabulation process, including Weighted Race techniques, which affords the capability to multiply a candidate's vote counts by a decimal factor.  For example, if candidate A received 1,000 votes and candidate B received 1,000, the Weighted Race technique can multiply candidate A's votes by a factor such as 2.5 and candidate B's by a factor of 0.8 to result in final tabulated vote counts for candidate A of 2,500 votes and candidate B of 800 votes, respectively.

Pursuant to Federal law, Galvin is required to securely store or retain for twenty-two (22) months any and all records generated in connection with an election for a Federal office, such as U.S. Senate.  U.S. Code provides:

> CHAPTER 207 - FEDERAL ELECTION RECORDS
> 52 USC 20701: Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation
>
> Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in

such election, except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both. ( Pub. L. 86–449, title III, §301, May 6, 1960, 74 Stat. 88 .)

52 U.S.C. § 20702 - Theft, destruction, concealment, mutilation, or alteration of records or papers; penalties
Any person, whether or not an officer of election or custodian, who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved shall be fined not more than $1,000 or imprisoned not more than one year, or both.

On that same day - September 9, 2020 - William Rosenberry, an Elections Division official in Defendant Secretary Galvin's office, was publicly documented on video at the Secretary's office declaring to Dr. Shiva that the Secretary possessed "no ballot images" as the Secretary's office "turned that feature off" so as to not save the ballot images, which were generated by the ballot scanners.  It should be noted that the default – factory setting – on the electronic machines is to save all ballot images so as to be compliant with Federal law. Rosenberry informed Dr. Shiva that he would send him an email documenting Secretary Galvin's position on the matter.

On Monday, September 21, 2020, Dr. Shiva returned in person back to Secretary Galvin's office to follow up on the Public Record Request. Dr. Shiva came with storage devices to collect the ballot images. He also documented, in writing, Rosenberry's earlier statement of the deletion of ballot images and further requested, in writing, what information the Secretary's office would be delivering him.   Defendant Tassinari was also present at this meeting, and Tassinari informed Dr. Shiva in the presence of Rosenberry that the Secretary's office did not

have to respond for ten (10) business days, and told Dr. Shiva that she would respond by the end of the day on Wednesday, September 23, 2020 by email.

On September 24, 2020, at approximately 9:00AM, Dr. Shiva contacted the Secretary's office via telephone and asked where the response to his Public Records request was as it was due on September 23, 2020. Rosenberry was recalcitrant and after Dr. Shiva informed him that he was in violation of Federal law for not delivering him his records within the ten (10) business days, Rosenberry responded and said, "No, I'm in violation of State law." At the end of the conversation, Rosenberry assured Dr. Shiva that he would deliver it by 5:00PM that day. Dr. Shiva documented this phone conversation in the email below, in which he specifically memorialized Rosenberry's admission to having violated Massachusetts State Law:


September 24, 2020

William Rosenberry
Elections Division

RE: Second Follow Up on Public Records Request

Dear William:

On my Monday, September 21, 2020, at approximately 4:45PM, my colleagues and I followed up with your office, in person, concerning my records request made on September 9, 2020. I provided you written communication of my office visit and request at that time. You and your attorney - all of which is documented - assured me that I would receive a formal written response to my September 9th records request, via email to vashiva@vashiva.com, which would have been yesterday, September 23, 2020.

You and your attorney, at the time of the Monday meeting, stated that the response was to be sent in "10 business days, not 10 calendar days" therefore, you and your attorney said you were obligated and required to send the response on September 23, 2020, not September 21st, by Massachusetts State Law.

Yesterday, September 23, 2020, I did not receive the response to my records request via email, as you and your attorney had promised and reassured me September 21, 2020. In fact, I do not have the response as of the time of the writing of this email.

This morning, September 24, 2020 at 9:32 AM, I called your office to reach you, as a follow up to see if you had responded to my records request, and if so, to the right address. Upon trying to reach you, I was put on hold by your assistant "Logan," and was told that you told Logan I should put anything else I

wanted in writing.  I told Logan that this made no sense, and I knew you were on site, and I wanted to speak to you.

Finally, I was transferred to you, and upon speaking with you, you said that I would receive the response to my records request "no later than 5PM today [September 24, 2020]."  You acknowledged that you had violated Massachusetts State Law by not delivering the response yesterday.


Dr. Shiva Ayyadurai
U.S. Senate Candidate


Within less than thirty (30) minutes of Dr. Shiva's transmitting the above email to

Rosenberry that documented Rosenberry's violation of State Law, Tassinari responded to Dr.

Shiva's request:


On Thu, Sep 24, 2020 at 10:47 AM Tassinari, Michelle (SEC) <michelle.tassinari@state.ma.us> wrote:

Good Morning-

I am writing to acknowledge receipt of your request for records. Please note, that this Office does not maintain voter tabulation software, firmware or hardware.  While this office certifies voting equipment, as required by law, we do not purchase or lease equipment.  Once equipment is approved by this Office, cities and towns can purchase or lease such equipment.  Accordingly, this Office has no records   responsive to your request.

Further, to the extent you request the same information from local election officials, please note that the approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images.

Michelle K. Tassinari

Director and Legal Counsel

Elections Division

One Ashburton Place, Room 1705

Boston, MA 02108

617-727-2828

----------------------------

Tassinari's last sentence, coming as it did from the Secretary's own legal counsel and

Director of the Election Division, struck Dr. Shiva as beyond bizarre given the supremacy of

Federal law. It was remarkable and required clarification.  Therefore, Dr. Shiva emailed back:

> **From:** Shiva Ayyadurai <vashiva@vashiva.com>
>
> **Sent:** Thursday, September 24, 2020 11:22 AM
>
> **To:** Tassinari, Michelle (SEC) <Michelle.Tassinari@sec.state.ma.us>
>
> **Subject:** Re: Records Request
>
> CAUTION: This email originated from a sender outside of the Commonwealth of  Massachusetts mail system.  Do not click on links or open attachments unless     you recognize the sender and know the content is safe.
>
> Michelle,
>
> Kindly refer me to the statute or law, in which the "...approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images."
>
> Thank you in advance.
>
> Warmest regards,
>
> Dr. Shiva Ayyadurai
>
> US Senate Candidate.
>
> ------------------------------

In response to Dr. Shiva's email requesting the specific Massachusetts law or regulation

that apparently authorizes the Secretary to ***prohibit*** "***capturing of ballot images"*** in

Massachusetts, Tassinari did not cite any law in her September 25, 2020 email response:

> On Sep 25, 2020, at 11:45 AM, Tassinari, Michelle (SEC) <michelle.tassinari@state.ma.us> wrote:
>
> Shiva-
>
> Attached please find the certification of two different types of digital scan equipment in Massachusetts.

Please note that while the ballot images are not stored, the actual ballots voted on at any federal election are secured and stored for 22 months in accordance with federal law. However, under state law, those ballots must remain sealed until such time as they can be destroyed.

Michelle K. Tassinari

Director and Legal Counsel

Elections Division

-------------------------------------

That email from Tassinari generated the following email response from Dr. Shiva:

From: Shiva Ayyadurai <vashiva@vashiva.com>

Date: September 25, 2020 at 10:33:09 PM EDT
To: "Tassinari, Michelle (SEC)" <michelle.tassinari@state.ma.us>
Cc: John R Brakey <johnbrakey@gmail.com>, Venu Julapalli <vrjula@protonmail.com>, Ralph Lopez <ralphlopez2008@gmail.com>,   benniejsmith@gmail.com, Jude Joffe-Block <JJoffe-Block@ap.org>
Subject: Destroying Ballots is Illegal. The Ballot Images ARE the Ballots. You DESTROYED Them. Period.

Subject:  Destroying Ballots is Illegal. The Ballot Images ARE the Ballots. You DESTROYED The Ballots. Period.

Michelle
First, you have NOT answered my question, from my previous email.  I repeat it below. PLEASE answer the question.

Kindly refer me to the statute or law, in which the "...approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images."

Second, neither the people of Massachusetts nor I are stupid. I presume you must be under incredible pressure from Bill Galvin and Charlie Baker to deflect  this issue to hope it disappears.

However, the fact is the State has illegally destroyed ballots. The electronic equipment used to tally and count the vote MUST first CREATE an image - the ballot image - in order for the vote to be processed and COUNTED by the machine.   When that image is created, that image becomes THE BALLOT, as it is THE entity used to count the vote.  If no image was created, no vote count could exist. You are required by Federal Law to store,preserve, archive those ballots for 22 months.  If those ballot images DO NOT exist, they were DESTROYED. This destruction is illegal, and therefore, the election is null and void.

Once again, please answer my question, above.

Warmest regards,

Dr.SHIVA Ayyadurai
US Senate Candidate
-------------------------------

Tassinari never replied to this email and did not cite the statute or law that allowed Massachusetts to destroy the ballot images that were generated in connection with a Federal election.  In addition, Tassinari consciously omitted this fourth email from her affidavit (#15-2) filed in court, a decision that can be construed only as aiming to conceal evidence from this court, given that the fourth email had been posted on Twitter and was one of the four (4) tweets specifically deleted by Twitter on behalf of the Defendants.

The ballot scanning machines scan the paper ballots and generate a ballot image, which is then used to tabulate the votes in a Federal election, while the paper ballot is merely physically retained.  It is fundamental statutory interpretation that the ballot image is a **record** and that, pursuant to 52 USC 20701, Secretary Galvin is required to store **all** records and papers which are generated in connection with Federal election.  *Owasso Independent School Dist. No. I-011 v. Falvo*, 534 U.S. 426 (2002), *Kasten v. Saint-Gobain Performance* Plastics Corp., 563 U.S. 1 (2011), *Dolan v. Postal Service*, 546 U.S. 481 (2006), *People v. Aleynikov*, 2018 NY Slip Op 03174 [31 NY3d 383]

It is important to note that when the Weighted Race feature is enabled, the number of votes tabulated will likely not match the number of ballot images.  Therefore, access to ballot images, in the chain of custody, is essential in verifying the integrity of an election.

It is an undeniable fact that the electronic systems for counting votes do generate the ballot images. That is how they work. Tassinari is incorrect in her use of the term "capturing" when it comes to these generated images. The images are created, and if they are not captured, that is merely a euphemism for destroyed.  If she meant that the records are "not stored" after they are generated, which is what Defendant O'Malley also stated, that is a written admission of

a Federal violation. And that indeed is exactly what Tassinari meant: "the ballot images are not stored[.]"

Tassinari's email conversation with Dr. Shiva intended to downplay the critical importance of ballot images in the tabulation process of votes, and to create a false impression of the preeminence of paper ballots.  Elections officials across the country are aware of lawsuits filed by election integrity activists, such as John Robert Brakey (YouTube video: https://www.youtube.com/watch?v=PESVW--fpOI ), seeking transparency in the handling of ballot images by State Elections Directors.   The only possible conclusion is that Tassinari, a practicing attorney, chose the word *capture* to mislead and misdirect Dr. Shiva and give the false impression that in Massachusetts ballot images never exist, at all, at any time. This is supported by the effort expended by both Tassinari and O'Malley to falsely claim, including in press statements, that the paper ballots are saved and so Federal law has been satisfied, as if paper ballots are used to tabulate the vote when electronic machines are used. Repeat, the votes, when electronically handled, are tabulated exclusively using the ballot images.

On September 24, 2020, Dr. Shiva posted on Twitter that Massachusetts destroys ballot images.  This is 100% factually correct as the scanners generate the image records and the Secretary's Election Division ensures that these records are destroyed – "not stored." Also, thus far the Secretary has been unable to cite any legal authority to support the  Secretary's "requirement" that ballot scanners certified for use in Massachusetts must delete all the ballot images after they are used to tabulate the vote. Dr. Shiva also posted that in seven (7) Massachusetts cities/towns there were more votes counted than are participating voters, and appended the Twitter hashtag #ElectionFraud to his tweets. This tweet went viral and generated much commentary.

**Dr.SHIVA Ayyadur…** ✓ · Sep 24   ⋯

BREAKING:
Massachusetts Destroys Over 1
MILLION Ballots in US SENATE
PRIMARY RACE committing
#ElectionFraud.  MA Elections
Attorney confirms to #Shiva4Senate
ballot images -  used for counting
votes - that MUST be saved by
FEDERAL LAW for 22 months are
nowhere to be found!

💬 157    🔁 2.5K    ♡ 3.1K    ⤻

Twitter did **not** delete this tweet.

O'Malley, as the official spokesperson for Galvin, Tassinari and the Elections Division,

released statements to the Associated Press, Reuters and Leadstories.com that this tweet

constituted "Election Misinformation" and that no (paper) ballot was destroyed in violation of

Federal law.

Dr. Shiva continued to tweet on this point:

**Dr.SHIVA Ayyadur…** ✓ · Sep 24   ⋯

"[A]ppropriate state or local authority
MUST PRESERVE ALL RECORDS to
detection & prosecution of election
crimes for 22-month federal retention
period, if records were generated in
connection w election that was held
in whole or in part to select federal
candidates."
-USC Title 42

**Dr.SHIVA Ayyadur...** ✔ · Sep 25   ⚬⚬⚬

IProtest #ElectionFraud and stealing
of a US Senate Federal Election by
the Massachusetts SWAMP.

TODAY - 12.30PM. Secretary of State
Office.
1 Ashburton Place, Boston, MA.

Just the beginning.

WRITE IN #Shiva4Senate on or by
November 3rd.
Victory for #TruthFreedomHealth

The Associated Press, Reuters and Leadstories.com ran "FACT CHECK" stories, which uniformly claimed that because Dr. Shiva had been contradicted by a government official, O'Malley, naturally Dr. Shiva's claim was FALSE.  In fact, Dr. Shiva's attorney sent a letter to Leadstories.com conveying the facts about ballot images, and asked them to correct their fake "FACT CHECK." They never corrected their "FACT CHECK," rather accepting the word of government official O'Malley as the ultimate "fact."

These "FACT CHECK" stories were circulated worldwide and appear as the top result on search engine pages whenever one searches for Dr. Shiva.  One sees these "FACT CHECK" articles, before one reads Dr. Shiva's position as shown in the screenshot below.  This exemplifies the result of "free press" partnering with the government to "combat" "election misinformation."



On September 25, 2020, Dr. Shiva followed his 'Massachusetts destroyed ballots' tweet with a thread of four (4) tweets that revealed, via screenshots, the email conversation with Tassinari that has been pasted above, which was written confirmation from the Secretary's own office that records generated during a Federal election – the ballot images - the very records used for tabulation -  were destroyed – "not stored."  Below is the threaded-tweet comprised  offour (4) tweets and the associated four (4) screenshots of the Tassinari email conversation that Dr. Shiva posted:

<u>Threaded-Tweet – First of 4 Tweets</u>



**Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email**
@va_shiva

BREAKING: Legal Counsel of Massachusetts FURTHER confirms #CharlieBaker Sec. of State DESTROYED 1 Million+ Ballots - images used to COUNT votes on electronic equipment. She evades answering what statute allows MA to DESTROY ballots &amp; evade Federal Law. Email exchange below: https://t.co/gcygVK1wiC

10:49 PM - 25 Sep 2020

---



**Shiva Ayyadurai** <vashiva@vashiva.com>
to Michelle, John, Venu, Ralph, benniejsmith, Jude ▾                    10:33 PM (9 minutes ago)  ☆  ↰  ⋮

Subject: Destroying Ballots is Illegal. The Ballot Images ARE the Ballots. You DESTROYED The Ballots. Period.

Michelle
First, you have NOT answered my question, from my previous email. I repeat it below. PLEASE answer the question.

        Kindly refer me to the statute or law, in which the "...approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images."

Second, neither the people of Massachusetts nor I are stupid. I presume you must be under incredible pressure from Bill Galvin and Charlie Baker to deflect this issue to hope it disappears.

However, the fact is the State has illegally destroyed ballots. The electronic equipment used to tally and count the vote MUST first CREATE an image - the ballot image - in order for the vote to be processed and COUNTED by the machine.   When that image is created, that image becomes THE BALLOT, as it is THE entity used to count the vote.  If no image was created, no vote count could exist. You are required by Federal Law to store,preserve, archive those ballots for 22 months.  If those ballot images DO NOT exist, they were DESTROYED. This destruction is illegal, and therefore, the election is null and void.

Once again, please answer my question, above.

Warmest regards,

Dr.SHIVA Ayyadurai
US Senate Candidate

## Threaded-Tweet – Second of 4 Tweets



**Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email**
@va_shiva

Email response from Massachusetts Legal Counsel to #Shiva4Senate confirming ballot images were DESTROYED. - September 25, 2020. 11:45AM. https://t.co/OPNvqdThvK

Sep 25, 2020, 10:49 PM

**Tassinari, Michelle (SEC)**
to me ▾                                    👁 11:45 AM (10 hours ago)   ☆   ↩   ⋮

Shiva-

Attached please find the certification of two different types of digital scan equipment in Massachusetts.

Please note that while the ballot images are not stored, the actual ballots voted on at any federal election are secured and stored for 22 months in accordance with federal law. However, under state law, those ballots must remain sealed until such time as they can be destroyed.

Michelle K. Tassinari
Director and Legal Counsel
Elections Division
One Ashburton Place, Room 1705
Boston, MA 02108
617-727-2828

## Threaded-Tweet – Third of 4 Tweets

 **Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email**
@va_shiva

Email response from Dr. SHIVA Ayyadurai to Massachusetts Legal Counsel request the statute or Law that allows Massachusetts to violate Federal Law - September 24, 2020. 11:22AM. https://t.co/LkGLoUFhRn

Sep 25, 2020, 10:49 PM

**From:** Shiva Ayyadurai <vashiva@vashiva.com>
**Sent:** Thursday, September 24, 2020 11:22 AM
**To:** Tassinari, Michelle (SEC) <Michelle.Tassinari@sec.state.ma.us>
**Subject:** Re: Records Request

CAUTION: This email originated from a sender outside of the Commonwealth of Massachusetts mail system.  Do not click on links or open attachments unless you recognize the sender and know the content is safe.

Michelle,

Kindly refer me to the statute or law, in which the "...approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images."

Thank you in advance.

Warmest regards,

Dr. Shiva Ayyadurai
US Senate Candidate.

<u>Threaded-Tweet – Fourth of 4 Tweets</u>

 **Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email**
@va_shiva

Email response from Massachusetts Legal Counsel to #Shiva4Senate request for ballot images. - September 24, 2020. 10:47AM. https://t.co/oDKf8my3pf

Sep 25, 2020, 10:49 PM

On Thu, Sep 24, 2020 at 10:47 AM Tassinari, Michelle (SEC) <michelle.tassinari@state.ma.us> wrote:

Good Morning-

I am writing to acknowledge receipt of your request for records. Please note, that this Office does not maintain voter tabulation software, firmware or hardware.  While this office certifies voting equipment, as required by law, we do not purchase or lease equipment.  Once equipment is approved by this Office, cities and towns can purchase or lease such equipment.  Accordingly, this Office has no records responsive to your request.

Further, to the extent you request the same information from local election officials, please note that the approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images.

Michelle K. Tassinari
Director and Legal Counsel
Elections Division
One Ashburton Place, Room 1705
Boston, MA 02108
617-727-2828

------------

Tassinari and O'Malley testified under oath at the October 30, 2020 emergency hearing that they had received one or two emails and one or two phone calls from the public about these tweets, which then prompted them to go on Twitter and read the tweets themselves, and Tassinari became upset because it was "Election Misinformation." Tassinari testified, she then decided that the tweet should be reported by O'Malley to Twitter for sanctions because this tweet would cause voter suppression. See Exhibit 1 - Transcript of TRO Hearing

O'Malley testified she is the point person in Galvin's office who manages the Election Division's official Verified Twitter account.



Mass. Elections ✔
@VotingInMass

Official account of the Elections Division,
Office of the Secretary of the Commonwealth
of Massachusetts. Register online at
RegisterToVoteMA.com.

Massachusetts    sec.state.ma.us/ele
Joined July 2012

650 Following    5,084 Followers

Tweets    Tweets & replies    Media

O'Malley testified that she reported the one tweet from September 24 in the complaint that she filed with Twitter via Twitter's online form and identified the complainant as the official Verified Twitter account of the Massachusetts Elections Division.

> Q.   And what brief description did you provide in this report?
> A.   To the best of my recollection, I explained that the statements regarding the destruction of ballots were false and that the statements attributed to the Massachusetts election attorney were a misrepresentation of what Attorney Tassinari had said.

O'Malley also revealed that Cohen-NASED had reported more of Dr. Shiva's tweets, and mentioned that she also reported the tweet to National Association of Secretaries of State (NASS). Discovery shall reveal the role played by NASS in conjunction with the Defendants in the silencing of Dr. Shiva's political speech.

```
            THE COURT:  Well, do you know of anybody who reported
    any other of Dr. Shiva's tweets?
            THE WITNESS:  I believe someone from the National
    Association of State Elections Directors may have reported some
    other tweets.
            THE COURT:  Why do you think that?
            THE WITNESS:  We were in communication with the
    National Association of State Elections Directors because they
    assist us in figuring out how to report these tweets.
            THE COURT:  So Ms. Tassinari asked you to report Dr.
    Shiva's one tweet; is that right?
            THE WITNESS:  Yes.
```

During direct testimony at the emergency hearing, Tassinari revealed that she, the President-Elect at NASED, contacted Cohen at NASED to also report Dr. Shiva's tweet.

```
            THE COURT:  And when you communicated with Ms. Cohen,
    the Executive Director of the National Association, was it your
    hope that the National Association also would report the
    matter?
            THE WITNESS:  Yes.  She is -- the National Association
    of State Election Directors is also a Twitter partner, and they
    often coordinate communications between the social media
    companies and state election directors generally.
```

Assistant Attorney General Adam Hornstine repeatedly asserted to Judge Mark Wolf that the Defendant had not complained to Twitter about the threaded tweets that displayed four (4) screenshots of the Tassinari emails that were the ones that Twitter repeatedly forced Dr. Shiva to delete. He did not reveal that this task had been *outsourced* to Cohen and NASED in order to maintain plausible deniability.

In response to questioning by Judge Mark Wolf, Tassinari testified that she had been personally upset by Dr. Shiva posting the screenshots of her emails on Twitter and him declaring

that because Massachusetts destroyed the ballot images used to tabulate votes, it constituted election fraud. Tassinari also revealed under questioning that she is the President-Elect of NASED, that she coordinated with Cohen at NASED to amplify pressure on Twitter to punish Dr. Shiva for his tweets about her emails, and hoped his account would get suspended such that he could not tweet at all during his election campaign for the official reason of "Election Misinformation," and that Cohen had telephoned her back to inform her that Cohen had done so. None of this was in Tassinari's affidavit (#15-2).

```
        THE WITNESS:  I think the goal was generally to ensure
   that misinformation wasn't being spread, and so whatever
   actions that we could take to make sure that the tweet was
   labeled as inaccurate or taken down, we were willing to pursue.
        THE COURT:  But did you think -- you had filed a
   report.  Did you want to do everything possible to try to
   assure that Twitter would take it seriously and either remove
   the tweet or label it inaccurate?
        THE WITNESS:  Yes.
        THE COURT:  And were you pleased when they deleted the
   tweet?
        THE WITNESS:  I believe I saw that it had been
   removed.  I was, yes, I was relieved.
```

The tweet that Tassinari was "relieved" to see removed was the September 25th threaded tweet containing the four screenshots of Tassinari's email conversation with Dr. Shiva, which exposed that Secretary Galvin was violating Federal law by destroying ballot images, even though Tassinari gave the court the impression that it was about the one election fraud tweet cited in her affidavit.  To reiterate, Twitter never removed Dr. Shiva's September 24th tweet that Tassinari initially claimed had been removed.

On October 30, 2020, during the emergency hearing for a TRO, O'Malley testified that Massachusetts' Elections Division is a "Twitter Partner," meaning a respected, trusted partner in the fight against "Election Misinformation," as is NASED and every state's Elections Division. O'Malley testified that NASED had arranged for Twitter to provide a response to complaints from these "Twitter Partners" as a matter of priority and without necessarily independently checking the veracity of their complaints, as they come from a State office that is a "Twitter Partner." ***One may visualize the difference between ordinary users - private citizens -  and "Twitter Partners" as the difference between a credit union debit card and Amex Black***. A complaint to Twitter from Elections Directors carries with it the full force of the government and receives **high priority** processing and response. None of these facts may be found in O'Malley's affidavit to this court (#15-1).

> Q.   And you mentioned a few moments ago in response to a
> question from the judge that the Elections Division is a
> Twitter partner; is that correct?
> A.   Yes, yes.
> Q.   And when you say that, what does that mean?
> A.   My understanding is that we are able to select certain
> reasons for reporting a tweet that may not be available to
> everyone and that they will -- that the people who review the
> tweets at Twitter, when complaints are made, will try to act
> quickly on the ones we report.

This sworn testimony directly contradicted Galvin's assertions to Judge Mark Wolf via AAG Adam Hornstine that a complaint to Twitter from Galvin's Office is just the same as and no different at all from a complaint from any ordinary civilian, even though he knew that the

Elections Division is a Twitter Partner and has access to complaint types that are not visible to ordinary users on Twitter.

While eliciting testimony from Dr. Shiva, Galvin's attorney, AAG Adam Hornstine, took pains to emphasize the point that Dr. Shiva could have been forced by Twitter to delete the Tassinari email tweets due to a report from just about anybody with a Twitter account. This was proven false, given the special relationship afforded to the Defendants, as was revealed during the testimony of Tassinari and O'Malley.

On September 26, 2020, in direct response to concerted, coordinated action by the Secretary of State, the state election director, the state Twitter liaison and spokesperson via the official Elections Division Verified Twitter account, and the National Association of State Election Directors, Twitter immediately forced Dr. Shiva to delete the thread of four tweets that revealed the Tassinari emails. Though he agreed to delete the thread with the four emails, Twitter suspended his Twitter account for a week, blocking him from speaking to his quarter-million followers and any potential voters during his Write-In election campaign.

Dr. Shiva continued to physically run his campaign. At the end of the week his access to Twitter was restored. Dr. Shiva posted tweets about the rallies he had held, his objections to election fraud and the destruction of ballot images. Those tweets remain public. When Dr. Shiva then again posted any tweets referencing Tassinari's emails exposing the Defendants violation of Federal law, immediately Twitter again forced him to delete those specific tweets and again suspended him for another week. This was during the last month of campaigning before Election Day, where as a Write-In candidate, Dr. Shiva needed as much public exposure as he could get.

Dr. Shiva was disappeared from Twitter for nearly all of the final month of campaigning!

During their sworn testimony at the October 30, 2020, emergency hearing, and in their affidavits, O'Malley and Tassinari took pains to claim that they complained about Dr. Shiva because his tweets constituted "Election Misinformation" and that they were relieved and pleased that Twitter deleted the tweet that they had reported. Neither Defendant chose to reveal in their affidavit that they asked Cohen and NASED to make Twitter delete the tweets about the Tassinari emails and that they were relieved and pleased that Twitter did so.

Dr. Shiva then testified that the tweet the Defendants testified to have reported and then verified as having been deleted is still public, and that Twitter had not forced him to delete it, but did force him, every single time, to delete tweets that referenced the Tassinari emails that documented violation of Federal law by Defendants.

```
Q.   Ms. Tassinari, are you aware that the four tweets that I
shared with our email interaction were deleted from Twitter?
A.   Yes.

Q.   Okay.  You have stated to the court that the main tweet
that I put up, which was exposing in fact ballot images were
destroyed, was deleted.  Are you aware that that tweet was
never deleted; it's still up?

A.   I do not know what action Twitter took.  I thought it had
```

```
-- I know tweets had been removed.  I don't follow every single
one of your tweets.
Q.   But did you not just assert to the court that this tweet
was removed?
A.   I thought it had been.
Q.   Okay.  But you do know that the four tweets that I shared
with you and I interacting about the ballot images were
removed; is that right?
A.   Yes.
```

After Dr. Shiva's testimony, Judge Wolf questioned Tassinari about her earlier testimony that she had checked Twitter and was happy that the reported tweet had been deleted. Tassinari claimed now that she may have been mistaken.

It is vital to note that Galvin, O'Malley and Tassinari had claimed under oath that they were duty-bound to protect the reputation and integrity of the election process in Massachusetts and prevent suppression of the people's vote, when they identified Dr. Shiva's election fraud tweet as "Election Misinformation" and merely reported the tweet to Twitter just as would any other user.

Assistant Attorney General Adam Hornstine from AG Maura Healey's Government Bureau even declared that Twitter deleted the tweets and suspended Dr. Shiva because he could have violated Twitter's Terms of Use and other internal policies and that the suspension could easily have been because of complaints from any ordinary random user.

After the emergency hearing revealed the special position held by "Twitter Partners" and the coordinated nature of the attack on Dr. Shiva's political speech, and the undeniable fact that

the Tassinari emails were the sole focus of the deletions, the Defendants immediately claimed

the opposite of what they swore to in their opposition, affidavits and initial testimony.

Their brand new narrative, minted during the emergency hearing, and akin to Big Brother

*increasing* chocolate rations, now involved claiming that because Twitter had not deleted the

tweet that they had classified as "Election Misinformation," the same tweet they had just sworn

had been well-deservedly deleted to keep the country safe, the Defendants were not responsible

for the suspension caused each time by Dr. Shiva posting the Tassinari email tweets, that Twitter

had not even responded to their complaint and that for some reason unknown to the Defendants,

Twitter by itself found only the Tassinari email tweets objectionable.

By the time discovery is complete, the Defendants' narrative may totally flip yet again.

It is impossible to overstate the fact that until the Defendants' coordinated attack, Twitter

did not and still has not forced Dr. Shiva to delete many tweets on diverse topics that could be

considered controversial or contrarian, the pandemic, BLM, face mask mandates, genetically

modified foods, mandatory vaccinations etc. - 30,000 tweets over nine years.  Here is a sample

of such recent tweets:





**Dr.SHIVA Ayyadur...** ✔ · Sep 26   ○○○

Too little too late.

> 🧑 **Jade** @jadescipioni · Sep 26
>
> Dr. Fauci says to take vitamin D if you're deficient — here's how to know cnb.cx/3mXbxzE

💬 97     ⟲ 443     ♡ 1.2K     ↗



**Dr.SHIVA Ayyadur...** ✔ · Sep 24   ○○○

Pushing #Vaccines - MANDATED one-size-fits-all Medicine - is a very profitable market opportunity - growing at 17.9% per year since 2011.   During this same period #BigPharma has been bleeding money on the drug front. #BigPharma NEEDS #ForcedVaccinations.



💬 11     ⟲ 214     ♡ 260     ↗



In addition, during the period from September 1, 2020 to September 25, 2020, Dr. Shiva

posted a series of tweets specifically on election fraud in Massachusetts, and on destruction of

ballots. Twitter neither did ban Dr. Shiva's access to his Twitter account for such tweets nor did

Twitter force Dr. Shiva to remove these tweets:





**Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email** ✔
@va_shiva

Just received a call from the @AP concerning #ElectionFraud in the Massachusetts U.S. Senate Primary Elections. I asked her to put her questions in writing. Here are my answers.  I share this for full transparency.

Question/Answer 1

On Sep 25, 2020, at 5:15 PM, Joffe-Block, Jude <JJoffe-Block@ap.org> wrote:

What is your basis for saying the state has destroyed more than one million ballots? (Election officials say these ballots are preserved under seal).

Let's be clear when electronic equipment is used, the  tally - count of vote - is performed on Athens ballot image.  Pursuant to chain of custody, the ballot image IS the ballot, and destroying these ballots is illegal by Federal Law.

6:07 PM · Sep 25, 2020 · Twitter for iPhone



**Dr.SHIVA Ayyadur...** ✔ · Sep 25   ०००

Dear @TheJusticeDept
Massachusetts SWAMP is violating
Federal Law. They have a long history
of DESTROYING BALLOTS - the ballot
images used for counting votes from
electronic machines.  Those ballot
images are to be saved for 22
months by Federal Law.

Lock up #CharlieBaker.

💬 17     🔁 258     🤍 417     ⌁



















**Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email** ✓
@va_shiva

Why did Verizon rep at store say, "both your iPhones hacked," "never seen this error before," & then said, "I can't help you."

Coincidence – both iPhones Verizon cellular service stopped working, among other things, after I began speaking up about  #ElectionFraud?

BlackBerry?

2:06 PM · Sep 11, 2020 · Twitter for iPhone



**Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email** ✓
@va_shiva

Why did Verizon rep at store say, "both your iPhones hacked," "never seen this error before," & then said, "I can't help you."

Coincidence – both iPhones Verizon cellular service stopped working, among other things, after I began speaking up about  #ElectionFraud?

BlackBerry?

2:06 PM · Sep 11, 2020 · Twitter for iPhone



Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email ✔
@va_shiva

Appears that #ElectionFraud and #ForcedVaccinations are TWO keywords @Twitter, @Facebook and @YouTube love to shadow ban and censor. Perhaps why my follower count has been throttled at 259k to 260k for past 5 months.

11:50 AM · Sep 11, 2020 · Twitter for iPhone





 **Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email** ✔
@va_shiva

The Establishment is ONE. #DeepState no longer hides its crimes. They do it openly - #ElectionFraud or #ForcedVaccinations.

They bank on your apathy.

BUT, the movement for #TruthFreedomHealth has inspired you to act. THAT is THEIR biggest fear.

VOTE #Shiva4Senate Nov. 3

8:58 AM · Sep 8, 2020 · Twitter for iPhone

 **Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email** ✔
@va_shiva

Voting is the most important element of a Democracy. The integrity of Voting demands the output from that Voting process is EVIDENCE of reality. When ALL Americans realize such EVIDENCE is NOT EVIDENCE, we will HAVE a necessary and well-deserved REVOLUTION, Beyond Left & Right!

1:04 PM · Sep 6, 2020 · Twitter Web App



**Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email** ✔
@va_shiva

What is "evidence?"

An accurate definition of EVIDENCE is: Unambiguous Prediction.

The stuff coming out of American voting machines predicting an outcome - unless inputs are verifiable & processing CAN'T be manipulated - is NOT EVIDENCE.

PERIOD.

The real awakening cometh.

6:11 AM · Sep 6, 2020 · Twitter for iPhone



**Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email** ✔
@va_shiva

BREAKING: Massachusetts

"It has been determined more than 3,000 ballots have not been counted in Franklin after more boxes of ballots are found." -Milford Daily News

UPDATED: It has been determined more than 3,000 ballots have not been …
The missing votes will be the deciding factor for the Norfolk County sheriff primary and the Democratic nominee for the 4th Congressional District.
🔗 milforddailynews.com

5:47 AM · Sep 6, 2020 · Twitter for iPhone



Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email ✓
@va_shiva

When YOU see the REALITY of how ANY election can be manipulated in seconds, YOU'll realize how THEY can make ANY doofus a "winner." This is what happened on SEPT 1, US SENATE MA Primary. I've been programming all my life – video explanation coming!

#Shiva4Senate Nov. 3 WRITE IN!

10:10 PM · Sep 5, 2020 · Twitter for iPhone



Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email ✓
@va_shiva

What would you say if I told you that your ONE vote was not ONE vote?

That your 1 vote could be multiplied by a weight – a factor – say 0.5 or 1.5 – to become a 1/2 vote or 1 1/2 votes?

Impossible?

All modern voting systems allow for such a feature.

Why?

9:07 PM · Sep 4, 2020 · Twitter for iPhone















To reiterate, Dr. Shiva was not forced to remove even one of the above tweets concerning election fraud.  The only possible conclusion is that Twitter by itself did not find that Dr. Shiva's tweets constituted "Election Misinformation" or violative of any internal policy or Terms of Use.

When Dr. Shiva posted the four (4) screenshots of the Tassinari email conversation in one threaded-tweet, which cited violation of Federal law, Twitter forced Dr. Shiva to delete that tweet, and began banning him repeatedly for most of the time left before election day. Here are the screenshots of Twitter forcing the deletion of Tassinari threaded-tweet:





Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email
@va_shiva

Email response from Massachusetts Legal Counsel to #Shiva4Senate request for ballot images. - September 24, 2020. 10:47AM. https://t.co/oDKf8my3pf

Sep 25, 2020, 10:49 PM

**Remove**

 **Dr.SHIVA Ayyadurai, MIT PhD. Inventor of Email**
@va_shiva

BREAKING: Legal Counsel of Massachusetts FURTHER confirms #CharlieBaker Sec. of State DESTROYED 1 Million+ Ballots - images used to COUNT votes on electronic equipment. She evades answering what statute allows MA to DESTROY ballots &amp; evade Federal Law. Email exchange below: https://t.co/gcygVK1wiC

10:49 PM - 25 Sep 2020

As a result, we've temporarily limited some of your account features. While in this state, you can still browse Twitter, but you're limited to only sending Direct Messages to your followers — no Tweets, Retweets, follows, or likes. Learn more. Your account will be restored to full functionality in: 7 days and 0 hours.

It beggars belief to think that Twitter independently found only the Tassinari email tweets to constitute "Election Misinformation" to such a dangerous degree that it warranted blocking a political candidate's speech during his run for Federal office as a Write-In candidate and prevent him all access to his account and quarter million followers for half of the time left before Election Day, and that Tassinari herself had nothing to do with it.

It is crucial for this court to note that the Defendants realized that the Tassinari emails exposed them to prosecution for violation of Federal law, as well as civil action by Dr. Shiva over the loss of his primary election to Kevin O'Connor. They acted swiftly and powerfully to conceal this evidence, to suppress Dr. Shiva's political speech entirely, and actively distributed through the "free press" their consciously false narrative that ballot images are not records covered by the storage requirements of Federal law and that Dr. Shiva's claim is false.

Their coordinated action, the enterprise, was intended to obstruct justice.

It is also a legal fact that the Defendants were prohibited by the Massachusetts Supreme Judicial Court from acting officially in any way against Dr. Shiva during his political campaign based on any claim that his speech was false.  The SJC ruled that per the First Amendment, which guarantees special protection for political speech, the Commonwealth could not criminalize or in any way retaliate against a Massachusetts candidate for the content of his political speech during an election campaign. *Commonwealth v. Melissa Lucas*, 472 Mass. 387 (2015)(*ALL government officials in Massachusetts are barred from censoring or sanctioning political speech by candidates in the midst of their election campaign*). It was already known to the Defendants that their action against Dr. Shiva's tweet, even under the convenient pretext of shutting down false speech, was specifically outlawed in Massachusetts. Even if ordinary civilians report such speech to Twitter, these government officials were explicitly prohibited

from using their privileged priority status and networks to shut down a candidate's political

speech in the middle of his political campaign. The Defendants consciously defied a known law.

So, both the pretext and the ulterior motive were already known to be unlawful. The

Defendants put their enterprise into action anyway, in order to obstruct justice and try to keep

concealed the official admission that Galvin and Tassinari **knew** that they violated Federal law.

Even though the Defendants are fully aware of the SJC's prohibition, Galvin claimed to

Judge Wolf that he should not be restrained from shutting down Dr. Shiva's political speech as

taking steps to silence a candidate during his campaign was permissible "Government Speech."

> "As the elected state official charged with ensuring free and fair elections in the
> Commonwealth, Secretary Galvin exercised his free speech rights and spoke on behalf of
> the government to ensure that the public had access to accurate information. The
> Secretary reported Plaintiff's misinformation to Twitter, just as any person could have
> done. Allegedly as a result, Twitter – not the Secretary –temporarily suspended
> Plaintiff's ability to post new information to his Twitter account. Plaintiff now contends
> that the Secretary should be unable to report false election claims to Twitter in the future.
> The Court should not entertain this request but should instead deny Plaintiff's effort to
> restrain future government speech."
>
> *Galvin's opposition to the motion for a TRO in this case* (ECF#15)

The fact remains that it is the Constitution, and the SJC, not the Plaintiff, that contends

that the Secretary should be unable to report false election claims to Twitter. Galvin's

protestation is breathtaking here in the United States, though it may be normal in foreign

countries without Constitutional and legal protection for political speech.

On October 20, 2020, Dr. Shiva had a private attorney file a complaint and a motion for a

Temporary Restraining Order to stop Galvin from continuing to cause Twitter to silence his

political speech during the few days left before Election Day. Despite being a licensed member

of the Massachusetts Bar, the attorney filed for monetary damages in Federal court against a

state official sued in his official capacity, which, as all lawyers are required to know, has been

barred for a hundred years by the Eleventh Amendment. However, this allowed an emergency

hearing to be held under the *Ex parte Young* exception as the TRO motion sought prospective injunctive relief, namely restraint on Galvin again silencing Dr. Shiva's political speech on Twitter between then and Election Day.

On October 30, 2020, Judge Mark Wolf held a four-hour long emergency hearing via Zoom with the participation of Dr. Shiva, Galvin via counsel Adam Hornstine from the AGO, O'Malley and Tassinari. AAG Adam Hornstine opposed the TRO hearing on 11th Amendment Immunity grounds. This action, knowing that Dr. Shiva was in his first ever hearing *pro se*, was egregious and Judge Mark Wolf placed that in the record.

> THE COURT:  It's clearly barred, but that's not what you're discussing here.  You're making a different argument here.
>
> MR. HORNSTINE:  I agree, but it primarily proceeds from the damages piece, and I'm happy to move on.
>
> THE COURT:  It doesn't say that.  You're happy to move on.  Frankly, I'm not.  You represent the government.  You should always be accurately describing the law.  But here you've got a pro se litigant on the other side.  And, you know, we're talking about the nuances of constitutional law, and the case is going very quickly.
>
> And, you know, this is not the only case I have.  I've been dealing for the last couple of days with an MS-13 murder case.  But this is consequential.  We're talking about fundamental constitutional law a couple of days before an election.  So I expect that if the Attorney General is going to give me a brief, I'm going to take it seriously.  But I was surprised to see this argument because it's not an argument that your bureau of your office has made to me before as recently as in the last two months in another suit against a cabinet secretary and the governor.  And I've been spending time trying to think if I've misunderstood *Will*.  I don't think I did.

Because the motion and facts within the complaint, in conjunction with fresh facts elicited during the hearing from O'Malley and Tassinari, were sufficient to show that Dr. Shiva satisfied the *Blum* standard and was likely to prevail on his claim that Twitter's action was indeed state action, Judge Wolf declared that there was enough justification for issuance of the TRO. However, Judge Wolf informed Galvin that if Galvin agreed on his own to not complain again to Twitter about Dr. Shiva's tweets between then and November 4th, 2020, and requested NASED to also desist, then Judge Wolf would accept such an Agreement and declare the motion to be moot. Galvin agreed and an Order (#20) issued. An amended complaint followed, later followed by this second amended complaint.

## THIS COMPLAINT MEETS THE *BLUM* STANDARD TO SHOW STATE ACTION

For four years now all social media companies have been under tremendous pressure to act against "election disinformation." This pressure has been unrelenting and from all sides: Congress, state politicians, DOJ, the press and public opinion. It never let up after the previous 2016 elections. In October 2020, Massachusetts U.S. Senator Edward Markey demanded in the Senate that FaceBook and other social media companies actively shut down voices that he deemed to be peddling 'election misinformation.'

https://www.boston.com/news/politics/2020/10/28/mark-zuckerberg-ed-markey-facebook-respond-donald-trump-election-posts

Twitter, a publicly traded corporation, is not immune from these strong pressures. And here it received a strong complaint from the Secretary that claimed Dr. Shiva's tweets were "Election Misinformation," a strong complaint that was further amplified by the Election Directors of all fifty (50) states in the Republic.

The fact of a coordinated complaint by "Twitter Partners" was confirmed during the emergency hearing.

In the current climate one can imagine fewer dog whistles more potent than "Election Misinformation." It was inevitable and entirely predictable that Twitter would not ignore an official complaint from the Massachusetts Secretary of State and related "Twitter Partners" that claimed Dr. Shiva's Twitter feed spread "Election Misinformation." The last thing any public corporation needs is a press statement from the Commonwealth of Massachusetts that it is aiding and abetting "Election Misinformation." And Twitter would have been left to hang by itself given that the "FACT CHECK" by large media sources such as Reuters and the AP simply peddle whatever government officials' position is and appear at the top of searches on both Google and Bing. Given the checkered history of shareholder lawsuits, no public company can tolerate that risk.

The evidence included within the four corners of this complaint is overwhelming that Twitter acted to delete specifically the Tassinari email tweets and silence Dr. Shiva's political speech during his run for Federal office *solely and exclusively* because of the Defendants' coordinated complaint to Twitter. Twitter got mobbed, by State actors. It was documentary evidence of conscious violation of Federal law in those emails that was the *motive* for Galvin's action. For Galvin to deny all responsibility for this sequence of events is consciously dishonest. He knew full well that as the Elections Officer for Massachusetts his complaint would carry enormous weight and it did carry enormous weight. Twitter's response was immediate and specific. The key sentence in the *Blum* ruling is:

> "A State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement that the choice must in law be deemed to be that of the State." *Blum v. Yaretsky*, 457 U.S. 991 (1982)

The evidence is overwhelming that the "Twitter Partners" and State Officials - Galvin, Tassinari and O'Malley - in concert with Cohen and NASED, *provided such significant*

*encouragement that the choice must in law be deemed that of the State*. At the emergency hearing, Judge Wolf ruled that Dr. Shiva is likely to prevail on his claim that Galvin was responsible for Twitter deleting only the Tassinari email tweets and silencing Dr. Shiva's political speech in the midst of his campaign:

> The testimony I heard, which I believe is candid and credible, was also helpful because it amplifies the affidavits which say there was a report.  The closest issue in my mind, and it's closer than it was based solely on the papers, is whether what I'll call the *Blum* test for converting Twitter's action into state action is met, or, to be more precise, whether it will probably be proven.  Because now we do know that Twitter gives high priority to reviewing reports or complaints from election officials and acts on them quickly, and they acted on Dr. Shiva's account, as I understand it, quickly after getting the report from the Secretary here and also from the National Association.
>
> So it may be probable that he will ultimately prove that state action is involved here.  If state action is involved here, then it appears to me probable that he will prove that his First Amendment rights have been violated.

Galvin's Cat's Paw defense that it wasn't him and that Twitter acted all by itself, has already failed. Discovery, including sworn depositions from Cohen and Twitter's leadership, can only produce more evidence in support of Dr. Shiva's claim.

### BOSTON HAS A LONG HISTORY OF STRONGLY ENCOURAGING PRIVATE ACTORS TO SUPPRESS SPEECH

The history of Boston is synonymous with suppression of speech. Boston is defined by suppression of speech. In 1650, the first book burning in the New World happened on Boston Common when the General Court ordered copies of William Pynchon's book to be ***burned*** because it was not sufficiently loyal and deferential to the folks in power in Massachusetts. William Pynchon was then expelled to England, where none of his books was burnt.



Image: Mason Green, *Springfield 1636-1886*, C.A. Nichols, Publishers, 1888

After that, for over 300 years, numerous books were Banned in Boston despite the establishment of the United States and the passage of the First Amendment to the US Constitution. Massachusetts continued to have laws on its books that defied the First Amendment and enforced the government's views on what was acceptable speech, and criminally prosecuted people who asserted their First Amendment rights.

In 1944 the anti-racism book ***Strange Fruit*** was banned in Boston. On May 26, 1944, the author, Lillian Smith, penned the following in her letter to the American Civil Liberties Union annual meeting, about why the powers in Boston banned her anti-racism book:

> "But there are many others who fear the effect of Strange Fruit on the racial status quo; and, I think, within this group we shall find Boston's major reason for banning the book. These people believe it is to their political and economic advantage to keep the Negro and the Jew and labor where they are today. They fear all change. They know when racial segregation begins to weaken, that other forms of segregation and exploitation will crumble with it. They fear the book because it has the effect of stirring imagination and reawakening guilt feelings.
>
> To these people, segregation in all its forms: racial, economic, religious, psychological, must be maintained at however great a cost to civil liberties and intellectual freedom. It is only by realizing that the charge of obscenity is a clumsy attempt to destroy the book's power and prestige, that we, who believe in civil rights, can defend these rights in terms of this book."

https://web.archive.org/web/20130226042510/http://beck.library.emory.edu/southernchanges/article.php?id=sc12-5_008

Abraham Isenstadt was criminally prosecuted by the government of Massachusetts for selling one copy of ***Strange Fruit*** in Cambridge, Mass. The SJC upheld his criminal conviction because the prosecution complied with the letter of the law, ch. 276 § 28, as had remained on the books in one form or another from 1711, and with case law as it existed in Massachusetts throughout. *Commonwealth v. Isenstadt*, 318 Mass. 543 (1945)

That law, ch. 272 § 28, remained the law in Massachusetts even after the US Supreme Court reversed the SJC in a later decision in 1966 that reiterated the supremacy of the US Constitution and the First Amendment, even in Massachusetts. *Memoirs v. Massachusetts*, 383 U.S. 413 (1966) The law was amended: 1959, 492, § 1; 1966, 418, § 1; 1974, 430, §1; 1982, 603, § 2.

The ban in Massachusetts on selling, possessing or reading ***Strange Fruit*** was ***repealed only in the year 1982***, after the legislature rewrote ch. 272 § 28 to seek compliance with the First

Amendment to the United States Constitution, **two hundred and six (206) years after**

**Massachusetts joined the Republic**. The legislature rewrote it again, 2011, 9, § 19, in response

to Judge Zobel finding even the 1982 version unconstitutional - *American Booksellers*

*Foundation v. Coakley*, No. 10-11165, 2010 WL 4273802, D. Mass. (2010)

 In addition to the consciously **pretextual use** of an unconstitutionally vague law, which

was easily understood back in 1944 by Lillian Smith herself, the powers in Boston strongly

encouraged all private actors to enforce the establishment's arbitrary moral code, be they book

distributors or cinema halls or theatres. See *Censorship of the Theatre in Boston*, Daniel M.

Doherty, Boston University MS Thesis, 1950 - https://core.ac.uk/download/pdf/142044252.pdf

The **Watch and Ward Society**'s influence was total and extended far beyond the plain text of

state law. The threat of individual prosecution was in addition to a real threat of withdrawing the

license of theatres, cinemas and booksellers if they offended authorities, just as in the People's

Republic of China today. This **abuse of licensing power** generated comprehensive self-

censorship both within Massachusetts and amongst publishers and film distributors outside

Massachusetts. Film distributors *voluntarily* made a special version to be shown in

Massachusetts movie theatres that was different from the same movie shown in the free parts of

the United States, such as Manhattan. *Doherty*, supra.

 After the US Supreme Court finally prevailed in establishing the writ of the First

Amendment within Massachusetts, the government seemingly complied - **for a few years**.

 With the arrival of computer algorithms however, the government of Massachusetts is

again free to enforce its will and return to its endemic, long-entrenched tradition of defying the

First and Fourteenth Amendments, now without any concern about public attention, let alone

opprobrium. The silencing of this Plaintiff's speech was accomplished **silently**, through strongly

encouraging Twitter to use computer algorithms to flag his tweets anytime he referred to

Tassinari and/or the screenshot images of her emails, which revealed the Defendants' intentional

violation of Federal law. These algorithms responded as programmed: first with a suspension for

a few hours, then with a suspension for a few days, then with a suspension for a few weeks, and

then finally with a permanent suspension.

      All of this was done by the Government of Massachusetts to suppress this Plaintiff's

speech for revealing the truth that the government, Galvin and Tassinari, fully knew that they

intentionally violated Federal law and the US Constitution. And it was possible only because

Twitter was already a Trusted Partner of the Government! The mechanism employed to silence

this Plaintiff for simply mentioning the Tassinari emails predated the Plaintiff's discovery that

the Defendants fully knew that they had violated Federal law. The government was already

aware that it and Twitter had this mechanism ready to be used. This fact belies all the efforts

taken by the Defendants, both the government and Twitter, to convey the false impression to the

American people that Twitter is wholly independent of the government and is not hand in glove

with it.

### TWITTER DIDN'T JUST SUCCUMB TO THE MASSACHUSETTS GOVERNMENT - TWITTER IS AN <u>ACTIVE PARTNER</u> IN THE GOVERNMENT'S SILENCING OF SPEECH

Given the century-long history of private actors succumbing to the will of the government of

Massachusetts, in fear of losing licenses or being publicly excoriated as anti-social or aiding

crime, one would think it is not a surprise that in the year 2020 Twitter too silently succumbed.

In fact, this Plaintiff testified at the October 30, 2020, hearing for a TRO, that Twitter had no

choice but cave to a concerted powerful push from a government and its agents to pretextually

classify Plaintiff's tweet, about Tassinari deleting ballot images in conscious violation of Federal

law, as "content that may suppress participation or mislead people about when, where, or how to participate in a civic process."

Judge Posner wrote the following regarding the affidavit filed by an employee at Visa that denied any coercion by Sheriff Dart, though the coercion was explicit for all to see:

> "It's true that Visa filed an affidavit stating that "at no point did Visa perceive Sheriff Dart to be threatening Visa." But what would one expect an executive of Visa to say? "I am afraid of the guy?" "He is in effect calling me an accomplice of a criminal organization (Backpage), and I'm afraid he might pull strings to get me investigated and even prosecuted by any one of several federal or state agencies?" More significant than Visa's denial of having succumbed to Sheriff Dart's pressure tactics is the statement in the affidavit that the withdrawal of credit card services from Backpage "follow[ed] communication with Sheriff Dart's staff" and with "Visa Legal Department" personnel."

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015)

In this case here it is a matter of record that the Secretary of State of Massachusetts and the state's Election Director acted in concert with the National Association of State Election Directors and the National Association of Secretaries of State to do ***whatever it takes*** to silence Plaintiff's speech on Twitter in the middle of his federal election campaign.

Three hundred years of Massachusetts history shows that most private businesses lack the gumption to withstand that level of Massachusetts state government power and single-handedly defend the Constitution of the United States.

But we would be wrong to think that is the end of the matter. The reality at Twitter is vastly different. Twitter consciously chose to collude with the government ***even before*** Tassinari, Galvin, Cohen, O'Malley and others reached out to do ***whatever it took*** to silence this Plaintiff during his run for Federal office.

Twitter actively established a "Trusted Partner" program with government and actively colludes with efforts by the state to silence speech using this privileged relationship. Twitter's "Trusted Partner" program serves exclusively as an end run around the US Constitution's

restrictions on the government. The sole purpose of Twitter's "Trusted Partner" program is to allow the government to silence speech *silently* without any public scrutiny of the state's actions and to serve as the government's convenient cut-out that allows the government plausible deniability for its own actions - *Who, us? No, no, Twitter did it all on its own, it's a private company you see*. This is repellent and execrable. **It is impossible to tell where the government ends and Twitter begins!**

But for this court eliciting testimony from O'Malley and Tassinari at the TRO hearing, these Defendants and Twitter would have continued to conceal the very existence of the Trusted Partner program. Nowhere on Twitter's website do we find any mention of Twitter's Trusted Partnership with **government officials** to help the state silence speech silently.

Twitter's website takes care to conceal its deep, willing, collusion with the government and strives to give the impression that it partners only with other private companies for marketing purposes. See: https://partners.twitter.com/en and https://partners.twitter.com/en/about-the-program The court now knows that this claim is a lie. In its anodyne descriptions on "civic integrity," Twitter takes care to avoid a description of the Trusted Partner program and that it is intended from the start as an end run around restrictions on the government. https://about.twitter.com/en/our-priorities/civic-integrity , https://blog.twitter.com/en_us/topics/company/2020/2020-election-changes.html

It is vital for all of us to acknowledge that Twitter did not do what the brave Abraham Isenstadt did all by himself back in 1944, i.e. stand up for the US Constitution's protected rights and liberties and the foundational principles of the American Revolution.

Isenstadt stood up to the government of Massachusetts despite being one solitary owner of one solitary bookshop. Twitter on the other hand is much more powerful and has the global

voice to not just stand up to the government but expose **whatever it takes** efforts by state officials to silence speech.

But Twitter founder, CEO and Director, Jack Dorsey, is not Isenstadt. Isenstadt in deeds, not in words, fought segregation, racism, discrimination when he was willing to put his own business on the line and risk acquiring a criminal record to fight for free speech and defend the First Amendment. Dorsey on the other hand gave Tassinari, Galvin – the Government of Massachusetts – a Trusted Twitter Partnership, colluded with them to silence a black-skinned, low-caste untouchable, who had exposed a conscious violation of Federal Law that intentionally denied the guarantee of "One Person, One Vote" to every American.

The irony and hypocrisy is beyond the pale. Unlike Twitter and Dorsey, Isenstadt chose to live not by lies.

Applying the Isenstadt analogy, Twitter's willing clandestine relationship with the government is equivalent to the government of Massachusetts having a backdoor to Isenstadt's bookstore and a collusive relationship with him to silently exclude books from sale that do not meet with the state's approval, while claiming it was a private business decision.

Twitter too may be visualized as a modern bookstore with the tweets being the equivalent of books. It is now a matter of record that unlike Isenstadt, Twitter founder and CEO Jack Dorsey has granted the government privileged backdoor access and a controlling say over which books Dorsey puts up on display. Both Dorsey and the government see eye to eye and are in full agreement that voices, such as this Plaintiff's, that promote all forms of desegregation and meaningful structural change, must be silenced, just like **Strange Fruit** was silenced by the "liberal" elite in Boston.

This is no different from how it was in the Soviet Union or East Germany and still is in

today's China. It is not credible to pooh pooh this fact as an unhinged conspiracy theory. Russian

dissident Alexei Navalny identified this nexus correctly in a tweet:



**Alexey Navalny** ✓
@navalny

Replying to @navalny

8. Of course, Twitter is a private company, but we have seen many examples  in Russian and China of such private companies becoming the state's best friends and the enablers when it comes to censorship.

1:15 PM · Jan 9, 2021 · Twitter Web App

What this litigation is expected to establish, via facts and sworn testimony already in the

record, is that ***Twitter is an agent of the government***, the State's best friend, even outside of

silencing any mention of the Tassinari emails, and that First Amendment principles apply to all

speech on Twitter that the government takes a dislike to. It is mandatory ***to examine every single***

***case of censorship or deplatforming*** to determine the role played by the government in that

decision to silence selected viewpoints.

The simplistic cover story that Big Tech is a brave independent private actor and not

merely an agent of the government that actively allows the government to silently circumvent

First Amendment restrictions, will be swept away by the facts of this case.

### JACK DORSEY AND TWITTER OPPOSE THE SOCIAL JUSTICE CAUSES THAT HAVE DEFINED THIS PLAINTIFF

Plaintiff Dr. Shiva was born a low-caste untouchable, and experienced grinding poverty and

crushing oppression on a farm in southern India.  His family moved to America in 1970, and he

grew up in the working class neighborhoods of New Jersey.  His entire life has been a fight against all forms of oppression and segregation, based on direct personal experience.

Plaintiff put his life on the line at each instance and placed personal interests at grave risk to take a public stand for the downtrodden. Ever since he moved to Massachusetts from New Jersey in 1981, his life has been a continuous struggle against the "liberal" elite in control of this state, and their daily hypocrisy, which predates the founding of the United States. What he has observed is that their words – of fighting for the poor, the oppressed, working people – are contrary to their deeds.

While at MIT, Plaintiff placed his degrees and PhD at risk when he fought publicly for the rights of women and protested the pervasive misogyny and sexism within the elite at that university. He was inspired by his mom's experiences and struggles in India, at a time when women, especially from her background, were not expected to become educated. He fought publicly for the rights of workers at the university, fought against "liberal" elites profiteering in Apartheid South Africa, fought to release political detainees from the genocidal Jayawardane government in Sri Lanka, fought for the entry and inclusion of more women, and poor – black and white – in science and engineering, fought against endless imperialist wars overseas, and fought against the fake Left-Right – Republican-Democrat – divide.





*1986 – On the occasion of MIT inviting Sri Lankan Prime Minister Jayawardane to MIT, Plaintiff protested genocide and demanded the release of his MIT colleague who was unlawfully detained in a Sri Lankan prison. His efforts resulted in the release of the detained physicist.*





In 2009, after completing his Fulbright, Dr. Shiva was invited by the Prime Minister of India to import his expertise in science and innovation to lead the reforming of India's leading scientific institution - the Council of Scientific and Industrial Research (CSIR) of India, for which the Prime Minister served as its President. The goal was to unleash innovation and commercialize the numerous scientific innovations and findings made by the many scientists in India. The scientists were relieved and overjoyed to finally have one of their own in authority, and supported Dr. Shiva fully. He quickly learned of the feudal and colonial infrastructure, which actively suppressed innovation, and realized his appointment was simply for show – to have an MIT PhD, Fulbright Scholar allegedly in-charge.

Plaintiff could have accepted the corruption and simply stayed on to enjoy the immense material benefits and stature they offered, while knowing it was an empty position. Instead, he wrote an honest report summarizing his findings for review by the leadership. That report resulted in not only his immediate termination but also eviction, death threats, and attempted false arrest and prosecution. All of this was unleashed by "progressive" and "liberal" elites of India who quote Gandhi every day. Plaintiff had to leave India in the middle of the night to avoid being killed. The most prestigious journal in the field of science, **Nature**, reported on Plaintiff being forced out of CSIR within five (5) months of his appointment.



https://www.nature.com/news/2009/091109/full/462152a.html

As a very dark-skinned Indian-American, Plaintiff has experienced racism daily throughout his stay in Massachusetts. Belmont Police threatened him with retaliation for purchasing a modern house in the "liberal" Snake Hill area. This was after they entered his home without a warrant because they could not believe that a black-skinned man could be living in such a house in Belmont.  Just as the progressive elites in India, the liberal elites of Belmont fabricated a false arrest, which was outright dismissed by the courts.  And true to form, the Boston Brahmins in control of Massachusetts tried to use that false arrest against him during his 2020 run for US Senate, even though the court records had been sealed by law.

All his life, Plaintiff chose to fight against all forms of segregation that the "liberal" elites support, as correctly delineated by Lillian Smith back in 1944 itself.  His fight has been real – not for show – and aimed at meaningful improvement in ordinary people's lives. It has not been a fake exercise in brand-building or aimed at becoming a member of the elite establishment himself.  At age 57, Plaintiff did not need to put himself at risk and run for US Senate and take on the "liberal" elites. He could easily live a comfortable life in Belmont, run his biotech companies in Cambridge, and make nice with the Boston Brahmins in charge regardless of who occupies the Governor's Office.  Plaintiff fights because that is a commitment he made to his oppressed grandparents, in that small farm in southern India when he was twelve, as well as to the many working class people  - black and white - in New Jersey, who taught him, and gave him his values.  It is who he is.  Which brings us to Twitter CEO Jack Dorsey.

Dorsey has actively colluded with the Boston Brahmins of Massachusetts to interfere in the election campaign of a low-caste black-skinned untouchable who ran for US Senate so he

could actually help the downtrodden and marginalized people of Massachusetts and the United

States with fresh new ideas and a strong background in science, engineering, and innovation.

It is undeniable and hideous that Dorsey has chosen to silence, on behalf of the elites in

power, a low-caste untouchable who has been an actual fighter for the oppressed and the

voiceless his whole life, while Dorsey puts out photos and press statements that claim he is a

champion of diversity, inclusion, and the fight against racism and casteism.  In 2018, Dorsey

traveled to India and claimed he strongly opposed casteism and other social ills in that foreign

country. Here is Dorsey in India claiming to "Smash Brahminical Patriarchy."



https://twitter.com/annavetticad/status/1064084446909997056?lang=en

It is beyond hypocritical that Dorsey has actively colluded with the elite establishment –

the Boston Brahmins in Massachusetts -  to SMASH a low-caste untouchable who came up the

hard way and ran for office to represent others who have been shut out by the one-party "liberal"

elites in control of Massachusetts,  and provided the government a covert means of silencing

him.  Dorsey has actively supported the caste system in Massachusetts while claiming to support inclusion, social equality and diversity overseas, and Black Lives Matter in the United States.

Unlike Dorsey, Plaintiff has fought against casteism his whole life both in the East and the West. Dorsey has supported the elites in power both in the East and the West.  In early 2021 Dorsey's Twitter silenced agitating farmers in India on behalf of the elites in power over there. As the child of poor dark-skinned Indian farmers, Plaintiff can only conclude that Dorsey is a posturing fraud who is a member of the "liberal" elite himself and has zero interest in changing the existing power structures in any way – in neither East nor West.

The recently-departed Michael Apted documented in his landmark *Up* series (1964 - 2019) the lack of socioeconomic mobility in English society. Dorsey supports the same lack of socioeconomic mobility and the continued preservation of power within the "liberal" upper caste of Massachusetts.

If Dorsey truly opposed casteism, he would have ensured that this Plaintiff's voice is not silenced by his own company on behalf of the agents of the Boston Brahmins - Tassinari, Galvin and Cohen, and would have ensured that his company does not provide establishment upper castes a covert means to accomplish an end run around the strong restrictions imposed on government by the US Constitution. Dorsey actively helps the upper caste carry on oppressing the downtrodden in the United States, undisturbed by the new elites in Big Tech or by any notions of due process or equal protection, or who the United States must be as a nation.

IT IS TIME TO LIVE NOT BY LIES

On February 13, 1974, despite being a native-born citizen and Army veteran, Aleksandr Solzhenitsyn was expelled from Russia by the progressive elite for "performing actions

systematically that are incompatible with being a citizen of the USSR," i.e. publicly revealing the fact that the Gulag slave labor system was established on original orders from Lenin himself.

On February 12, 1974, just the day prior, Solzhenitsyn penned a letter titled *Live Not By Lies*, that was published in full on February 18, 1974, in the Washington Post. The credo expressed in that essay 46 years ago applies fully to us today and to the resolution of this case.

There is testimony already in the record, even before any depositions or discovery, that the government officials who are Defendants here, in concert with Cohen and NASED, strongly encouraged Twitter to do ***whatever it takes*** to silence this Plaintiff's speech. There is evidence in the record that this action involved the use of computer algorithms that detected certain words and/or images, an algorithm that the Defendants allowed to continue in place ***even after*** the Defendants assured this court that they would ensure that this Plaintiff would no longer be silenced on Twitter ***because of them***. The silencing of this citizen's speech through the use of a stealthy computer algorithm, by the government of Massachusetts, is as unacceptable as the documented silencing of citizens' speech for decades through the threat of licensing actions, by the government of Massachusetts. There is no difference. The contempt for the First Amendment shown by the government of Massachusetts, throughout the entire period of the existence of the United States, is palpable, is part of Massachusetts' essential nature, and now continues covertly.

These Defendants expect everyone to live by lies and behave as if Twitter acted on its own to silence this Plaintiff, and that the government of Massachusetts does not silence speech.

It is time to live not by lies. It is time to stop suspending disbelief.

Twitter must be held responsible for covertly acting as the agent of the elites in government and for living by the lie that the government has no influence on who Twitter deplatforms. It remains unacceptable for Twitter to run a covert program designed specifically to

provide the government a stealthy way to perform an end run around the US Constitution. This court must ensure that the truth is finally revealed and ordinary citizens are protected from a covert program that allows the government to violate their rights at will under the garb of the private sector.

## THIS COMPLAINT MEETS THE TWOMBLY / IQBAL PLAUSIBILITY STANDARD

This complaint pleads chronological facts included within the four corners and contains no conclusory statements whatsoever. It also follows the emergence of additional facts during a hearing for a TRO. Thus this complaint exceeds the plausibility standard required by the Court to survive a motion to dismiss under Rule 12. *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), *Rodi v. Southern NESL*, 389 F.3d 5 (1st Cir. 2004)

Furthermore, *pro se* complaints are to be liberally construed. *Estelle et al v. Gamble*, 29 U.S. 97 (1976), *Haines v. Kerner*, 404 U.S. 519 (1972), *Alston v. Parker*, 363 F.3d 229 (3d Cir. 2004), *Vartanian v. Monsanto Co*., 14 F.3d 697 (1st Cir. 1994),  *Hart v. Mazur*, 903 F.Supp. 277 (D.R.I. 1995)

And at this stage the plaintiff's facts must be construed as true and the court may not dismiss on the basis of facts not ascertainable within the four corners of the complaint. Galvin, Tassinari and O'Malley have already been shown to have unclean hands. *Hazel-Atlas Glass Co. v. Hartford-Empire Co*., 322 U.S. 238 (1944) Even their sworn affidavits and testimony are unreliable.

## PRAYER FOR RELIEF

### COUNT ONE

## MONETARY DAMAGES UNDER 42 U.S.C. § 1983 FOR VIOLATION OF A CONSTITUTIONAL RIGHT UNDER THE COLOR OF LAW

Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

Galvin, Tassinari and O'Malley are state actors. Cohen and NASED acted as agents for state actors. NASED is an association for and of state actors actually in office. NASED is inextricably linked with state actors and exists for the sole purpose of amplifying the voice of state actors. Through its Trusted Partner program, Twitter is inextricably linked with state actors and runs the Partnership solely to provide the government a stealthy end run around First Amendment restrictions. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001)  It is impossible to tell where Twitter ends and where the government begins.

All Defendants are bound by the very same conspiracy and goal: suppress dissemination of tweets that reveal official emails that confirm conscious violation of Federal law. All Defendants coordinated their attack on Dr. Shiva's political speech in conscious, willful, contemptuous violation of his First Amendment right to the highest protections for his political speech.

> "While some means of communication may be less effective than others at influencing the public in different contexts, any effort by the Judiciary to decide which means of communications are to be preferred for the particular type of message and speaker would raise questions as to the courts' own lawful authority. Substantial questions would arise if courts were to begin saying what means of speech should be preferred or disfavored. And in all events, those differentiations might soon prove to be irrelevant or outdated by technologies that are in rapid flux. See *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 639 (1994). Courts, too, are bound by the First Amendment. We must decline to draw, and then redraw, constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker." "The Government may not render a ban on political speech constitutional by carving out a limited exemption through an amorphous regulatory interpretation." "First Amendment standards, however, "must give the benefit of any doubt to protecting rather than stifling speech." *WRTL*, 551 U. S., at 469 (opinion of ROBERTS, C. J.) (citing *New York Times Co. v. Sullivan*, 376 U. S. 254, 269–270 (1964))." "As the foregoing analysis confirms, the Court cannot resolve this case on a narrower ground without chilling political speech, speech that is central to the meaning and purpose of the First Amendment. See *Morse v. Frederick*,551 U. S. 393, 403 (2007)."

> *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010)

Here it is undisputed that the Defendants stifled the Plaintiff political candidate's political speech during an election campaign based solely on the content of Plaintiff's speech, which exposed an official email that supported his contention that Galvin violated Federal law when he destroyed records (ballot images) generated in the course of a Federal election, a matter of great public concern.

This was *per se* unconstitutional. *Commonwealth v. Melissa Lucas*, 472 Mass. 387 (2015)  "It is speech on "matters of public concern'" that is "at the heart of the First Amendment's protection." *First National Bank of Boston v. Bellotti*, 435 U. S. 765, 435 U. S. 776 (1978), citing *Thornhill v. Alabama*, 310 U. S. 88, 310 U. S. 101 (1940)

The suppression of Dr. Shiva's political speech, as well as ***all*** of his speech on Twitter for half of the last month prior to Election Day, November 3, 2020, caused massive irreparable harm to him as he was running for Federal office as a Write-In candidate who needed as much visibility as he could get, so voters could learn that he was still a candidate whose name they would have to write in themselves if they chose. Dr. Shiva had built up a following of a quarter of a million followers on Twitter and via Twitter had a reach that did not require additional expense, compared to advertising on television. The Defendants intentionally made his voice disappear at a crucial time and have already admitted to it under oath.

Galvin and the other Defendants, through their conscious, defiant, contempt for and violation of bedrock American principles enshrined in the Constitution via the First Amendment, deliberately caused immense harm to this candidate Plaintiff solely to block the candidate from raising public awareness of Galvin's violation of Federal law and the way Galvin counts votes, which is as content-based as a restriction on speech by a government actor can get.

"The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United

States, 354 U. S. 476, 354 U. S. 484 (1957); New York Times Co. v. Sullivan, 376 U. S. 254, 376 U. S. 269 (1964). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison v. Louisiana, 379 U. S. 64, 379 U. S. 74-75 (1964). Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the "highest rung of the hierarchy of First Amendment values,'" and is entitled to special protection. NAACP v. Claiborne Hardware Co., 458 U. S. 886, 458 U. S. 913 (1982); Carey v. Brown, 447 U. S. 455, 447 U. S. 467 (1980)."

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985)

Given their deliberate contempt for both the U.S. Constitution and the right of voters to have free and fair elections without government interference, it is the height of cynicism and hypocrisy for the Defendants to portray themselves as the defenders of democracy.

Judge Wolf's questioning of Tassinari revealed that the Defendants did not for one moment have any intention of respecting Dr. Shiva's right under the First Amendment to the Constitution, where the sole constitutional response to so-called bad speech is good speech. Judge Wolf asked Tassinari why she did not simply issue a tweet from the Election Division's official Twitter account that debunked Dr. Shiva's tweet rather than coordinating an effort to delete his tweet and have him suspended in the midst of his election campaign.

Tassinari offered no explanation for why she and the other Defendants did not do this.

The reason Tassinari was unable to explain her choice to Judge Wolf is that Tassinari and the other Defendants did not act in response to bad speech, they acted to conceal official evidence of the conscious violation of Federal law by Galvin. In addition, the Defendants already knew the SJC decision in *Lucas* officially prohibited them from retaliating in any way. This fact precludes their action from availing of the defense of qualified immunity.

The Court has ruled that suit for monetary damages from state actors for violations of Constitutional rights, an intentional tort, is permitted if they are sued in their individual capacities by U.S. Citizens and there is no demand on the public purse. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), *Butz v. Economou*, 438 U.S. 478 (1978), *Davis v. Passman*,

442 U.S. 228 (1979), *Ziglar v. Abbasi*, 582 U.S. ___ (2017)

Naturally this also means that Massachusetts Defendants must pay privately for their defense prospectively and the expense must not be dumped on the taxpayer. "The Legislature, by excluding intentional torts from the waiver of governmental immunity, sought to insulate the government from liability for intentional conduct which it had not authorized." *Doe v. Town of Blandford*, 402 Mass. 831 (1988), MGL ch. 258 § 10(c). While the Defendants chose to violate Dr. Shiva's First Amendment rights through abuse of office, and abuse of privileged networks available only to state officials, such as the cooperation of NASED and "Twitter Partner" status, this abuse was not authorized by the Commonwealth itself and did not fall within their scope of employment. ***No state law requires that the Treasury pay for Tassinari's and O'Malley's defense.***

The complaint lays out with particularity all the actions the Defendants took under the color of law to repeatedly and pointedly violate Dr. Shiva's right to special protection under the First Amendment for his political speech and to be free of unlawful retaliation by state actors for the content of his speech. The Defendants also took conscious steps to conceal their actions from this court and consciously misrepresented facts in a continuing effort to obstruct justice.

Galvin obstructed justice, *United States v. Dunnigan,* 507 U.S. 87 (1993), and committed a crime which violated his oath and 'laws applicable to his office or position.' *State Retirement Board v. Bulger*, 446 Mass. 169 (2006), *In the Matter of Robert A. Griffith*, 440 Mass. 500 (2003) And AAG Adam Hornstine, a lawyer, fully knew that his statements on the record at the hearing were materially false and "could not have been calculated to assist the Court in the administration of justice, but only to win an advantage." *Tesco Corp. v. Weatherford Int'l, Inc.*, No. H-08-2531, 2014 WL 4244215 (S.D. Tex. 2014)

Under established case law, members of a conspiracy are substantively liable for the foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640 (1946) But for Twitter implementing its Trusted Partnership program in order to help government actors covertly violate citizens' First Amendment rights, this effort to obstruct justice and violate Plaintiff's constitutional rights would not have succeeded.

The Defendants have engaged in the malicious, willful, and consciously fraudulent commission of wrongful acts, and because of the outrageous and reprehensible nature of their acts, Dr. Shiva is entitled to and must be awarded punitive damages against each of the Defendants. The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and fees and pre- and post-judgment interest from the Defendants.

## COUNT 2

### CONSPIRACY TO VIOLATE CIVIL RIGHTS - 42 U.S. CODE § 1985

Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

The "**Ku Klux Klan Act**," enacted as part of the Civil Rights Act of 1871, and now codified as 42 U.S.C. § 1985, provides Dr. Shiva with a private cause of action to seek monetary damages from the Defendants for participating in a conspiracy to violate his First and Fourteenth Amendment rights under the color of law. The Court provided the binding interpretation of this law in *Griffin v. Breckenridge*, 403 U.S. 88 (1971). The reach of this Ku Klux Klan Act encompasses the deprivation of Dr. Shiva's constitutional rights by all the Massachusetts Defendants, and also those state actors and agents of state actors, such as NASED and Cohen who predictably will claim to be wholly private individuals, even though the very existence of NASED and its actions, via its salaried Executive Director Cohen on behalf of Tassinari,

O'Malley and Galvin, are inextricably linked with state action. Through its Trusted Partner

program, Twitter is inextricably linked with state actors and runs the Partnership solely to

provide the government a stealthy end run around First Amendment restrictions. *Brentwood*

*Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001)  It is impossible to tell

where Twitter ends and where the government begins. Even when Cohen, NASED and Twitter

claim that they are private persons, they shall not escape the reach of 42 U.S.C. § 1985.

**Congress passed the Ku Klux Klan Act *to hold liable precisely persons like them, for***

***monetary damages***.

All of the Defendants are bound by the very same conspiracy and goal: suppress

dissemination of tweets that reveal official emails that confirm conscious violation of Federal

law. All Defendants coordinated their attack on Dr. Shiva's political speech in conscious,

willful, contemptuous violation of his First Amendment right to the highest protections for his

political speech and his Fourteenth Amendment right to equal protection under the law.

> "While some means of communication may be less effective than others at influencing
> the public in different contexts, any effort by the Judiciary to decide which means of
> communications are to be preferred for the particular type of message and speaker would
> raise questions as to the courts' own lawful authority. Substantial questions would arise if
> courts were to begin saying what means of speech should be preferred or disfavored. And
> in all events, those differentiations might soon prove to be irrelevant or outdated by
> technologies that are in rapid flux. See *Turner Broadcasting System, Inc. v. FCC*, 512
> U.S. 622, 639 (1994). Courts, too, are bound by the First Amendment. We must decline
> to draw, and then redraw, constitutional lines based on the particular media or technology
> used to disseminate political speech from a particular speaker." "The Government may
> not render a ban on political speech constitutional by carving out a limited exemption
> through an amorphous regulatory interpretation." "First Amendment standards, however,
> "must give the benefit of any doubt to protecting rather than stifling speech." *WRTL*, 551
> U. S., at 469 (opinion of ROBERTS, C. J.) (citing *New York Times Co. v. Sullivan*, 376
> U. S. 254, 269–270 (1964))." "As the foregoing analysis confirms, the Court cannot
> resolve this case on a narrower ground without chilling political speech, speech that is
> central to the meaning and purpose of the First Amendment. See *Morse v. Frederick*,551
> U. S. 393, 403 (2007)."
>
> *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010)

Here it is undisputed that the Defendants stifled the Plaintiff political candidate's political speech during an election campaign based solely on the content of Plaintiff's speech, which exposed an official email that supported his contention that Galvin violated Federal law when he destroyed records (ballot images) generated in the course of a Federal election, a matter of great public concern. This was *per se* unconstitutional. *Commonwealth v. Melissa Lucas*, 472 Mass. 387 (2015)  "It is speech on "matters of public concern"' that is "at the heart of the First Amendment's protection." *First National Bank of Boston v. Bellotti*, 435 U. S. 765, 435 U. S. 776 (1978), citing *Thornhill v. Alabama*, 310 U. S. 88, 310 U. S. 101 (1940)

The suppression of Dr. Shiva's political speech, as well as ***all*** of his speech on Twitter for half of the last month prior to Election Day, November 3, 2020, caused massive irreparable harm to him as he was running for Federal office as a Write-In candidate who needed as much visibility as he could get, so voters could learn that he was still a candidate whose name they would have to write in themselves if they chose.  Dr. Shiva had built up a following of 360,000 followers on Twitter and via Twitter had a reach that did not require additional expense, compared to advertising on television.  The Defendants willfully made his voice disappear at a crucial time in order to obstruct justice and conceal official evidence.

Galvin and the other Defendants, through their conscious, defiant, contempt for and violation of bedrock American principles enshrined in the Constitution via the First Amendment, deliberately caused immense harm to this candidate Plaintiff solely to block the candidate from raising public awareness of Galvin's violation of Federal law and irregularities with the way Galvin counts votes, which is as content-based as a restriction on speech by a government actor can get.

"The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." <u>Roth v. United</u>

States, 354 U. S. 476, 354 U. S. 484 (1957); New York Times Co. v. Sullivan, 376 U. S. 254, 376 U. S. 269 (1964). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison v. Louisiana, 379 U. S. 64, 379 U. S. 74-75 (1964). Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the "highest rung of the hierarchy of First Amendment values,'" and is entitled to special protection. NAACP v. Claiborne Hardware Co., 458 U. S. 886, 458 U. S. 913 (1982); Carey v. Brown, 447 U. S. 455, 447 U. S. 467 (1980)."

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc*., 472 U.S. 749 (1985)

Given their deliberate contempt for both the U.S. Constitution and the right of voters to have free and fair elections without government interference, it is the height of cynicism and hypocrisy for the Defendants to portray themselves as the defenders of democracy.

Judge Wolf's questioning of Tassinari revealed that the Defendants did not for one moment have any intention of respecting Dr. Shiva's right under the First Amendment to the Constitution, where the sole constitutional response to so-called bad speech is good speech. He asked Tassinari why she did not simply issue a tweet from the Election Division's official Twitter account that debunked Dr. Shiva's tweet rather than coordinating an effort to delete his tweet and have him suspended in the midst of his election campaign. Tassinari offered no explanation for why she and the other Defendants did not do this.

The reason Tassinari was unable to explain her choice to Judge Wolf is that Tassinari and the other Defendants did not act in response to bad speech, they acted to conceal official evidence of the violation of Federal law by Galvin.  In addition, the Defendants already knew the SJC decision in *Lucas* officially prohibited them from retaliating in any way. This fact precludes their action from availing of the defense of qualified immunity.

The Court has ruled that suit for monetary damages from state actors for violations of Constitutional rights, an intentional tort, is permitted if they are sued in their individual capacities by U.S. Citizens and there is no demand on the public purse. *Bivens v. Six Unknown*

*Named Agents*, 403 U.S. 388 (1971), *Butz v. Economou*, 438 U.S. 478 (1978), *Davis v. Passman*, 442 U.S. 228 (1979), *Ziglar v. Abbasi*, 582 U.S. ___ (2017)

Naturally this also means that Massachusetts Defendants must pay privately for their defense prospectively and the expense must not be dumped on the taxpayer. "The Legislature, by excluding intentional torts from the waiver of governmental immunity, sought to insulate the government from liability for intentional conduct which it had not authorized." *Doe v. Town of Blandford*, 402 Mass. 831 (1988), MGL ch. 258 § 10(c). While the Defendants chose to violate Dr. Shiva's First Amendment rights through abuse of office, and abuse of privileged networks available only to state officials, such as the cooperation of NASED and "Twitter Partner" status, this abuse was not authorized by the Commonwealth itself and did not fall within their scope of employment. ***No state law requires that the Treasury pay for Tassinari's and O'Malley's defense***.

The complaint lays out with particularity, with the benefit of revelations from sworn testimony, all the actions the Defendants took under the color of law to repeatedly and pointedly violate Dr. Shiva's right to special protection under the First Amendment for his political speech and to be free of unlawful retaliation by state actors for the content of his speech. The Defendants also took conscious steps to actively conceal their actions from this court and consciously misrepresented facts under oath in a continuing effort at obstructing justice. Galvin obstructed justice, *United States v. Dunnigan,* 507 U.S. 87 (1993), and committed a crime which violated his oath and 'laws applicable to his office or position.' *State Retirement Board v. Bulger*, 446 Mass. 169 (2006), *In the Matter of Robert A. Griffith*, 440 Mass. 500 (2003) And AAG Adam Hornstine, a lawyer, fully knew that his statements on the record at the hearing were materially false and "could not have been calculated to assist the Court in the administration of

justice, but only to win an advantage." *Tesco Corp. v. Weatherford Int'l, Inc.*, No. H-08-2531, 2014 WL 4244215 (S.D. Tex. 2014)

Under established case law, members of a conspiracy are substantively liable for the foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640 (1946)  But for Twitter implementing its Trusted Partnership program in order to help government actors covertly violate citizens' First Amendment rights, this effort to obstruct justice and violate Plaintiff's constitutional rights would not have succeeded.

The Defendants have engaged in the malicious, willful, and consciously fraudulent commission of wrongful acts, and because of the outrageous and reprehensible nature of their acts, Dr. Shiva is entitled to and must be awarded punitive damages against each of the Defendants. The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and fees and pre- and post-judgment interest from the Defendants.


<u>COUNT 3</u>

VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)

Dr. Shiva re-alleges and incorporates by reference each and every foregoing paragraph of this complaint as if set forth in full herein.

At all relevant times each Defendant as well as Dr. Shiva is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c). The Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the "enterprise."  Each of the Defendants participated in the operation or management of the enterprise.

The Defendants and their co-conspirators (Leadstories.com, Thomson Reuters, AP et al) are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, the obstruction of justice, as described in the foregoing paragraphs of this complaint.  The Defendants realized that the Tassinari emails exposed them to prosecution for violation of Federal law, as well as civil action by Dr. Shiva over the loss of his primary election to Kevin O'Connor.  The Defendants were also aware that Dr. Shiva had filed a sworn criminal complaint against them with US Attorney Andrew Lelling. They acted swiftly and powerfully to conceal this evidence, to suppress Dr. Shiva's political speech entirely, and actively distributed through the "free press" their false narrative that ballot images are not covered by the storage requirements of Federal law and that Dr. Shiva's claim is false. The Defendants' false narrative now appears whenever anyone uses a search engine to read about Dr. Shiva and his claim, and appears more prominently such that one's eyes catch the Defendants' narrative before one gets to read Dr. Shiva's evidence. This is intentional. Defendants are welcome to argue in open court that conspiring to retaliate against the person who swore out a pending criminal complaint against them does not qualify as impeding, influencing, obstructing the due administration of justice.

Their coordinated action, the enterprise, was intended to obstruct justice in violation of 18 U.S.C. § 1503. The enterprise has been structured to operate as a unit in order to accomplish the goals of their scheme. All Defendants are in agreement that they needed to suppress the Tassinari email tweets, and acted to do so through their enhanced, priority, Trusted Partner relationship with Twitter, and to conceal their doing so, and to claim that Twitter acted all on its own to delete them and suppress Dr. Shiva's political speech about a matter of great public concern.

The enterprise also included intentional, conscious factual misrepresentations to this court under oath, to paraphrase:

*We simply filled out Twitter's online complaint form just as any ordinary civilian, the tweet that we reported was a clear case of "Election Misinformation" that threatened the integrity of the elections and would have suppressed the vote, the tweet that we reported for "Election Misinformation" was deservedly deleted and we were very pleased when we looked a few days later and learned that Twitter had indeed responded to our complaint and deleted it, oh we believed Your Honor that tweet was deleted but we may have been mistaken when we testified under oath about that just now Your Honor after declaring just that in our sworn affidavits prepared before this hearing that contain certain verbatim paragraphs in common, oh well as that tweet was never deleted by Twitter surely we did not harm Dr. Shiva over his political speech or cause him to be suspended by Twitter during his Write-In political campaign, we have no idea why Twitter solely and exclusively deleted only those tweets that revealed the Tassinari emails, it is entirely possible that Twitter deleted the Tassinari tweets and suspended Dr. Shiva each time he tweeted them as a result of a complaint from any ordinary civilian but it wasn't us.*

It is notable that Galvin, O'Malley and Tassinari chose to not present this court, via affidavit, screenshots or printouts of the actual text of the complaint submitted by them to Twitter. Discovery shall clear this up.

The Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c). First they identified Dr. Shiva's dissemination of the Tassinari emails as a threat that could lead to indictments for violation of Federal election law given his sworn criminal complaint to US

Attorney, then they acted in concert through abuse of official powers and relationships to conceal the Tassinari emails, then they acted in concert to ensure Dr. Shiva was slandered and libeled internationally for stating that Massachusetts destroyed ballots, then they ensured his own voice disappeared entirely - for weeks at a time - in retaliation for each time he tried to publicly expose the content of the Tassinari emails, and that Dr. Shiva was hobbled in the midst of his political campaign where he needed as much visibility and exposure so potential voters would learn that he was a Write-In candidate. In sum, the Defendants consciously operated a racketeering enterprise whose main goal was the obstruction of justice and suppression of a credible witness. And the cover story for the enterprise was 'combating election misinformation' (*we care passionately about voter suppression, you see, it was our duty to save the country!*).

As a direct and proximate result of the predicate acts of racketeering by the enterprise, including but not limited to using their "Trusted Twitter Partner" status, abusing the huge influence of the office of the Massachusetts Secretary of State, the amplification provided by NASED, the communications from Cohen and NASED to Twitter - which the conspirators know are not easily discoverable public records and which Galvin, O'Malley and Tassinari chose to conceal from this court in both their opposition and their affidavits, and other acts in furtherance of their continuing effort to obstruct justice, yet to be revealed by court-ordered discovery, Dr. Shiva has been massively and irreparably damaged, and his injury includes but is not limited to being cheated out of a free and fair election, global loss of reputation and goodwill, and severe emotional distress due to the real fear that any mention of the Tassinari emails would lead to swift and severe retribution from the enterprise.

Given that Dr. Shiva's family chose to live in the United States and sacrificed greatly to rebuild their lives in a new country, and fully believed that in this country freedom of speech

would be protected by state officials, Dr. Shiva has been severely shocked that Galvin,

O'Malley, Tassinari, Cohen, and all the Elections Directors that comprise NASED, share the

very same contempt for freedom of speech and the rights of the individual as state officials back

in the Socialist British Commonwealth of India. The Defendants have no red line within

themselves regarding this great nation's founding and defining principles that they would not

cross. This knowledge has been extremely disheartening and demoralizing.

Further, these injuries to Dr. Shiva were a direct, proximate, reasonably foreseeable and

intentional result of the violations of 18 U.S.C. § 1962. Dr. Shiva is the ultimate victim of the

Defendants' unlawful enterprise. Galvin obstructed justice, *United States v. Dunnigan,* 507 U.S.

87 (1993), and committed a crime which violated his oath and 'laws applicable to his office or

position.' *State Retirement Board v. Bulger*, 446 Mass. 169 (2006), *In the Matter of Robert A.

Griffith*, 440 Mass. 500 (2003) And AAG Adam Hornstine, a lawyer, fully knew that his

statements on the record at the hearing were materially false and "could not have been calculated

to assist the Court in the administration of justice, but only to win an advantage." *Tesco Corp. v.

Weatherford Int'l, Inc.*, No. H-08-2531, 2014 WL 4244215 (S.D. Tex. 2014)

Under established case law, members of a conspiracy are substantively liable for the

foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v. United States*,

328 U.S. 640 (1946)  The Defendants must be held liable for damages to Dr. Shiva with an

initial demand of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva

also requests that the court order all costs and fees and pre- and post-judgment interest from the

Defendants.

Pursuant to 18 U.S.C. § 1964(c), Dr. Shiva is entitled to recover treble damages plus

costs and attorneys fees from the Defendants.

<u>COUNT 4</u>

CONSPIRACY TO VIOLATE RICO, VIOLATION OF 18 U.S.C. § 1962(d)

Dr. Shiva re-alleges and incorporates by reference each and every foregoing paragraph of this complaint as if set forth in full herein.

At all relevant times each RICO Defendant as well as Dr. Shiva is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c). The Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the "enterprise." Each of the Defendants participated in the operation or management of the enterprise.

The Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) and 18 U.S.C. § 1503, as described above, in violation of 18 U.S.C. § 1962(d).

As documented with particularity in this complaint, with the benefit of revelations from sworn testimony, the Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and knew the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

Even the limited testimony and pleadings filed by the Defendants thus far demonstrate the existence of this conspiracy and their common understanding of the need to disseminate their false narrative that they did not act in concert to conceal tweets regarding the Tassinari emails.

As a direct and proximate result of the Defendants' conspiracy, the acts of racketeering activity of the enterprise as detailed in Count 3, the overt acts taken in furtherance of that

conspiracy, including but not limited to using their "Trusted Twitter Partner" status, abusing the huge influence of the office of the Massachusetts Secretary of State, the amplification provided by NASED, the communications from Cohen and NASED to Twitter - which the conspirators know are not easily discoverable public records and which Galvin, O'Malley and Tassinari chose to conceal from this court in both their opposition and their affidavits in furtherance of their continuing effort to obstruct justice, and other acts yet to be revealed by court-ordered discovery, Dr. Shiva has been massively and irreparably damaged, and his injury includes, but is not limited to, being cheated out of a free and fair election, global loss of reputation and goodwill, and severe emotional distress due to the real fear that any mention of the Tassinari emails would lead to swift and severe retribution from the enterprise, including consciously misleading press statements that ricochet across the Internet and are prioritized by search engines.

Given that Dr. Shiva's family chose to live in the United States for the sake of liberty and individual rights, and sacrificed greatly to rebuild their lives in a new country, and fully believed that in this country freedom of speech would be protected by state officials, Dr. Shiva has been severely shocked that Galvin, O'Malley, Tassinari, Cohen, and all the Elections Directors that comprise NASED, share the very same contempt for freedom of speech and the rights of the individual as state officials back in the Socialist British Commonwealth of India.

The Defendants have absolutely no regard for this great nation's founding and defining principles. The conclusion that such individuals exist in government has been extremely disheartening and demoralizing.

Further, these injuries to Dr. Shiva were a direct, proximate, reasonably foreseeable and intentional result of the violations of 18 U.S.C. § 1962. Dr. Shiva is the ultimate victim of the

Defendants' unlawful enterprise. Galvin obstructed justice, *United States v. Dunnigan,* 507 U.S. 87 (1993), and committed a crime which violated his oath and 'laws applicable to his office or position.' *State Retirement Board v. Bulger*, 446 Mass. 169 (2006), *In the Matter of Robert A. Griffith*, 440 Mass. 500 (2003) And AAG Adam Hornstine, a lawyer, fully knew that his statements on the record at the hearing were materially false and "could not have been calculated to assist the Court in the administration of justice, but only to win an advantage." *Tesco Corp. v. Weatherford Int'l, Inc.*, No. H-08-2531, 2014 WL 4244215 (S.D. Tex. 2014)

Under established case law, members of a conspiracy are substantively liable for the foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640 (1946) The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and fees and pre- and post-judgment interest from the Defendants.

Pursuant to 18 U.S.C. § 1964(c), Dr. Shiva is entitled to recover treble damages plus costs and attorneys fees from the Defendants.


COUNT 5

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

Due exclusively to the Defendants' enterprise, Dr. Shiva was made to live in fear that his speech regarding the official evidence contained in the Tassinari emails would inevitably and swiftly lead to his silencing on social media, during his political campaign for U.S. Senate.

This is *per se* intolerable in a country founded for the specific purpose of being the exact opposite of Her Britannic Majesty's United Kingdom in terms of protections for political speech,

and which on paper at least provides "special protection" for political speech on matters of great public concern. "As the foregoing analysis confirms, the Court cannot resolve this case on a narrower ground without chilling political speech, speech that is central to the meaning and purpose of the First Amendment. See *Morse v. Frederick*,551 U. S. 393, 403 (2007)*." Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the "highest rung of the hierarchy of First Amendment values,'" and is entitled to special protection. NAACP v. Claiborne Hardware Co., 458 U. S. 886, 458 U. S. 913 (1982); Carey v. Brown, 447 U. S. 455, 447 U. S. 467 (1980)." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc*., 472 U.S. 749 (1985) "It is speech on "matters of public concern'" that is "at the heart of the First Amendment's protection."" *First National Bank of Boston v. Bellotti*, 435 U. S. 765, 435 U. S. 776 (1978), citing *Thornhill v. Alabama*, 310 U. S. 88, 310 U. S. 101 (1940) *Commonwealth v. Melissa Lucas*, 472 Mass. 387 (2015)(ALL government officials are prohibited from retaliating against the content of a political candidate's speech during his campaign)

That Dr. Shiva was not provided this special protection during his political campaign for U.S. Senate may not be denied. In fact, the Defendants themselves do not deny it, and initially ***proudly justified it*** on the basis of combating "election misinformation" even though they knew that, per the U.S. Constitution and the SJC's ruling in *Lucas*, political speech is allowed to be inaccurate or even deliberately false and state actors are explicitly prohibited from suppressing it.

This was extremely shocking to Dr. Shiva and has shaken him to his core. The rug has been pulled out from under his feet. It is as if he is on the other side of the looking glass, something he never anticipated, a stranger in a land that he no longer recognizes. Dr. Shiva finds

this experience extremely distressing and most unwelcome. The Defendants' actions have gutted his lifelong beliefs in the American system and is now dependent on this court for relief.

To prevail on his claim for intentional infliction of emotional distress, Dr. Shiva must establish "(1) that the Defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (2) that the Defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the Defendant were the cause of the plaintiff's distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it." *Payton v. Abbott Labs*, 386 Mass. 540, 555 (1982), citing *Agis v. Howard Johnson Co.*, 371 Mass. 140, 145 (1976)

All four factors have already been pleaded with particularity in this complaint, with the benefit of revelations from sworn testimony.

The Defendants' cold, heartless, intentional, infliction of extreme anguish on Dr. Shiva in order to corruptly extort suppression of an official email that confirmed the violation of Federal law, silence him totally on Twitter, and label him a fabulist and baseless conspiracy theorist, is beyond the bounds of human decency. *Commonwealth v. Adams*, 416 Mass. 558 (1993)('the officers, in the phrase of the day, `don't get it,' and they do not understand how unacceptably they acted thereafter'). Dr. Shiva is entitled to substantial remedy from this court.

The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and fees and pre- and post-judgment interest from the Defendants.

Dr. Shiva requests such other and further relief as this court may deem just and proper.

<u>COUNT 6</u>

ISSUANCE OF A PERMANENT INJUNCTION ENJOINING **SECRETARY GALVIN**, **NASED** AND **TWITTER** FROM VIOLATING Dr. SHIVA'S OR ANYONE'S POLITICAL SPEECH

Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

Secretary William Francis Galvin has been sued in his official capacity in order to obtain from Federal court a permanent injunction that enjoins him from suppressing political speech and silencing a candidate wholesale during the candidate's election campaign, be it for Federal, state or local office. This is permissible under the exception carved out by the Court for prospective injunctive relief under *Ex parte Young*, 209 U.S. 123 (1908) NASED is comprised entirely of state actors, and Twitter has established a Trusted Partner program solely for state actors to violate the First Amendment covertly under the garb of the private sector.

The court must weigh four factors when deciding whether to grant injunctive relief: (1) The likelihood of success on the merits; (2) The potential for the movant to be irreparably harmed by denial of the relief; (3) The balance of the movant's hardship if relief is denied versus the nonmovant's hardship if relief is granted; and (4) The effect that granting relief will have on the public interest. *Phillip Morris, Inc. v. Harshbarger*, 159 F.3d 670, 674 (1st Cir., 1998), *Monsanto v. Geertson*, 561 U.S. 139 (2010), *Trump v. Hawaii*, 585 U.S. ___ (2018), *Arborjet, Inc. v. Rainbow Treecare*, 794 F.3d 168 (1st Cir. 2015), *Planned Parenthood League v. Bellotti*, 641 F.2d 1006 (1st Cir. 1981)  These factors are easily met in this action.

1        Likelihood of success on the merits favors the Plaintiff

The facts of this case demonstrate that the Plaintiff here has a great likelihood of success on the merits because it is beyond dispute that Defendant Galvin, in collusion with NASED and Twitter, in order to maintain plausible deniability if discovered, violated an explicit prohibition

on any government official imposing content-based restrictions on speech, especially on a

political candidate in the midst of his campaign. There are few cases where the required result is

as open and shut as enjoining a government official from continuing to abuse his official power

to censor speech and make a candidate's voice disappear.

> "While some means of communication may be less effective than others at influencing the public in different contexts, any effort by the Judiciary to decide which means of communications are to be preferred for the particular type of message and speaker would raise questions as to the courts' own lawful authority. Substantial questions would arise if courts were to begin saying what means of speech should be preferred or disfavored. And in all events, those differentiations might soon prove to be irrelevant or outdated by technologies that are in rapid flux. See *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 639 (1994). Courts, too, are bound by the First Amendment. We must decline to draw, and then redraw, constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker." "The Government may not render a ban on political speech constitutional by carving out a limited exemption through an amorphous regulatory interpretation." "First Amendment standards, however, "must give the benefit of any doubt to protecting rather than stifling speech." *WRTL*, 551 U. S., at 469 (opinion of ROBERTS, C. J.) (citing *New York Times Co. v. Sullivan*, 376 U. S. 254, 269–270 (1964))." "As the foregoing analysis confirms, the Court cannot resolve this case on a narrower ground without chilling political speech, speech that is central to the meaning and purpose of the First Amendment. See *Morse v. Frederick*, 551 U.S. 393, 403 (2007)."
> *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010)

Here it is undisputed that Galvin and co-Defendants together stifled the plaintiff political

candidate's political speech during an election campaign based solely on the content of

plaintiff's speech, which exposed irregularities in the way Galvin conducted and influenced the

counting of votes during the recent Republican primary elections, and exposed an official email

that confirmed that Galvin consciously violated Federal law, a matter of great public concern.

This was unconstitutional *per se*. No court should require voluminous briefing on this point.

Galvin has already agreed to desist from doing so until November 4, 2020. Count 6 seeks to

make this a permanent injunction upon both Galvin and Twitter. A court order is necessary

because these Defendants have already proved their intrinsic contempt for the Constitution.

External control is mandatory.

"It is speech on "matters of public concern"" that is "at the heart of the First

Amendment's protection." *First National Bank of Boston v. Bellotti*, 435 U. S. 765, 435 U. S.

776 (1978), citing *Thornhill v. Alabama*, 310 U. S. 88, 310 U. S. 101 (1940)

The Plaintiff, the candidate who has been consciously and willfully harmed in a most un-

American fashion by NASED, through abuse of its status of being the voice for fifty (50) State

Elections Directors, and Secretary Galvin, through abuse of his official status and powers, is

assured of succeeding on the merits of his claim. His claim also meets the required plausibility

standard. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544

(2007), *Iannacchino v. Ford Motor*, 451 Mass. 623 (2008).


2       This political candidate has already been irreparably harmed

The Defendants had Dr. Shiva blocked from using from Twitter for most of the last

month of campaigning left prior to Election Day 2020. This caused massive harm to a Write-In

candidate who needed as much public recognition as possible so voters could learn that he was

still a candidate whose name they would have to write in themselves if they chose. The

Defendants, through their conscious defiant violation of bedrock American principles enshrined

in the Constitution via the First Amendment, deliberately caused immense harm to this candidate

by making him disappear from a platform that he had been dependent on for political outreach

and political speech. The Defendants did this solely to block the candidate from exposing an

official email that confirmed the candidate's contention that Galvin violated Federal law by

deleting ballot images, which is as content-based as a restriction on speech by the government

can get.

"The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U. S. 476, 354 U. S. 484 (1957); New York Times Co. v. Sullivan, 376 U. S. 254, 376 U. S. 269 (1964). "[S]peech concerning public affairs is more than self-expression; it is the essence of self-government." Garrison v. Louisiana, 379 U. S. 64, 379 U. S. 74-75 (1964). Accordingly, the Court has frequently reaffirmed that speech on public issues occupies the "highest rung of the hierarchy of First Amendment values,'" and is entitled to special protection. NAACP v. Claiborne Hardware Co., 458 U. S. 886, 458 U. S. 913 (1982); Carey v. Brown, 447 U. S. 455, 447 U. S. 467 (1980)."

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc*., 472 U.S. 749 (1985)

"Entitled" means this court is duty-bound to immediately enjoin Galvin and NASED from further willful violations of the Constitution including causing Dr. Shiva's political speech to be silenced on Twitter. The Defendants have actively cheated Dr. Shiva out of a free and fair election in 2020, and must be enjoined by this court from doing it again in the future, a prospect that is very likely to recur. *Already v. Nike*, 568 U.S. 85 (2013).

3        Defendants Galvin, NASED and Twitter face no harm from an injunction

Galvin faces no harm whatsoever from being required by this court to further refrain from abusing his office to violate the candidate plaintiff's free speech rights and to be enjoined from stifling political speech on a matter of public concern. NASED faces no harm from being required by this court to comply with the U.S. Constitution and refrain from using its clout to help State Election Directors nationwide silence political speech. Twitter faces no harm for being called out for assisting the government to covertly violate the First Amendment. An injunction would protect Twitter from further government coercion or inducement. Again, no voluminous briefing is required for this court to follow hornbook law. "Strong medicine is required to cure the Defendant's disrespect for the law." *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), *Zimmerman v. Direct Fed. Credit Union*, 262 F.3d 70 (1st Cir. 2000) The injunction must issue.

4       The requested injunction is in the public interest

It is in the public interest to uphold the rule of law and require elected officials to stop abusing their office to impose content-based restraints on political speech during an election campaign in order to actively sabotage a candidate's prospects and throw the election.  It is in the public interest to comply with 100 years of Supreme Court rulings that require courts to strongly support and protect First Amendment rights. *Dun & Bradstreet, Inc.,* supra, *Snyder v. Phelps*, 562 U. S. 443 (2011)

It is settled law in Massachusetts that a court can maintain jurisdiction over a public servant to enjoin future violations of the law even when the record indicates only one prior violation. *Commonwealth v. Adams*, 416 Mass. 558 (1993)

> "A single, egregious incident involving a collective violation of a citizen's rights and a collective failure to prevent or to report that violation would warrant issuance of an injunction where, as here, the judge found that, without any injunction, the defendants "will regard themselves as free to continue" their unlawful conduct. Moreover, the judge was justified in regarding the failure of the defendants, many of whom had considerable professional experience, to report the incident as contributing in a fundamental way to the obstruction of justice."

This court must note that it was the Attorney General that sought the injunction in *Adams*. As noted by the SJC in *Adams*, the Defendants here cannot claim that the Plaintiff faces no harm in the future from the Defendants because, unless they are in prison, the Plaintiff suffers the same risk of being silenced during his next election campaign, as do all future candidates. The relief sought is for the court to enjoin these Defendants from silencing ***any and all candidates in the future***, just as in *Adams*. The relief sought is for this court to maintain jurisdiction over these Defendants ***so they do not again violate the Federal civil rights of a candidate for Federal office*** as a result of their contemptuous disregard for a Federal statute, 52 U.S.C. 20701, and the SJC's ruling in *Lucas* regarding the ***Federal First Amendment***.

The Attorney General is *estopped* from opposing this relief.

In summary, the permanent injunction must be issued.

COUNT 7

DECLARATORY INJUNCTION THAT MASSACHUSETTS DEFENDANTS MUST PAY PRIVATELY FOR THEIR DEFENSE

Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

The Court has ruled that suit for monetary damages from state actors for violations of Constitutional rights, an intentional tort, is permitted if they are sued in their individual capacities and there is no demand on the public purse. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), *Butz v. Economou*, 438 U.S. 478 (1978), *Davis v. Passman*, 442 U.S. 228 (1979), *Ziglar v. Abbasi*, 582 U.S. ___ (2017)

Naturally this also means that Massachusetts Defendants must pay privately for their defense prospectively and the expense must not be dumped on the taxpayer. "The Legislature, by excluding intentional torts from the waiver of governmental immunity, sought to insulate the government from liability for intentional conduct which it had not authorized." *Doe v. Town of Blandford*, 402 Mass. 831 (1988), MGL ch. 258 § 10(c). While the Defendants chose to violate Dr. Shiva's First Amendment rights through abuse of office, and abuse of privileged networks available only to state officials, such as the cooperation of NASED and "Twitter Partner" status, this abuse was not authorized by the Commonwealth itself and did not fall within their scope of employment. **No state law requires that the Treasury pay for Tassinari's and O'Malley's defense**.

MGL ch. 258 § 9 states:

> "Public employers may indemnify public employees, and the commonwealth shall indemnify persons holding office under the constitution, from personal financial loss, all

damages and expenses, including legal fees and costs, if any, in an amount not to exceed $1,000,000 arising out of any claim, action, award, compromise, settlement or judgment by reason of an intentional tort, or by reason of any act or omission which constitutes a violation of the civil rights of any person under any federal or state law, if such employee or official or **holder of office under the constitution** at the time of such intentional tort or such act or omission was acting within the scope of his official duties or employment. No such employee or official, **other than a person holding office under the constitution** acting within the scope of his official duties or employment, shall be indemnified under this section for violation of any such civil rights if he acted in a grossly negligent, willful or malicious manner."

In other words, Tassinari and O'Malley ***SHALL NOT*** be indemnified as a matter of law. Governments are prohibited from authorizing the violation of the U.S. Constitution and other laws and from spending money from the Treasury on defending mere employees in civil claims. The present Attorney General routinely violates this principle in order to obtain public employees' willingness to violate laws and purchase their silence with tax dollars. The AGO's decision to spend $1 Million on private attorneys to defend former employees personally facing bar discipline has caused much comment already -

https://www.wbur.org/news/2021/03/31/verner-foster-kaczmarek-fees-massachusetts-attorney-generals-office

It bears repeating that <u>*NO* state law requires that the Treasury pay for Tassinari's and O'Malley's legal defense</u>. Any claim to the contrary is not supported by standard statutory interpretation.  Galvin, Tassinari and O'Malley are sued under RICO for engaging in an enterprise to obstruct justice by concealing evidence of their violation of Federal law through violation of the Plaintiff's civil rights under the Federal Constitution in a willful and malicious manner, including silencing Plaintiff's political speech in the last month before the 2020 General

Election, and in gross, willful, malicious violation of an explicit ruling from the SJC five (5) full

years ago in *Lucas*, that made it explicit to government **servants** such as Galvin, Tassinari and

O'Malley that they are barred from silencing a candidate's speech during an election campaign.

The law has been known to these three defendants for five full years now.

It naturally follows that in order to comply with the plain ***and full*** text of Section 9, the

Attorney General must refuse to defend Tassinari and O'Malley at public expense because

"***triable issues of fact existed concerning the applicability of the exclusions***" regarding

Tassinari's and O'Malley's gross, willful and malicious violation of Plaintiff's civil rights. Only

that would be consistent with the law, and the explicit ruling from the SJC in *Maimaron v.*

*Commonwealth*, 449 Mass. 167 (2007).

The Massachusetts Tort Claims Act expressly ***prohibits indemnification*** of mere public

employees for gross, willful or malicious violation of a person's civil rights. Tassinari and

O'Malley are ***not*** persons holding office under the constitution. Indemnifying Tassinari and

O'Malley even where ***triable issues of fact exist concerning the applicability of the exclusions***,

intentionally violates the law and promotes corruption, crime and further violations of citizens'

civil rights under the Federal constitution. Any action by the Attorney General to fund their

defense at public expense violates public policy, the will of the Legislature, and the Plaintiff's

Fourteenth Amendment Right to equal protection.

This court must issue an Order that the Commonwealth must be insulated from all costs

of litigating the Defendants' defense of the individual capacity claims in this complaint and that

the Massachusetts Defendants, especially Tassinari and O'Malley, must retain private attorneys

at their personal expense during the course of this litigation.

COUNT 8

IMPLIED RIGHT TO PRIVATE ACTION AGAINST TWITTER FOR INTERFERING IN A
FEDERAL ELECTION AS AN UNDECLARED SUPER-PAC

Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

Twitter holds itself out as an internet platform under the "Good Samaritan" protections of

the Communications Decency Act, 47 U.S. Code § 230: Protection for "Good Samaritan"

blocking and screening of offensive material:

> (1) Treatment of publisher or speaker - No provider or user of an interactive computer
> service shall be treated as the publisher or speaker of any information provided by
> another information content provider. (2) Civil liability - No provider or user of an
> interactive computer service shall be held liable on account of—(A) any action
> ***voluntarily taken in good faith to restrict access*** to or availability of material that the
> provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent,
> harassing, or otherwise objectionable, whether or not such material is constitutionally
> protected; or (B) any action taken to enable or make available to information content
> providers or others the technical means to restrict access to material described in
> paragraph (1).  <u>emphasis added</u>

The law states that any action by Twitter must be done "voluntarily" and "in good faith"

in order to avail of section 230 immunity.  Twitter's action against this Plaintiff was ***<u>not</u>***

voluntary and ***<u>not</u>*** in good faith. Twitter established and runs a Trusted Partner program in order

to provide government actors a covert mechanism to violate citizens' First Amendment rights

and apply content-based restraints on the speech of political candidates in the midst of their

campaigns.

On behalf of the co-Defendants and at their request, Twitter consciously chose to interfere in the conduct of an election for Federal office, the 2020 Republican primary for US Senator from Massachusetts. On behalf of Massachusetts Defendants, Twitter blocked this Plaintiff, a candidate whose speech was fully protected by Massachusetts law, as construed by the SJC in *Commonwealth v. Melissa Lucas*, 472 Mass. 387 (2015). There was no lawful basis underlying Twitter's decision to silence this Plaintiff's campaign statements during his election campaign in Massachusetts. As a direct result of its unlawful actions, Twitter ensured a significant advantage to the Plaintiff's opponents, Kevin O'Connor, and Edward Markey.

It is elementary that Plaintiff's revealing screenshots of public emails – on September 25, 2020, 25 days **after** the U.S. Republican Primary election was over –, which documented that Tassinari and Galvin knew full well that they were required by Federal law to preserve digital ballot images created in an election that was already over on September 1, 2020, does not in any way constitute "content that may suppress participation or mislead people about when, where, or how to participate in a civic process."   The only legitimate conclusion from the record already available in this case is that Twitter's proferred reason for deleting the tweets and suspending this Plaintiff, and now permanently as of February 1, 2021, was entirely pretextual, in deliberate bad faith, and entirely due to its Trusted Partner relationship with the Defendants. Twitter's bad faith actions in this case strip it of any "Good Samaritan" immunity granted by Section 230.

In addition, actively interfering in the conduct of a Federal election, in this case the three-way race between this Plaintiff, Kevin O'Connor and Edward Markey, violated Federal election laws and granted Plaintiff's opponents a massive impermissible benefit. Twitter acted as an un-registered un-declared SuperPAC instead of a neutral internet platform. Twitter's action equates to it running negative attack advertisements against this Plaintiff during a campaign, in

conscious violation of Federal election law. Twitter didn't just publish against this candidate, it silenced this candidate to allow his opponent a free and clear field.

Twitter naturally will claim that no statute provides candidates with a private cause of action for violation of Federal election law. That ship sailed in 1916 when the Court ruled in *Texas and Pac. Rly. v. Rigsby*, 241 U.S. 33 (1916) that courts may recognize an implied private cause of action, and ruled further that a private cause of action is permissible to redress violations of Federal law when the agency charged with policing those violations either lacks the resources to do so, *J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964), or because the agency's administrators may abuse their discretion and fail to act because they are unsympathetic to the legislative purpose of the statute, *Wills v. Trans World Airlines, Inc*., 200 F. Supp. 360 (S.D. Cal. 1961)(*Failure of the Civil Aeronautics Board to employ even its limited sanctioning powers demonstrated the need for private action*) For more than fifty (50) years thus there has been no exclusive right of action by administrative agencies because that could lead to manifest injustice and corruption, both of which public concerns are vital to the proper functioning of this democracy and supercede any deference owed to administrators. It is beyond dispute that corporations may not interfere in a Federal election against or for any candidate without publicly declaring their involvement and without filing records with the Federal Election Commission. Twitter did not register with the Federal Election Commission as a Super PAC.

In our case here, Twitter is already a Defendant in a RICO claim, and it will be an efficient use of scarce public resources to evaluate in this court itself claims against Twitter for conscious violation of Federal election law and the consequent abrogation of Section 230 immunity.

By actively functioning as an undeclared unregistered Super-PAC and interfering with the course and conduct of Plaintiff's campaign for Federal office in favor of his opponents Kevin O'Connor and Edward Markey, Twitter has massively and unlawfully harmed this political candidate. Twitter's action both sounds in tort as well as a constitutional violation claim given that Twitter acted wholly as an agent of Massachusetts government officials. As a direct and proximal result of Twitter's conscious violation of Federal election law and its Section 230 status, Dr. Shiva has been massively and irreparably damaged, and his injury includes but is not limited to being cheated out of a free and fair election, global loss of reputation and goodwill, and severe emotional distress due to the real fear that any mention of the Tassinari emails would lead to swift and severe retribution from the enterprise.  Twitter must be punished and held liable for exemplary damages in order to ensure that neither Twitter nor any of the other Big Tech firms repeat this violation in any election in the future, with an initial demand of $500 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and fees and pre- and post-judgment interest from the Defendants.

## JOINT AND SEVERAL LIABILITY

Massachusetts Defendants are jointly and severally liable. *O'Connor v. Raymark*, 401 Mass. 586 (1986) Particularly in this case they are liable because they acted in concert and caused harm at the same time in the same action.

## CONCLUSION

Based on the facts and points of law within the four corners of this complaint, the court must immediately grant the two preliminary injunctions and allow the remaining claims to be considered by a jury after discovery.

Respectfully submitted under the pains and penalties of perjury,

/s/ Dr. Shiva Ayyadurai

_____

**Dr. Shiva Ayyadurai**

April 6, 2021

Plaintiff, *pro se*
701 Concord Ave,
Cambridge, MA 02138
Phone: 617-631-6874
Email: vashiva@vashiva.com