IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Dr. SHIVA AYYADURAI,<br><br>   Plaintiff,<br><br> v.<br><br>WILLIAM FRANCIS GALVIN, MICHELLE K. TASSINARI, DEBRA O'MALLEY, AMY COHEN, NATIONAL ASSOCIATION OF STATE ELECTION DIRECTORS, all in their individual capacities, and WILLIAM FRANCIS GALVIN, in his official capacity as Secretary of State for Massachusetts,<br><br>   Defendant. | Case No. 1:20-CV-11889-MLW |

**BRIEF OF *AMICUS CURIAE* BRENNAN CENTER FOR JUSTICE AT NYU LAW**

**IN SUPPORT OF DEFENDANTS**

# TABLE OF CONTENTS

Table of Contents ............................................................................................................. i

Table of Authorities ........................................................................................................ ii

Corporate Disclosure Statement ..................................................................................... 1

Interest of *Amicus Curiae* ............................................................................................... 1

Summary of Argument .................................................................................................... 2

Argument ......................................................................................................................... 3

    I.     Election Disinformation Threatens Election Officials, Election Workers, and our Democracy ............................................................................. 3

    II.    Election Officials Should Be Free to Combat Disinformation About Elections ............................................................................................ 5

    III.   Private Companies Can Rely on Election Administration Experts, Including Election Officials, to Recognize and Rebut Election Disinformation ......................................................................................... 7

Conclusion ...................................................................................................................... 8

# TABLE OF AUTHORITIES

**Cases**

*Heineke v. Santa Clara University*,
   965 F.3d 1009 (9th Cir. 2020) ............................................................................................... 7

*Miami Herald Pub. Co. v. Tornillo*,
   418 U.S. 241 (1974) ......................................................................................................... 2, 7

*Pleasant Grove City, Utah v. Summum*,
   555 U.S. 460 (2009) ............................................................................................................ 2

**Statutes**

Ga. Stat. § 21-2-386 .................................................................................................................. 6

La. Rev. S. § 566.2 .................................................................................................................... 6

N.C. Stat. § 163-234 .................................................................................................................. 6

Tenn. Stat. § 2-7-112 ................................................................................................................. 6

**CORPORATE DISCLOSURE STATEMENT**

*Amicus* Brennan Center for Justice at NYU Law, by its undersigned counsel, certifies that it has no parent corporation and that no publicly traded company owns 10% or more of its stock.

**INTEREST OF *AMICUS CURIAE*[1]**

The Brennan Center for Justice is an independent, nonpartisan law and policy organization that works to reform, revitalize, and when necessary, defend our country's systems of democracy and justice. Protecting free and fair elections against threats, including dangerous disinformation campaigns about their integrity, is central to the mission of the Brennan Center for Justice. The Brennan Center advocates for election security measures that will ensure the accuracy of election outcomes and boost confidence in US election outcomes, such as the use of paper ballot records and pre-certification tabulation audits, while at the same time seeking to debunk inaccurate myths of widespread voter fraud and election "rigging," which are leveraged to justify making it harder for citizens to exercise their rights to vote. The Brennan Center respectfully submits this brief to highlight for the Court the strong and ongoing public interest—above and beyond the interests of the parties in this case—in allowing both election officials and the private sector to protect voters and the integrity of elections by combatting lies about elections. Chilling election officials' ability to address lies about elections by, for example,

---

[1] Plaintiff and counsel for Defendants were contacted via email on May 19, 2021 to request assent for the filing of this brief. Counsel for Defendants assented. Plaintiff did not respond to the request prior to the filing of this brief. No party's counsel or any other person except *amicus* and its counsel authored this brief or contributed money to fund its preparation or submission.

reporting them to private companies, such as Twitter, would harm the nation's interest in accurate information about elections, undermining the need and rights of both election officials and the private sector to defend our democracy against baseless mis- and disinformation[2] campaigns. *See Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467-68 (2009); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

## SUMMARY OF ARGUMENT

It is crucial to the health of our democracy that false information about elections, including falsehoods about how to vote and election results, does not drown out accurate information. In the U.S., elections are decentralized, administered by more than 8,000 state and local election officials including Secretaries of State, State Election Directors, County Registrars and Election Directors, Municipal Clerks and Recorders, and more.[3] They often learn about misinformation when they receive calls from upset voters and must clear up the confusion, using their expertise in how elections are administered in their specific jurisdiction. When such election officials—who control no law enforcement agency, legislature, or agency that regulates the internet—encounter lies that will mislead the public about elections, they should be empowered to confront them. In addition, when socially responsible private entities wish to act

---

[2] Disinformation is false or misleading information that is spread deliberately to influence others. Misinformation is false or misleading information that may be spread by someone who does not realize the information is false. *See* "Disinformation."; "Misinformation.", Merriam-Webster.com Dictionary, *available at* https://www.merriam-webster.com/dictionary/misinformation.

[3] *See* Adona et al., *Stewards of Democracy: The Views of American Local Election Officials* (2019).

in the public interest by responding to the problem of election disinformation, they should not be chilled from relying upon information from experts on election administration, including state and local election officials, non-governmental professional associations of those officials, and nonprofit civil society organizations.

Falsehoods about elections have destructive effects on our democracy and have led to deprivations of the right to vote, threats of violence against election workers, pressure from elected leaders to overturn legitimate election results, and actual violence at the US Capitol. These attempts to reject the will of the voters have continued well after January 6, 2021. Election officials must be able to report falsehoods about elections to those who may be unwittingly hosting them. And private entities who wish to do their part in protecting our democracy should be free to consult with experts on the frontlines of administering elections.

**ARGUMENT**

**I.    Election Disinformation Threatens Election Officials, Election Workers, and our Democracy**

Democracy in the United States is being threatened by a flood of disinformation about elections. During the 2020 election cycle, individuals spread false narratives about the integrity of the election, such as claims that election workers were engaged in fraud,[4] or that ballots had

---

[4] *See, e.g.*, McKenzie Sadhegi, "Fact Check: Viral Video Shows Pennsylvania Workers Fixing Damaged Ballots," USA Today, Nov. 6, 2020. *available at* https://www.usatoday.com/story/news/factcheck/2020/11/06/fact-check-video-shows-pennsylvania-poll-workers-fixing-damaged-ballots/6185589002/.

3

been shredded and thrown out.[5] These claims of a "stolen" election led to threats of violence against election officials[6] and election workers.[7] Some public officials even attempted to leverage acceptance of election falsehoods by members of the public in order to pressure election officials into overturning legitimate election results.[8] These lies, many spread online, culminated in an attempted insurrection at the U.S. Capitol on January 6, 2021, that resulted in many injuries and five deaths.[9] While election officials were able to withstand these threats and pressure to overturn the election outcome, they continue to be subject to threats of violence associated with

---

[5] *See, e.g.*, AP News, "Photo does not show shredded ballots in Georgia," Jan. 6, 2021, *available at* https://apnews.com/article/fact-checking-afs:Content:9881424587.

[6] *See e.g.*, Jonathan Lai, "Philly elections officials are getting death threats as Trump targets the city," Philadelphia Inquirer, Nov. 9, 2020, *available at* https://www.inquirer.com/politics/election/philadelphia-elections-officials-death-threats-20201109.html

[7] *See e.g.*, Johnny Kauffman, "'You Better Run': After Trump's False Attacks, Election Workers Faced Threats," NPR, Feb. 5, 2021, *available at* https://www.npr.org/2021/02/05/963828783/you-better-run-after-trumps-false-attacks-election-workers-faced-threats.

[8] Amy Gardner & Paulini Firozi, "Here's the Full Transcript and Audio of the Call Between Trump and Raffensperger," Washington Post, Jan. 2, 2020 ("And a lot of Republicans are going to vote negative because they hate what you did to the president. Okay? They hate it. And they're going to vote. And you would be respected. Really respected, if this thing could be straightened out before the election."), *available at* https://www.washingtonpost.com/politics/trump-raffensperger-call-transcript-georgia-vote/2021/01/03/2768e0cc-4ddd-11eb-83e3-322644d82356_story.html.

[9] *See* Michael Biesecker, *et al*, "Who Were They? Records Reveal Trump fans Who Stormed Capitol," AP News, Jan. 11, 2021 ("[M]any of the rioters had taken to social media after the November election to retweet and parrot false claims by Trump that the vote had been stolen . . . ."), *available at* https://apnews.com/article/us-capitol-siege-trump-supporters-8edfd3bb994568b7cdcd2243ad769101; Eric Levenson, et al., "What we know about the 5 deaths in the pro-Trump mob that stormed the Capitol," CNN, Jan. 8, 2021, *available at* https://www.cnn.com/2021/01/07/us/capitol-mob-deaths/index.html.

misinformation about the legitimacy of the November election.[10] For American democracy to be realized, public servants who run our elections must be empowered to confront falsehoods that undermine public acceptance of the election outcomes.

## II. Election Officials Should Be Free to Combat Disinformation About Elections

In the face of a global pandemic that threatened voters' and their own health, the threat of interference and intimidation by sophisticated actors affiliated with foreign governments, and a disinformation campaign including U.S. elected leaders that undermined faith in election outcomes, the more than 8,000 state and local election officials who administer elections in the United States delivered an election in November 2020 that was "the most secure in American history."[11]

The nation's interest in ensuring that these public servants continue to be able to administer fair elections—and have the outcomes of those fair elections accepted—could not be higher. In order for this to occur, election officials must be able to combat disinformation about elections, including by reporting falsehoods to those who host social media platforms, where disinformation can spread instantly to vast numbers of people.[12] The state election laws and

---

[10] *See, e.g.*, Anna Maja-Rappard & Paul LeBlanc, "Arizona Secretary of State Assigned Protection Following Death Threats Amid Election Audit," CNN, May 7, 2021, *available at* https://www.kctv5.com/arizona-secretary-of-state-assigned-protection-following-death-threats-amid-election-audit/article_5c3e4867-e382-5171-ade2-a77f7dbabc12.html.

[11] Joint Statement from Elections Infrastructure Government Coordinating Council and the Election Infrastructure Sector Coordinating Executive Committees, Nov. 12, 2020, *available at* https://www.cisa.gov/news/2020/11/12/joint-statement-elections-infrastructure-government-coordinating-council-election.

[12] *See Department of Justice*, "Social Media Influencer Charged with Election Interference Stemming from Voter Disinformation Campaign: Defendant Unlawfully Used Social Media To

regulations that election officials implement, such as provisional ballot rules, or whether and in what manner absentee ballots may be counted before Election Day, vary among the states. *Compare* La. Rev. S. § 566.2 *with* Tenn. Stat. § 2-7-112; *compare* Ga. Stat. § 21-2-386 *with* N.C. Stat. § 163-234.  The equipment used, such as ballot scanners, varies too, often even within a single state.[13]  Election officials are experts in election administration in their jurisdiction who can recognize mis- and disinformation about their own elections as well as explain why it is false.  They are also highly aware of election misinformation because they receive calls from upset voters, and must clear up resulting confusion.  Indeed, Plaintiff's proposed Second Amended Complaint alleges that members of the Massachusetts Secretary of State's office were alerted to his tweets, containing what they consider to be election misinformation about the destruction of ballots, by phone calls and emails from the public.  Dkt Entry #78 at 24.  And sadly, their awareness is also heightened by the fact that they are targeted by those who encounter disinformation—sometimes with harassment, violent threats, and posting of their personal information online, such as a home address.  *See supra notes* 7-8, 10.

While election officials have expertise when it comes to recognizing and rebutting election disinformation, they are not part of law enforcement, they are not legislators, and their departments have no authority to regulate the internet.  When they report election disinformation – or harassment, for that matter – to an internet company such as a social media platform, they

---

Deprive Individuals of Their Right To Vote," Jan. 27, 2021 *available at* https://www.justice.gov/opa/pr/social-media-influencer-charged-election-interference-stemming-voter-disinformation-campaign.

[13] Texas Secretary of State, Voting Systems by County, Feb. 11, 2020, *available at* https://www.sos.state.tx.us/elections/forms/sysexam/voting-sys-bycounty.pdf

are not exercising coercive power because they have no leverage—not even implicit—over the platform. *Cf. Heineke v. Santa Clara University*, 965 F.3d 1009 (9th Cir. 2020) (noting that the exercise of coercive power over a private entity can sometimes convert private action into state action, but finding that standard unmet). Indeed, Plaintiff alleges, Dkt. Entry 78 at 26, 28, that Twitter gave priority to reports of election disinformation from election officials as well as non-governmental professional associations through a Partner program —which they have every right to do. *See infra* at Part III.

### III. Private Companies Can Rely on Election Administration Experts, Including Election Officials, to Recognize and Rebut Election Disinformation

When a private company decides what speech it wants to promote, the company is itself exercising rights implicated by the First Amendment. *See Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974). Some private companies, such as Twitter, may wish to exercise those First Amendment rights to bolster American democracy — an issue at the heart of the First Amendment's protections. Specifically, they may respond to false information about election processes spreading through their platforms by deleting false or misleading content, labeling misleading content, and providing additional information to users that engage with misleading content.[14]

Private companies that choose to exercise their speech rights to promote democracy should be allowed to rely on election official input and expertise to inform these activities.

---

[14] Twitter, Civic Integrity Policy, Jan. 2021, https://help.twitter.com/en/rules-and-policies/election-integrity-policy (last visited May 19, 2021).

7

These officials are an obvious resource for a company, like Twitter, that wants to identify false election information and promote correct information. Each election official has first-hand knowledge of how elections are run in his or her jurisdiction — an invaluable resource for a national company given the variation in election law from state to state, and even within a given state. *See supra* Part II. Election officials also consistently engage with situations that may cause voter confusion and as a result are well suited to identify disinformation, given that disinformation often begins with a routine but misunderstood observation. *Id.*

Seeking input from trusted sources allows private companies to act in a responsible manner even when these acts extend beyond its institutional expertise. This practice should not be chilled simply because individuals best suited to providing input happen to be government officials.

## CONCLUSION

Due to the epidemic of mis- and disinformation about elections, the associated threats against election workers, and the attempts to leverage disinformation to overturn certified election results, it is vital to our nation's democracy that election officials—the public servants who administer our elections—be able to report election mis- and disinformation to media platforms. Those platforms must also be able, if they choose, to give special priority to election officials' reports as they respond to election disinformation. For these reasons, this Court should dismiss Plaintiff's claims that his First Amendment rights to free speech have been violated.

Dated: May 19, 2021

Respectfully submitted,

By:    /s/ *Craig R. Smith*
       Craig R. Smith (BBO No. 636,723)
       Eric P. Carnevale (BBO No. 677,210)
       **LANDO & ANASTASI, LLP**
       60 State Street, 23rd Floor
       Boston, MA 02109
       Tel: (617) 395-7000
       Fax: (617) 395-7070
       Email: csmith@lalaw.com
              ecarnevale@lalaw.com

Of counsel:

Lawrence Norden*
Gowri Ramachandran*
Derek Tisler*
**BRENNAN CENTER FOR JUSTICE
AT NYU SCHOOL OF LAW**
120 Broadway, Suite 1750
New York, NY 10271
Tel: (646) 292-8310
Email: lawrence.norden@nyu.edu
       gowri.ramachandran@nyu.edu
       derek.tisler@nyu.edu

**Pro Hac Vice Motion Pending*

### CERTIFICATE OF SERVICE

I certify that on May 19, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which automatically sends email notification of such filing to registered participants. Any other counsel of record will receive the foregoing via e-mail in PDF format.

                                               */s/ Craig R. Smith*
                                               Craig R. Smith