UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CASE No. 1:20-CV-11889-MLW

| | | |
|---|---|---|
| Dr. SHIVA AYYADURAI | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM FRANCIS GALVIN, | ) | |
| MICHELLE K. TASSINARI, | ) | |
| DEBRA O'MALLEY, | ) | JURY DEMANDED |
| AMY COHEN, | ) | |
| NATIONAL ASSOCIATION OF | ) | |
| STATE ELECTION DIRECTORS, | ) | |
| TWITTER, INC., | ) | |
| all in their individual capacities, and | ) | |
| WILLIAM FRANCIS GALVIN, | ) | |
| in his official capacity as Secretary | ) | |
| of State for Massachusetts, | ) | |
| Defendants. | ) | |

---

**REVISED SECOND AMENDED COMPLAINT**

**I. INTRODUCTION**

1.     This case is about the government surveilling and blacklisting a minority,

political candidate Dr. Shiva Ayyadurai ("Dr. Shiva"), and then eventually silencing his

speech, in the midst of his U.S. Senate campaign, because he criticized government officials,

thereby violating his First Amendment rights – the foundational principle of the United

States.

2.     Starting in June of 2020, Dr. Shiva, a candidate for U.S. Senate in

Massachusetts, was one of the top six (6) individuals in the United States who had been

identified,in *The Long Fuse Report*, as an Influence Operator (IO) per the Playbooks

(created by the Defendants), and was under 24/7 surveillance by teams working 4-hour shifts, using an infrastructure – of technology and relationships as shown in **Exhibit A**, co-architected by the Defendants in this case. ***Dr. Shiva is mentioned twenty-two (22) times in The Long Fuse Report.***

3.      Starting in October 2017, government officials concluded that **though** the nature of U.S. elections was **decentralized** - spread across 10,000 jurisdictions and using different kinds of machines (and diverse methods: paper and electronic) - was the best defense to cyberhacking, they needed to eliminate such decentralization because it was a hindrance to their desire to establish and use a centralized infrastructure with non-governmental entities to "fill the gap" between domestic government agencies who had no power to curtail speech, and federal intelligence agencies who were forbidden from curtailing domestic speech, in order to censor speech by surveilling, blacklisting, and silencing U.S. citizens, *domestically*, and thus allow government officials to violate the First Amendment without fear of being sued.

4.      The Defendants in this case were architects of this infrastructure. The Defendants and their allies co-authored the foundational documents – The *Playbooks* – at Harvard's Belfer Center for Defending Digital Democracy, testified to the US Senate Intelligence Committee to lobby for such an infrastructure, and forged relationships with billionaires, in particular **Pierre Omidyar**, through his Democracy Fund, as well as the Rockefeller Brothers, the Murdoch Family's Quadrivium, Mark Zuckerberg, and other non-governmental entities, to fund, design and deploy this centralized infrastructure for censorship of speech. The network diagram in **Exhibit A** provides a visual illustration of those relationships and the technology infrastructure they created to censor speech. These

relationships provided the Defendants special access to channels to use if when and necessary for personal benefit, to not only blacklist and surveil US citizens, but also to silence their domestic speech, which is what they did to Dr. Shiva starting on September 25, 2020.

5.      The existence of this infrastructure was discovered during the course of this lawsuit: On October 30, 2020, testimony elicited by this Court, revealed for the first time the existence of a "Trusted Twitter Partnership" between Government and Twitter; on May 19, 2021, Dr. Shiva discovered the "Playbooks" co-authored by the Defendants, which were presented to this Court during the May 20-21, 2021 hearings, that detail the step-by-step process for identifying Influence Operators (IOs), monitoring them and silencing their speech; and, on June 28, 2021, the staggering discovery of the *The Long Fuse Report*, confirmed that this infrastructure had been monitoring Dr. Shiva starting as early as June of 2020. Discovery of the *Long Fuse Report* is as momentous in US History as discovery of the Pentagon Papers. This lawsuit provides the context to understand it.

6.      Dr. Shiva Ayyadurai ("Dr. Shiva"), MIT PhD, the inventor of email, is a scientist, technologist, political activist (see **Exhibit B)**, and educator - *an independent thinker* -, a minority, who was born as a low-caste "Untouchable" in India's deplorable caste system,  earned four degrees from MIT, a Fulbright Scholar, Westinghouse Science Talents Honors Award recipient, Lemelson-MIT Awards Finalist, nominee for the Presidential National Medal of Technology and Innovation.  His life has been about identifying problems and proposing solutions based on a *systems science approach* – that is neither partisan nor bi-partisan -, is beyond left and right, and is based on objectively understanding the interconnections of the parts of any system.  He developed a systems science curriculum,

which he originally taught at MIT, that he now teaches to the broad public to educate them

on applying a systems approach to any problem.  This approach is what Dr. Shiva employs

in his videos and social media posts in analyzing a problem or situation.

7.     Since 2011, Dr. Shiva worked hard to build his followers on Twitter – his

main platform for education, outreach, and political activism -  from 0 to 360,000 followers

with a reach of tens to hundreds of millions as documented in *The Long Fuse Report*, before

he was deplatformed by these Defendants on February 1, 2021.  His content, combining

text posts, images and video streams, enabled his students and followers on Twitter to get

a deep and unique education, from a systems approach, on any number of issues be it

innovation, healthcare, education, agriculture, vaccines, election integrity, Big Tech, etc.

Given that Twitter is the most powerful megaphone for politics (politicians and political

activists must be on Twitter to even have a chance of their message being heard), Dr.

Shiva's content, based on this systems-based approach, appealed to the broad mass of

independent thinkers in America. Up until September 25, 2020, Dr. Shiva was never

suspended or deplatformed from Twitter, though he spoke on a number of controversial

topics, from a non-mainstream, systems-science-based approach.

8.     In February of 2017, Dr. Shiva decided to engage in electoral politics. He ran

as an Independent for U.S. Senate from Massachusetts in 2018 against Elizabeth Warren. In

2020, he ran as a Republican (though the Massachusetts GOP did not support him, given he

had his own independent base) in the U.S. Senate primary; and later, in the U.S. Senate

general elections as a write in candidate on the platform of #StopElectionFraud and

#TruthFreedomHealth.

9.      Dr. Shiva's Truth Freedom Health platform and movement inspired citizens to support policies that ensure that FREEDOM – the First Amendment – is not violated as it is the basis for open debate and discourse, that ensures the scientific method may enable science to elicit TRUTH, from which one may uncover real problems and real solutions to create HEALTH, be it for one's body or a national infrastructure, from which the strength and resilience emerge to provide the fuel to fight for FREEDOM and TRUTH.  Dr. Shiva's campaign galvanized millions, not only in Massachusetts but also across the country, who were inspired by his message of TRUTH FREEDOM HEALTH.

10.      On September 1, 2020, following the confounding results from his own U.S. Senate Primary election Dr. Shiva began his journey to discover two (2) systemic problems in the processes of U.S. electronic voting systems:

a.      The certification by State Election Directors of voting systems software with features that allowed for the multiplication of a voter's vote by a factor (the "weighted race" feature), thus denying one person one vote; and,

b.      The lack of adherence to Federal law 52 USC 20701 that election officials must preserve digital ballot images for twenty-two (22) months for federal elections, to enable auditing.

11.      During September 1-24, 2020, Dr. Shiva used Twitter to educate his nearly 260,000 students and followers, from a systems science approach, to appreciate the realities of these two systemic system problems that he had identified. He tweeted, shared posts, did videos on his own experience during his primary election campaign, the mechanics of the weighted race feature that denies one person one vote, how ballot images were being deleted – thus thwarting forensic audits, and the slogan of his U.S. Senate Write

In campaign: #StopElectionFraud. *The Long Fuse Report* documents that at that time, the infrastructure co-architected by these Defendants was being **only** used to surveil him and actively analyze his 'influence and reach' to gauge his threat severity. During this period, Twitter never took any action to silence any of his tweets (see **Exhibit C**) or deplatform his tweets or his Twitter account.

12.     Dr. Shiva held at least (4) protests in Boston and in front of Galvin's office exposing Galvin and Tassinari's not adhering to Federal Law; volunteers across Massachusetts did nearly 500 standouts while holding up signs #StopElectionFraud on street corners, over highway overpasses, and at supermarkets; and, they passed out over 2 million flyers with the slogan #StopElectionFraud in every town and city in Massachusetts.

13.     On September 24, 2020, Dr. Shiva tweeted out about destruction of digital ballot images by Tassinari and Galvin, which went viral on social media.  In response to this tweet, Defendant Galvin had his office respond with a press release disputing Dr. Shiva's tweet.  Galvin's office also officially filed a complaint with Twitter through their dedicated Partner Support Portal ("PSP"). Galvin's office is a "Trusted Twitter Partner," which means any complaints from them receive a higher priority response than some normal private citizen complaining to Twitter. The Playbooks explain this in detail.

14.     On September 25, 2020, Dr. Shiva posted a threaded tweet sharing four (4) screenshots of emails that explicitly named Defendant Michelle Tassinari, ("the September 25, 2020 Tassinari Tweet").  Tassinari holds many positions of power at the key intersection of governmental and non-governmental members of the infrastructure established to censor domestic speech:

a.     State Election Director of Massachusetts;

b.       Chief Legal Counsel for Massachusetts Secretary of State Galvin;

c.       President of the National Association of State Election Directors (NASED);

d.       Executive Committee Member of the DHS Cybersecurity and Infrastructure Security Agency's Election Infrastructure-Government Coordinating Council (CISA EI-GCC);

e.       Member of the Advisory Board of the MIT Election Data & Science Laboratory;

f.       Member of the U.S. Election Assistance Commission (US EAC);  and,

g.       Member of the Council of State Governments

15.     The September 25, 2020 Tassinari Tweet went viral and revealed her personal role in destroying digital ballot images. This time, unlike the earlier official response, Tassinari had Amy Cohen, the Executive Director of NASED and someone who commanded immense influence through relationships that Cohen had forged over years in Washington DC, as shown in **Exhibit A**, to do 'whatever it takes' to get Dr. Shiva's tweet removed.

16.     Tassinari and Cohen's coordination with Twitter and using the relationships they had forged, resulted in Dr. Shiva's tweet being removed and Dr. Shiva being locked out of his Twitter account for most of the one month period leading to the general elections on November 3, 2020.  Tassinari had used the relationships and the infrastructure to benefit her personally i.e. removing the tweet that revealed ***her*** violation of federal law. The deliberate silencing of Dr. Shiva on Twitter in the midst of his U.S. Senate campaign just prior to election day, severely crippled his last month of efforts including: raising money, reaching out to voters, sharing his message, etc.

17.     On October 20, 2020, Dr. Shiva filed a lawsuit and sought to enjoin Galvin from further silencing him on Twitter. On October 30, 2020, this Court held a TRO hearing

and elicited testimony which gave us the first glimpses of the infrastructure designed by the Defendants i.e. the "Trusted Twitter Partnership."  In her affidavit, Tassinari had concealed the Trusted Twitter Partnership and her use of the infrastructure through Amy Cohen to do 'whatever it took' to stop Dr. Shiva from spreading the news of Tassinari's violation of federal law. This Court ruled in Dr. Shiva's favor, ordered Galvin to stop contacting Twitter; Galvin to stop contacting NASED; and, ordering Galvin to respond to Dr. Shiva's speech on Twitter with his own speech. At that hearing, this Court also indicated that it was more than likely that, per the *Blum* test, Dr. Shiva would prevail in his lawsuit in demonstrating that Twitter's action was State Action.

18.     Dr. Shiva would discover, later that Tassinari's and Cohen's influence and coercive power far outweighs that of the average state election director.

19.      Starting on November 4, 2020, when Dr. Shiva was back on Twitter, until January 31, 2021, Dr. Shiva tweeted on all different topics.  At this time his followers had grown to 360,000 and his influence and reach had also grown, as documented in *The Long Fuse Report.*

20.     On February 1, 2021, when he once again shared the September 25, 2020 Tassinari Tweet in a video lecture about developments in this very lawsuit, to his students and followers, Dr. Shiva received, within ***seventeen(17) minutes*** of the lecture ending, an official Twitter email informing him that Twitter had permanently suspended his account. Those seventeen (17) minutes permitted no time for Twitter to exercise any independent private internal judgment; it kicked Dr. Shiva off Twitter because the other Defendants wanted it to do so. Interestingly, Tassinari, Cohen, and Twitter's counsel Stacia Cardille ("Cardille"), who has submitted false affidavits in this case, were all together at NASED's

February 1-5, 2021 Winter Conference at which Tassinari and Cohen had invited Cardille to give a talk on "Managing Misinformation on Social Media Platforms," at the same time that Twitter deplatformed Dr. Shiva.

21.     The Defendants, to conceal their coordinated efforts to silence Dr. Shiva, then coordinated together to conceal from this Court the existence of their relationship. Already in this case, multiple of the Defendants have made repeated omissions as well as direct factual misrepresentations via testimony and affidavit. Two of the more recent efforts to conceal the truth from this Court include:

a.     Defendants failed to disclose to the Court the existence of the Playbooks setting out the means by which they were to regulate speech on social media and the fact that Twitter Legal, Tassinari and Cohen co-wrote them; and

b.     Cardille, on behalf of the Defendants, misrepresented that Twitter deplatformed Dr. Shiva through internal deliberations within Twitter. Cardille was confronted with the need to explain the 17-minute response time. This would have required her to reveal to this Court that 24/7 live surveillance teams were watching Dr. Shiva's tweets on 4-hour shifts every day on behalf of the Defendants, as documented in the *Long Fuse Report*. Cardille chose to conceal this fact and filed a false affidavit instead.

22.     *The Long Fuse Report* analyzed Dr. Shiva as the test subject, the canary in the coal mine, the first U.S. Senate candidate deplatformed during his election campaign, to see if the infrastructure works as designed, in order to next be employed against a sitting member of Congress (which is now underway as this lawsuit is being filed). In fact *The Long Fuse Report*, recommends in its closing chapters that political speech not be given

preferential treatment – openly challenging the highest protection afforded by the First Amendment - and bringing the United States back in line with the British Commonwealth.

## II. PARTIES

23.     Plaintiff Dr. Shiva Ayyadurai ("**Dr. Shiva**") lives and works in this District. He holds four (4) degrees from the Massachusetts Institute of Technology (MIT) including his PhD in Biological Engineering, where he collaborated on research with Professor Noam Chomsky, a noted linguist; and with Professor Robert Langer, a world-renowned engineer. Dr. Shiva founded and runs multiple technology companies in Cambridge, MA at 701 Concord Avenue, and has now campaigned for Federal office three times, including presently for U.S. Senate. He started his account on Twitter in August 2011 and since then has worked assiduously to grow his presence. Until he was deplatformed by the Defendants on February 1, 2021, his Verified Twitter account was followed by 360,000 people, giving him a significant presence on the nation's social media landscape, a fact confirmed in great detail in the *Long Fuse Report*.

24.     Defendant **William Galvin** is a career politician, presently the Secretary of State for the Commonwealth of Massachusetts, and the person responsible for ensuring that Federal law is complied with during the conduct of elections for Federal office. He resides at 46 Lake Street, Brighton, MA 02135

25.     Defendant **Michelle Tassinari** is Defendant Galvin's legal counsel and Elections Director of the Massachusetts Elections Division and the person required to ensure Galvin's office complies with Federal law. Tassinari is also responsible for assisting the 351 towns conduct elections. Tassinari's annual salary is $149,925. Tassinari has a

degree in History from Brandeis University and a law degree from the New England School of Law.  Tassinari holds at least a Secret-level security clearance from the Department of Homeland Security (DHS) and sits on the Advisory Board of Directors at MIT's Election Data and Science Lab, which funds Charles Stewart III, who Reuters and the Associated Press claimed is an independent expert who refuted Dr. Shiva.  Tassinari sits on the US Election Assistance Commission (US EAC). Here are Tassinari's and Cohen's relationships in a diagram that demonstrates the infrastructure used to carry out their RICO enterprise (also available in **Exhibit A** in high-resolution format):



Tassinari's scope of employment involves: ensuring that election laws are followed by local officials statewide; administration of a statewide voter registration database required by Help America Vote Act (HAVA); assisting local election officials by providing training courses or materials on running elections in the state; providing a process for testing and certifying voting equipment for use in the state; providing legal counsel for the Secretary of State to assist him in his duties; furnishing affidavits to courts when the

Secretary is sued.

Tassinari's scope of employment ***does NOT include***: co-authoring a Playbook with Twitter Legal to launder censorship through Twitter of US Citizens identified by unelected government officials as High Severity Influence Operators; creating an infrastructure to assist unelected government officials interact with social and traditional media via a private organization – Elections Infrastructure Information Sharing and Analysis Center (EI-ISAC) - that promises rapid silencing of US Citizens across many platforms; speaking twice a month with other state election directors via either NASED or EI-ISAC to promote surveillance of US Citizens' speech; working as President of NASED; organizing and speaking at NASED conferences; conspiring with Charles Stewart III at MIT to defame Dr. Shiva via Reuters and the AP; and, concealing from Judge Wolf her deep personal connections to Stewart, Harvard's Belfer Center, Stacia Cardille at Twitter Global Legal, her Directorship of an Omidyar-funded MIT Lab, her co-authorship of the infrastructure Playbook documents with Twitter and Cohen. Tassinari resides at 5A Lee St, Wilmington, MA 01887.

26.     Defendant **Debra O'Malley** is Defendant Galvin's and Defendant Tassinari's spokesperson and handles the Election Division's official Twitter account (@VotinginMass). O'Malley provided cover for Tassinari by misdirecting the public away from the Tassinari email tweets that had been deleted and declared to the press that Dr. Shiva is not a credible person. Defendant **Twitter** is a Delaware corporation headquartered at 1355 Market Street, Suite 900, San Francisco, CA 94103, and registered with the Massachusetts Secretary of State. Its Massachusetts office is located at 141 Portland Street, Cambridge, MA 02139. Twitter depends heavily on the government for maintaining its

Section 230 platform status, that allows its high valuation by stock analysts and thus make borrowing money cheaper and easier.

27.    Defendant **Amy Cohen** is the Executive Director for Defendant NASED and holds at least a Secret-level security clearance from the Department of Homeland Security (DHS). Cohen has a bachelor of arts degree in political science from Washington University in St. Louis and a masters in public policy from Georgetown University. Cohen has an account on Twitter at @AyyEllCee. Cohen has no training or experience in cybersecurity. Cohen worked for Pew Trusts for four years. Cohen 'left' Pew and founded Center for Election Innovation & Research (CEIR) with David Becker to promote centralization of elections.

Cohen remains the agent of record for CEIR, which received $50 Million from Mark Zuckerburg and Priscilla Chan prior to the 2020 elections in order to induce local election officials to centralize the tabulation of votes. Cohen works for DemocracyWorks, which is funded by the Rockefeller Brothers and the Murdoch Family's Quadrivium Fund, and which took over NASED in 2017. Cohen was installed in January 2018 by DemocracyWorks as Executive Director of NASED. Cohen testified in March 2018 to the US Senate Intelligence Committee as a national expert on CyberSecurity. Cohen admitted in her testimony that the decentralized system of voting in the US via 10,000 electoral jurisdictions using 10,000 different machines and counting all votes locally is intrinsically the best safety feature against foreign election interference and hacking.

Cohen strongly pushed for the US voting system to be fully centralized and brought under one control via a 'Whole Government Approach' which included a new federal agency - Cybersecurity and Infrastructure Security Agency (CISA - *Defend Today and Secure*

*Tomorrow!*) - constituted under the Department of Homeland Security (DHS). Cohen testified to Congress in March 2018 alongside Eric Rosenbach, from the Belfer Center at the Harvard Kennedy School of Government, who referred to Cohen and NASED as strong allies. Cohen's and Rosenbach's testimony was crucial in the formation and funding of CISA. Cohen sits on CISA's Election Infrastructure Government Coordinating Council.

Cohen was crucial to the creation of the Elections Infrastructure Information Sharing and Analysis Center (EI-ISAC) within the Center for Internet Security (CIS) that is funded by Pierre Omidyar as the "singular conduit" between government officials and social media companies, and as the conduit for information to be sent to the Elections Integrity Project (EIP) for analysis on behalf of CISA (DHS). Cohen speaks to all state election directors twice a month in order to convince them of the need to surveil speech in their jurisdictions, teach them to report speech to EI-ISAC, and to bring peer pressure on a fortnightly basis upon them to ensure they are onboard the enterprise aimed at subverting the First Amendment by referring to surveillance as Best Practices, as described in the Playbooks written by her and Tassinari, that were then published by Harvard's Belfer Center.

Cohen co-wrote the Playbook with Twitter Legal. Cohen co-wrote the foundational document underlying the Playbook with Tassinari, who is the President of NASED. Cohen defended CISA Director Chris Krebs after OIG-DHS exposed major failures in Krebs' management of CISA. Cohen runs NASED's conferences bringing together members from both government and private actors to "forge relationships" on a regular basis in order to push forward the goals of the enterprise. Amy Cohen worked on the RABET-V Pilot Program with Beau Woods of the Atlantic Council (which funded the *Long Fuse Report*).

Cohen is a member of the Advisory Group for the Global Cyber Alliance which brings in funding from British government entities and private parties. Cohen works with the Bipartisan Policy Center. Cohen works with Brian Spear, Head of EI-ISAC. Cohen works closely with Tassinari at the US Election Assistance Commission.

Cohen is dedicated to bringing the US election system under centralized Federal Control, with a role for the British government. Cohen and her cohorts have identified the First Amendment as a problem that needs a policy solution. Cohen is dedicated to establishing, and has already established, a private infrastructure available to both unelected state and local officials as well as federal officials at both DHS (CISA) and US State (GEC) that they may use to target US Citizens within the United States for their speech on social and traditional media.

Cohen caused the establishment of the private EI-ISAC, with funding from Pierre Omidyar, and operated by NSA retirees, in order to advise the government on what is legitimate and illegitimate speech and provide an enforcement mechanism that unelected government officials may use to rapidly silence US Citizens on social and traditional media for domestic speech that officials, EI-ISAC, EIP and CISA decide is illegitimate. Cohen established via the Playbook, and an additional mechanism at Twitter - the Partner Support Portal - an expedited pathway that unelected officials may also use to rapidly silence US Citizens' domestic speech that officials deem illegitimate.

Cohen invited Twitter Global Legal's Stacia Cardille to speak at NASED's Winter Conference on February 1-5, 2021, and concealed her relationship with Stacia Cardille from Judge Wolf in a RICO case where Cohen is a defendant and Cardille filed a false affidavit to conceal from Judge Wolf that 24/7 surveillance teams monitored Dr. Shiva's

tweets and then deplatformed him within seventeen (17) minutes. Cohen's efforts to establish the infrastructure used to silence Dr. Shiva and sabotage his US Senate campaign were declared as successful by Ashwin Ramaswami at CISA and Stanford University, Graham Brookie at the Atlantic Council, and others, via their *Long Fuse Report.*

Cohen's next goal, shared by all her cohorts, is to use the infrastructure that she has created, to silence and deplatform a sitting US House Representative or a US Senator, while they are still in office, a goal explicitly described in the *Long Fuse Report*, which was funded by Pierre Omidyar, the Atlantic Council, Craig Newmark, and the Hewlett Foundation.

28.     Defendant **Twitter** is a Delaware corporation headquartered at 1355 Market Street, Suite 900, San Francisco, CA 94103, and registered with the Massachusetts Secretary of State. Its Massachusetts office is

29.     Defendant National Association of State Election Directors ("**NASED**") is a 501(c)(3) professional organization headquartered at 1200 G Street NW, Suite 800, Washington, DC 20005. Its members are the Elections Directors in the fifty (50) states. In 2018, Democracy Works, which is funded by **Kathryn & James Murdoch**' Quadrivium Foundation, the Rockefeller Brothers Foundation et al, took over the management of NASED. NASED concealed from this court that it is an entity entirely within and controlled by privately-funded Democracy Works, Inc. Democracy Works Inc.'s 2018 Form 990 declares that NASED operates "within" Democracy Works, Inc.


### III. NON-DEFENDANT MEMBERS OF THE ENTERPRISE

23.     Member **Center for Internet Security** (CIS) (https://www.cisecurity.org/) is a private entity that operates the Elections Infrastructure Information Sharing and

Analysis Center™ (EI-ISAC®). Cohen pushed for the formation of EI-ISAC under the auspices of the private CIS, and for the creation of federal CISA. CIS is operated by Brigadier General (retd.) **John M. Gilligan**, formerly Chief Information Officer for the US Air Force and currently co-chair at the Cyber Committee of the Armed Forces Electronics Association; **Tony Sager**, formerly at the National Security Agency (NSA) for 34 years as an Information Assurance professional, mathematical cryptographer and software vulnerability analyst, who won the Presidential Rank Award; **Curtis Dukes**, formerly the Deputy National Manager for National Security Systems reporting directly to the Director of NSA and charged with securing systems that handle classified information or are otherwise critical to military and intelligence activities; **Kathleen Moriarty**, formerly Security Innovations Principal in Dell Technologies Office of the CTO, Internet Engineering Task Force (IETF) Security Area Director, and Operations Management in multiple roles with MIT Lincoln Laboratory; Colonel (retd.) **Ed Mattison**, who was the Chief of Information Assurance (Cybersecurity) at the Pentagon from 2013 - 2015, Senior Cybersecurity Advisor to the Secretary of the Army and the Lead IT Security Inspector General; and others.

24.     Member **Charles Stewart III** serves with Tassinari on the Board of the MIT Election Data Science Lab, which is funded by **Pierre Omidyar**. Stewart claimed to the Associated Press and to Reuters that Dr. Shiva was wrong to state that federal law requires retention of digital ballot images and thus not a credible person. Stewart did not disclose his close relationship with Tassinari.

25.     Member **The Atlantic Council** is a member of the Global Cyber Alliance with the UK National Cyber Security Centre, City of London Police and NASED, and via its Digital

Forensics Lab (**Graham Brookie**) funded the *Long Fuse Report* on the success of the infrastructure built by Cohen and Tassinari in silencing Dr. Shiva during his run for US Senate. The *Long Fuse Report* explicitly identified the First Amendment to the US Constitution as a problem that required a policy solution. The Atlantic Council is funded by the British Government.

26.     Member **National Association of Secretaries of State** (NASS) is an integral part of the infrastructure built to enable government officials to silence the speech of US Citizens through EI-ISAC.

27.     Member **Pierre Omidyar**, via his Democracy Fund, funded DemocracyWorks (NASED), CIS, Stanford Internet Observatory, Bipartisan Policy Center and the MIT Election Data Science Lab (Stewart III)

28.     Member **Craig Newmark** funded the *Long Fuse Report* and the Global Cyber Alliance.

29.     Member **Ashwin Ramaswami** is affiliated with CISA's Election Security Initiative, studied computer science at Stanford, and per the *Long Fuse Report* is one of the founders of the **Election Integrity Partnership**. He is a co-author of the *Long Fuse Report* along with Brookie *et al*, which detailed the use of 24/7 teams on shifts to surveil Dr. Shiva and sabotage his run for US Senate. Immediately after Dr. Shiva filed his amended complaint and named **Amy Cohen** as a defendant, Ramaswami changed the Wikipedia page on Dr. Shiva and attacked him as a "pseudo-scientist" who promotes conspiracy theories. Ramaswami has a placement at Georgetown University in Washington DC to study law next, while remaining associated with CISA.

30.     Member **Robert Kolasky** is a graduate of the Harvard Kennedy School and

works at the US Department of Homeland Security and is a Director at CISA. Kolasky serves

with Tassinari on the CISA Executive Committee of Election Infrastructure Government

Coordinating Council (EI-GCC), and works with Cohen through the EI-GCC.

## IV. VENUE

31.     Venue is proper because the Defendants violated Dr. Shiva's rights in this

district. In addition, Dr. Shiva lives and works in this District as do four of the Defendants.

## V. JURISDICTION

32.     This court has jurisdiction over this case because the complaint involves

violation of a right guaranteed by the United States Constitution by persons under the color

of law, as well as national statutory jurisdiction over all the Defendants because the claims

include racketeering to obstruct justice and conspiracy.  28 U.S.C. § 1331, 28 U.S.C. § 1343,

42 U.S.C. § 1983, 18 U.S.C. § 1961(3), 18 U.S.C. § 1962(c), 18 U.S.C. § 1962(d) and 42 U.S.C. §

1985.  In addition, there is diversity between the parties: two of the Defendants, Cohen and

NASED, are based in different Districts. This court has jurisdiction under *Ex parte Young*,

209 U.S. 123 (1908) over Secretary Galvin in his official capacity as the relief sought is

prospective and injunctive.

## VI. LIABILITY

33.     Pursuant to *Kentucky v. Graham*, 473 U.S. 159 (1985), Galvin, O'Malley and

Tassinari may be sued in their individual capacities for monetary damages caused by their

intentional torts, which in this case include violation of Dr. Shiva's First Amendment rights

under color of law through abuse of their official positions. Tassinari may not avail of

qualified immunity for acts that were outside of her scope of employment and with the sole

purpose of obstructing justice where Tassinari, personally, alone, was the subject of a sworn complaint to the US Attorney regarding her violation of Federal law, and where her acts using nonpublic information about the private infrastructure she built with Amy Cohen to serve as the conduit to Twitter, benefited Tassinari personally. This is argued fully below.

34.     Sworn testimony elicited from the Defendants during an emergency hearing for a Temporary Restraining Order implicated Defendants Cohen and NASED in the intentional violation of Dr. Shiva's First Amendment rights.

35.     The U.S. District Court for Massachusetts has already ruled that Dr. Shiva has met the threshold of likelihood of being able to prevail on his claim that Twitter's action was State action and due solely to the actions of these Defendants. See *Blum v. Yaretski*, 547 U.S. 991 (1982). On October 30, 2020, Judge Mark L. Wolf thus ordered (#20) that Galvin, his agents, employees, and other persons in active concert with any of them shall not report or complain to Twitter concerning Dr. Shiva's tweets and that Galvin shall ask NASED to not report or complain to Twitter as well.  Defendants Galvin agreed to this while on notice that Dr. Shiva intended to seek monetary damages.

## VII. THIS REVISED AMENDED COMPLAINT IS APPROPRIATE

36.     Even in the absence of court-ordered discovery, Dr. Shiva has uncovered significant evidence that have enormous bearing on the claims in this case, including the deep and hitherto concealed web of relationships between the Defendants, the detailed account of the infrastructure, and the way it was used to silence Dr. Shiva as detailed in the *Long Fuse Report*.

## VIII. GALVIN MAY BE SUED IN BOTH INDIVIDUAL AND OFFICIAL CAPACITIES

37. Each of a person's different legal capacities constitutes a separate 'party.'

"Under well-established rules of res judicata, recognized in Maine, an action brought against an individual in one capacity does not bar a later action brought against the same individual in a different capacity. See also    Restatement (Second) of Judgments § 36; 1B Moore's Federal Practice ¶ 0.411[3] (2d ed. 1982). We therefore hold that res   judicata does not bar the present action as against the individual Defendants but does bar it against the city." *Roy v. City of Augusta, Maine*, 712 F. 2d 1517 (1st Circuit 1983).

Also *Kentucky v. Graham, 473 U.S. 159, 165-66 (1985)*, *Unimex, Inc. v. United States Dep't of Hous. & Urban Dev.*, 594 F.2d 1060, 1061 n. 3 (5th Cir. 1979), *Headley v. Bacon*, 828 F.2d 1272, 1279-80 (8th Cir. 1987), *Andrews v. Daw*, 201 F.3d 521 (4th Cir. 2000), *Leftridge v. Matthews*, 1:11-cv-03499-ELH (Dist. MD. 2012), *Favors v. Cuomo*, 11-cv-5632 (E.D.N.Y. Oct. 29, 2013)("each of a person's different legal capacities constitutes a separate 'party'"), *McCarthy v. Wood*, 219 Mass. 566 (1914), *Duffee v. Boston Elev. Rlwy*, 191 Mass 563 (1906), *Sturbridge v. Franklin,* 160 Mass. 149 (1893), *Anderson v. Phoenix*, 387 Mass. 444 (1982), *Campbell v. Ashler*, 320 Mass. 475 (1946)

38.     Galvin is thus sued in his individual capacity for monetary damages, and in his official capacity in order to avail of the *Ex parte Young* exception and obtain prospective injunctive relief via a court order to Galvin to ensure the reversal of all steps taken by him and Tassinari via the domestic censorship infrastructure and restores Dr. Shiva's account to its original unmolested state. This is necessary because of the ongoing harm to Dr. Shiva in terms of his speech, his ability to run for office, his ability to do his activism on any number of topics, his ability to raise money for political purposes, and his ability to earn from his systems science lectures.

39.     Dr. Shiva also seeks a permanent injunction that bars Galvin, as Secretary of State, from abusing his office again to suppress constitutionally-protected political speech, whether it concerns speech from Dr. Shiva or any other candidate for political office,

during that candidate's run for office.

40.     This court must enforce the writ of the United States Constitution upon a recalcitrant Secretary of State who claims his decision to delete digital ballot images supersedes Federal law regarding the preservation of ***all*** records generated during Federal elections.

## IX. ORAL HEARINGS

41.     Dr. Shiva respectfully requests oral hearings prior to resolution of any substantive motion, such as a motion by Defendants to delay filing a pleading or a motion to dismiss.

## X.  THE DOMESTIC CENSORSHIP INFRASTRUCTURE

42.     This case credibly alleges, through public published data, that Twitter, the government's Trusted Partner, is not an independent, defiant bastion of free speech, and that Twitter is merely a coerced agent of the government that provides the government an end run around the First Amendment.

43.     It is impossible to tell where Twitter ends and where the government begins. And this is the intentional result of the infrastructure built by Tassinari and Cohen to enable the silencing of US Citizens by unelected government officials who decide which speech is legitimate and which is illegitimate.

44.     A diagram from the *Long Fuse Report* - authored by Tassinari's and Cohen's close associates - documents the comprehensive involvement of the government with Twitter in censoring domestic speech and is pasted in below. Given this evidence within the four corners of this RICO complaint, if the Defendants state in their next motion to

dismiss that Twitter is a private actor that deplatformed Dr. Shiva all on its own, that would be a sanctionable fraud on this court.



45.     Defendants coordinated an effort to strongly encourage Twitter, via their Trusted Partnership, to delete tweets that specifically referenced public emails from Defendant Galvin's Office, and to get Twitter to suspend Dr. Shiva repeatedly such that he was unable to send out any tweets during the last month of his campaign run. Those emails, which revealed that ballot images from electronic voting machines have all been deleted, substantiated Dr. Shiva's claim that Federal law had been violated by Defendants Galvin and Tassinari.

46.     Defendants acted in concert with the common purpose of abusing their official position and influence to suppress Dr. Shiva's political speech. Defendants violated Dr. Shiva's First Amendment rights under the color of law, thus giving rise to this § 1983 claim. Defendant Galvin is sued in both official and individual capacities because of the need to invoke the *Ex parte Young* exception. *Ex parte Young*, 209 U.S. 123 (1908)

## XI. DR. SHIVA AYYADURAI – INDEPENDENT THINKER

47.     Dr. Shiva was born in India in 1963 into India's oppressive caste system as a low-caste untouchable. The oppressive conditions and the corrupt system of socialist governance in India motivated his parents to immigrate to the United States in 1970 to seek greater liberty and respect for individual rights, including the U.S. Constitution's iron-clad protection for freedom of speech, as well as opportunities for themselves and their children.

48.     Dr. Shiva earned four (4) degrees from the Massachusetts Institute of Technology: a bachelor's in Electrical Engineering and Computer Science, masters degrees in both Mechanical Engineering and Visual Studies, as well as a doctoral degree in Biological Engineering.

49.     Dr. Shiva is a Fulbright Scholar, a Westinghouse Honors Award recipient, a member of multiple research and engineering academic honor societies including Eta Kappa Nu, Sigma Xi, and Tau Beta Pi, a Lemelson-MIT Awards Finalist, and was nominated for the National Medal of Technology and Innovation bestowed by the President of the United States.

50.     As an educator, Dr. Shiva has developed new curricula and taught at both undergraduate and graduate levels at MIT and has presented invited lectures at leading academic institutions across the world.

51.     In addition Dr. Shiva is responsible for seven (7) start-up technology companies and presently runs a biotechnology company, CytoSolve; an educational institute, Systems Health; an artificial intelligence company, EchoMail; and, a not-for-profit research center, International Center for Integrative Systems.   Justia's list of Dr. Shiva's

patents is at https://patents.justia.com/inventor/v-a-shiva-ayyadurai

52.     In August of 2011, Dr. Shiva opened his Twitter account, **@va_shiva**, to build

an independent base and reach local, national and global audiences to support his activism

in various scientific, social and governance causes. This Twitter account also served as his

primary platform to communicate with potential voters during his runs for political office.

It is vital for this court to note that as a private citizen, this Twitter account represents the

speech of a private individual even during a run for political office.

## XII. DR. SHIVA AYYADURAI RUNS FOR U.S. SENATE

53.     In January 2019, Dr. Shiva began his run as a Republican candidate for U.S.

Senate against incumbent Senator Edward Markey. For this, he participated in a primary

election within the Republican Party, and met the challenge with a ground organization of

approximately 3,100 volunteers, distributed approximately 10,000 lawn signs, received

donations from about 20,000 people that funded billboards at prominent spots on

highways, advertisements on social media, radio and television, and made "Dr. Shiva" a

recognized household name across all 351 cities and towns in Massachusetts.

54.     In February 2020, one year after Dr. Shiva began his campaign, Kevin

O'Connor, in his first run for political office, entered the Republican primary race.

55.     On September 1, 2020, the Massachusetts Republican primary for U.S. Senate

was held. Dr. Shiva's internal polls had shown him leading in all counties. The announced

results showed he had won in Franklin County by nearly ten-percent (10%) over his

opponent, but had lost in all other counties by a consistent ratio of approximately 60% to

40%, to an opponent with little visibility, only a handful of volunteers, and no real

campaign organization. His opponent had won.

56.     Dr. Shiva investigated and discovered that Franklin County was the only county where approximately seventy-percent (70%) of the towns counted the paper ballots by hand. The rest of the counties primarily used electronic systems that generated digital ballot images, which were then analyzed by a computer program to tabulate vote counts.

### XIII. SYSTEMIC SYSTEMS FAILURES DISCOVERED IN THE ELECTRONIC VOTING SYSTEMS

57.     On September 9, Dr. Shiva personally went to Secretary Galvin's office to deliver a Public Records Request to the Secretary, under MGL ch. 66, to get copies of all digital ballot images, as it is these digital records generated in the course of a federal election, that are used to tabulate votes when ballots are electronically processed.  It is important to note that in all counties, other than Franklin County, the majority of paper ballots were simply collected and stored.

58.     In those counties, which primarily use electronic systems for tabulating votes, the ballot images ***are*** the ballots, since the ballot images are the objects upon which tabulation takes place.  The electronic systems employ various computer algorithms during the tabulation process, including Weighted Race techniques, which affords the capability to multiply a candidate's vote counts by a decimal factor.

59.     Pursuant to Federal law, Galvin is required to securely store or retain for twenty-two (22) months any and all records generated in connection with an election for a Federal office, such as U.S. Senate.  U.S. Code provides:

CHAPTER 207 - FEDERAL ELECTION RECORDS
52 USC 20701: Retention and preservation of records and papers by officers of elections;  deposit with custodian; penalty for violation

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the     office of President, Vice President, presidential elector, Member of the Senate, Member     of the House of Representatives, or Resident Commissioner from the Commonwealth of Puerto Rico are voted for, all records and papers which come into his possession relating   to any application, registration, payment of poll tax, or other act requisite to voting in     such election, except that, when required by law, such records and papers may be  delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both. ( Pub. L. 86–449, title III, §301, May 6, 1960, 74 Stat. 88 .)

52 U.S.C. § 20702 - Theft, destruction, concealment, mutilation, or alteration of records or papers; penalties

Any person, whether or not an officer of election or custodian, who willfully steals, destroys, conceals, mutilates, or alters any record or paper required by section 20701 of this title to be retained and preserved shall be fined not more than $1,000 or imprisoned not more than one year, or both.

60.     On that same day - September 9, 2020 - William Rosenberry, an Elections Division official in Defendant Secretary Galvin's office, declared that the Secretary possessed "no ballot images" as the Secretary's office "turned that feature off" in order to not save the digital ballot images generated by the ballot scanners.

61.     On Monday, September 21, 2020, Dr. Shiva returned in person with storage devices to collect the digital ballot images.

62.     Defendant Tassinari informed Dr. Shiva in the presence of Rosenberry that she would respond by the end of the day on Wednesday, September 23, 2020 by email.

63.     Dr. Shiva documented his September 24, 2020, follow up phone conversation in the email below, in which he specifically memorialized Rosenberry's admission to having violated Massachusetts State Law:

September 24, 2020

William Rosenberry
Elections Division

RE: Second Follow Up on Public Records Request

Dear William:

On my Monday, September 21, 2020, at approximately 4:45PM, my colleagues and I followed up with your office, in person, concerning my records request made on September 9, 2020.  I provided you written communication of my office visit and request at that time.   You and your attorney - all of which is documented - assured me that I would receive a formal written response to my September 9th records request, via email to vashiva@vashiva.com, which would have been yesterday, September 23, 2020.

You and your attorney, at the time of the Monday meeting, stated that the response was to be sent in "10 business days, not 10 calendar days" therefore, you and your attorney said you were obligated and required to send the response on September 23, 2020, not September 21st, by Massachusetts State Law.

Yesterday, September 23, 2020, I did not receive the response to my records request via email, as you and your attorney had promised and reassured me September 21, 2020. In fact, I do not have the response as of the time of the writing of this email.

This morning, September 24, 2020 at 9:32 AM, I called your office to reach you, as a follow up to see if you had responded to my records request, and if so, to the right address.  Upon trying to reach you, I was put on hold by your assistant "Logan," and was told that you told Logan I should put anything else I wanted in writing.  I told Logan that this made no sense, and I knew you were on site, and I wanted to speak to you.

Finally, I was transferred to you, and upon speaking with you, you said that I would receive the response to my records request "no later than 5PM today [September 24, 2020]."  You acknowledged that you had violated Massachusetts State Law by not delivering the response yesterday.


Dr. Shiva Ayyadurai
U.S. Senate Candidate

64.     Within less than thirty (30) minutes of Dr. Shiva's transmitting the above

email to Rosenberry, Tassinari responded to Dr. Shiva's request:

On Thu, Sep 24, 2020 at 10:47 AM Tassinari, Michelle (SEC) <michelle.tassinari@state.ma.us> wrote:

Good Morning-

I am writing to acknowledge receipt of your request for records. Please note, that this Office does not maintain voter tabulation software, firmware or hardware.  While this office certifies voting equipment, as required by law, we do not purchase or lease equipment.  Once equipment is approved by this Office, cities and towns can purchase or lease such equipment.  Accordingly, this Office has no records responsive to your request.

Further, to the extent you request the same information from local election officials, please note that the approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images.

Michelle K. Tassinari

Director and Legal Counsel

Elections Division

One Ashburton Place, Room 1705

Boston, MA 02108

617-727-2828

----------------------------

65.     Tassinari's last sentence, coming as it did from the Secretary's own legal counsel and Director of the Election Division, struck Dr. Shiva as beyond bizarre given the supremacy of Federal law. It was remarkable and required clarification.  Therefore, Dr. Shiva emailed back:

**From:** Shiva Ayyadurai <vashiva@vashiva.com>

**Sent:** Thursday, September 24, 2020 11:22 AM

**To:** Tassinari, Michelle (SEC) <Michelle.Tassinari@sec.state.ma.us>

**Subject:** Re: Records Request

CAUTION: This email originated from a sender outside of the Commonwealth of  Massachusetts mail system.  Do not click on links or open attachments unless     you recognize the sender and know the content is safe.

Michelle,

Kindly refer me to the statute or law, in which the "...approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images."

Thank you in advance.

Warmest regards,

Dr. Shiva Ayyadurai

US Senate Candidate.

-------------------------------

66.     In response to Dr. Shiva's email requesting the specific Massachusetts law or

regulation that apparently authorizes the Secretary to **prohibit** "**capturing of ballot**

**images"** in Massachusetts, Tassinari did not cite any law in her September 25, 2020 email

response:

> On Sep 25, 2020, at 11:45 AM, Tassinari, Michelle (SEC) <michelle.tassinari@state.ma.us>
> wrote:
>
> Shiva-
>
> Attached please find the certification of two different types of digital scan equipment in
> Massachusetts.
>
> Please note that while the ballot images are not stored, the actual ballots voted on at any federal
> election are secured and stored for 22 months in accordance with federal law. However, under
> state law, those ballots must remain sealed until such time as they can be destroyed.
>
> Michelle K. Tassinari
>
> Director and Legal Counsel
>
> Elections Division
>
> --------------------------------------

67.     That email from Tassinari generated the following email response from Dr.

Shiva:

> From: Shiva Ayyadurai <vashiva@vashiva.com>
>
> Date: September 25, 2020 at 10:33:09 PM EDT
> To: "Tassinari, Michelle (SEC)" <michelle.tassinari@state.ma.us>
> Cc: John R Brakey <johnbrakey@gmail.com>, Venu Julapalli <vrjula@protonmail.com>, Ralph
> Lopez <ralphlopez2008@gmail.com>,     benniejsmith@gmail.com, Jude Joffe-Block
> <JJoffe-Block@ap.org>
> Subject: Destroying Ballots is Illegal. The Ballot Images ARE the Ballots. You DESTROYED
> Them. Period.
>
> Subject:  Destroying Ballots is Illegal. The Ballot Images ARE the Ballots. You DESTROYED The
> Ballots. Period.
>
> Michelle
> First, you have NOT answered my question, from my previous email.  I repeat it below. PLEASE
> answer the question.

Kindly refer me to the statute or law, in which the "...approval of digital scan equipment in Massachusetts specifically prohibits the capturing of ballot images."

Second, neither the people of Massachusetts nor I are stupid. I presume you must be under incredible pressure from Bill Galvin and Charlie Baker to deflect  this issue to hope it disappears.

However, the fact is the State has illegally destroyed ballots. The electronic equipment used to tally and count the vote MUST first CREATE an image - the ballot image - in order for the vote to be processed and COUNTED by the machine.   When that image is created, that image becomes THE BALLOT, as it is THE entity used to count the vote.  If no image was created, no vote count could exist. You are required by Federal Law to store,preserve, archive those ballots for 22 months.  If those ballot images DO NOT exist, they were DESTROYED. This destruction is illegal, and therefore, the election is null and void.

Once again, please answer my question, above.

Warmest regards,

Dr.SHIVA Ayyadurai
US Senate Candidate
-------------------------------

68.     Tassinari never replied to this email and did not cite the statute or law that allowed Massachusetts to destroy the ballot images that were generated in connection with a Federal election.  In addition, Tassinari consciously omitted this fourth email from her affidavit (ECF #15-2).

69.     The ballot scanning machines scan the paper ballots and generate a ballot image, which is then used to tabulate the votes in a Federal election, while the paper ballot is merely physically retained.  It is fundamental statutory interpretation that the ballot image is a ***record*** and that, pursuant to 52 USC 20701, Secretary Galvin is required to store ***all*** records generated in connection with Federal election.  *Owasso Independent School Dist. No. I-011 v. Falvo*, 534 U.S. 426 (2002), *Kasten v. Saint-Gobain,* 563 U.S. 1 (2011), *Dolan v. Postal Service*, 546 U.S. 481 (2006)

70.     It is important to note that when the Weighted Race feature is enabled, the number of votes tabulated will likely not match the number of ballot images.  Therefore, access to digital ballot images, in the chain of custody, is essential in verifying the integrity

of an election.

71.     By "the ballot images are not stored" Tassinari meant that the records are "not stored" **after they are generated and used**, which is what Defendant O'Malley also stated. That is a written admission of a Federal violation.

72.     Tassinari's email conversation with Dr. Shiva intended to create a false impression of the preeminence of paper ballots.

73.     The only possible conclusion is that Tassinari, a practicing attorney, chose the word *capture* to mislead and give the false impression that in Massachusetts digital ballot images never exist, at all, at any time.

### XIV. THE SEPTEMBER 24, 2020 TWEET

74.     On September 24, 2020, Dr. Shiva posted on Twitter that Massachusetts destroys ballot images and appended the Twitter hashtag #ElectionFraud to his tweets. This is 100% factually correct as the scanners generate the image records and the Secretary ensures that these records are erased.

75.     This tweet went viral and generated much commentary.

Dr.SHIVA Ayyadur... ✓ · Sep 24   °°°
BREAKING:
Massachusetts Destroys Over 1
MILLION Ballots in US SENATE
PRIMARY RACE committing
#ElectionFraud.  MA Elections
Attorney confirms to #Shiva4Senate
ballot images -  used for counting
votes - that MUST be saved by
FEDERAL LAW for 22 months are
nowhere to be found!

💬 157    🔁 2.5K    ♡ 3.1K    ⤴

76.    Twitter did **not** delete this tweet.

77.    O'Malley released statements to the Associated Press, Reuters and

Leadstories.com that this tweet constituted "Election Misinformation" and that no (paper)

ballots were destroyed in violation of Federal law.

78.    Dr. Shiva continued to tweet on this point:

> **Dr.SHIVA Ayyadur...** ✔ · Sep 24   ⚬⚬⚬
> "[A]ppropriate state or local authority
> MUST PRESERVE ALL RECORDS to
> detection & prosecution of election
> crimes for 22-month federal retention
> period, if records were generated in
> connection w election that was held
> in whole or in part to select federal
> candidates."
> -USC Title 42

> **Dr.SHIVA Ayyadur...** ✔ · Sep 25   ⚬⚬⚬
> IProtest #ElectionFraud and stealing
> of a US Senate Federal Election by
> the Massachusetts SWAMP.
>
> TODAY - 12.30PM. Secretary of State
> Office.
> 1 Ashburton Place, Boston, MA.
>
> Just the beginning.
>
> WRITE IN #Shiva4Senate on or by
> November 3rd.
> Victory for #TruthFreedomHealth

79.    The Associated Press, Reuters and Leadstories.com ran "FACT CHECK"

stories, which uniformly claimed that because Dr. Shiva had been contradicted by a

government official, O'Malley, naturally Dr. Shiva's claim was FALSE.  Dr. Shiva's attorney

sent a letter to Leadstories.com conveying the facts about ballot images, and asked them to correct their fake "FACT CHECK." They never corrected their "FACT CHECK."

80.     Reuters and the AP quoted as independent expert one Charles Stewart III at MIT's Election Data Lab who flatly denied that digital ballot images need to be retained per Federal law and declared that Dr. Shiva was not credible. No party disclosed that Stewart is closely affiliated with both Tassinari and Cohen, and receives funding from Pierre Omidyar, or that the AP is a member of the Global Cyber Alliance funded by Pierre Omidyar.

81.     These "FACT CHECK" stories were circulated worldwide and appear as the top result on search engine pages whenever one searches for Dr. Shiva.

82.      This coordination is described in the Playbook co-authored by Cohen and Tassinari with Twitter Legal and confirmed in the *Long Fuse Report*.

83.     Tassinari and O'Malley testified under oath at the October 30, 2020 emergency hearing that they had received one or two emails and one or two phone calls from the public about these tweets, which then prompted them to go on Twitter and read the tweets themselves.

84.     O'Malley testified she manages the Election Division's official Verified Twitter account, and that she reported the one tweet from September 24 in a complaint that she filed with Twitter via Twitter's online form and identified the complainant as the official Verified Twitter account of the Massachusetts Elections Division.


## XV. THE SEPTEMBER 25, 2020, TASSINARI EMAIL TWEET

85.     On September 25, 2020, Dr. Shiva followed his 'Massachusetts destroyed ballots' tweet with a thread of four (4) tweets that revealed, via screenshots, the email

conversation with Tassinari that has been pasted above, which was written confirmation from the Secretary's own office that records generated during a Federal election – the ballot images - the very records used for tabulation -  were destroyed – "not stored."

86.    At the October 30, 2020, O'Malley revealed that Tassinari had been very upset about the email tweets.

87.    O'Malley also revealed that Cohen-NASED had reported more of Dr. Shiva's tweets, and mentioned that she also reported the tweet to National Association of Secretaries of State (NASS).

88.    Tassinari testified that she, the then President-Elect at NASED, contacted Cohen at NASED to do whatever it took to get the email tweets deleted, and hoped his account would get suspended such that he could not tweet at all during his election campaign, and that Cohen had telephoned her back to inform her that Cohen had done so. None of this was in Tassinari's affidavit (#15-2).

89.    Tassinari testified that she felt "relieved" to see on Twitter that the tweets had been removed.

90.    O'Malley testified that the Elections Division is a "Twitter Partner," meaning a respected, trusted partner in the fight against "Election Misinformation," as is NASED and every state's Elections Division. O'Malley testified that NASED had arranged for Twitter to provide a response to complaints from these "Twitter Partners" as a matter of priority and without necessarily independently checking the veracity of their complaints, as they come from a State office that is a "Twitter Partner." ***One may visualize the difference between ordinary users - private citizens -  and "Twitter Partners" as the difference between a credit union debit card and Amex Black***. A complaint to Twitter from Elections Directors

carries with it the full force of the government and receives **high priority** processing and response, as detailed in the Playbooks co-authored by Tassinari, Cohen and Twitter. None of these facts may be found in O'Malley's or Tassinari's affidavits. The *Long Fuse Report* details that the function of the EI-ISAC infrastructure is to bring coercive pressure to bear upon Twitter to delete tweets that government officials want deleted. The coercive impact of pressure from the Department of Homeland Security via CISA must not be underestimated.

## XVI. TASSINARI ORDERS THE INFRASTRUCTURE TO SILENCE DR. SHIVA AYYADURAI FOR GOOD

91.     On September 26, 2020, in direct response to concerted, coordinated action by the Secretary of State, Tassinari, Amy Cohen, the National Association of State Election Directors and EI-ISAC, Twitter immediately forced Dr. Shiva to delete the thread of four tweets that revealed the Tassinari emails and her violation of federal law. Though he agreed to delete the thread with the four emails, Twitter suspended his Twitter account for a week, blocking him from speaking to his quarter-million followers and all potential voters during his Write-In election campaign.

92.     Dr. Shiva continued to physically run his campaign. At the end of the week his access to Twitter was restored. Dr. Shiva posted tweets about the rallies he had held, his objections to election fraud and the destruction of ballot images.

93.     Those tweets remained public.

94.     When Dr. Shiva then again posted any tweets referencing Tassinari's emails exposing the Defendants' violation of Federal law, immediately Twitter again forced him to delete those specific tweets and again suspended him for another week during the last month of campaigning before Election Day.

95.     Dr. Shiva was disappeared from Twitter for nearly all of the final month of campaigning, THE most important megaphone for politicians.

96.     After the emergency hearing revealed the special position held by "Twitter Partners" and the coordinated nature of the attack on Dr. Shiva's political speech, and the undeniable fact that the Tassinari emails were the ***<u>sole focus</u>*** of the deletions, the Defendants immediately claimed the opposite of what they swore to in their opposition, affidavits and initial testimony.


## XVII. COORDINATED CONCEALMENT OF THE COORDINATION

97.     Their brand new narrative, minted during the emergency hearing, and akin to Big Brother *increasing* chocolate rations, now involved claiming that because Twitter had not deleted the tweet that they had classified as "Election Misinformation" - the same tweet they had just sworn had been well-deservedly deleted to keep the country safe - the Defendants were not responsible for the suspension caused each time by Dr. Shiva posting the Tassinari email tweets, that Twitter had not even responded to their complaint and that for some reason unknown to the Defendants, Twitter by itself as a private corporation found only the Tassinari email tweets objectionable.

98.     The *Long Fuse Report* proves the Defendants' claim is false.

99.     Their coordinated action, the enterprise, was intended to obstruct justice and suppress a witness. The *Playbook* and the *Long Fuse Report* confirm the existence of this enterprise and how it was used.

100.    Between October 30, 2020 and February 1, 2021, Dr. Shiva continued to tweet on  topics (see **Exhibit B**) and continued to analyze the votes cast in the 2020

Republican Primary. On February 1, 2021, Dr. Shiva responded to repeated queries from his students across the United States for news about his lawsuits against Tassinari and Galvin. He broadcast live on Twitter an educational video lecture that described the facts of his lawsuit, what the parties had argued thus far and what the judge had said. This live broadcast included, for the first time since September 2020, the screenshots of the emails from Tassinari, all of which are authentic public records.

101.    This live broadcast concluded at 2131h EST. Within exactly seventeen (17) minutes, at 2148h EST, Dr. Shiva received notice from Twitter via email that his account had been permanently suspended.

102.    Later, via sworn affidavit, Twitter Global Legal's Stacia Cardille claimed to Judge Wolf that Twitter had deplatformed Dr. Shiva entirely on its own, via entirely internal review processes on many levels based entirely on internal private policies and that the deplatforming was methodical, proper, thoughtful, based on Dr. Shiva violating Twitter's internal Civic Integrity Policy, was unconnected to any government official, and occurred on February 3, 2021.

103.    In response Dr. Shiva filed evidence that the deplatforming occurred on February 1, 2021, and that the confirmed 17-MINUTE response time was impossible to reconcile with Cardille's sworn affidavit.

104.    Twitter's Cardille immediately filed a "clarification" which still did not explain how Dr. Shiva was deplatformed within precisely SEVENTEEN (17) MINUTES of discussing the Tassinari emails, or why private corporation Twitter would care so deeply about Tassinari's emails that it would deliver a final blow within seventeen (17) minutes.

105.    The only possible conclusion is that Stacia Cardille committed perjury in

Judge Wolf's court. This was confirmed by the revelation in the Long Fuse Report that multiple teams on shift duty maintained 24-hour surveillance on Dr. Shiva's speech across multiple social media platforms - Twitter, Facebook, YouTube - and the surveillance team was thus able to respond within 17 minutes of the live broadcast and it all had nothing to do with the drivel peddled to Judge Wolf by all the Defendants.

106.     From February 1, 2021 on, Dr. Shiva embarked on a quest to understand the deep connection between Tassinari, Cohen and Twitter. This effort resulted in the discovery of foundational policy documents co-authored by Tassinari, Cohen and Twitter Legal in 2017 at Harvard's Belfer Center, that led to the authoring by Cohen and Twitter Legal of the PLAYBOOK which laid out the exact procedures for government officials to follow in order to identify undesirable domestic dissidents, termed "Influence Operators" who, for example, accuse state officials of corruption, and how to report them to Twitter for silencing. Dr. Shiva reported this factual discovery to the court at the May 20, 2021, hearing, read relevant portions into the record, and filed a supplemental affidavit (ECF #118) with the Playbook documents as exhibits.

107.     Further investigation has revealed the domestic censorship infrastructure built by Cohen and Tassinari, as well as additional reports that explain the goals of the infrastructure/ecosystem. The latest of these reports, *The Long Fuse Report*, funded by Pierre Omidyar, the Atlantic Council and Craig Newmark, is a truly breathtaking document. The full report is attached as an exhibit. Some excerpts shall suffice here.

108.     "US elections are decentralized: almost 10,000 state and local election offices are primarily responsible for the operation of elections. Dozens of federal agencies support this effort, including the Cybersecurity and Infrastructure Security Agency (CISA) within

the Department of Homeland Security, the United States Election Assistance Commission (EAC), the FBI, the Department of Justice, and the Department of Defense. However, none of these federal agencies has a focus on, or authority regarding, election misinformation originating from domestic sources within the United States. This limited federal role reveals a critical gap for non-governmental entities to fill."

109.   "Yet, no government agency in the United States has the explicit mandate to monitor and correct election mis- and disinformation. This is especially true for election disinformation that originates from **within the United States, which would likely be excluded from law enforcement action under the First Amendment and not appropriate for study by intelligence agencies restricted from operating inside the United States**." emphasis added

110.   The *Long Fuse Report* clearly identifies the stakeholders who acted together to silence the speech of US Citizens, and especially Dr. Shiva:



Figure 1.3: Major stakeholder groups that collaborated with the EIP.

111.   "In this election cycle, the EI-ISAC served as a singular conduit for election officials to report false or misleading information to platforms. By serving as a one-stop reporting interface, the EI-ISAC allowed election officials to focus on detecting and

countering election misinformation while CIS and its partners reported content to the proper social media platforms."

112.    "The AARP collaboration was maintained by the Center for an Informed Public and was notable because it involved empowering and training retired adults to identify false or misleading information as part of a "Factcheck Ambassador" training program."

113.    The DDR had a name for such "Factcheck Ambassadors." They were named ***Inoffizieller Mitarbeiter***. https://en.wikipedia.org/wiki/Unofficial_collaborator

114.    From page 153 on, the *Long Fuse Report* devotes itself to discussing Dr. Shiva by name, who it describes as a prominent 'repeat spreader' of misinformation and identifies him as the third most viewed voice on YouTube and Twitter.

115.    Page 203 has the most significant ***OMISSION*** however: "After a failed primary campaign for the US Senate in September 2020, Ayyadurai began promoting a conspiracy theory that computer tabulation systems system-atically switched votes in favor of his opponent. After November 3, he extended this claim—based on fraught statistical analysis[31]—to asserting fraud in the US presidential election."

116.    What has been consciously omitted from the above paragraph? The period between September 25, 2020, and the General Election on November 3, 2020, the exact period in which Dr. Shiva was suspended repeatedly for mentioning Tassinari and her emails, the exact period in which a US Citizen running for US Senate was silenced and his campaign actively sabotaged, the exact period in which this court held a TRO hearing and obtained an agreement from Defendants Galvin and Tassinari that they would cease and desist from silencing Dr. Shiva on Twitter between October 30, 2020 and Election Day

2020, and would request Cohen and NASED to also desist from silencing Dr. Shiva on Twitter.

117.    As omissions go, this one is as big a whopper as Cardille's affidavit. The conscious omission here demonstrates that the funders of the *Long Fuse Report* did not wish to bring public attention to an event that they still are squeamish about - ***the active concerted sabotage of a US Senate campaign*** - though they have asserted the next policy goal of silencing a sitting Member of the US Congress.

118.    The *Long Fuse Report* reveals the enormous power Tassinari wielded, with her Secret-level security clearance from the US Department of Homeland Security, instant personal access to "former" senior NSA staff and military leaders and Twitter Legal, when she invoked the powerful infrastructure that she and Cohen had built and enjoyed VIP status within, to bring the entire weight of EI-ISAC, CISA, NASED and NASS upon Twitter to delete ***only the tweets about her emails***, and ensure ongoing surveillance of Dr. Shiva on ALL social media platforms by surveillance teams on 24/7 shift duty, which resulted in his deplatforming from Twitter on February 1, 2021, within SEVENTEEN (17) MINUTES of ***mentioning Tassinari and her emails*** in a live video.

119.    Tassinari knew she was obstructing justice and suppressing the witness who filed a sworn complaint against her with the US Attorney.

120.    Tassinari and Cohen, through their relationships and the infrastructure that they have created, represent a concentration of power that is unprecedented in the history of the United States, a concentration of power with the explicit goal of erasing a fundamental distinction between the United States and Her Britannic Majesty's United Kingdom, the same fundamental distinction that led Dr. Shiva's parents to flee the British

Commonwealth and allowed their family to thrive in the United States.

## XVIII. THE ACTION BY ALL THE DEFENDANTS WAS STATE ACTION

121.    Before the Plaintiff and Judge Wolf knew about the Playbooks or the *Long Fuse Report*, within days of the complaint first being filed, Judge Wolf ordered the parties to brief, at the October 30, 2020, TRO hearing, whether the action in this case met the standard set by *Blum v. Yaretsky*, 457 U.S. 991 (1982): "A State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement that the choice must in law be deemed to be that of the State."

122.    The testimony elicited from O'Malley and Tassinari at that hearing was already enough to show that Dr. Shiva was likely to prevail in showing that his suspension from Twitter during his campaign run for US Senate was state action initiated by Tassinari.

123.    At the May 20-21, 2021, Rule 12 hearings, Galvin, Tassinari and O'Malley already conceded that the coerced deletion of the Tassinari email tweets and the suspension from Twitter prior to Election Day 2020 was state action, but they disputed that the deplatforming on February 1, 2021, was state action and argued that it was due to Twitter as a private company taking a private decision based on private internal policy, and cited the false Cardille affidavit. The *Long Fuse Report* proves this is false.

124.    The US Supreme Court has ruled repeatedly on what constitutes state action. The Court requires a fact-specific analysis, case-by-case, but certain fundamentals are mandatory: Any action that is "governmental" or by actors so intertwined with the government that they cannot be teased apart, is state action. The line of cases here - *Marsh v. Alabama*, 326 U.S. 501 (1946), *Terry v. Adams*, 345 U.S. 461 (1953), *Shelley v. Kraemer*,

334 U.S. 1 (1948), *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961) - all establish this fundamental principle.

125.    Tassinari, Cohen and Twitter acted in concert to formulate, advocate for and establish an infrastructure expressly designed to enable the government to surveil and silence domestic speech that government officials deem unworthy. The infrastructure is explicitly for the use of the government. and involves a specific agency within the Department of Homeland Security - CISA - to serve as the whip to force social media companies and traditional journalists into line.

126.    Tassinari's and Cohen's infrastructure, EI-ISAC, ensured that Twitter is even more of a state actor than Tennessee Secondary School Athletic Association was in *Brentwood Academy v. Tennessee Secondary School Athletic Assn.*, 531 US 288 (2001). EI-ISAC is entirely a state actor, and all users of its infrastructure are state actors. In our case here that means Cohen, NASED and Twitter.

127.    The *Long Fuse Report*, and the Playbooks document that Twitter was a state actor when it silenced domestic political speech during an election, and acted together with Tassinari and Cohen to obstruct justice and silence a witness who had filed with a US Attorney a sworn complaint against Tassinari for violating Federal law.

128.    Twitter's action was not just state action, it was participation in a racketeering enterprise to obstruct justice.

## XIX. THIS COMPLAINT MEETS THE TWOMBLY / IQBAL PLAUSIBILITY STANDARD

129.    This complaint pleads chronological facts included within the four corners and contains no conclusory statements whatsoever. It also follows the emergence of

additional facts during a hearing for a TRO and after. Thus this complaint exceeds the

plausibility standard required by the Court to survive a motion to dismiss under Rule 12.

*Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), *Rodi v.*

*Southern NESL*, 389 F.3d 5 (1st Cir. 2004)

130.    And at this stage the plaintiff's facts must be construed as true and the court

may not dismiss on the basis of facts not ascertainable within the four corners of the

complaint. Galvin, Tassinari and O'Malley have already been shown to have unclean hands.

*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238 (1944) Even their sworn

affidavits and testimony are unreliable.


## XX. PRAYER FOR RELIEF

### COUNT ONE

MONETARY DAMAGES UNDER 42 U.S.C. § 1983 AND THE MASSACHUSETTS
CONSTITUTION FOR VIOLATION OF A CONSTITUTIONAL RIGHT UNDER THE
COLOR OF LAW

131.    Dr. Shiva incorporates here by reference all the paragraphs above as if set

forth herein.

132.    Galvin, Tassinari and O'Malley are state actors. Cohen and NASED acted as

agents for state actors. NASED is an association for and of state actors actually in office.

NASED is inextricably linked with state actors and exists for the sole purpose of amplifying

the voice of state actors. It does so via EI-ISAC, the infrastructure built by Cohen and

Tassinari to intentionally blur the lines between government and the private sector so as to

erase "the gap" created by the First Amendment, which the Defendants and their allies

have identified as a problem. Through EI-ISAC and its own Trusted Partner program,

Twitter is inextricably linked with state actors and runs the Partnership solely to provide the government a stealthy end run around First Amendment restrictions. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001)  It is impossible to tell where Twitter ends and where the government begins, thanks to Cohen, Rosenbach and allies creating EI-ISAC. This became an established fact in the record with the discovery of the Playbook and the *Long Fuse Report.*

133.    All Defendants are bound by the very same conspiracy and goal: suppress dissemination of tweets that reveal official emails that confirm conscious violation of Federal law by Tassinari and Galvin. All Defendants coordinated their attack on Dr. Shiva's political speech in conscious, willful, contemptuous violation of his First Amendment right to the highest protections for his political speech, especially immediately prior to election day.

134.    *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), *Commonwealth v. Melissa Lucas*, 472 Mass. 387 (2015)

135.    Defendants stifled the Plaintiff political candidate's political speech during an election campaign, especially just prior to election day, based solely on the content of Plaintiff's speech, which exposed an official email that supported his sworn complaint that Galvin and Tassinari violated Federal law when they destroyed records (digital ballot images) generated in the course of a Federal election, a matter of great public concern, and subject to court rulings in many other states.

136.    This was *per se* unconstitutional. "It is speech on "matters of public concern'" that is "at the heart of the First Amendment's protection." *First National Bank of Boston v. Bellotti*, 435 U. S. 765, 435 U. S. 776 (1978), *Citizens United v. Federal Election Commission*,

558 U.S. 310 (2010)

137.    The suppression of Dr. Shiva's political speech, as well as **all** of his speech on Twitter for half of the last month prior to Election Day, November 3, 2020, caused massive irreparable harm to him as he was running for Federal office. Dr. Shiva had built up a following of a quarter of a million followers on Twitter and via Twitter had a reach that did not require additional expense, compared to advertising on television.

138.    Galvin and the other Defendants, blocked the candidate from raising public awareness of Galvin's violation of Federal law and the way Galvin counts votes, which is as content-based as a restriction on speech by a government actor can get.

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc*., 472 U.S. 749 (1985), *Citizens*, supra

139.    The Court has ruled that suit for monetary damages from state actors for violations of Constitutional rights, an intentional tort, is permitted if they are sued in their individual capacities by U.S. Citizens and there is no demand on the public purse. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388 (1971), *Butz v. Economou*, 438 U.S. 478 (1978), *Davis v. Passman*,

140.    442 U.S. 228 (1979), *Ziglar v. Abbasi*, 582 U.S. ___ (2017)

141.    The Defendants also took conscious steps to conceal their actions from this court and consciously misrepresented facts in a continuing effort to obstruct justice.

142.    Galvin and Tassinari obstructed justice, *United States v. Dunnigan,* 507 U.S. 87 (1993), and committed a crime which violated their oath and 'laws applicable to his [or her] office or position.' *State Retirement Board v. Bulger*, 446 Mass. 169 (2006), *In the Matter of Robert A. Griffith*, 440 Mass. 500 (2003)

143.    Under established case law, members of a conspiracy are substantively liable for the foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v.*

*United States*,

144.        328 U.S. 640 (1946) But for Twitter implementing its Trusted Partnership

program in order to help government actors covertly violate citizens' First Amendment

rights, this effort to obstruct justice and violate Plaintiff's constitutional rights would not

have succeeded.

DEFENDANTS TASSINARI AND GALVIN MUST NOT
AVAIL OF QUALIFIED IMMUNITY

145.    The court must determine whether the Defendants qualify for immunity and

this determination is wholly fact-specific. In almost all cases this determination is made

after fact-discovery and full briefing by all parties. The case law for qualified immunity is

huge and includes cases regarding traffic stops, police brutality and unlawful entry, as well

as actions by white collar government officials, which in this case are Tassinari and Galvin.

For qualified immunity to be granted, the defendant must have acted within her scope of

employment and the plaintiff must fail to prove that it was established at the time of the

action that the defendant's conduct was unconstitutional.

**Tassinari's action was outside of her scope of employment**

146.    Tassinari's scope of employment ***does NOT include***: co-authoring a Playbook

with Twitter Legal to launder censorship through Twitter of US Citizens identified by

unelected government officials as High Severity Influence Operators; creating an

infrastructure to assist unelected government officials interact with social and traditional

media via a private organization - EI-ISAC - that promises rapid silencing of US Citizens

across many platforms; speaking twice a month with other state election directors via

either NASED or EI-ISAC to promote surveillance of US Citizens' speech; working as

President of NASED; organizing and speaking at NASED conferences; conspiring with

Charles Stewart III at MIT to defame Dr. Shiva via Reuters and the AP; using her connection to Google via her infrastructure to ensure negative statements about Dr. Shiva issued by O'Malley and Stewart are ranked higher than Dr. Shiva's own statements on Google's search results, and concealing from Judge Wolf her deep personal connections to Stewart, Harvard's Belfer Center, Stacia Cardille at Twitter Global Legal, her Directorship of an Omidyar-funded MIT Lab.

147.    The *Long Fuse Report*, which reflected Tassinari's view that the 1st Amendment is a problem that needs a policy solution, details the unconstitutional nature of Tassinari's actions against Dr. Shiva, all of it outside her scope of employment. She committed an intentional tort. G.L.c. 258 § 10(c).

## Tassinari's action violated state law - ch. 268A § 23

148.    MGL ch. 268A § 23 explicitly declares that conduct such as Tassinari's efforts to derive a private benefit that accrues personally to her and not to her office - through her use of a secretive infrastructure in order to silence the witness who filed a sworn complaint against Tassinari personally with the US Attorney - is conduct that violates the statute's mandatory "standards of conduct."

> Section 23.
> In addition to the other provisions of this chapter, and in supplement thereto, standards of conduct, as hereinafter set forth, are hereby established for all state, county, and municipal employees.
>
> No current officer or employee of a state, county or municipal agency shall knowingly, or with reason to know:
> (2) (i) solicit or receive anything of substantial value for such officer or employee, which is not otherwise authorized by statute or, for or because of the officer or employee's official position; or (ii) use or attempt to use such official position to secure for such officer, employee or others unwarranted privileges or exemptions which are of substantial value and which are not properly available to similarly situated individuals

149.     Tassinari obtained a privilege or exemption of substantial value that is not available to similarly situated individuals, thanks to Cohen and the network of relationships forged with powerful persons and close collaborations over many years with "former" NSA officers and retired Brigadiers General. With one phone call, Tassinari was able to conceal from public view evidence of her violation of federal law and was able to obstruct justice, silence a US Citizen during his campaign for US Senate, initiate active 24/7 surveillance of that US Citizen across ALL social media platforms, deplatform him permanently within SEVENTEEN (17) MINUTES of mentioning her emails in a live video on Twitter, and get Cardille and Twitter to lie under oath to Judge Wolf. As a privilege of substantial value, that beats MA Senator Brian Joyce receiving free coffee and dry-cleaning. https://www.justice.gov/usao-ma/pr/former-state-senator-brian-joyce-arrested-and-charged-federal-indictment

150.     No act that affirmatively violates Section 23 may be granted qualified immunity by a court.

### The SJC had already established by the time of Tassinari's action that such conduct was unconstitutional

151.     *A priori*, any lawyer, and especially the legal counsel to the Secretary of State and the elections division, knows or should know that political speech enjoys the highest protection in the United States. *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010)

152.     Congress reinforced this when it passed in 2010 the Securing the Protection of our Enduring and Established Constitutional Heritage (SPEECH) Act, which makes foreign libel judgments unenforceable in U.S. courts, unless either the foreign legislation applied offers at least as much protection as the U.S. First Amendment (concerning free

speech), or the defendant would have been found liable even if the case had been heard under U.S. law.

153.    No graduate of the New England School of Law, or legal counsel to the Secretary of State, can credibly claim that she was unaware that honoring our First Amendment is our enduring and established constitutional heritage. Dr. Shiva is ready to depose every single professor at the New England School of Law on this point, in addition to the framers of the questions in the Massachusetts Bar Exam.

154.    And if this weren't enough, in 2015 the Massachusetts Supreme Judicial Court discussed the importance of protecting political speech, even when it is totally false. *Commonwealth v. Melissa Lucas*, 472 Mass. 387 (2015) In *Lucas*, the SJC addressed the constitutionality of G. L. c. 56, § 42, which criminalized certain false statements about political candidates, and concluded that the scenario of the statute chilling speech was capable of repetition yet evading review, and so delivered a full opinion via *certiorari* even though defendant Lucas could have filed a motion to dismiss in the usual course. That's how important political speech is in Massachusetts and the United States.

155.    In *Lucas*, the SJC concluded that G. L. c. 56, § 42 is inconsistent with the fundamental right of free speech guaranteed by art. 16 of the Massachusetts Declaration of Rights.

156.    It is impossible to locate a more on-point case or fact pattern that applies to a state official/lawyer who suppressed political speech and sabotaged a political candidate's election campaign.

157.    In their motion to dismiss the amended complaint, Tassinari and Galvin claimed that *Lucas* applied solely to violation of the Massachusetts Declaration of Rights

and not to violation of the US Constitution. This specious argument is belied by the text of the opinion in *Lucas* itself, in which the SJC relied on the US Supreme Court's ruling in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) to both hear and decide the case. The SJC further relied on an 8th Circuit case to decide *Lucas*: *281 Care Comm. v. Arneson*, 766 F.3d 774, 790 & n.12 (8th Cir. 2014), cert. denied, 135 S. Ct. 1550 (2015) ("State has constructed a process that allows its enforcement mechanisms to be used to extract a cost from those seeking to speak out on elections, ***right at the most crucial time for that particular type of speech***. And if the allegations turn out to be unfounded, there is no possibility of timely remedy").

158.    The SJC further declared: "Our constitutional system "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all.'" *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964), quoting *United States v. Associated Press, 52 F. Supp. 362, 372 (S.D.N.Y. 1943)*. [Note 5] As a general proposition, therefore, any attempt by the government to restrict speech "because of its message, its ideas, its subject matter, or its content" is presumptively invalid and the burden is on the government to establish its constitutionality. *Alvarez*, 132 S. Ct. at 2543-2544, quoting *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002). See *Mendoza v. Licensing Bd. of Fall River*, 444 Mass. 188 , 197 n.12 (2005). These principles have their "'fullest and most urgent application' to speech uttered during a campaign for political office." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817 (2011)"

159.    It is objectively untenable to sustain the claim that the SJC decided *Lucas*

strictly on the basis of Article 16 of the Massachusetts Declaration of Rights and without considering the US Constitution.

160.    In this Circuit, government officials need to show that their conduct was reasonable prior to a court granting them qualified immunity for their action. *Joyce v. Tewksbury*, 112 Fed.3d 19 (1st. Cir. 1997)

161.    It is *per se* impossible for Galvin and Tassinari to show that chilling the **political speech of the candidate himself** during his run for US Senate, in the period just prior to election day, was reasonable. This fact distinguishes these defendants from those in *Santana v. Calderon*, 342 Fed. 3d. 18 (1st Cir. 2003)

162.    Tassinari fully knew that using the domestic censorship infrastructure that she and Cohen built, to silence the political speech of Dr. Shiva, especially during election season, was "***presumptively invalid***," explicitly unconstitutional under both the Federal and Massachusetts constitutions, and *per se* unreasonable. Applying the US Supreme Court's guidance in *Filarsky v. Delia*, 566 U.S. 377 (2012), *Pearson v. Callahan*, 555 U.S. 223 (2009) and *Saucier v. Katz*, 533 U.S. 194 (2001), the facts establish that Tassinari's actions do not meet established criteria for the grant of qualified immunity.

163.    The Defendants have engaged in the malicious, willful, and consciously fraudulent commission of wrongful acts, and because of the outrageous and reprehensible nature of their acts, Dr. Shiva is entitled to and must be awarded punitive damages against each of the Defendants. The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and attorney's fees and pre- and post-judgment interest from the Defendants.

## COUNT 2

CONSPIRACY TO VIOLATE CIVIL RIGHTS - 42 U.S. CODE § 1985

164.    Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

165.    The "**Ku Klux Klan Act**," enacted as part of the Civil Rights Act of 1871, and now codified as 42 U.S.C. § 1985, provides Dr. Shiva with a private cause of action to seek monetary damages from the Defendants for participating in a conspiracy to violate his First and Fourteenth Amendment rights under the color of law. The Court provided the binding interpretation of this law in *Griffin v. Breckenridge*, 403 U.S. 88 (1971). The reach of this Ku Klux Klan Act encompasses the deprivation of Dr. Shiva's constitutional rights by all the Massachusetts Defendants, and also those state actors and agents of state actors, such as NASED, Cohen and Twitter, who predictably will claim to be wholly private individuals, even though the very existence of NASED and its actions, via its salaried Executive Director Cohen on behalf of Tassinari, O'Malley and Galvin, are inextricably linked with state action. Through its Trusted Partner program and its collaboration with EI-ISAC, an infrastructure created with Twitter's own involvement with Tassinari and Cohen, Twitter is inextricably linked with state actors and actively provides the government a stealthy end run around First Amendment restrictions. *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n*, 531 U.S. 288 (2001)  It is impossible to tell where Twitter ends and where the government begins. Even when Cohen, NASED and Twitter falsely claim that they are private persons, they shall not escape the reach of 42 U.S.C. § 1985. ***Congress passed the* Ku Klux Klan Act *to hold liable precisely persons like them, for monetary damages***.

166.    All of the Defendants are bound by the very same conspiracy and goal:

suppress dissemination of tweets that reveal official emails that confirm conscious

violation of Federal law. All Defendants coordinated their attack on Dr. Shiva's political

speech in conscious, willful, contemptuous violation of his First Amendment right to the

highest protections for his political speech and his Fourteenth Amendment right to equal

protection under the law. *Citizens United v. Federal Election Commission*, 558 U.S. 310

(2010)

167.   Here it is undisputed that the Defendants stifled the Plaintiff political

candidate's political speech during an election campaign based solely on the content of

Plaintiff's speech. This was *per se* unconstitutional. *Commonwealth v. Melissa Lucas*, 472

Mass. 387 (2015), *Citizens United, supra*

168.   The suppression of Dr. Shiva's political speech, as well as ***all*** of his speech on

Twitter for half of the last month prior to Election Day, November 3, 2020, caused massive

irreparable harm to him as he was running for Federal office as a Write-In candidate.  Dr.

Shiva had built up a following of 360,000 followers on Twitter and via Twitter had a reach

that did not require additional expense, compared to advertising on television. Twitter is a

monopoly in the social media space when it comes to political speech. There is no other

platform that comes close to Twitter. A politician not on Twitter everyday is a nobody. The

Defendants willfully made Dr.. Shiva's voice disappear at a crucial time in order to obstruct

justice, conceal official evidence and make him a nobody politically.

169.   Under established case law, members of a conspiracy are substantively liable

for the foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v.

United States*, 328 U.S. 640 (1946)  But for Twitter implementing its Trusted Partnership

program and collaborating with EI-ISAC in order to help government actors covertly

violate citizens' First Amendment rights, this effort to obstruct justice and violate Plaintiff's constitutional rights would not have succeeded.

170.    The Defendants have engaged in the malicious, willful, and consciously fraudulent commission of wrongful acts, and because of the outrageous and reprehensible nature of their acts, Dr. Shiva is entitled to and must be awarded punitive damages against each of the Defendants. The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and attorney's fees and pre- and post-judgment interest from the Defendants.

## COUNT 3

### VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)

171.    Dr. Shiva re-alleges and incorporates by reference each and every foregoing paragraph of this complaint as if set forth in full herein.

172.    At all relevant times each Defendant as well as Dr. Shiva is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c). The Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the "enterprise."  Each of the Defendants participated in the operation or management of the enterprise.

173.    The Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, the obstruction of justice, as described in the foregoing paragraphs of this complaint.  The Defendants realized that the Tassinari email tweets exposed them to prosecution for

violation of Federal law, as well as civil action by Dr. Shiva over the loss of his primary election to Kevin O'Connor.  The Defendants were also aware that Dr. Shiva had filed a sworn criminal complaint against them with US Attorney Andrew Lelling. They acted swiftly and powerfully to conceal this evidence, to suppress Dr. Shiva's political speech entirely, and actively distributed through the "free press" their false narrative that digital ballot images are not covered by the retention requirements of Federal law and that Dr. Shiva's claim is false. The Defendants' false narrative now appears whenever anyone uses a search engine to read about Dr. Shiva and his claim, and appears more prominently such that one's eyes catch the Defendants' narrative before one gets to read Dr. Shiva's evidence. This is intentional.

174.    Their coordinated action, the enterprise, was intended to obstruct justice in violation of 18 U.S.C. § 1503. The enterprise has been structured to operate as a unit in order to accomplish the goals of their scheme. All Defendants are in agreement that they needed to suppress the Tassinari email tweets, and acted to do so through their enhanced, priority, Trusted Partner relationship with Twitter and the coercive power they wield over Twitter via CISA and EI-ISAC, and to conceal their doing so, and to claim that Twitter acted all on its own to delete them and suppress Dr. Shiva's political speech about a matter of great public concern.

175.    The enterprise also included intentional, conscious material factual misrepresentations to this court under oath.

176.    The Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C.

§ 1962(c). First they identified Dr. Shiva's dissemination of the Tassinari emails as a threat that could lead to indictments for violation of Federal election law given his sworn criminal complaint to US Attorney, then they acted in concert through abuse of official powers and relationships to conceal the Tassinari emails, then they acted in concert to ensure Dr. Shiva was slandered and libeled internationally for stating that Massachusetts destroyed ballots, then they ensured his own voice disappeared entirely - for weeks at a time - in retaliation for each time he tried to publicly expose the content of the Tassinari emails. Eventually, through the use of 24-hour surveillance and a 17-minute response time the Defendants silenced Dr. Shiva permanently on Twitter, which is a severe, crippling, ***ongoing harm*** that in addition to muzzling him, makes it impossible for him to ever campaign for public office. In sum, the Defendants consciously operated a racketeering enterprise whose main goal was the obstruction of justice and ***ongoing*** suppression of a credible witness. This racketeering enterprise remains ongoing, and includes false testimony and false affidavits presented to Judge Wolf.

177.   As a direct and proximate result of the predicate acts of racketeering by the enterprise, including but not limited to using their VIP status within the domestic censorship infrastructure that they architected, abusing the huge influence of the office of the Massachusetts Secretary of State, the amplification provided by NASED, the communications from Cohen and NASED to Twitter - which the conspirators know are not easily discoverable public records and which Galvin, O'Malley and Tassinari chose to conceal from this court in both their opposition and their affidavits, and other acts in furtherance of their continuing effort to obstruct justice, yet to be revealed by court-ordered discovery, Dr. Shiva has been massively and irreparably damaged, and his injury

includes but is not limited to being cheated out of a free and fair election, global loss of

reputation and goodwill, severe emotional distress, and with his deplatforming off Twitter,

a massive loss of monthly income, loss of his ability to pursue a career in politics and the

near-total silencing of his speech.

178.    Given that Dr. Shiva's family chose to live in the United States and sacrificed

greatly to rebuild their lives in a new country because they believed that in this country

freedom of speech would be protected by officials, Dr. Shiva has been severely shocked

that Galvin, O'Malley, Tassinari, NASED, and Twitter share the very same contempt for

freedom of speech and the rights of the individual as government officials back in the

Socialist British Commonwealth of India.

179.    Further, these injuries to Dr. Shiva were a direct, proximate, reasonably

foreseeable and intentional result of the violations of 18 U.S.C. § 1962. Dr. Shiva is the

ultimate victim of the Defendants' unlawful enterprise.

180.    Under established case law, members of a conspiracy are substantively liable

for the foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v.

United States*, 328 U.S. 640 (1946)  The Defendants must be held liable for damages to Dr.

Shiva with an initial demand of $100 million, and a final amount to be determined by a jury

at trial. Dr. Shiva also requests that the court order all costs and attorney's fees and pre-

and post-judgment interest from the Defendants.

181.    Pursuant to 18 U.S.C. § 1964(c), Dr. Shiva is entitled to recover treble

damages plus costs and attorneys fees from the Defendants.

## COUNT 4

CONSPIRACY TO VIOLATE RICO, VIOLATION OF 18 U.S.C. § 1962(d)

182.    Dr. Shiva re-alleges and incorporates by reference each and every foregoing paragraph of this complaint as if set forth in full herein.

183.    At all relevant times each RICO Defendant as well as Dr. Shiva is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c). The Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the "enterprise." Each of the Defendants participated in the operation or management of the enterprise.

184.    The Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) and 18 U.S.C. § 1503, as described above, in violation of 18 U.S.C. § 1962(d).

185.    As documented with particularity in this complaint, with the benefit of revelations from sworn testimony, the Playbook and the *Long Fuse Report*, the Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and knew the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

186.    Even the limited testimony and pleadings filed by the Defendants thus far demonstrate the existence of this conspiracy and their common understanding of the need to disseminate their false narrative that they did not act in concert to conceal tweets

regarding the Tassinari emails and obstruct justice by suppressing a witness.

187.   As a direct and proximate result of the Defendants' conspiracy, the acts of racketeering activity of the enterprise as detailed in Count 3, the overt acts taken in furtherance of that conspiracy, including but not limited to using their "Trusted Twitter Partner" status and abusing the huge influence of the infrastructure architected by Tassinari and Cohen and the coercive power of EI-ISAC and CISA, which the conspirators chose to conceal from this court in their motions and their affidavits in furtherance of their continuing effort to obstruct justice, and other acts yet to be revealed by court-ordered discovery, Dr. Shiva has been massively and irreparably damaged, and his injury includes, but is not limited to, being cheated out of a free and fair election, global loss of reputation and goodwill, severe emotional distress, and with his deplatforming off Twitter, a massive loss of monthly income, loss of his ability to pursue a career in politics and the near-total silencing of his speech.

188.   Given that Dr. Shiva's family chose to live in the United States for the sake of liberty and individual rights, and sacrificed greatly to rebuild their lives in a new country, and fully believed that in this country freedom of speech would be protected by state officials, Dr. Shiva has been severely shocked that Galvin, O'Malley, Tassinari, Cohen, NASED, and Twitter share the very same contempt for freedom of speech and the rights of the individual as government officials back in the Socialist British Commonwealth of India.

189.   Further, these injuries to Dr. Shiva were a direct, proximate, reasonably foreseeable and intentional result of the violations of 18 U.S.C. § 1962. Dr. Shiva is the ultimate victim of the Defendants' unlawful enterprise. Galvin and Tassinari obstructed justice, *United States v. Dunnigan,* 507 U.S. 87 (1993), and committed a crime which

violated their oath and 'laws applicable to his [and her] office or position.' *State Retirement Board v. Bulger*, 446 Mass. 169 (2006)

190.    Under established case law, members of a conspiracy are substantively liable for the foreseeable criminal conduct of the other members of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640 (1946) The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and attorney's fees and pre- and post-judgment interest from the Defendants.

191.    Pursuant to 18 U.S.C. § 1964(c), Dr. Shiva is entitled to recover treble damages plus costs and attorneys fees from the Defendants.


**COUNT 5**

INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

192.    Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

193.    Due exclusively to the Defendants' enterprise, Dr. Shiva was made to live in fear that his speech regarding the official evidence contained in the Tassinari emails would inevitably and swiftly lead to his silencing on social media, during his political campaign for U.S. Senate.

194.    This is *per se* intolerable in a country founded for the specific purpose of being the exact opposite of Her Britannic Majesty's United Kingdom in terms of protections for political speech, and which on paper at least provides "special protection" for political speech on matters of great public concern. "As the foregoing analysis confirms, the Court

cannot resolve this case on a narrower ground without chilling political speech, speech that is central to the meaning and purpose of the First Amendment." *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749 (1985) *First National Bank of Boston v. Bellotti*, 435 U. S. 765, 435 U. S. 776 (1978), *Commonwealth v. Melissa Lucas*, 472 Mass. 387 (2015)(government officials are prohibited from retaliating against political speech during a campaign)

195.    This was extremely shocking to Dr. Shiva and has shaken him to his core. The rug has been pulled out from under his feet. It is as if he is on the other side of the looking glass, something he never anticipated, a stranger in a land that he no longer recognizes. Dr. Shiva finds this experience extremely distressing and most unwelcome. The Defendants' actions have gutted his lifelong beliefs in the American system and is now dependent on this court for relief.

196.    To prevail on his claim for intentional infliction of emotional distress, Dr. Shiva must establish "(1) that the Defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (2) that the Defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community, (3) the actions of the Defendant were the cause of the plaintiff's distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it." *Payton v. Abbott Labs*, 386 Mass. 540, 555 (1982), citing *Agis v. Howard Johnson Co.*, 371 Mass. 140, 145 (1976)

197.    All four factors have already been pleaded with particularity in this complaint, with the benefit of revelations from sworn testimony and the *Long Fuse Report*

which detailed the surveillance that Dr. Shiva was subjected to 24 hours a day.

198.    The Defendants' cold, heartless, intentional, infliction of extreme anguish on Dr. Shiva in order to corruptly extort suppression of an official email that confirmed the violation of Federal law, silence him totally on Twitter, and label him a "pseudo-scientist" and baseless conspiracy theorist, is beyond the bounds of human decency. *Commonwealth v. Adams*, 416 Mass. 558 (1993)('the officers, in the phrase of the day, `don't get it,' and they do not understand how unacceptably they acted thereafter'). Dr. Shiva is entitled to substantial remedy from this court.

199.    The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and attorney's fees and pre- and post-judgment interest from the Defendants.

200.    Dr. Shiva requests such other and further relief as this court may deem just and proper.

## COUNT 6

### ISSUANCE OF A PERMANENT INJUNCTION ENJOINING **SECRETARY GALVIN**, **NASED** AND **TWITTER** FROM VIOLATING Dr. SHIVA'S OR ANYONE'S POLITICAL SPEECH

201.    Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

202.    Secretary William Francis Galvin has been sued in his official capacity in order to obtain from Federal court a permanent injunction that enjoins him from continuing to suppress political speech and from silencing a candidate wholesale during

the candidate's election campaign, be it for Federal, state or local office, or at any time

after. This is permissible under the exception carved out by the Court for prospective

injunctive relief from ongoing harm, under *Ex parte Young*, 209 U.S. 123 (1908)

203.    NASED is comprised entirely of state actors, and Twitter has established a

Trusted Partner program solely for state actors to violate the First Amendment covertly

under the garb of the private sector, in addition to being a state actor itself via its

involvement with CISA via EI-ISAC, an inherently coercive relationship. Because of CISA

and EI-ISAC, should this court order Galvin to restore Dr. Shiva's account on Twitter, the

deplatforming shall be reversed overnight. Nothing prevents the infrastructure from

operating in reverse.

204.    The court must weigh four factors when deciding whether to grant injunctive

relief: (1) The likelihood of success on the merits; (2) The potential for the movant to be

irreparably harmed by denial of the relief; (3) The balance of the movant's hardship if

relief is denied versus the nonmovant's hardship if relief is granted; and (4) The effect that

granting relief will have on the public interest. *Phillip Morris, Inc. v. Harshbarger*, 159 F.3d

670, 674 (1st Cir., 1998), *Monsanto v. Geertson*, 561 U.S. 139 (2010), *Trump v. Hawaii*, 585

U.S. __ (2018), *Arborjet, Inc. v. Rainbow Treecare*, 794 F.3d 168 (1st Cir. 2015), *Planned

Parenthood League v. Bellotti*, 641 F.2d 1006 (1st Cir. 1981)  These factors are easily met in

this action.

1.    Likelihood of success on the merits favors the Plaintiff

205.    The facts of this case demonstrate that the Plaintiff here has a great

likelihood of success on the merits because it is beyond dispute that Defendant Galvin, in

collusion with NASED and Twitter, in order to maintain plausible deniability if discovered,

violated an explicit prohibition on any government official imposing content-based restrictions on speech, especially on a political candidate in the midst of his campaign. There are few cases where the required result is as open and shut as enjoining a government official from continuing to abuse his official power to censor speech and make a candidate's voice disappear. *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010)

206.     Here it is undisputed that Galvin and co-Defendants together stifled the plaintiff political candidate's political speech during an election campaign based solely on the content of plaintiff's speech, which exposed irregularities in the way Galvin conducted and influenced the counting of votes during the recent Republican primary elections, and exposed an official email that confirmed that Galvin consciously violated Federal law, a matter of great public concern. This was unconstitutional *per se.*

207.     Count 6 seeks a permanent injunction upon both Galvin and Twitter. A court order is necessary because these Defendants have already deplatformed Dr. Shiva from Twitter through a permanent suspension, which as detailed above, is causing him severe and multiple harms every single day that the suspension is in place.

208.     The Plaintiff, the candidate who has been consciously and willfully harmed in a most un-American fashion by NASED, through abuse of its status of being the voice for fifty (50) State Elections Directors, and Secretary Galvin, through abuse of his official status and powers, is assured of succeeding on the merits of his claim. His claim also meets the required plausibility standard. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), *Iannacchino v. Ford Motor*, 451 Mass. 623 (2008).

2.     This political candidate has already been irreparably harmed

209.    The Defendants had Dr. Shiva blocked from using from Twitter for most of the last month of campaigning left prior to Election Day 2020. This caused massive harm to a Write-In candidate. And on February 1, 2021, Galvin and the other Defendants permanently deplatformed Dr. Shiva from Twitter through a permanent suspension which, as detailed above, is causing him severe and multiple harms every single day that the suspension is in place.

210.    "Entitled" means this court is duty-bound to immediately enjoin Galvin from ongoing willful violations of the Constitution including causing Dr. Shiva's political speech to be silenced on Twitter to this day. The Defendants have actively cheated Dr. Shiva out of a free and fair election in 2020, and must be enjoined by this court from doing it again in the future, a prospect that is very likely to recur. *Already v. Nike*, 568 U.S. 85 (2013).

### 3    Defendants Galvin, NASED and Twitter face no harm from an injunction

211.    Galvin faces no harm whatsoever from being required by this court to further refrain from abusing his office to violate the candidate plaintiff's free speech rights and to be enjoined from stifling political speech on a matter of public concern. NASED faces no harm from being required by this court to comply with the U.S. Constitution and refrain from using its clout to help State Election Directors nationwide silence political speech. Twitter faces no harm for being called out for assisting the government to covertly violate the First Amendment. An injunction may even protect Twitter from further government coercion or inducement. Again, no voluminous briefing is required for this court to follow hornbook law. "Strong medicine is required to cure the Defendant's disrespect for the law." *BMW of North America, Inc. v. Gore*, 517 U.S. 559 (1996), *Zimmerman v. Direct Fed. Credit*

*Union*, 262 F.3d 70 (1st Cir. 2000) The injunction must issue.

### 4        The requested injunction is in the public interest

212.    It is in the public interest to uphold the rule of law and require elected officials to stop abusing their office to impose content-based restraints on political speech during an election campaign in order to actively sabotage a candidate's prospects and throw the election.  It is in the public interest to comply with 100 years of Supreme Court rulings that require courts to strongly support and protect First Amendment rights. *Snyder v. Phelps*, 562 U. S. 443 (2011)

213.    It is settled law in Massachusetts that a court can maintain jurisdiction over a public servant to enjoin future violations of the law even when the record indicates only one prior violation. *Commonwealth v. Adams*, 416 Mass. 558 (1993)

214.    The relief sought is for the court to enjoin these Defendants from silencing ***any and all candidates in the future***, just as in *Adams*. The relief sought is for this court to maintain jurisdiction over these Defendants ***so they do not again violate the constitutional rights, both state and federal, of a candidate for federal office***.

215.    In summary, the permanent injunction must be issued restoring Dr. Shiva's account on Twitter, and maintaining a tight leash on the Secretary and the other Defendants in order to ensure they do not silence the speech of candidates in the future.

## COUNT 7

DEFAMATION

68

216.    Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

217.    The defendants actively acted in concert to defame Dr. Shiva in order to damage his credibility as a complainant and witness. This defamation was part and parcel of their comprehensive effort to obstruct justice and give the US Attorney the impression that Dr. Shiva is an unscientific, unhinged, wild, conspiracy theorist. This effort also served to misdirect the public away from the fact that Tassinari's email admitted that Tassinari and Galvin ensure that digital ballot images are deleted in conscious violation of Federal law 52 USC 20701.

218.    The defendants issued their own statements to known collaborators of EI-ISAC, namely AP and Reuters. The defendants trotted out their associate Charles Stewart III to add the "independent" gravitas of the MIT brand to support their false narrative, while all concerned concealed from the American people that Tassinari sits on the Board at Stewart's Lab at MIT.

219.    The defendants then had their close collaborator, and later co-author of the Long Fuse Report, Ashwin Ramaswami, attack Dr. Shiva via Wikipedia by describing him as a "pseudo-scientist" who pushes conspiracy theories. Ramaswami did this on behalf of Cohen and CISA despite knowing that Dr. Shiva has published his scientific research in **Nature**, the #1 science journal on earth.

220.    A plaintiff must show that:

"(a) The defendant made a statement, concerning the plaintiff, to a third party,

(b) The statement could damage the plaintiff's reputation in the community,

(c) The defendant was at fault in making the statement; and,

(d) The statement either caused the plaintiff economic loss (traditionally referred to as "special damages" or "special harm"), or is actionable without proof of economic loss.

221.    Here in Massachusetts, four types of statements are actionable without proof of economic loss:

statements that constitute libel; statements that charge the plaintiff with a crime; statements that allege that the plaintiff has certain diseases; and statements that may prejudice the plaintiff's profession or business." *Ravnikar v. Bogojavlensky*, 438 Mass. 627 (2003)

222.    The actions by the defendants, taken in concert in order to impeach the credibility of a complainant who reported a crime, meet the *Ravnikar* standard.

223.    The Defendants must be held liable for damages to Dr. Shiva with an initial demand of $100 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and attorney's fees and pre- and post-judgment interest from the Defendants.

## **COUNT 8**

IMPLIED RIGHT TO PRIVATE ACTION AGAINST TWITTER FOR INTERFERING IN A FEDERAL ELECTION AS AN UNDECLARED SUPER-PAC

224.    Dr. Shiva incorporates here by reference all the paragraphs above as if set forth herein.

225.    Twitter holds itself out as an internet platform under the "Good Samaritan" protections of the Communications Decency Act, 47 U.S. Code § 230: Protection for "Good Samaritan" blocking and screening of offensive material:

Treatment of publisher or speaker - No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider. (2) Civil liability - No provider or user of an

interactive computer service shall be held liable on account of—(A) any action *__voluntarily taken in good faith to restrict access__* to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).  emphasis added

226.    The law states that any action by Twitter must be done "voluntarily" and "in good faith" in order to avail of section 230 immunity.  Twitter's action against this Plaintiff was __*not*__ voluntary and __*not*__ in good faith. Twitter established and runs a Trusted Partner program in order to provide government actors a covert mechanism to violate citizens' First Amendment rights and apply content-based restraints on the speech of political candidates in the midst of their campaigns. In addition, as a Collaborator with EI-ISAC, Twitter acts entirely at the behest of government officials and the Department of Homeland Security and takes no action on its own in good faith. The deplatforming of Dr. Shiva on February 1, 2021, __*within 17-minutes*__, after his speech was surveilled by teams on rotating shifts, was the definition of acting in bad faith! If it had been in good faith, Cardille and Twitter would not have lied about it under oath.

227.    On behalf of the co-Defendants and at their request, Twitter consciously chose to interfere in the conduct of an election for Federal office, the 2020 Republican primary for US Senator from Massachusetts. On behalf of Massachusetts Defendants, Twitter blocked this Plaintiff, a candidate whose speech was fully protected by Massachusetts law, as construed by the SJC in *Commonwealth v. Melissa Lucas*, 472 Mass. 387 (2015) and Federal law. *Citizens United*, supra  There was no lawful basis underlying

Twitter's decision to silence this Plaintiff's campaign statements during his election campaign in Massachusetts. As a direct result of its unlawful actions, Twitter ensured a significant advantage to the Plaintiff's opponents, Kevin O'Connor, and Edward Markey.

228.    It is elementary that Plaintiff's revealing screenshots of public emails – on September 25, 2020, 25 days ***after*** the U.S. Republican Primary election was over  –,  which documented that Tassinari and Galvin knew full well that they were required by Federal law to preserve digital ballot images created in an election that was already over on September 1, 2020, does not in any way constitute "content that may suppress participation or mislead people about when, where, or how to participate in a civic process."   The only legitimate conclusion from the record already available in this case is that Twitter's proferred reason for deleting the tweets and suspending this Plaintiff, and now permanently as of February 1, 2021, was entirely pretextual, in deliberate bad faith, and entirely due to its Trusted Partner relationship with the Defendants and its collaboration with the EI-ISAC infrastructure architected by Tassinari and Cohen. Twitter's bad faith actions in this case strip it of any "Good Samaritan" immunity granted by Section 230.

229.    In addition, actively interfering in the conduct of a Federal election, in this case the three-way race between this Plaintiff, Kevin O'Connor and Edward Markey, violated Federal election laws and granted Plaintiff's opponents a massive impermissible benefit. Twitter acted as an un-registered un-declared SuperPAC instead of a neutral internet platform. Twitter's action equates to it running negative attack advertisements against this Plaintiff during a campaign, in conscious violation of Federal election law. Twitter didn't just publish against this candidate, it silenced this candidate to allow his

opponent a free and clear field.

230.    Twitter naturally will claim that no statute provides candidates with a
private cause of action for violation of Federal election law. That ship sailed in 1916 when
the Court ruled in *Texas and Pac. Rly. v. Rigsby*, 241 U.S. 33 (1916) that courts may
recognize an implied private cause of action, and ruled further that a private cause of
action is permissible to redress violations of Federal law when the agency charged with
policing those violations either lacks the resources to do so, *J.I. Case Co. v. Borak*, 377 U.S.
426, 432 (1964), or because the agency's administrators may abuse their discretion and
fail to act because they are unsympathetic to the legislative purpose of the statute, *Wills v.
Trans World Airlines, Inc.*, 200 F. Supp. 360 (S.D. Cal. 1961)(*Failure of the Civil Aeronautics
Board to employ even its limited sanctioning powers demonstrated the need for private
action*) For more than fifty (50) years thus there has been no exclusive right of action by
administrative agencies because that could lead to manifest injustice and corruption, both
of which public concerns are vital to the proper functioning of this democracy and
supersede any deference owed to administrators. It is beyond dispute that corporations
may not interfere in a Federal election against or for any candidate without publicly
declaring their involvement and without filing records with the Federal Election
Commission. Twitter did not register with the Federal Election Commission as a Super PAC.

231.    In our case here, Twitter is already a Defendant in a RICO claim, and it will be
an efficient use of scarce public resources to evaluate in this court itself claims against
Twitter for conscious violation of Federal election law and the consequent abrogation of
Section 230 immunity.

232.    By actively functioning as an undeclared unregistered Super-PAC and

interfering with the course and conduct of Plaintiff's campaign for Federal office in favor of his opponents Kevin O'Connor and Edward Markey, Twitter has massively and unlawfully harmed this political candidate. Twitter's action both sounds in tort as well as a constitutional violation claim given that Twitter acted wholly as an agent of government officials. As a direct and proximal result of Twitter's conscious violation of Federal election law and its Section 230 status, Dr. Shiva has been massively and irreparably damaged, and his injury includes but is not limited to being cheated out of a free and fair election, global loss of reputation and goodwill, and with his deplatforming off Twitter, a massive loss of monthly income, loss of his ability to pursue a career in politics and the near-total silencing of his speech.  Twitter must be punished and held liable for exemplary damages in order to ensure that neither Twitter nor any of the other Big Tech firms repeat this violation in any election in the future, with an initial demand of $500 million, and a final amount to be determined by a jury at trial. Dr. Shiva also requests that the court order all costs and attorney's fees and pre- and post-judgment interest from the Defendants.

### XXI. JOINT AND SEVERAL LIABILITY

233.    Massachusetts Defendants are jointly and severally liable. *O'Connor v. Raymark*, 401 Mass. 586 (1986) Particularly in this case they are liable because they acted in concert and caused harm at the same time in the same action

## XXII. CONCLUSION

234.    Based on the facts and points of law within the four corners of this complaint, the court must immediately grant the two preliminary injunctions and allow the remaining claims to be presented to a jury.

Respectfully submitted,


Dr. SHIVA AYYADURAI

/s/ Dr. Shiva Ayyadurai
_____
Date: July 22, 2021                    **Dr. Shiva Ayyadurai**
                                       701 Concord Ave
                                       Cambridge, MA 02138
                                       Phone: 617-631-6874
                                       Email: vashiva@vashiva.com