UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CASE No. 1:20-CV-11889-MLW

| | | |
|---|---|---|
| Dr. SHIVA AYYADURAI | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WILLIAM FRANCIS GALVIN, | ) | |
| MICHELLE K. TASSINARI, | ) | |
| DEBRA O'MALLEY, | ) | JURY DEMANDED |
| AMY COHEN, | ) | |
| NATIONAL ASSOCIATION OF | ) | |
| STATE ELECTION DIRECTORS, | ) | |
| TWITTER INC. | ) | |
| all in their individual capacities, and | ) | |
| WILLIAM FRANCIS GALVIN, | ) | |
| in his official capacity as Secretary | ) | |
| of State for Massachusetts, | ) | |
| Defendants. | ) | |

**DR. SHIVA AYYADURAI'S AFFIDAVIT PROVIDING BACKGROUND TO
MEMORANDUM OF LAW AND REVISED AMENDED COMPLAINT**

This Affidavit provides a background to the memorandum of law and to the revised amended

complaint.  On February 19, 2021, this court ordered me to consider adding Twitter, Inc., a

Delaware Corporation, as a Defendant in this case, because it was "questionable whether the

court may grant plaintiff complete relief on his Motion if Twitter is not a party to this case. Such

relief may also implicate Twitter's interests, which could be impaired in its absence." On July

16, 2021, this court further ordered that I file a revised second amended complaint: "By July 22,

2021: (a) Dr. Ayyadurai, Mr. Cornell, and Mr. Cooper shall confer and file a revised Second

Amended Complaint[.]"

I hereby file this affidavit in support of the memorandum of law and the revised amended

complaint, that were electronically filed on July 22, 2021, by my new counsel.

**I WAS TARGETED BY THE MASSIVE DOMESTIC CENSORSHIP**

**INFRASTRUCTURE**

On September 25, 2020, I discovered that I was targeted by the Defendants solely for the content of my domestic speech. I was running for US Senate and publicly reported on my discovery that Galvin and Tassinari admitted in writing, in a public record, that they delete digital ballot images acquired during a federal election. Tassinari initially tried to fob me off with the claim that state regulations require this deletion. Upon my questioning her for the exact name and number of that state regulation and how it could supersede Federal law, she fell silent, and then silenced me.

Between September 25, 2020, and Election Day - November 4, 2020, the Defendants actively ensured my voice was silenced on Twitter - the only social media platform that matters in politics - and thereby sabotaged my election campaign. I had not shouted FIRE in a crowded theatre, I had not tried to disenfranchise any voters, I had not lied about anything or anyone, and I had not violated any of Twitter's internal rules. All I had done was file a sworn criminal complaint with the US Attorney for Massachusetts against Galvin and Tassinari based on my personal discovery of their conscious violation of Federal law.

On October 30, 2020, Galvin, Tassinari and O'Malley stipulated to this court that they would cease and desist from further silencing my voice. They knew at the time that they were never going to abide by their commitment to this court. They already knew what neither the court nor I knew at the time - the fact that I had been placed under official surveillance back in June 2020 already, that multiple teams on shift duty 24 hours a day were surveilling my speech on all social media platforms (Twitter, Facebook, YouTube), that my social media presence was being quantified and analyzed, that the standard methods employed by intelligence analysts against foreign citizens and governments was being employed by 'retired' intelligence analysts

against the domestic speech of a patriotic US Citizen who upholds Federal law, and that it was

inevitable that I would be permanently deplatformed in due course.

The fact that all actions against my speech were exclusively connected to my exposure of

Galvin's and Tassinari's violation of Federal law was inescapable from the get go. This is why I

filed my lawsuit against Galvin to stop silencing me on Twitter. What **was unknown in October**

**2020 to both the court and to me** was the existence of an already-established and functioning

domestic censorship infrastructure of massive scale and national scope, and the fact that

Tassinari has been at the heart of its establishment as one of its founders.

On May 19, 2021, I discovered the actual documents co-authored by Tassinari, Amy

Cohen and Twitter's legal department that described the foundation of the domestic censorship

infrastructure. As a patriotic American who strongly supports the exceptional support given by

our Constitution to freedom of expression and the press, I found the very premise underlying

those documents disorienting and chilling. It was actually hard to believe that our public servants

were engaged in an effort to establish and run a domestic censorship system that employed the

private sector to silence the speech of American citizens at home, and yet there it was, in black

and white, published by Harvard's Belfer Center and freely available under a Creative Commons

copyright license. I also encountered the 2018 testimony provided by Amy Cohen and the

Belfer's Eric Rosenbach to the Senate Intelligence Committee in which both strongly advocated

for the creation of a Federal Cybersecurity and Infrastructure Security Agency (CISA) within the

Department of Homeland Security with authority over domestic speech under the convenient

pretext of combating foreign interference in elections.

On May 20, 2021, I read portions of these documents into the record at the court's Rule

12 hearing and then filed them. These documents included the foundational documents along

with how-to manuals for unelected government officials to identify Americans who are not meekly in lock-step with the official orthodoxy, who actually have the temerity to accuse public servants of corruption, and who have the ability to influence the views of other Americans.

Together they are called the Playbooks. And they provide step-by-step instructions and recommendations for what public officials must do to ensure those Americans are silenced and how the domestic censorship infrastructure will help them achieve that goal. Specifically in the case of Twitter, the company established a separate portal and program for government officials to silence Americans' domestic speech and assured officials that they would enjoy priority access, special complaint options, and priority responses that are not available to private citizens.

I filed those Playbooks into the record in this case for the court's examination. The data in the Playbooks wholly confirm the factual deductions I had arrived at based on the facts in my own case and went even beyond. They make it undeniable at this point that Tassinari and Cohen are not the same as random private citizens who happen to be on Twitter, that their complaints are assured by Twitter to be treated very differently from complaints made by random private citizens, and that Twitter did in fact treat as a priority Tassinari's and Cohen's coordinated complaint which was presented to Twitter through the domestic censorship infrastructure that they had caused to be established and are active principals within. The Playbooks make it undeniable at this point that Galvin, Tassinari, Cohen and Twitter actively and consciously lied to this court when they all claimed in unison that Tassinari and Cohen were just private citizens and treated by Twitter as such.

After the May 20-21, 2021, hearing, I further studied the actions that led to the creation of the domestic censorship infrastructure. The original reason provided for censorship of domestic speech was to combat child sex trafficking. The V-Chip to censor content on television

was struck down by the Supreme Court as unconstitutional. In 2014, the reason changed to security for critical infrastructure when H.R. 3696 - National Cybersecurity and Critical Infrastructure Protection Act of 2014 was introduced. This Bill was the first to refer to the use of private entities by government officials to silence domestic speech and to fund them from the national defense budget. Here is the Congressional Budget Office's description:

> Section 103 would require that at least $25 million of the funds provided to DHS's Office of Cybersecurity and Communications in fiscal years 2014 to 2016 be used to support the presence of Information Sharing Analysis Centers (ISAC) at DHS's National Cybersecurity and Communications Integration Center (NCCIC). ISACs are private centers that serve as **conduits for passing cybersecurity and other information between DHS and private organizations.** They are also responsible for coordinating the response of the private sector and the federal government to cybersecurity incidents and other events affecting the nation's critical infrastructure. At present, there is no dedicated funding provided to support the operations of such centers at the NCCIC and amounts spent for such purposes are insignificant. (emphasis added)

I discovered that Amy Cohen, who testified in support of CISA's creation and is committed to the concept of centralization, is associated with one of the ISACs funded by defense dollars: Election Infrastructure - ISAC. EI-ISAC is mentioned by name in the Playbooks as the entity that assists government officials target Americans for their domestic speech and designate them to Twitter for silencing. The same term "conduit" used to describe EI-ISAC in the 2014 Bill made it into *The Long Fuse Report* in 2021.  EI-ISAC was established by Cohen and friends and funded with defense dollars to serve as the conduit for government officials aiming to silence the domestic speech of Americans without getting sued personally in return.

My investigation further revealed, on June 29, 2021, *The Long Fuse Report* which provides a comprehensive analysis of the domestic censorship infrastructure, how real world results compare to the original goals of the domestic censorship enterprise and where to take the system in the future. The funders and authors of this analysis encountered the problem posed by the existence of the First Amendment, and measured the success of the infrastructure in

bypassing the various restrictions placed on public officials by the constitution and case law such that they could succeed in censoring domestic speech without getting sued in their individual capacity in the process. The Long Fuse Report is the system's first Report Card. If one can reduce the report to a score, the system got an A-minus. It successfully silenced an incorruptible minority politician during his run for Federal office (A) but could not take credit publicly for it (minus).

The Long Fuse Report's funders funded more than a report; they funded surveillance teams who monitored my speech 24 hours a day on Twitter, Facebook and YouTube. These teams were integral to my deplatforming off Twitter on February 1, 2021, within seventeen (17) minutes of my mentioning Tassinari and her public emails in a live video broadcast. Given that Twitter has purchased startups that invented code to analyze keywords in videos in real time, I initially concluded that a keyword algorithm must have been used to identify Tassinari's name in my video lecture. The Long Fuse Report informs us that the truth is both more prosaic and more chilling: actual human teams deployed 24/7, in 4-hour shifts, to monitor the domestic speech of an American. So who are these funders? The Atlantic Council (funded by the British Government) and billionaire Pierre Omidyar.

The Long Fuse Report provides much-needed clarity regarding the components of the domestic censorship infrastructure and the relationships between them. The authors refer to the various players as stakeholders. This illustration reveals that the stakeholders represent a large section of organizations that most Americans would not associate with assisting government officials surveil and silence domestic speech. This is either intentional or defense dollars simply proved irresistible for the NAACP, AARP and Common Cause. The description in The Long Fuse Report of the enterprise training retired persons to become domestic informants is beyond

chilling.



Figure 1.3: Major stakeholder groups that collaborated with the EIP.

The Long Fuse Report lays bare what the Defendants have actively concealed from this court. It established that the domestic censorship enterprise exists and was used by the Defendants against me during my run for Federal office in 2020 and for talking about this very lawsuit in 2021. Equally importantly, it explained the hows and the wherefores of the seventeen-minute response time on February 1, 2021, the same response time that Twitter's Associate General Counsel, Stacia Cardille, struggled so hard to conceal from this court.  The Playbooks and Long Fuse Report are the smoking gun in this case.  The Playbooks, as I shared in the May 20-21, 2021, hearing defined the process, in detail, that was used to surveil, blacklist, and silence me based on my being a High Severity Influence Operator (IO). The Long Fuse Report confirms that I was specifically being surveilled and tracked. Both of these documents are a monumental discovery as the discovery of the Pentagon Papers, or the revelation that James 'Whitey' Bulger had been a Top Echelon FBI informant all along. It reveals to ordinary law-abiding Americans what elitists such as Galvin and Tassinari have always known.

### GALVIN, TASSINARI AND COHEN REPRESENT
### AN EVER-PRESENT DANGER TO OUR REPUBLIC

The founders of our Republic took special pains to identify freedom of expression as a liberty that must be protected from the heavy hand of government officials. They had more than 100 years of experience by that point to learn that this must be a defining principle of their Grand Experiment.



The history of Boston is synonymous with suppression of speech. In 1650, the first book burning in the New World happened on Boston Common when the General Court ordered copies of William Pynchon's book to be *burned* because it was not sufficiently loyal and deferential to the folks in power in Massachusetts. William Pynchon was then expelled to England, where none of his books was burnt.  Image: Mason Green, *Springfield 1636-1886*, C.A. Nichols, Publishers, 1888

After that, for over 300 years, numerous books were Banned in Boston despite the establishment of the United States and the passage of the First Amendment to the US Constitution. Massachusetts continued to have laws on its books that defied the First Amendment and enforced the government's views on what was acceptable speech, and criminally prosecuted people who asserted their First Amendment rights.

In 1944 the anti-racism book *Strange Fruit* was banned in Boston. On May 26, 1944, the author, Lillian Smith, penned the following in her letter to the American Civil Liberties Union annual meeting, about why the powers in Boston banned her anti-racism book:

"But there are many others who fear the effect of Strange Fruit on the racial status quo; and, I think, within this group we shall find Boston's major reason for banning the book. These people believe it is to their political and economic advantage to keep the Negro

and the Jew and labor where they are today. They fear all change. They know when racial segregation begins to weaken, that other forms of segregation and exploitation will crumble with it. They fear the book because it has the effect of stirring imagination and reawakening guilt feelings.

To these people, segregation in all its forms: racial, economic, religious, psychological, must be maintained at however great a cost to civil liberties and intellectual freedom. It is only by realizing that the charge of obscenity is a clumsy attempt to destroy the book's power and prestige, that we, who believe in civil rights, can defend these rights in terms of this book."

https://web.archive.org/web/20130226042510/http://beck.library.emory.edu/southernchanges/article.php?id=sc12-5_008

Abraham Isenstadt was criminally prosecuted by the government of Massachusetts for selling one copy of **Strange Fruit** in Cambridge, Mass. The SJC upheld his criminal conviction because the prosecution complied with the letter of the law, ch. 276 § 28, as it had remained on the books in one form or another from 1711, and with case law as it existed in Massachusetts throughout. *Commonwealth v. Isenstadt*, 318 Mass. 543 (1945)

That law, ch. 272 § 28, remained the law in Massachusetts even after the US Supreme Court reversed the SJC in a later decision in 1966 that reiterated the supremacy of the US Constitution and the First Amendment, even in Massachusetts. *Memoirs v. Massachusetts*, 383 U.S. 413 (1966) The law was amended: 1959, 492, § 1; 1966, 418, § 1; 1974, 430, §1; 1982, 603, § 2.

The ban in Massachusetts on selling, possessing or reading **Strange Fruit** was **repealed only in the year 1982**, after the legislature rewrote ch. 272 § 28 to seek compliance with the First Amendment to the United States Constitution, **two hundred and six (206) years after Massachusetts joined the Republic**. The legislature rewrote it again, 2011, c.9, § 19, in response to Judge Zobel finding even the 1982 version unconstitutional - *American Booksellers Foundation v. Coakley*, No. 10-11165, 2010 WL 4273802, (D. Mass. 2010)

In addition to the consciously **pretextual use** of an unconstitutionally vague law, which was easily understood back in 1944 by Lillian Smith herself, the powers in Boston strongly encouraged all private actors to enforce the establishment's arbitrary moral code, be they book distributors or cinema halls or theatres. See *Censorship of the Theatre in Boston*, Daniel M. Doherty, Boston University MS Thesis, 1950 - https://core.ac.uk/download/pdf/142044252.pdf The **Watch and Ward Society**'s influence was total and extended far beyond the plain text of state law. The threat of individual prosecution was in addition to a real threat of withdrawing the license of theatres, cinemas and booksellers if they offended authorities. This **abuse of licensing power** generated comprehensive self-censorship both within Massachusetts and amongst publishers and film distributors outside Massachusetts. Film distributors *voluntarily* made a special version to be shown in Massachusetts movie theatres that was different from the same movie shown in the free parts of the United States, such as Manhattan. *Doherty*, supra.

After the US Supreme Court finally prevailed in establishing the writ of the First Amendment within Massachusetts, the government seemingly complied - **for a few years**. It is now readily apparent that Galvin and Tassinari, convinced like all Massachusetts officials before them, that the First Amendment is a problem, set about creating a domestic censorship infrastructure that is funded by defense dollars to ensure it would survive a challenge in the US Supreme Court through the convenient pretext of "national security" and "critical infrastructure." Unlike the V-Chip and other censorship efforts, this pretext would be a winner.

These Massachusetts officials helped create a domestic censorship infrastructure to get back the power that they had lost through the Supreme Court's enforcement of the writ of the First Amendment upon Massachusetts.  They used this enterprise to suppress my speech because I criticized them.  I revealed in my tweets that Galvin and Tassinari fully knew that they

intentionally violated Federal law and the US Constitution. And the analysis of their success was paid for by private parties and billionaires, including foreign powers such as the British Government, who are still opposed to the First Amendment. Britain was the same foreign power that thousands of patriotic Americans gave their lives to defeat, the same foreign power whose King's Warrants were so hated they led to the Fourth Amendment, the same foreign power that burnt the White House down to the ground in 1812.  Today, the architects and authors of the Playbooks and The Long Fuse Report, seek to burn First Amendment to the ground.  The Defendants have yet to utter one single apology to me for what they did to me – a brown-skinned, minority, who came to this country with nothing, and earned everything he has, and ran for U.S. Senate on the principles of Truth Freedom Health.



It is undeniable that the deliberate blurring of the lines between the government and the private sector is designed to provide the imprimatur of DHS/CISA upon aims funded by foreign powers. It is impossible to tell whether a particular deplatforming of a US Citizen was done on the orders of a domestic government official or a private actor or even foreign power. Galvin and Tassinari are an ever-present danger to our Republic.   They must held personally accountable for their actions.

Here is yet another example of speech that fits the Tassinari standard for targeting the speaker through the domestic censorship infrastructure that she helped create. The City of

Lowell, Mass., recently hired Charles Stewart III to assist it in redistricting the City prior to the next elections. Hiring Stewart, the very person chosen by Tassinari to falsely declare to the Associated Press and Reuters that Federal law does not require the retention of digital ballot images, would indeed be the perfect choice if a City wishes to enjoy a smooth approval process without any opposition from Galvin and Tassinari. See https://www.lowellsun.com/2021/07/28/lowell-hires-expert-from-mit-for-subdistricting/

Now if I were on Twitter, naturally I would tweet wondering about the existence of backhanders between Tassinari and Stewart and the City of Lowell to, as they say, grease the process. That tweet would immediately be flagged by Tassinari's and Cohen's domestic censorship infrastructure, defense-dollar-funded EI-ISAC would serve as the "conduit," as it does, between Tassinari and Twitter, and CISA would weigh in on behalf of VVIP Tassinari to ensure that Twitter deleted either my tweet or my account. ***The Playbooks co-authored by Tassinari, Cohen and Twitter compel this outcome, as confirmed by the Long Fuse Report.***

Galvin and Tassinari are an ever-present danger to our Republic.

All the members of the domestic censorship infrastructure see eye to eye and are in full agreement that voices, such as mine – brown, low-caste, diverse, immigrant, independent-thinking, self-made, passionate in my love for America, uncompromising in holding government officials personally accountable for their actions, must be silenced, just like ***Strange Fruit*** was silenced by the "liberal" elite in Boston. This is no different from how it was in the Soviet Union or East Germany and still is in today's China. The Long Fuse Report confirms that the seamless coordination between the



**Alexey Navalny** ✔
@navalny                          ···

Replying to @navalny

8. Of course, Twitter is a private company, but we have seen many examples  in Russian and China of such private companies becoming the state's best friends and the enablers when it comes to censorship.

1:15 PM · Jan 9, 2021 · Twitter Web App

government and private companies that Alexei Navalny tweeted about is the intentional result of the enterprise.

The "state's best friend" describes Twitter perfectly. Twitter must comply because the government can strip it of Section 230 immunity in a New York Minute. Twitter is dependent on Sec. 230 immunity for its 50x multiple of revenue valuation ($50 Billion), and its status as a platform in order to keep its market valuations high, which makes it easier to borrow money on the commercial market to grow and succeed, compared to traditional newspapers such as the New York Times Company which, unlike Twitter, actually turns a profit, but is valued much lower (3x of revenue - $6 Billion) because it is a "publisher" not a "platform."

TASSINARI CONTINUES TO MISREPRESENT FACTS TO THE PUBLIC

Recently Tassinari personally responded to a public record request, which sought specific answers. Here is Tassinari's answer to request #8 even though Tassinari and Cohen co-authored the Guide that led to the creation of the Playbooks:

**From:** Tassinari, Michelle (SEC) <michelle.tassinari@state.ma.us>
**To:** jerrypaine@yahoo.com <jerrypaine@yahoo.com>
**Cc:** Sec.RAO@sec.state.ma.us <sec.rao@sec.state.ma.us>
**Sent:** Monday, July 26, 2021, 01:30:30 PM EDT
**Subject:** RE: Public Records Request Response

8.    All documents related to the creation of the Elections Influenced Operations Playbook for State and Local Officials.

There are no records responsive to your request.  No person from this Office was involved with the creation of such playbook.

<b>COHEN IS A REGULAR COLLABORATOR WITH TASSINARI IN USING THE CENSORSHIP INFRASTRUCTURE TO SILENCE DOMESTIC SPEECH</b>

Public record requests reveal that Cohen is a known, accepted, routine, daily collaborator with Tassinari and helps report targeted Americans to ISAC for silencing.

From: Amy Cohen
To: O"Malley, Debra (SEC); Maria Benson
Cc: Tassinari, Michelle (SEC)
Subject: Re: Massachusetts Twitter Activity
Date: Monday, April 6, 2020 1:03:57 PM
Success!
I also forwarded your original email to the ISAC so they would have a record of it. Also, I mentioned this to Michelle already, but nice work on the ProPublica story!

**From:** "O'Malley, Debra (SEC)" <debra.o'malley@state.ma.us>
**Date:** Monday, April 6, 2020 at 12:13 PM
**To:** Amy Cohen <acohen@nased.org>, Maria Benson <mbenson@sso.org> **Cc:** "Tassinari, Michelle (SEC)" <michelle.tassinari@state.ma.us>
**Subject:** RE: Massachusetts Twitter Activity
Hi Again,
They just got back to me and they have removed all of those tweets for violating Twitter rules. Thanks for your help with this.
Best, Deb

**From:** Amy Cohen <acohen@nased.org>
**Sent:** Monday, April 6, 2020 10:13 AM
**To:** O'Malley, Debra (SEC) <debra.omalley@sec.state.ma.us>; Maria Benson <mbenson@sso.org> **Cc:** Tassinari, Michelle (SEC) <Michelle.Tassinari@sec.state.ma.us>
**Subject:** Re: Massachusetts Twitter Activity
Keep us posted on the result!

**From:** "O'Malley, Debra (SEC)" <debra.o'malley@state.ma.us>
**Date:** Monday, April 6, 2020 at 10:12 AM
**To:** Amy Cohen <acohen@nased.org>, Maria Benson <mbenson@sso.org> **Cc:** "Tassinari, Michelle (SEC)" <michelle.tassinari@state.ma.us>
**Subject:** RE: Massachusetts Twitter Activity
Thank you to both of you.
Best, Deb


**IT IS TIME TO LIVE NOT BY LIES**

On February 13, 1974, despite being a native-born citizen and Army veteran, Aleksandr

Solzhenitsyn was expelled from Russia by the progressive elite for "performing actions

systematically that are incompatible with being a citizen of the USSR," i.e. publicly revealing

the fact that the Gulag slave labor system was established on original orders from Lenin himself,

meaning it was a feature, not a bug.

On February 12, 1974, just the day prior, Solzhenitsyn penned a letter titled *Live Not By Lies*, that was published in full on February 18, 1974, in the Washington Post, and is attached to this affidavit as an exhibit. The credo expressed in that essay 46 years ago applies fully to us today and to the resolution of this case.

There is testimony already in the record that Tassinari and Cohen strongly encouraged Twitter to do **whatever it takes** to silence my speech. The Long Fuse Report confirms that the Defendants did fully use the domestic censorship infrastructure that they created and control to silence my speech, impeach my credibility through "independent academic" Stewart III, the AP and Reuters, did obstruct justice by ensuring 360,000 people could not hear me, did sabotage my campaign run, and had me under 24/7 surveillance by actual teams of people.

In response to my revealing these facts and filing them with this court, it is the Defendants who claim that the very fact that they are named Defendants is a tremendous hardship that is intrinsically prejudicial given their high VVIP status, that a one week delay is so prejudicial that the entire lawsuit must be dismissed, and that the pleadings in this case must be either sealed or struck. But apparently sabotaging my campaign run and silencing me through 24/7 surveillance is perfectly okay. The Defendants' attitude is best described as Victorian and instantly makes me recall the memorable scene where Oliver Twist asks for more soup.

> "The board were sitting in solemn conclave, when Mr Bumble rushed into the room in great excitement, and addressing the gentleman in the high chair, said, 'Mr Limbkins, I beg your pardon, sir! Oliver Twist has asked for more!' There was a general start. Horror was depicted on every countenance. 'For MORE!' said Mr Limbkins. 'Compose yourself, Bumble, and answer me distinctly. Do I understand that he asked for more, after he had eaten the supper allotted by the dietary?' 'He did, sir,' replied Bumble. 'That boy will be hung,' said the gentleman in the white waistcoat. 'I know that boy will be hung.'"

These Defendants expect everyone to live by lies. It is time to live not by lies.

This court must ensure that justice is done, that the truth is finally revealed and ordinary

citizens are protected from a domestic censorship infrastructure that allows government officials to violate their rights at will under the garb of the private sector with plausible deniability, specifically to avoid individual capacity lawsuits.  How clever!

The Defendants and their attorneys have gone to great lengths to characterize me as some junglee – with no decorum, crazy who does "antics," doesn't follow rules, speaks out of turn, is "violent," and even wants to endanger others. ***Such characterization is nothing but pure, unadulterated racism***.  And, such "liberal" racism, as my experience informs me, goes even deeper.  While these same individuals claim to support liberal ideas including individual pronouns, and social justice, they despise a dark brown-skinned man, who came up on his own, speaks his mind, and is not beholden to them, and stands independently to object to his being silenced.

They perpetuate stereotypes of how a brown-skinned Indian-American should behave – nod his head left to right, be ready to take a lynching with grace, and simply shut up when told, and definitely not file lawsuits, not assert his dignity to make sure they are held accountable as individuals for their actions, and surely not apply his brain to connect the dots to expose a conscious censorship infrastructure that they architected and designed to violate the foundational principle of this country.

The future of this Grand Experiment called the United States, a new country that many immigrants like me came to because of the First Amendment's protection for speech – and particularly political speech – from censorship, is wholly dependent on this court.   It is unfortunate for these Defendants that I will not simply walk into the dark night and become an Invisible Man, that my love for this country and its people compels me to demand that they be held accountable for their actions.

Respectfully submitted under the pains and penalties of perjury,

/s/ Dr. Shiva Ayyadurai

_____

**Dr. Shiva Ayyadurai**

Date: August 3, 2021                701 Concord Ave.
Cambridge, MA 02138
Phone: 617-631-6874
Email: vashiva@vashiva.com