UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DR. SHIVA AYYADURAI,

        Plaintiff,

   v.

WILLIAM FRANCIS GALVIN,
MICHELLE K. TASSINARI,
DEBRA O'MALLEY, TWITTER, INC.,
AMY COHEN,
NATIONAL ASSOCIATION OF
STATE ELECTION DIRECTORS,
all in their individual capacities, and
WILLIAM FRANCIS GALVIN,
in his official capacity as the Secretary
of the Commonwealth of Massachusetts,

        Defendants.

Case No.: 1:20-cv-11889-MLW

## REVISED AMENDED COMPLAINT

### Introduction

1.    Under both the First Amendment of the U.S. Constitution and Article XVI of the

Massachusetts Declaration of Rights, a political candidate's criticism of government actors

embodies a species of speech that resides at the very heart of citizens' free speech

protections.

2.    Despite this, the Defendants in action unlawfully coordinated a complex web of

governmental and ostensibly private actors to silence the political speech of a U.S. Senate

candidate, the Plaintiff Dr. Shiva Ayyadurai ("Dr. Shiva"), for criticizing a government actor.

3.    Shortly after Dr. Shiva posted these critical tweets on Twitter, the Defendants moved

quickly. Dr. Shiva's tweets described a government employee's, Massachusetts State Election director Michelle Tassinari ("Tassinari"), role in destroying the digital ballot images used to tabulate votes the Defendants acted swiftly. Rather than rebut Dr. Shiva's speech publicly, they leveraged the deep relationships they and the other Defendants had built together to regulate speech to remove those troublesome tweets. And then they got Dr. Shiva removed from Twitter entirely, effectively silencing him.

4.     Twitter is essential for any political candidate. It provides a unique and broad mechanism for a political candidate to engage directly and immediately with supporters and potential supporters. No national politician can succeed today without Twitter. By removing Dr. Shiva from Twitter, the Defendants effectively stripped Dr. Shiva of his ability to raise money and succeed as a political candidate.

5.     Far beyond developing a formal, transparent process for addressing election information, the Defendants have developed an informal infrastructure through which they can ensure that social media speech which they deem undesirable is censored.  This plan includes an entity sometimes called the Elections Infrastructure Information Sharing and Analysis Center (EI-ISAC). The Defendants articulated their vision for this scheme through a series of "Playbooks" which set out the theory and practice of regulating speech which government officials choose to label as "misinformation" or "disinformation." These are such vague and malleable terms, however, that they amount to a means for government actors to choose to censor the speech they simply do not like by applying one of those labels, thus enabling classic viewpoint discrimination.

6.     One of the types of "misinformation" which the Playbooks endorse censoring is speech that disparages elections officials like Tassinari.

7.     Of course, this "best practice" contradicts the fundamental First Amendment and Article

XVI right to criticize the government. Twitter's participation in the development of this infrastructure is clear: they contributed to the development of the Playbooks themselves and grant formalized, preferential treatment to government actors who seek to censor speech. A visual depiction of the network of individuals and agencies that comprise this web of governmental and ostensibly private actors is attached here as Exhibit A.

8.

9.   The Defendants' complex conspiracy to silence Dr. Shiva is a clear violation of his speech rights. More ominous, the machinery that the Defendants mobilized to silence him remains and is being further developed every day.

10.  The trouble began on September 24, 2020, Dr. Shiva, without identifying Tassinari, tweeted about the Commonwealth of Massachusetts' failure to preserve, and thus to destroy, the ballot images used to tabulate votes. Once Dr. Shiva criticized Tassinari, the government gears started turning. The Defendants implemented the formal infrastructure they developed, as well as the informal channels of influence to shut down Dr. Shiva's speech.

11.  Tassinari reacted quickly and caused a report to Twitter. Meanwhile, the Secretary of State William Francis Galvin's public relations director Debra O'Malley put out a press release disputing the claim, thus legitimately combating what the Defendants viewed as "bad speech" with "good speech." But then O'Malley filed a complaint with Twitter through the designated Partner Support Portal ("PSP") to which she had access from the Massachusetts Elections Division (the "Division") Twitter account, and which granted her preferential treatment by Twitter because the Division is a "Trusted Twitter Partner."

12.  Then Dr. Shiva on September 25, 2020 tweeted out four screenshots of his email

correspondence with Tassinari regarding the destruction of digital ballot images and criticized her role in destroying ballot images, explaining that these are the ballots themselves because they are used to tabulate votes. Instead of debating his assertion, the Defendants acted in coordinated fashion to ensure the four screenshot tweets were deleted.

13. Instead of filing a complaint with Twitter directly or putting out a press release, Tassinari covertly used her close connection with the Defendant Executive Director of the National Association of State Election Directors ("NASED"), Amy Cohen, to cause Defendant NASED to file a complaint with Twitter.

14. As a result of Tassinari, Cohen, and NASED's coercion, strong encouragement, and coordination with Twitter, NASED's complaint to Twitter had the intended effect: the tweets were deleted.

15. Rather than exercise its independent judgement, Twitter undertook exactly the action that Tassinari, Cohen, and NASED wanted in deleting the September 25, 2020 screenshot tweets. Twitter acted as it was told to act by Cohen both because it values it cooperative relationship with the other Defendants and because it recognizes that as a publicly traded company that faces intense scrutiny in the public eye, a failure to remove content deemed by the state to be "misinformation" would harm its valuation and image.

16. Twitter faces severe risk in disagreeing with the complaint of NASED, Cohen, Tassinari, and others who are directly integrated into the web of government regulation of social media platforms.

17. As a direct result of Tassinari, NASED, and Cohen's conduct, Twitter, and the EISAC infrastructure continued to monitor Dr. Shiva's tweets and social media activities. Months

later on February 1, 2021 when Dr. Shiva re-tweeted his September 25, 2020 screenshot tweets regarding Tassinari via an educational lecture about this lawsuit, Twitter acted immediately to deplatform him.

18.   Within *seventeen minutes* of Dr. Shiva posting the September 25, 2020 screenshot tweets, he received an official Twitter email informing him that Twitter had suspended his account.

19.   Those seventeen minutes permitted no time for Twitter to exercise any independent judgment. Twitter kicked Dr. Shiva off Twitter because the other Defendants wanted it to do so. Incredibly, Tassinari, Cohen, and Twitter's counsel who has submitted multiple affidavits in this case, Stacia Cardille ("Cardille"), were all together at NASED's Winter Conference when Twitter deplatformed Dr. Shiva, at which Tassinari and Cohen had invited Cardille to give a talk on "Managing Misinformation on Social Media Platforms."

20.   The Defendants have been determined to conceal from this Court and from the public their coordinated efforts to regulate speech on social media broadly and as to Dr. Shiva in particular. Already in this case, several of the Defendants have made repeated misrepresentation of omission as well as direct misrepresentations including simply as a handful of examples:

21.   The evidence of these misrepresentations and others is set out below:

      a.   Tassinari and O'Malley in their October 29, 2020 affidavits about their reports to Twitter of Dr. Shiva's September 24, 2020 failed to disclose that the Massachusetts Elections Division is a Twitter Trusted Partner entitled to preferential treatment by Twitter, including where it submits complaint via the Partner Support Portal;

b.  Tassinari swore that she never reported Dr. Shiva's September 25, 2020 screenshot tweets regarding her emails at all, when she actually reported that tweet to Cohen at NASED to maximize the impact of the complaint to Twitter;

c.  Defendants failed to disclose to the Court the existence of the Playbooks setting out how they were to regulate speech on social media; and

d.  Cardille on behalf of Twitter misrepresented that Twitter deplatformed Dr. Shiva on February 3, 2021, despite the existence of the February 1, 2021 email announcing Dr. Shiva's suspension from Twitter, to create the misimpression that Twitter had two days to consider whether to deplatform Dr. Shiva.

22.  The infrastructure the Defendants helped build and the relationships they used to silence Dr. Shiva remain firmly in place. Though Dr. Shiva may have been among the first and most prominent of individuals to suffer the consequences of a web of government actors focused on removing troublesome speech, in the absence of action by this Court, he will not be the last.

ii. Parties

23.  Plaintiff Dr. Shiva Ayyadurai lives and works in this District. Dr. Shiva founded and runs multiple technology companies in Cambridge, MA at 701 Concord Avenue, and has now campaigned for federal office three times, including for U.S. Senate.

24.  Defendant William Galvin is the Secretary of State for the Commonwealth of

Massachusetts.

25.   Defendant Michelle Tassinari is Galvin's legal counsel and Elections Director of the

Massachusetts Elections Division and the person required to ensure Galvin's office

complies with Federal law. Tassinari is also the President of Defendant National

Association of State Election Directors, and a member on the Standards Board of the U.S.

Election Assistance Commission.

26.   Defendant Debra O'Malley is Defendant Galvin's spokesperson and also handles the

Election Division's official Verified Twitter account (@VotinginMass).

27.   Defendant Twitter is a Delaware corporation headquartered at 1355 Market Street, Suite

900, San Francisco, CA 94103, and registered with the Massachusetts Secretary of State. Its

Massachusetts office is located at 141 Portland Street, Cambridge, MA 02139.

28.   Defendant National Association of State Election Directors is a 501(c)(3) professional

organization headquartered at 1200 G Street NW, Suite 800, Washington, DC 20005. Its

members are the elections directors in the 50 states. NASED acts in close coordination with

and on behalf of those election directors as an extension of those government actors.

29.   Defendant Amy Cohen is the Executive Director of Defendant NASED.

## Venue

30.     Venue is proper because the Defendants violated Dr. Shiva's

rights in this District. Dr. Shiva also lives and works in this District.

## Jurisdiction

31.     This court has jurisdiction over this case because the

complaint involves violation of a right guaranteed by the United States

Constitution by persons under the color of law. 28 U.S.C. § 1331, 28 U.S.C. §

1343, 42 U.S.C. § 1983. In addition, there is diversity between the parties in

that two of the Defendants, Cohen and NASED, are based in different Districts.

This court has jurisdiction over Twitter because the actions at issue and

those between all the Defendants and does not pertain to the terms of

use that Dr. Shiva agreed to in opening his Twitter account. This court has

jurisdiction under *Ex parte Young,* 209 U.S. 123 (1908) over Secretary Galvin in

his official capacity as the relief sought is prospective and injunctive.

## Facts

### A.  The Defendants develop a system for censorship

32.     The Defendants have all played a particular and general role in developing and

implementing the infrastructure by which various government and private actors

regulate social media platforms, including to censor speech that they conclude

constitutes "misinformation" or "disinformation" regarding elections. That

system is constructed of a tightly knit web of governmental and ostensibly

private actors who work in concert to eliminate whatever speech they deem

undesirable. A graph depicting the roles and relationships of the actors in this

network is attached here as Exhibit A.

33.   The Defendants weaponized the system they developed, including through their respective close relationships with Twitter, to ensure the deletion of Dr. Shiva's September 25, 2020 screenshot tweets and the eventual decision to deplatform Dr. Shiva from Twitter on February 1, 2021. Twitter's suspension of Dr. Shiva continues through the present.

34.   Beginning in 2017, Cohen and Tassinari together with a host of others began to develop a theory and system for regulating speech on social media which various government actors, with the support of non-governmental groups, concluded were alleged "misinformation" or "disinformation."

35.   In October 2017, the Election Infrastructure Government Coordinating Council ("EI-GCC") was formed with a stated purpose of seeking to ensure the integrity of elections.

36.   Both Tassinari and Cohen would sit on the EI-GCC's Executive Committee and the EI-GCC, respectively. Among other things, the EI-GCC evaluated the means by which to regulate and censor speech on social media platforms.

37.   In extra-governmental roles, Cohen and Tassinari—together with NASED and Twitter's Legal Department—have been consistent contributors to the leading policy documents on the regulation and censorship of speech on social media platforms, namely the collective "Playbooks" published by the Harvard Kennedy School's Belfer Center which have been the foundation for government regulation and censorship of speech on social media. Notably, Eric Rosenbach ("Rosenbach"), Former Chief of Staff at the Pentagon and Co-Director of the Belfer

Center, is listed as the lead author on each of these documents.

38.    The first of these Playbooks was intended directly for CISA's EI-GCC, Election Cyber Incident Communication Coordination Guide. That guide focused on coordination of communications among election officials in response to cyber attacks. Both Cohen and Tassinari contributed to the creation of that document.

39.    Cohen and Tassinari were similarly listed as contributors to the Belfer Center's "The State and Local Election Cybersecurity Playbook." That Playbook articulated the view of myriad threats to elections, despite the decentralized nature of election systems in the United States and sought to highlight potential strategies for guarding against cyber-attacks.

40.    Tassinari and Cohen together with Twitter's legal team also developed the manuals establishing the "best practices" for how government actors, and particularly for how election directors like Tassinari, should conceptualize and respond to speech about elections on social media platforms, namely Parts 1 and 2 of the "Election Influence Operations Playbook." These Playbooks were published shortly before Dr. Shiva's September 24 and 25 tweets.

41.    Part 1 of the Playbook describes so-called "Influence Operations," schemes by which certain individuals attack the integrity of elections as acts of war through coordinated schemes of disinformation and misinformation about elections. Part 1 of the Playbook identified the species of speech to be regulated not exclusively as such frontal attacks by antagonistic state actors, however, but also highlights the need to censor even "[i]naccurate information spread in error without malicious intent."

42.     The explicit mission of the Playbook is to facilitate censorship of disinformation or misinformation. *Id.* Of course, the government actors who undertake the strategies and methods set out in the Playbook must themselves make the determination of what speech on social media platforms constitutes "disinformation" or "misinformation." As a result, in implementing the Playbook, Government actors like Tassinari, Cohen, and others must themselves make the determination about what speech, including political speech, they consider problematic.

43.     The authors of the Playbook boast that the Playbook:

> connects you to organizations that can support your process, like the Cybersecurity and Infrastructure Security Agency (CISA), Department of Homeland Security (DHS), the Elections Infrastructure Information Sharing and Analysis Center (EI-ISAC), the Federal Bureau of Investigation (FBI), the National Association of Secretaries of State (NASS), and the National Association of State Election Directors (NASED).
> *Id.* (emphasis supplied).

44.     Part 2 of the Playbook particularly lays out a "Mis/Disinformation Response Plan," including identifying alleged threats like Dr. Shiva and how to briskly identify and respond to such threats.

45.     The Playbook emphasizes that election officials must act to remove any information that they believe may cause a threat to elections, even if that information is allegedly only inaccurate: "For election officials, any incorrect information, regardless of source or intention, presented to voters can pose a threat to elections, because it can undermine voters' understanding of trust in the election." Playbook, Part 2, at 2 (emphasis in original). In other words, the Playbook, authored by Cohen and Tassinari among others, endorses removing

any speech that an election official-a government actor-believes to be inaccurate, even where the speech is political in nature.

46.  In identifying alleged "misinformation" or "disinformation" to which election officials should be particularly attuned, the Playbook identifies people that "[i]mpersonate or disparage the people that run elections." *Id*. at 17. Thus, government officials are advised to censor members of the public who might "disparage" them. As an example of purportedly problematic speech, the Playbook specifically identifies criticism of government officials running elections such as "The people who run elections are corrupt."  In so doing, the Playbook strikes at the very heart of free speech protections, which protect the right of every individual to criticize the government.

47.  The Playbook explicitly advises government officials to report allegedly problematic speech both to social media platforms like Twitter and also to report to the Elections Infrastructure Sharing and Analysis Center ("EI-ISAC"), which in tum "is able to route reports through a network of collaborators including CISA, the FBI, and other federal authorities." *Id.* at 23.

48.  As to Twitter in particular, the Playbook explains that Twitter has a special reporting tool for election officials known as the "Partner Support Portal (PSP)," which "expedites the review of content flagged for potentially violating Twitter's rules around civic events." *Id.* at 46.

49.  Part 3 of the Playbook, which is not publicly available but rather distributed solely to election officials, sets out particularized tactics and strategies for election official to respond to what is viewed as "misinformation" or "disinformation."

50.     Even beyond the creation of the Playbooks, Cohen strongly advocated for the
        creation of what is now the government agency most closely tethered to the
        regulation and censorship of speech on social media. In Congressional testimony
        in March 2018, Cohen spoke in favor of the creation of the CyberSecurity and
        Infrastructure Security Agency ("CISA"). In that testimony, she sat alongside
        Rosenbach, who referred to Cohen and NASED as "strong allies" of the Belfer
        Center. Cohen is recognized and treated as a national expert on cyber security.

51.     Cohen was crucial to the creation of the EI-ISAC within the Center for Internet
        Security ("CIS"), a non-governmental entity funded by billionaire Pierre Omidyar,
        as the singular conduit between local and state officials and social media
        companies for alleged misinformation and disinformation, and as the conduit for
        information to be sent to the Elections Integrity Project ("EIP") funded by the
        Atlantic Council (funded by the British government) for analysis on behalf of
        CISA.

52.     Cohen is integrated in a host of other governmental and ostensibly private
        organizations in the cyber security space, including in her role running NASED's
        conferences. Among other things, she is a member of the Advisory Group for the
        Global Cyber Alliance which brings in funding from British government entities
        and private parties.

53.     Just as Cohen, Tassinari has been integral in creating and implementing the
        combination of government and non-government actors to regulate free speech.
        Tassinari sits on the U.S. Election Assistance Commission, the Executive
        Committee of CISA's Election Infrastructure Government Coordinating Council
        (EI-GCC), the Bi-Partisan Policy Center's Elections Task Force, Member of the

Overseas Voting Initiative of the Council of State Governments, and Advisory
Board Member of the MIT Elections Data and Science Laboratory.

54.   Even beyond growing the ecosystem of organizations by which speech on Twitter
and other social media platforms is regulated and censored by government
actors, Tassinari, Cohen, and Galvin's office have particularly coercive influence
over Twitter as a result of the roles they hold within the network of agencies that
regulate and censor speech on social media platforms. Exhibit A.

55.   More particularly, Tassinari and Cohen have especially close ties and coercive
influence over Twitter's legal team, with whom they authored the Playbook. As
just a single example, Tassinari, Cohen, and Stacia Cardille of Twitter's legal team,
were all at NASED's Winter Conference held on February 1-5 2021, when Twitter
deplatformed Dr. Shiva. Among other things, NASED President Tassinari and
Executive Director Cohen invited Twitter's Stacia Cardille, Associate General
Counsel, to give a talk on "Managing Misinformation on Social Media Platforms"
at that conference.

56.   Twitter is vulnerable to the coercive power of the system the other Defendants
developed. Indeed, the crucial influence which Tassinari and Cohen have
accumulated within the network of actors set out in Exhibit A. Twitter is well-
aware that Tassinari and Cohen can mobilize the network of government
regulators against Twitter if Twitter does not comply with their requests to
censor speech. All of the allegations in this action deal with the relationship
between the Defendants and Twitter. Twitter's action in banning Dr. Shiva from
Twitter was entirely reflexive on Twitter's part and served as no more than an
arm of the other Defendants' concerted actions.

57.     Indeed, for years, all social media companies have been under tremendous
        pressure to act against "election disinformation." This pressure has been
        unrelenting and from all sides: Congress, state politicians, DOJ, the press and
        public opinion. It never let up after the previous 2016 elections. In October 2020,
        Massachusetts U.S. Senator Edward Markey demanded in the Senate that
        FaceBook and other social media companies actively shut down voices that he
        deemed to be peddling "election misinformation."

58.     As a publicly traded corporation, Twitter is susceptible to these strong pressures.
        When any allegation that Twitter might promote or tolerate election
        misinformation would strike a blow to its valuation, Twitter is particularly
        vulnerable to the coercion of government actor like Tassinari who might allege
        that a tweet constitutes election misinformation or disinformation.

59.     Both the Massachusetts Elections Division and NASED are Twitter Trusted
        Partners, a status which provides each with access to a preferential Partner
        Support Portal ("PSP") entitling them to preferential treatment and response
        times to any complaints they may make.

60.     Ultimately, Dr. Shiva would land face-to-face with the tools the Defendants built
        to censor political speech on social media platforms when he ran for U.S. Senate
        in Massachusetts.

**Dr. Shiva Makes the United States his Home and Builds a Career in the Sciences as
Well as a Strong Candidacy for Senate**

61.     Long before the Defendants conspired to censor speech on social media, Dr. Shiva
        was born in India in 1963 into India's oppressive caste system as a low-caste

untouchable. The oppressive conditions and the corrupt system of socialist

governance in India motivated his parents to immigrate to the United States in

1970 to seek greater liberty and respect for individual rights, including the U.S.

Constitution's iron-clad protection for freedom of speech, as well as

opportunities for themselves and their children.

62.     Dr. Shiva earned four degrees from the Massachusetts Institute of Technology: a

bachelor's in Electrical Engineering and Computer Science, two masters degrees -

one in Mechanical Engineering and the other in Visual Studies - as well as a

doctoral degree in Biological Engineering.

63.     Dr. Shiva is a Fulbright Scholar, a Westinghouse Honors Award recipient, a

member of multiple research and engineering academic honor societies including

Eta Kappa Nu, Sigma Xi, and Tau Beta Pi, a Lemelson-MIT Awards Finalist, and

was nominated for the National Medal of Technology and Innovation bestowed

by the President of the United States.

64.     As an educator, Dr. Shiva has developed new curricula and taught at both

undergraduate and graduate levels at MIT and has presented invited lectures at

leading academic institutions across the world.

65.     Dr. Shiva is responsible for seven start-up technology companies and now runs a

biotechnology company, CytoSolve; an educational institute, Systems Health; an

artificial intelligence company, EchoMail; and, a not-for-profit research center,

International Center for Integrative Systems. Justia's list of Dr. Shiva's patents is

at https://patents.justia.com/inventor/v-a-shiva-ayyadurai

66.     Dr. Shiva has a long personal history of political activism including, among other

things, speaking out publicly about a myriad of issues. After leading a 5,000-person strong protest against apartheid in South Africa, he burned the South African flag on the steps of MIT. He has organized and led protest in support of fair wages for food service workers. Indeed, he has led hundreds of protests in Massachusetts on issues ranging including, among other issues, election integrity, digital rights for all, and clean food.

67. Though he never experienced government regulation of his free speech rights in the United States until the events described in this Complaint, the government of India did strike against him in retaliation for his political speech. He authored a document entitled "Innovation Demands Freedom," which detailed corruption in the Indian government run scientific organizations and which the prestigious journal Nature published. The Indian government successfully pressured Nature to take down the article, however, to silence Dr. Shiva's detailed reports of corruption.

68. As part of his consistent exercise of his free speech rights, in August 2011, Dr. Shiva opened his Twitter account, @va_shiva, to build an independent base and reach local, national, and global audiences to support his activism in various scientific, social and governance causes. This Twitter account also served as his primary platform to communicate with potential voters during his runs for political office. It is vital for this court to note that as a private citizen, this Twitter account represents the speech of a private individual even during a run for political office.

69. Between August 2011 and August 2020, Dr. Shiva had grown his Twitter audience from zero to a quarter of a million people who regularly heard what he

had to say on diverse political topics important to him, and interacted with him online. At the time of his deplatforming on February 1, 2021, he had 360,000 people following him on Twitter.

70.    In February 2017, as a natural outgrowth of his longstanding political activism, Dr. Shiva decided to run for the U.S. Senate as an Independent candidate mainly to seek to bring integrity and accountability to government. Ultimately, Dr. Shiva lost to incumbent Senator Warren in the 2018 campaign.

**Dr. Shiva disputes the results of the Massachusetts Republican Primary for U.S. Senate, including  based on the  Commonwealth's destruction of electronic ballots**

71.    Dr. Shiva ran for U.S. Senate again in 2020, this time as a Republican.

72.    Through his campaigns, Dr. Shiva had built a movement of millions of people in Massachusetts and across the United States, including 3,000 volunteers on the ground in Massachusetts. Through Twitter, Dr. Shiva raised over $1 million in support of his political campaign.

73.    Ironically, given the events detailed in this lawsuit, Dr. Shiva's platform was based upon, among other things, election integrity, and free speech. His campaign slogans, which he consistently used on Twitter as hash tags, were #StopElectionFraud and #TruthFreedomHealth.

74.    Dr. Shiva began his run for U.S. Senate against incumbent Senator Edward Markey as a Republican candidate in January 2019.

75.    Dr. Shiva built a ground organization of approximately 3,100 volunteers, distributed about 10,000 lawn signs, received donations from about 20,000

people that funded billboards at prominent spots on highways, advertisements on social media, radio, and television, and made "Dr. Shiva" a recognized household name across all 351 cities and towns in Massachusetts. In addition, Dr. Shiva personally crisscrossed the state and held rallies to reach a diversity of demographics. Dr. Shiva's campaign always met or exceeded all regulatory requirements set by the Elections Division at the Office of the Secretary of State.

76.    In February 2020, one year after Dr. Shiva began his campaign, Kevin O'Connor, in his first run for political office, entered the Republican primary race. O'Connor had little visibility, only a handful of volunteers, and no real campaign organization.

77.    On September 1, 2020, the Massachusetts Republican primary for U.S. Senate was held. Polling showed that Dr. Shiva was leading in all counties. The announced results showed he had won in Franklin County by nearly ten-percent (10%) over his opponent, but had lost in all other counties by a consistent ratio of approximately 60% to 40%.

78.    Franklin County was the only county that used mostly paper ballot, in which about 70 percent  of the votes were cast by paper ballot. The rest of the counties primarily used electronic systems that generated digital ballot images, which were then analyzed by a computer program to tabulate vote counts.

79.    Dr. Shiva's campaign filed Public Records Requests to the various counties, under MGL ch. 66, for (a) the list of participating voters - those who actually voted in the election, and (b) the counts of the actual numbers of votes cast. Seven of the fourteen towns/cities provided the records. In all seven towns/cities, the number of tabulated votes was larger than the number of participating voters. Boston had

about 4,100 more votes than participating voter, and Newton had about 1,700 more votes than participating voters. Accessing and analyzing the ballot images - which are in the chain of custody of tabulating votes - therefore became critical to understanding the root cause of the discrepancy between Franklin County and the other counties.

80.     On September 9, 2020, Dr. Shiva personally went to Secretary Galvin's office to deliver a Public Records Request to the Secretary, under MGL c. 66, to determine whether the Secretary of State stored all digital ballot images used to tabulate votes when ballots are electronically processed and to request copies of those digital ballot images. In all counties other than Franklin County (where the paper ballots are used for vote tabulation), the majority of paper ballots in the State were simply collected and stored, given the digital ballot images are what are used for tabulating votes in electronic voting machines.

81.     In those counties, which mainly use electronic systems for tabulating votes, the ballot images are the ballots, since the ballot images are the objects on which tabulation takes place. The ballot scanning machines scan the paper ballots and generate a ballot image, which ballot images are then counted to tabulate the votes in a federal election, while the paper ballots are merely physically retained and not used.

82.     Pursuant to federal law, including under 52 U.S.C. § 207(1), Galvin must securely store or retain for 22 months all records generated in connection with an election for a federal office, such as U.S. Senate.

83.     A video recording reveals that on the same day Dr. Shiva submitted his public records request, September 9, 2020, William Rosenberry, an Elections Division

official in Defendant Secretary Galvin's office, told Dr. Shiva that the Secretary possessed "no ballot images" as the Secretary's office "turned that feature off" so as to not save the ballot images, which were generated by the ballot scanners. The default setting on the electronic machines is to save all ballot images so as to be compliant with Federal law. Rosenberry informed Dr. Shiva that he would send him an email documenting Secretary Galvin's position on the matter.

84. On Monday, September 21, 2020, Dr. Shiva returned in person to Secretary Galvin's office to follow up on the Public Record Request. Dr. Shiva came with storage devices to collect the ballot images. He also documented, in writing, Rosenberry's earlier statement of the deletion of ballot images and further requested, in writing, what information the Secretary's office would be delivering him. Tassinari was also at this meeting, and informed Dr. Shiva in the presence of Rosenberry that the Secretary's office did not have to respond for 10 business days, and would respond by email by the end of the day on Wednesday, September 23, 2020 by email.

85. After not receiving any such email, on September 24, 2020, at about 9:00AM, Dr. Shiva contacted the Secretary's office by telephone and asked where the response to his Public Records request was. Rosenberry was recalcitrant and after Dr. Shiva informed him that he violated federal law for not delivering him his records within the 10 business days. Rosenberry responded, "No, I'm in violation of State law."

86. At the end of the conversation, Rosenberry assured Dr. Shiva that he would deliver it by 5:00 p.m. that day. Dr. Shiva documented this phone conversation by email, in which he specifically memorialized Rosenberry's admission to having

violated Massachusetts state law.

87.     Within less than 30 minutes of Dr. Shiva's email to Rosenberry, Tassinari
        responded to Dr. Shiva's request. Tassinari wrote, in part, that "the approval of
        digital scan equipment in Massachusetts specifically prohibits the capturing of
        ballot images."

88.     In response, Dr. Shiva asked Tassinari to identify the statute that Tassinari relied
        on for the claim that capturing ballot images was "prohibit[ed]." *Id.* In the
        following email exchange between Tassinari and Dr. Shiva, Tassinari identified no
        relevant statute that supported her contention, but did acknowledge that "the
        ballot images are not stored." *Id*. In other words, Dr. Shiva advocated in support
        of his position that after the electronic system for voting creates an image of a
        ballot, which image is then used to tabulate votes, the Commonwealth chooses
        not to maintain that ballot image, such that it is destroyed or disappears entirely.

89.     Finally, in a fourth email, Dr. Shiva reiterated his request for Tassinari to identify
        any statute that supported Tassinari's claim that capturing ballot images was
        prohibited, and explained that the Commonwealth had violated federal law by
        failing to maintain images of the electronic ballots. *Id.*

90.     Tassinari never replied to Dr. Shiva's final, fourth email and cited no statute or
        law that allowed Massachusetts to destroy the ballot images that were generated
        in connection with a federal election. Tassinari omitted Dr. Shiva's fourth email
        from her affidavit filed in this matter, a decision that can be construed only as
        aiming to conceal evidence from this court, given that the fourth email had been
        posted on Twitter and, as discussed below, was one of the four tweets specifically
        deleted by Twitter on behalf of the Defendants.

91.     Tassinari's email conversation with Dr. Shiva intended to downplay the critical
        importance of ballot images in the tabulation process of votes, and in Dr. Shiva's
        understanding to create a false impression of the preeminence of paper ballots.
        Elections officials across the country are aware of lawsuits filed by election
        integrity activists, such as John Robert Brakey seeking transparency in the
        handling of ballot images by State Elections Directors.

92.     The only possible conclusion is that Tassinari, a practicing attorney, chose the
        word "capture" in her original email to mislead and misdirect Dr. Shiva and give
        the false impression that in Massachusetts ballot images never exist, at all, at any
        time. The reality is that they are used to tabulate votes. This is supported by the
        effort expended by both Tassinari and O'Malley to falsely claim, including in press
        statements, that the paper ballots are saved and so Federal law has been
        satisfied, as if paper ballots are used to tabulate the vote when electronic
        machines are used.

### The Defendants Conspire to Retaliate Against Dr. Shiva for Dr. Shiva's Exercise of his Free Speech Rights

93.     During the period from September 1, 2020 to September 25, 2020, Dr. Shiva
        posted a series of tweets specifically on election fraud in Massachusetts,
        reiterating his position that Massachusetts had destroyed ballots. None of those
        tweets specifically identified Tassinari.

94.     As a result of those tweets, Twitter neither banned Dr. Shiva nor forced Dr. Shiva
        to remove these tweets. Among those tweets, on September 24, 2020, Dr. Shiva
        posted on Twitter that Massachusetts destroys ballot images. Dr. Shiva also
        posted that in seven Massachusetts cities/towns there were more votes counted

than are participating voters, and appended the Twitter hashtag #ElectionFraud to his tweets. This tweet went viral and generated much commentary. It did not, however, identify Tassinari by name or position.

95.   Upon learning of Dr. Shiva's September 24, 2020 tweet, Tassinari instructed O'Malley, who as the Communications Director, is the point person in Galvin's office who manages the Election Division's official Verified Twitter account, to report that tweet to Twitter, which O'Malley did.

96.   Tassinari took no action to advocate for the removal of the September 24, 2020 tweet other than instructing O'Malley to report that tweet to Twitter.

97.   O'Malley, as the official spokesperson for Galvin, Tassinari, and the Elections Division, released statements to the Associated Press, Reuters, and Leadstories.com that this tweet constituted "Election Misinformation" and claimed that no ballot was destroyed in violation of federal law.

98.   Twitter did not delete the September 24, 2020 tweet.

99.   On September 25, 2020, Dr. Shiva followed his September 24, 2020 tweet with a thread of four tweets that revealed, via screenshots, the email conversation with Tassinari, which was written confirmation from the Secretary's own office that records generated during a Federal election – the ballot images - the very records used for tabulation - were destroyed and "not stored."

100.  Unlike the September 24, 2020 tweet, the September 25, 2020 screenshot tweets identified Tassinari by name and Dr. Shiva relied on them to support his contention that she and Galvin's office more broadly violated federal law, including because they included screenshots of Dr. Shiva's emails with Tassinari.

101. Dr. Shiva's September 25, 2020 screenshot tweets upset Tassinari, particularly because they identified her by name. She was highly motivated to ensure that the September 25, 2020 screenshot tweets were removed because they revealed that she personally engaged in problematic conduct.

102. Unlike the decision to send out a press release to the media regarding the Commonwealth's position on Dr. Shiva's September 24, 2020 tweet, no one at Galvin's office sent out a press release in response to the September 25, 2020 screenshot tweets or otherwise sought to speak publicly to contradict the substance of Dr. Shiva's September 25, 2020 screenshot tweets. They chose not to combat what they considered "bad speech" with "good speech."

103. Tassinari testified under oath at the October 30, 2020 hearing in this matter that she did not report the September 25, 2020 screenshot tweets to Twitter, did not ask O'Malley to do so, and did nothing else to cause the September 25, 2020 screenshot tweets to be reported to twitter. Oct. 30 Tr. at 53:24–54:14.

104. Contrary to Tassinari's testimony that she did nothing to cause the September 25, 2020 screenshot tweets to be reported to Twitter, Tassinari—at a time when she was the President-elect of NASED—communicated directly with NASED Executive Director Cohen in the hope that Cohen would report Dr. Shiva's September 25, 2020 screenshot tweets to Twitter.

105. By coordinating with Cohen, she hoped to amplify pressure on Twitter to punish Dr. Shiva for his tweets about her emails, and hoped that doing so would cause Twitter to suspend his account so that he could not tweet at all during his election campaign for the official reason of "Election Misinformation."

106.   Tassinari's decision to use Cohen and NASED as an intermediary to submit a
complaint about Dr. Shiva's September 25, 2020 screenshot tweets was
consistent with the unconstitutional principle in the Playbook that election
directors should seek to censor speech on social media that "disparage[s] the
people that run elections." *Id*. at 17. Tassinari also chose this route to avoid
creating a public record.

107.   NASED, via Cohen did report Dr. Shiva's September 25, 2020 screenshot tweets to
Twitter through the Partner Support Portal. Indeed, the Declaration of Stacia
Cardille reveals that Twitter learned of the September 25, 2020 screenshot
tweets through a report from NASED through the Partner Support Portal. ECF No.
96, ¶13.

108.   NASED made its report based on the allegations that Tassinari supplied to Cohen.

109.   NASED's report to Twitter contained contentions that mirrored Tassinari's
position:

> [The Tweet] is incorrect. Massachusetts does not, and did not,
> destroy ballots. The voting equipment used in Massachusetts does
> not store images of the ballots, and Massachusetts stores physical
> copies of the paper ballots consistent with federal laws. This person
> doesn't understand that the images are not the ballots of record, the
> physical ballots are the records, which Massachusetts retains for 22
> months.
> *Id*. ¶14.

110.   As a direct result of NASED's report via Cohen that Tassinari prompted, Twitter
caused the removal of the September 25, 2020 screenshot tweets and repeatedly
locked Dr. Shiva out of his Twitter account until November 4, 2020, the day after
the general election.

111.   After Cohen reported back to Tassinari that her directive had been followed, Tassinari went on Twitter to verify the September 25, 2020 screenshot tweets had been deleted, and "was relieved" to see that Twitter indeed had removed them.

112.   As a direct result, of the other Defendants' coercive conduct described above, Twitter continued to monitor Dr. Shiva's tweets.

113.   Dr. Shiva continued to run his campaign. On October 4, 2020, his access to Twitter was restored. Dr. Shiva posted tweets about the rallies he had held, his objections to election fraud and the destruction of ballot images. Those tweets remain public.

114.   Twitter did not censor Dr. Shiva or to any of his tweets until February 1, 2021.

115.    On February 1, 2021, Dr. Shiva through a video lecture published on Twitter the September 25, 2020 screenshots tweets to educate his students on developments in his lawsuit.

116.   Dr. Shiva's video lecture including the September 25, 2020 screenshot tweets concluded at 9:31 PM on February 1, 2021.

117.   At 9:48 p.m., just seventeen minutes after the conclusion of the video lecture posted on Twitter containing the September 25, 2020 screenshot tweetss, Twitter emailed Dr. Shiva to announce that he had been suspended permanently: deplatformed.

118.   That email stated: "Your account va_shiva has been suspended for violating the Twitter Rules" and in the subject line, "Your Twitter account has been

suspended," and warned him that "…if you attempt to evade a permanent suspension by creating new accounts, we will suspend your new accounts."

119. Dr. Shiva appealed the suspension through Twitter's internal appeal process and received no response, until April 9, 2021, after Twitter was named a proposed Defendant in this lawsuit, and was served with a Motion for Joinder.

120. Twitter never undertook any independent review of Dr. Shiva's at-issue tweets. In the seventeen minutes between the conclusion of Dr. Shiva's video lecture and Twitter's announcement that Dr. Shiva's account had been suspended, there was insufficient time for any purportedly independent review. Instead, Twitter relied entirely on the judgment of the Defendants. Twitter suspended Dr. Shiva's account at the behest of the other Defendants and because of the coercive influence that Tassinari, Cohen, and others had and continue to have over Twitter.

121. Twitter's suspension of Dr. Shiva continues through the present.

122. Leading up to September 25, 2020 and following the conclusion of Twitter's initial suspension of Dr. Shiva, Dr. Shiva tweeted on a host of highly controversial topics, including, among others, a tweet "The #DeepState created #[Black Lives Matter] to distract US from uniting Working People," another criticizing COVID-19 vaccinations and stating that COVID-19 is a fraud, and—critically—many other tweets asserting election fraud in Massachusetts.

123. Twitter did not discipline Dr. Shiva in any respect for any other of his highly controversial tweets, in stark contradiction to the Tweets that specifically identified Tassinari.

124.   Twitter's choice not to discipline Dr. Shiva for his controversial tweets confirms that Twitter suspended Dr. Shiva as a direct result of the other Defendants coercion of Twitter, and not for any other reason.

**The Defendants Misrepresented to the Court that they solely reported Dr. Shiva's September 24, 2020 tweet through Twitter's ordinary portal.**

125.   The choice of Twitter not to discipline Dr. Shiva for his controversial tweets confirms that Twitter suspended Dr. Shiva as a direct result of the other Defendants coercion of Twitter, and not for any other reason.

126.   The Defendants in this case, both in affidavits and through counsel, have sought both through material omissions and affirmative misrepresentations to conceal their conspiracy to censor Dr. Shiva. Their consistent cooperation in doing so confirms the extent to which Twitter is coerced and strongly encouraged by and cooperates with the other Defendants.

127.   The Defendants' failed attempts to conceal that conspiracy have confirmed the extent to which all the Defendants continue to work together to seek to ensure the censorship of Dr. Shiva.

128.   The government Defendants endeavored to conceal their particularly coercive power over Twitter, despite themselves developing the well-articulated plan for how to respond to purported misinformation and disinformation and holding positions of particular influence enabling them to coerce Twitter.

129.   The Defendants at first took the firm position that they did nothing but report a single tweet of Dr. Shiva, the September 24, 2020 tweet, as being false "just as any person could have done." Opposition to Plaintiff's Motion for an Emergency

Temporary Restraining Order (ECF No. 15), at 1.

130. None of the Defendants disclosed to this Court the existence of the Playbook. To the contrary, they at first asserted that each of them had done nothing but report Dr. Shiva's tweets to Twitter as any ordinary member of the public might do.

131. O'Malley swore in her October 29, 2020 affidavit that she simply reported Dr. Shiva's September 24, 2020 tweet "as false, using the mechanism within Twitter for reporting Tweets that violate the terms and conditions of that platform." ECF No. 15-1, ¶5.

132. Tassinari, as well, chose not to disclose to the Court in her October 29, 2020 affidavit that Galvin's office is a Twitter Trusted Partner that receives preferential treatment when it reports tweets. ECF No. 15-2.

133. Both O'Malley and Tassinari swore that O'Malley's report of Dr. Shiva's September 24, 2020 tweet was "the one and only time I, or to my knowledge, anyone in my office, has reported one of Ayyadurai's Tweets to Twitter for any reason." ECF No. 15-1, ¶9; ECF No. 15-2, ¶11. But Tassinari did report the September 25, 2020 screenshot tweets identifying her in particular to Cohen at NASED, without filing a complaint directly through Twitter. She did this so that Cohen, who speaks for NASED, could complain to Twitter on Tassinari's behalf.

134. The October 30, 2020 evidentiary testimony before this Court revealed that O'Malley and Tassinari had each chosen not to include in their affidavits the special relationship that Galvin's office enjoys with Twitter and with NASED.

135. At that hearing O'Malley revealed for the first time that Galvin's office as well as NASED enjoy preferential treatment in reporting complaints about tweets to

Twitter as a "Twitter Trusted Partner." October 30, 2020 Hearing Transcript, at 61:9–19.

136.   As a Twitter Trusted Partner, Twitter looks at reports from the Massachusetts Elections Division "quickly" because they are "Aware of which accounts are election official accounts." *Id.* at 61:16–62:4. 120. As the Court put it following O'Malley's testimony when describing how the Defendants reported Dr. Shiva's tweets, "I now know that not only did Secretary Galvin's office report this complaint about [the tweet], but it was through an account that they and their colleagues around the country had been assured would get priority attention and that the executive director of the national organization [Cohen], as Secretary Galvin hoped, also filed a report, and the hope was that the tweet would be deleted." Transcript of October 30, 2020 Hearing, 80:7–15.

137.   While the September 24, 2020 tweet was not deleted, "Four others were, and there's no evidence that there's any other reason the others [from September 25, 2020] were deleted." *Id.* at 80:16–17. 121. The October 30, 2020 hearing also revealed that, contrary to her sworn affidavit, Tassinari caused the September 25, 2020 screenshot tweets to be deleted and was "relieved" that they had been removed. In particular, Tassinari testified that she checked to see if Dr. Shiva's tweet relating to her had been removed and was "relieved" when she saw that it was. *Id.* at 73:12–23.

138.   Only the September 25, 2020 screenshot tweets were deleted—not the September 24, 2020 tweet—so the only reason for Tassinari to have been relieved was that the September 25, 2020 screenshot tweets that included her emails with Dr. Shiva had been deleted.

139. The Affidavit of Stacia Cardille, Director and Associate General Counsel for
Twitter, reveals how much Twitter was willing to go to conceal its participation
in the conspiracy to censor Dr. Shiva. *See* ECF No. 96. 27 123. Cardille claims that
Twitter suspended Dr. Shiva's account as a result of multiple tweets upon with
Twitter acted. But review of the complete set of tweets reveals that he sworn
statements are inaccurate.

140. Although Twitter suspended Dr. Shiva on February 1, 2021, Cardille falsely
claimed in her affidavit that Twitter did not suspend Dr. Shiva's account until a
full two days later on February 3, 2021. ECF No. 96, ¶23. More particularly,
Cardille's sworn statement that Dr. Shiva's "suspension took effect on February 3,
2021," *id.*, is directly contradicted by Twitter's February 1, 2021 email to him
stating that his account "has been suspended."

141. The demonstrably false claim of Cardille that Twitter did not suspend Dr. Shiva
until February 3, 2021 demonstrates the lengths to which Twitter will go to claim
it exercises independent judgment rather than simply responding to the demands
of government actors with disproportionate influence, like Tassinari.

142. For example, while Cardille claimed that two January 17, 2021 tweets of Dr. Shiva
violated Twitter's rules so that Twitter locked Dr. Shiva's account, the reality is
that Twitter did not lock Dr. Shiva's account. *See* ECF No. 96, ¶20. Rather, he
continued to tweet on that same date.

143. Bizarrely, on the basis of Facebook posts—not tweets on Twitter—Cardille
further swore that Dr. Shiva violated Twitter's rules. *Id.* ¶¶22–23. 128. In
response to Dr. Shiva's articulation of the respects in which Cardille's original
affidavit (ECF No. 96) was false, Cardille submitted a supplemental affidavit. In

that supplemental affidavit (ECF No. 100) she conceded that Twitter had "reviewed" the February 1, 2021 tweets "shortly before" 9:48 PM, when Twitter emailed Dr. Shiva announcing that his account "has been suspended." ECF No. 100, ¶3. Cardille also claimed that, despite the technological prowess of Twitter, Twitter had inadvertently concluded that it had suspended Dr. Shiva's account on February 3, 2021. *Id*. ¶4. In fact, as Twitter now concedes through Cardille, Twitter suspended Dr. Shiva's account "immediately" after the Twitter employee saw it. *Id*.

144. The coordinated efforts of the Defendants to misrepresent their awareness of the violations of law they are committing and fear for their exposure.

**F. Analysis of Regulation of Purported Misinformation Confirms Censorship of Dr. Shiva.**

145. On June 15, 2021, a group known as the Election Integrity Partnership published a report describing purported misinformation in the 2020 election which highlighted Dr. Shiva, titled as "The Long Fuse: Misinformation and the 2020 Election." A copy of that report is attached here as Exhibit B. 131. The Long Fuse report highlights, consistent with the efforts of the Defendants to regulate and censor speech on social media platforms, that no federal agency has an explicit focus on "election misinformation originating from domestic sources." *Id*. at v.

146. Indeed, the Long Fuse report laments, consistent with the Defendants' efforts, that "disinformation that originates from within the United States, which would likely be excluded from law enforcement action under the First Amendment and not appropriate for study by intelligence agencies restricted from operating inside the United States." *Id.* at 2.

147.  Published several months after Dr. Shiva was suspended from Twitter, the Long Fuse report devotes substantial attention to Dr. Shiva and identifies him as a purveyor of electoral misinformation who must be censored. *Id.* at 203.

148.  Conspicuously, the Long Fuse report omits any mention of the Defendants censorship of Dr. Shiva but devotes itself to further advocating for regulating and censoring him based on what it concluded were "dubious" arguments. *Id.* at 134.

149.  At bottom, the Defendants' censorship of Dr. Shiva reflects the implementation of a determined effort to strip social media platforms of any speech that government actors working with ostensibly private actors view as "dubious" or problematic.

150.  The Defendants, including Twitter, continue to discuss and implement the banning of Dr. Shiva from Twitter, at least because of this lawsuit, but also as demonstrated in their discussion of Dr. Shiva in the Playbook.

PRAYER FOR RELIEF

**Count 1**
**Injunctive and Declaratory Relief**

151.  Freedom of speech is a right guaranteed under the First Amendment of the United States Constitution.

152.  As alleged above, the Defendants have unlawfully deprived the Plaintiff of his constitutional rights and, without the Court's intervention, will continue to do so.

153.  Unless enjoined by order of this Court, the conduct alleged above will cause great and irreparable injury to Plaintiff. Further, a judicial declaration is necessary and appropriate so that all parties may know the basis of the injunctive relief and understand their respective rights and act accordingly.

WHEREFORE, Plaintiff prays for judgment as follows:

1. A declaration that Defendants' actions, described herein, violate the First Amendment to the United States Constitution;

2. An order enjoining all Defendants and their employees, agents, and any persons acting in concert with them from further violation of Plaintiff's civil rights under the First Amendment to the United States Constitution.


August 9, 2021                          /s/ Timothy Cornell
                                        Timothy Cornell (BBO# 654412)
                                        tcornell@cornelldolan.com
                                        Cornell Dolan, P.C.
                                        10 Post Office Square,
                                        Ste 800 South
                                        Boston, MA 02119
                                        (617) 850-9036