UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                                    )
DR. SHIVA AYYADURAI,                )
                                    ) Civil Action
          Plaintiff,                ) No. 20-11889-MLW
                                    )
v.                                  )
                                    )
MICHELLE K. TASSINARI, DEBRA O'MALLEY,  )
AMY COHEN, NATIONAL ASSOCIATION OF  )
STATE ELECTION DIRECTORS, TWITTER, INC.,)
all in their individual capacities, and )
WILLIAM FRANCIS GALVIN, in his official )
capacity as Secretary of State for  )
Massachusetts,                      )
                                    )
          Defendants.               )
                                    )
```

* SEALED PORTION OF PROCEEDING REMOVED FROM TRANSCRIPT

BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE

VIDEOCONFERENCE
HEARING

August 4, 2021
2:14 p.m.

John J. Moakley United States Courthouse
Courtroom No. 1
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
One Courthouse Way, Room 3200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    Counsel on behalf of Plaintiff:
      Pro Se
 3    Shiva Ayyadurai
      701 Concord Avenue
 4    Cambridge, MA 02101

 5    Howard M. Cooper
      Max Stern
 6    Max D. Stern
      Benjamin Wish
 7    Todd & Weld
      One Federal Street
 8    Boston, MA 02110
      617-720-2626
 9
      Timothy M. Cornell
10    Cornell Dolan, P.C.
      One International Place
11    Boston, MA 02110
      603-277-0838
12
      Counsel on behalf of Defendants William Galvin, Michelle
13    Tassinari and Debra O'Malley:
      Adam Hornstine
14    Anne L. Sterman
      Attorney General's Office
15    18th Floor
      One Ashburton Place
16    Boston, MA 02108
      617-963-2048
17
      Counsel on behalf of Defendant Amy Cohen and NASED:
18    Nolan Mitchell
      Quarles & Brady LLP
19    1701 Pennsylvania Avenue, Suite 700
      Washington, DC 20006
20    202-780-2644

21    Counsel on behalf of Defendant Twitter:
      Felicia H. Ellsworth
22    Ari Holtzblatt
      Wilmer Cutler Pickering Hale and Dorr LLP
23    60 State Street
      Boston, MA 02109
24    617-526-6000

25
```

P R O C E E D I N G S

SEALED PORTION OF PROCEEDING REMOVED FROM TRANSCRIPT

COURTROOM CLERK:  Your Honor, the other litigants are in the main session, and we are slowly adding the rest of the public to the public session.

THE COURT:  Okay.  Please let me know when you've succeeded in that because there are three others, Dilan Esper, Michelle Jeffalone and John Medlar that need to be on.

COURTROOM CLERK:  Yes, and I don't see those folks in the waiting room.

MR. AYYADURAI:  Your Honor, they're physically in my home.  Michelle is my fiance and John is my assistant.

THE COURT:  And what about Mr. Esper?

MR. AYYADURAI:  He should be coming in online.  He's from California.

THE COURT:  He should have been coming in online at 2:00.  It's now 3:45.  What's his number?

MR. AYYADURAI:  His phone number?

THE COURT:  Yes.  I assume, if he's a lawyer, it's a matter of public record.

MR. AYYADURAI:  Should I give it to you, Your Honor?

THE COURT:  Yes.

MR. AYYADURAI:  It's 1-323-839-6618.

THE COURT:  Okay.  After she calls the case, the clerk will call Mr. Esper and tell him he's --

1              (Phone interruption.)

2         COURTROOM CLERK:  Your Honor, if he's joining --

3         THE COURT:  What's that?

4         COURTROOM CLERK:  If Mr. Esper is joining by video,

5    then his name should appear in our waiting room, but it doesn't

6    appear that he's called in yet.

7         THE COURT:  All right.  So you'll need to call him up

8    after you call the case.

9         COURTROOM CLERK:  Yes.

10        THE COURT:  Please do call the case.

11        COURTROOM CLERK:  This is Civil Action No. 20-11889,

12   *Shiva Ayyadurai v. William Francis Galvin, Michelle K.*

13   *Tassinari, Debra O'Malley, Amy Cohen and National Association*

14   *of State Election Directors*.

15        Participants are reminded that recording and

16   rebroadcasting of this hearing is prohibited and may result in

17   sanctions.

18        THE COURT:  Good afternoon.  Let me emphasize the

19   obligation that nobody, including any member of the public,

20   tweet or rebroadcast these proceedings.  I've said this at

21   other hearings, and months ago we had a violation.  But I'm

22   conducting this hearing by videoconference in part because of

23   the resurgence of the pandemic but in part so it can be

24   accessible to the public, and there are many people, many

25   members of the public who are evidently interested in this and

1    have joined this videoconference.  But if there's a violation

2    of the court rules and requirements in this regard, there won't

3    be any more videoconferences open to the public at least.

4           I regret the delay in starting this public session,

5    but I've been involved in discussions with the plaintiff, Dr.

6    Ayyadurai, Todd & Weld and Timothy Cornell, and they took

7    longer than I anticipated.

8           Would counsel please identify themselves for the Court

9    and for the record.  And I will say by way of preamble that as

10   a result of the discussions we've had, Mr. Cornell is going to

11   continue to represent Dr. Ayyadurai.  Dr. Ayyadurai understands

12   that he's the client, not the lawyer.  I have not authorized

13   what's generally called hybrid representation.  If he wants to

14   present factual information to the Court which will, unless I'm

15   asked and in advance authorize something else, the information

16   will be provided in an affidavit or in possible testimony.

17          And I will consider on a case-by-case,

18   request-by-request basis in the context of specific requests

19   whether to let Dr. Ayyadurai speak if this case continues and

20   is not dismissed.  And that, as I also discussed, is an open

21   issue, if it's not dismissed as a sanction.  But in any event,

22   Mr. Cornell, do you want to identify yourself for the record.

23          MR. CORNELL:  Timothy Cornell of Cornell Dolan for the

24   plaintiff, Dr. Shiva Ayyadurai.

25          THE COURT:  Okay.  And I am going to grant Todd &

```
 1    Weld's motion to withdraw, so why don't we start with what I'll
 2    call the Galvin defendants.
 3              MR. HORNSTINE:  Good afternoon, Your Honor.  Assistant
 4    Attorney General Adam Hornstine.  My pronouns are he/him/his,
 5    and I'm here today on behalf of Secretary Galvin, Michelle
 6    Tassinari and Debra O'Malley.
 7              MS. STERMAN:  Good afternoon, Your Honor.  Assistant
 8    Attorney General Anne Sterman, she/her/hers, also on behalf of
 9    the same defendants.
10              MR. MITCHELL:  Good afternoon, Your Honor.  Nolan
11    Mitchell from Quarles & Brady.  I represent the National
12    Association of State Election Directors and Ms. Cohen.
13    Ms. Cohen is here today, as is Keith Ingrim, the representative
14    from NASED.
15              MS. ELLSWORTH:  Good afternoon, Your Honor.  Felicia
16    Ellsworth from Wilmer Hale here on behalf of non-party Twitter.
17    My partner Ari Holtzblatt is also here also on behalf of
18    Twitter.
19              THE COURT:  Okay.  As I indicated in my August 2
20    order, docket number 176, and as I amplified in the closed
21    session, I've decided to dismiss the claims against the
22    defendants individually for money damages based on qualified
23    immunity at least and the claim with regard to Count 5, I
24    believe it is, for infliction of emotional distress because it
25    doesn't state a plausible claim.  And there may be other
```

1    reasons to dismiss some of the claims, except for Count 6.

2         I will issue a written decision explaining my

3    reasoning, but the only remaining claim is Count 6 as a

4    practical matter and the open question of whether Twitter

5    should be added as a party and related question of whether it

6    can be sued in the District of Massachusetts.

7         I'll say that, although I received some information

8    under seal, ex parte, that information -- I reached my

9    conclusion before I received that information, and that

10   information is not material or didn't have any impact on my

11   decision.  I did have the July 22 memorandum signed by

12   Mr. Cornell on behalf of the plaintiff, which I did consider.

13        I'll give the plaintiff an opportunity to be heard on

14   this if he wishes, but it's my present intention to strike the

15   proposed revised second amended complaint filed on July 22,

16   because it's signed by Dr. Ayyadurai at a time when he was

17   represented by counsel.  That is not permissible under Rule

18   11(a), and the rule says it must be struck.

19        However, if I don't dismiss this case, I am going to

20   give the plaintiff a couple of days to file the revised

21   complaint that alleges only the claim in Count 6 and seeks to

22   add Twitter as a party to that claim.  And then in my present

23   conception I would decide the Eleventh Amendment issue, which I

24   discussed extensively with you in May and received from the

25   Attorney General a further brief on on June 1, I believe.

```
 1            So as I said, I'm going to strike it, and when I
 2    strike it, I'll put it under seal because, as I did discuss in
 3    the nonpublic session, it does include information that
 4    shouldn't be part of the public record, the home addresses of
 5    the defendants, for example, although plaintiff pointed out to
 6    me that that information has been on the public record since
 7    his original complaint and this is the first time he says that
 8    the issue has been raised.  But that's how I intend to deal
 9    with that, subject to hearing from you.
10            Mr. Cornell, do you want to be heard on that?
11            MR. CORNELL:  No.  We have no objection.
12            THE COURT:  All right.  And do the defendants want to
13    be heard on that, subject to perhaps coming back to it after I
14    hear the argument with regard to sanctions, including dismissal
15    as a possible sanction?
16            MR. HORNSTINE:  On behalf of Commonwealth defendants,
17    Your Honor, no need to be heard further on that.
18            MR. MITCHELL:  Same goes with respect to NASED and
19    Ms. Cohen.
20            THE COURT:  All right.  At the moment, Twitter is not
21    a party, but Ms. Ellsworth or Mr. Holtzblatt, do you want to be
22    heard on that?
23            MS. ELLSWORTH:  No need for us to be heard on that,
24    Your Honor.  Thank you.
25            THE COURT:  All right.  So you have a series of -- do
```

1    we have Mr. Esper yet?  I'll ask the clerk if she's reached

2    him.

3              COURTROOM CLERK:  Not yet.  I did leave a voicemail.

4              THE COURT:  Do you have an email address for

5    Mr. Esper, Dr. Ayyadurai?

6              MR. AYYADURAI:  Yes.  Should I give it publicly, Your

7    Honor?

8              THE COURT:  Is it his law firm's email address?

9              MR. AYYADURAI:  I'm not sure if it's his personal.

10   Let me find out.

11             COURTROOM CLERK:  Your Honor, the plaintiff can email

12   that to me.

13             THE COURT:  Why don't you email it to the clerk.

14             MR. HORNSTINE:  Your Honor, if it pleases the Court,

15   his email address, his firm email address is publicly available

16   online.  If it would be easier for me to read it to the clerk,

17   I'd be happy to do so.

18             THE COURT:  Go ahead, but if there's a personal email

19   address, the plaintiff should send it.

20             MR. HORNSTINE:  So his firm --

21             MR. AYYADURAI:  I will send it to you, Ms. Loret.

22             COURTROOM CLERK:  Thank you.

23             THE COURT:  Was that his firm email address or his

24   personal email address?

25             MR. AYYADURAI:  I'm not sure if he uses it for both,

 1 | Your Honor.

 2 |         THE COURT:  All right.  But it's the law firm address?

 3 |         MR. AYYADURAI:  It has that as the suffix.

 4 |         THE COURT:  Right.  Harder & Harder?

 5 |         MR. AYYADURAI:  No.  Harder LLP.

 6 |         THE COURT:  Harder LLP, okay.  Is that the only email

 7 | address you have?

 8 |         MR. AYYADURAI:  Yes.

 9 |         THE COURT:  And did you tell me earlier today in the

10 | closed session that you spoke to Mr. Esper and told him I had

11 | ordered you to cause him to attend this hearing?

12 |         MR. AYYADURAI:  Yes, I told him immediately.

13 |         THE COURT:  And did he tell you he would do that?

14 |         MR. AYYADURAI:  Yes.  That's what he told me.

15 |         COURTROOM CLERK:  Your Honor, I have sent the Zoom

16 | invitation link to Mr. Esper.

17 |         THE COURT:  Okay.  You should let me know if and when

18 | he appears.

19 |         COURTROOM CLERK:  Yes.

20 |         THE COURT:  All right.  The next item on my agenda is

21 | whether to impose sanctions and/or commence contempt

22 | proceedings for the violation of my June 16 order caused by the

23 | termination of Todd & Weld on about July 13, two days before

24 | substantial submissions were due on July 15, and Mr. Cornell's

25 | subsequently withdrawn motion to withdraw as new counsel for

1    the plaintiff.

2         The background of this is discussed in detail in my

3    ten-page July 16, 2021 order, docket 160, and there's

4    additional relevant orders, my August 3 order, docket 178 --

5    well, my August 3 order, 178, my August 4 order, 182, and the

6    responses to it.

7         My tentative view -- well, generally speaking, the

8    legal standard with regard to sanctions, the standards with

9    regard to sanctions include the following:  Rule 16(f) of the

10   Federal Rules of Civil Procedure states that, "On motion or on

11   its own, the Court may issue any just order including those

12   authorized by" -- excuse me.  I'll ask the deputy clerk, on my

13   screen there's a big green telephone in the middle where the

14   speaker should be, and I think I'm getting some feedback from

15   it.  Do we know who that is?

16        COURTROOM CLERK:  Your Honor, it's a member of the

17   public.  As members of the public join, for a split second

18   there will be an indication that they have joined, and we are

19   muting everybody.

20        THE COURT:  Well, I don't think that's what that was.

21   But, okay.  Let's start again.  Thank you.

22        Rule 16(f) of the Federal Rules of Civil Procedure

23   states that, "On motion or on its own, the Court may issue any

24   just orders, including those authorized by Rule 37(b)(2), if a

25   party fails to obey a scheduling order or other pretrial order.

1      "Rule 37(b)(2) provides a range of sanctions available

2    to the Court, including dismissing the action or proceeding in

3    whole or in part.  Further, instead of or in addition to any

4    other sanction, the Court must order the party, its attorney or

5    both, to pay the reasonable expenses, including attorneys' fees

6    incurred because of any noncompliance with this rule, unless

7    the noncompliance was substantially justified or other

8    circumstances make an award of expenses unjust.

9      "When confronted with a party's defiance of its

10   management authority, a District Court is necessarily vested

11   with considerable discretion in deciding whether to impose

12   sanctions on that party, and, if so, in determining what form

13   the sanctions should take," as the First Circuit said in *Jones*,

14   990 F.2d 1, 5.

15     "However, prior to choosing the harsh sanction of

16   dismissal, the District Court should consider the broad panoply

17   of lesser sanctions available to it, such as contempt, fines,

18   conditional orders of dismissal," et cetera, the First Circuit

19   said in *Crossman*, 316 F.3d 36, 39-40.

20     "Relevant substantive factors for the Court to

21   consider when weighing sanctions include the severity of the

22   violation, the legitimacy of the party's excuse, repetition of

23   violations, the deliberateness vel non of the misconduct,

24   mitigating excuses, prejudice to the other side and to the

25   operations of the Court and the adequacy of lesser sanctions,"

1    the First Circuit said in *Vallejo*, 607 F.3d 1, 7-8.

2         There is also a procedural dimension.  "Although Rule

3    16 and others do not formally require any particular procedure,

4    counsel's disregard of a prior warning from the Court

5    exacerbates the offense, and the lack of warning sometimes

6    mitigates it."  That's *Robson*, 81 F.3d 1, 2-3.

7         So in my July 16 order I put the plaintiff on notice

8    that I would consider sanctions, including possibly dismissal

9    as well as possible contempt proceedings.  And I've since

10   received filings from the plaintiff, the Galvin defendants and

11   the NASED defendants, on those issues.

12        So Mr. Hornstine, would you like to go first with

13   regard to sanctions up to and including dismissal?

14        MR. HORNSTINE:  I would be happy to go first if that

15   is what the Court wishes.

16        THE COURT:  I think so.  And there's still information

17   under seal that I've been asked to keep under seal from the

18   attorneys, but one thing that's relevant to possible sanctions

19   is who wrote the July 22 memo, and that's why I felt you

20   essentially had a right to know about the discrepancy of the

21   information I received, and I did discuss that with the

22   plaintiff and Mr. Cornell, and I want to discuss it with

23   Mr. Esper, which the plaintiff has authorized in the closed

24   session.

25        But I think you should go ahead.  I'll hear from

1    Mr. Mitchell and then from Mr. Cornell, and hopefully Mr. Esper

2    will join so we can get relevant information from him.  But go

3    ahead.

4              MR. HORNSTINE:  Thank you very much, Your Honor.

5              Perhaps before proceeding, might I ask -- and I'm

6    certainly aware of why the Court wanted to proceed earlier this

7    afternoon with the ex-parte under-seal proceedings, but might I

8    ask if at some point portions of that transcript might be able

9    to be redacted and others made public, that would be helpful

10   for counsel to know at some point, but we can cross that bridge

11   another day perhaps.

12             THE COURT:  Yes.  In fact, yes.  And I think I'd need

13   a motion.  I'd have to see what's relevant.  You know, I did

14   order the parties to file it under seal.  I think implicit in

15   that is the risk that it wouldn't stay permanently under seal.

16   But unless there's some good reason to unseal it, Mr. Cooper at

17   least would prefer the matters remain under seal.

18             And actually, I mean, my agenda today, maybe I should

19   have laid it out, is to address the sanction issue, including

20   what your reasonable attorney's fees are and what the NASED

21   defendants' are.  Because if I find there's no substantial

22   justification for the failure of the plaintiff to obey my June

23   16 order, the rule says I must order compensation to you, and

24   it's at a minimum what I tentatively intend to do.  And again,

25   I put this in my order on August 2, Monday, number 176.  But is

1   there anything that you or any of the other attorneys feel we

2   ought to discuss before we get to the sanctions issue?

3        MR. HORNSTINE:  The only issue that I wanted to raise

4   was the issue that I just raised, the question of whether all

5   or some portion of the proceedings under seal might at some

6   point be unsealed for the benefit of counsel.

7        THE COURT:  We'll see.  But in fact, let me tell you

8   all the following.  And this was a view that was reached before

9   I developed questions as to who wrote the July 22 memo and got

10  the response from Dr. Ayyadurai who will reiterate, I expect

11  emphatically, that he wrote it, not an attorney.  And that

12  could be relevant to what sanction, if any, to impose.  But my

13  tentative view is, at a minimum, and this is based in part on

14  what I have under seal, I find that there was no substantial

15  justification for discharging Todd & Weld, and as a result, the

16  failure to obey the scheduling order which the plaintiff knew

17  would occur as a result.  That's one.  And then I would order

18  compensation to you.

19       Sanctions can be not just to compensate the defendant.

20  They can also serve a punitive purpose, so I would have the

21  discretion to impose a fine that will be paid to the court.

22  And I didn't read all of the jurisprudence.  It's been cited in

23  the submissions.  But while dismissal is sort of the ultimate

24  sanction, the Court is not obligated to impose lesser

25  sanctions.  Nevertheless, the law and this court generally

1    prefer that matters be decided on the merits.

2         So if I don't dismiss the case, it's my present and

3    tentative intention to order the plaintiff to file a revised

4    complaint by next Monday, the 9th, one that realleges Count 6,

5    the request for injunctive relief against Secretary Galvin,

6    making claims that can properly be made under Rule 11(b) and

7    presumably addressing why allegedly there's a continuing

8    violation, not just a past violation, a continuing harm.

9         Then I would order the defendants to file a renewed

10   motion to dismiss or supplementary memoranda ideally by August

11   13 and, if not, the 16th, order the plaintiff to respond to the

12   defendants' filings by the 20th or possibly the 23rd with a

13   view to having the hearing start on the 25th and go on the 26th

14   and 27th, what I ordered back in June, possibly in May.

15        That's my current state of mind.  And I've admonished

16   the plaintiff that there are to be no more allegations that

17   include personal information in this case, it would be with

18   regard to Secretary Galvin's home address or photographs,

19   anything like the information in the prior complaints that are

20   going to be sealed, struck and sealed, or anything else that's

21   not permissible under Rule 12.

22        So that's my state of mind at the moment.  Go ahead.

23   You've been waiting a long time.

24        MR. HORNSTINE:  Thank you very much again, Your Honor.

25        Let me begin with the caveat, of course, that neither

1   my office nor my clients have affirmatively asked for

2   sanctions, including money to be paid to my office, and that is

3   in part driven by the fact, Your Honor, that neither

4   Ms. Sterman nor I bill our time on an hourly basis.  We are, of

5   course, salaried employees of the Commonwealth.  And though we

6   are fully prepared to answer the Court's order of August 4 --

7   excuse me, August 2, today is August 4 -- concerning how much

8   time we estimate that we have essentially worked since the

9   breach of the June scheduling order, I will also caution with

10  the caveat that, because we do not bill our time on an hourly

11  basis, we do not, like Mr. Mitchell or Ms. Ellsworth, bill in

12  six-minute increments to a software.  So we have attempted as

13  best as we can to do some archeology through our emails,

14  through our Westlaw logs and the like to come up with an

15  estimate for the Court to the extent the Court wants it.  But

16  this perhaps highlights why the nature of our brief that was

17  filed concerning the sanctions issue focuses as it does on

18  dismissal.

19          The harm that my clients have suffered, not just due

20  to the breach of this scheduling order but for all prior

21  breaches of the rules of this Court, has been that they have

22  suffered the delay of having their motions to dismiss, which

23  were filed as long ago as last December of 2020, including with

24  the assertions of various immunities from suit under the

25  Eleventh Amendment and qualified immunity, those decisions have

1    long since been delayed by a series of pleadings that keep

2    getting filed, notwithstanding the admonitions of this Court.

3            And most importantly, not only have the individual

4    defendants had the cloud of litigation over their head for a

5    long time, and I understand the Court's tentative view that it

6    intends to dismiss those claims, but the office, the Secretary

7    has had to spend significant resources not just litigating this

8    case but also dealing with, every time plaintiff files a

9    document that makes these charged accusations, they have to

10   deal with the blow-back that distracts them from their job,

11   which is running fair and safe elections in the Commonwealth.

12           And although the Secretary has been asserting his

13   Eleventh Amendment immunity and the individual defendants have

14   been asserting their qualified immunity from suit, for many,

15   many months, the Court's resolution of those important

16   threshold issues has been repeatedly frustrated by the

17   violation of the rules.

18           As a result, Your Honor, plaintiff's actions have

19   caused substantial delay and substantial prejudice to my

20   clients.  And this is to say nothing of the bombshell that we

21   received yesterday.  And I have to confess that when we saw

22   plaintiff's filing that was perhaps either assisted by counsel

23   from California or ghost-written by counsel from California,

24   and I know I'm not privy to all the facts, but when that was

25   filed, it struck us as odd that the caption that appeared on it

1    was different than any other caption that plaintiff had

2    previously used before, that the font was different, that the

3    style was different, and it immediately struck us as being

4    suspicious.  And only to have those suspicions perhaps

5    confirmed the other day was disquieting, to say the least.  So

6    in light of that, and I'm cognizant of the hour, Your Honor --

7          THE COURT:  Let me just pause you for a moment because

8    you're talking about the memorandum of law filed on July 22,

9    2021, docket 166, so it's signed by Dr. Ayyadurai, not by his

10    lawyer.  I noted in the nonpublic session that it didn't read

11    like anything else he had submitted that I've read in about the

12    last nine months, and you point out that the font at least is

13    different, and I hadn't compared them.

14          MR. HORNSTINE:  Well, look at the caption, Your Honor,

15    for docket 166.  First of all, it uses parentheses along the

16    right-hand side.  Typically plaintiff's filings have a square

17    around it.  And it lists Secretary Galvin as being the

18    Secretary of State for Massachusetts; whereas Dr. Ayyadurai

19    typically calls him the Secretary of the Commonwealth.  So

20    there are many discrepancies apart from mere style that are

21    here in this document.

22          And again, the Court knows more than I do, so I want

23    to speak cautiously, and I want to speak carefully and with

24    great solemnity because this is a serious issue, and I know the

25    Court is treating it as such under Rule 37.

1          THE COURT:  Actually, actually, and I think I should
2     tell you that I told the plaintiff in the closed session that
3     he may have a Fifth Amendment right not to answer questions
4     concerning the preparation of that submission because he's told
5     me twice essentially -- well, he told me twice under oath that
6     he wrote it.  And I explained that he doesn't have a Fifth
7     Amendment right not to answer a question if he intends to give
8     an intentionally false material answer.  But if answering the
9     question would provide a link in the chain proving that his
10    prior response was perjury, then he would have a Fifth
11    Amendment right.
12         And I also told him that under one of the two federal
13    perjury statutes under 18, United States Code, Section 1621 --
14    well, under 18, United States Code, Section 1623, there's a
15    so-called safe harbor provision where, in the same continuous
16    court or grand jury proceeding in which a declaration under
17    oath is made, the person making the declaration admits such
18    declaration to be false, such admission shall bar prosecution
19    under this section if at the time the admission is made the
20    declaration has not substantially affected the proceeding or it
21    has not become manifest that such falsity has been or will be
22    exposed.
23         There's another statute involving perjury generally,
24    Section 1621, that doesn't have a comparable safe harbor
25    provision, I advised.  And in the closed session, the plaintiff

1   told me he didn't wish to assert a Fifth Amendment right with

2   regard to this.  He spoke to the issue, and I believe he's

3   waived any Fifth Amendment right.  But if he asserts one, we'll

4   deal with it.

5        MR. HORNSTINE:  Very good, Your Honor.  It also drew

6   to mind a comment that the plaintiff made during the May

7   hearing when, in response to a question that Ms. Ellsworth had

8   raised I believe about the hybrid counsel or arrangements

9   concerning counsel, plaintiff volunteered that he was, I

10  believe the word he used was "insulted" that anyone would

11  accuse him of having shadow counsel.  And now we learn that

12  that is -- again, the Court knows more than I do, but from what

13  I've seen from the public pleadings, it now seems that that is

14  minimally the case, is that he had shadow counsel.

15       To what extent counsel was involved in writing or

16  ghost-writing pleadings, that remains to be seen.  But my point

17  in raising this all, Your Honor, is that the Court would be

18  fully warranted in dismissing this case.  And again, my clients

19  have been asking for this case to be dismissed since last

20  December.  Such a response would be warranted for conduct that

21  has unfairly prejudiced the defendants' ability to vindicate

22  their immunities from suit, caused substantial delay to this

23  tribunal and obstructed the ability of the Court to fully and

24  fairly and truthfully resolve this case.

25       THE COURT:  Well, I have told you more definitively

1    today that I am going to dismiss the claims against the

2    defendants individually for money damages.  So only the

3    Eleventh Amendment issue will remain in the case if it's not

4    dismissed.  And I expect you'll hear that again the plaintiff

5    is insulted by my having questioned whether he wrote the July

6    22 memorandum.  But he's spoken to it, so I might let him speak

7    to it again, because I have said that in appropriate

8    circumstances I'd let him speak or testify.  But why don't you

9    go ahead.

10           MR. HORNSTINE:  Again, the only response is -- perhaps

11    counsel from Mr. Harder's firm in California can shed some

12    light on this matter.  I don't know if he's available or not.

13    But again, to get back to the heart of it, even addressing the

14    Eleventh Amendment immunity, this suit and plaintiff's serial

15    violations of the rules has affected a real drag on the ability

16    of the Secretary's Office to do the business of the

17    Commonwealth.  This case has been a distraction, again, to say

18    nothing of the harassment and the threats that the office has

19    received that coincide typically --

20           THE COURT:  Do I have -- I think I saw that in your

21    memo.  Do I have any affidavit regarding threats or harassment?

22           MR. HORNSTINE:  No, Your Honor.  And we were

23    deliberately trying to be circumspect about that.  Plaintiff is

24    correct we did not personally object when personal addresses

25    were placed in the record for fear that drawing a circle around

1    it would further fan the flames.

2         So again, I've been trying to be circumspect in those

3    pleadings, and I assume Mr. Mitchell will tell you something

4    similar with respect to NASED and his individual client about a

5    similar response.

6         THE COURT:  But basically it's not in your motion.

7         MR. HORNSTINE:  Correct.

8         THE COURT:  If I'm going to rely on certain facts,

9    there should be evidence relating to them in the record.  There

10   should be evidence of them in the record, an affidavit or

11   something.  But we'll see where all this goes.  There are

12   things coming into sharper focus.

13        MR. HORNSTINE:  Thank you, Your Honor.  Unless the

14   Court had further questions for me about our hours or anything

15   else, I'd be happy to --

16        THE COURT:  I am interested in your hours.

17        MR. HORNSTINE:  Yes, Your Honor.  So Ms. Sterman and I

18   did the best as we could, mindful, as I say, that we don't

19   track our time on like a matter-by-matter basis at the Attorney

20   General's Office.

21        THE COURT:  And this should be hours essentially

22   following my July 16 order.

23        MR. HORNSTINE:  Correct.  So following the July 16

24   order, we had to respond to Mr. Cornell's motion to compel, to

25   meet and confer about that.  We've had to file briefs on both

1    the response to the Court's order asking for my client's views

2    on Rule 37 and Rule 16 issues.  We have had to file the motion

3    to strike under Rule 11(a).  And most recently we've had to

4    review all of the filings including the 75-page fourth version

5    of a pleading allegedly from plaintiff.

6         And so, all told, including research, meet and

7    confers, writing, et cetera, Ms. Sterman and I estimate that as

8    of yesterday evening we had worked approximately 25 hours on

9    those matters.  That obviously doesn't include the time that we

10   spent today at this hearing or preparing for the hearing today.

11        THE COURT:  And while I might not order that you be

12   compensated at Wilmer Hale rates, although I think the quality

13   of your work seems to be comparable, what do you think the

14   evidence would support as a reasonable rate?

15        MR. HORNSTINE:  Respectfully, Your Honor, I wouldn't

16   even be able to begin to fathom a response.  I can tell the

17   Court what I make on an annual basis for my salary.

18        THE COURT:  But I pointed this out in my order.  There

19   are cases on this.  I mean, this has consumed a tremendous

20   amount of my time, including the last three days and the last

21   month as well.

22        Just a minute.  As I pointed out in my August 2 order,

23   docket 176, if you were a public interest organization like the

24   Civil Liberties Union -- well, here, State-funded entities can

25   be awarded attorneys' fees.  In *Blum v. Stenson*, "Attorneys'

 1    fees are calculated according to the prevailing market rates in

 2    the relevant community regardless of whether a party is

 3    represented by private or nonprofit counsel."

 4            MR. HORNSTINE:  Right.

 5            THE COURT:  You're essentially nonprofit counsel.

 6            MR. HORNSTINE:  Quite correct, Your Honor.  So Your

 7    Honor, again, with the caveats that I've given, an attorney --

 8    so we have some, I'll call it office guidance based on years of

 9    experience.  Myself, I fall in the 11- to 15-year band.

10    Generally speaking, we think of that level of counsel for the

11    market rate as being somewhere in the range of 275 to 325 an

12    hour.

13            Again, I work on a salary basis.  My salary

14    information is public.  I'm happy to share that with the Court

15    to the extent it is useful.

16            THE COURT:  You can, but that may be low.  But anyway

17    -- sure, what's your salary?

18            MR. HORNSTINE:  I make $91,000 a year, Your Honor.

19    Ms. Sterman makes more than I do.

20            THE COURT:  All right.  And why is dismissal rather

21    than a lesser sanction appropriate, most appropriate?  Because

22    there's a reasonable range of sanctions.  Why is it most

23    appropriate in this case based on what we know so far?

24            MR. HORNSTINE:  Sure.  And my response to that is

25    twofold.  One, if past performance is indicative of what

1   happens in the future, Your Honor, where the Court has

2   repeatedly admonished plaintiff to stop violating the rules and

3   yet he has continued to transgress them, a sanction short of

4   dismissal will not cease that pattern of behavior.

5       Second, as I have discussed previously, the magnitude

6   of the harm and delay that has been caused by plaintiff's

7   serial refusal to follow the rules, again, this has thrown this

8   case into turmoil, and it has hampered the Court and the

9   litigants from addressing the central questions of the case.

10  So both because of the magnitude and the pattern of conduct,

11  Your Honor, that is the basis for our submission to the Court.

12      THE COURT:  Well, it's my hope and indeed expectation

13  that if I don't dismiss the case, which is still an open issue,

14  the fact that the plaintiff is now represented by counsel,

15  Mr. Cornell, who has assured me that he doesn't anticipate ever

16  asking to withdraw again and that he'll meet the short

17  deadlines that I just described to you, and the fact that the

18  plaintiff Dr. Ayyadurai is now on even more clear notice that

19  any violations of the rules or of court orders by him or his

20  attorney may very well result in dismissal of the case without

21  regard to the merits and other sanctions, including possible

22  criminal contempt proceedings that could result in

23  incarceration, the past won't be prolog.  That's my hope.

24      And I expect we'll hear from Mr. Cornell and probably

25  the plaintiff.  I may let him speak to this, subject to -- or

1    testify to it.  We'll see.  Do we have Mr. Esper yet?

2              COURTROOM CLERK:  Not yet, Your Honor.

3              THE COURT:  All right.  Mr. Mitchell.

4              MR. MITCHELL:  Thank you, Your Honor.  I'd just like

5    to amplify a few points that Mr. Hornstine just made and

6    address your question at the end as to why dismissal is an

7    appropriate sanction here.

8              To be sure, the Court has advised the plaintiff today

9    about the risk of sanctions and contempt proceedings, but the

10   Court also did it on July 22 in an order and made it crystal

11   clear that further violations would threaten these penalties.

12   And a week later, on July 22, what we see is a complaint that

13   violates Rule 11(a) on its face, that is confusing as to, you

14   know, whether he's a represented party, whether he isn't.  That

15   includes even more outlandish --

16             THE COURT:  What do you mean it's confusing as to

17   whether he's a represented party?

18             MR. MITCHELL:  Well, it was unclear to me when I saw a

19   series of filings, some of which were by his counsel and some

20   of which were by the plaintiff, as to what was going on.  And I

21   think I can infer why there wasn't an attorney signature on

22   certain documents, but we didn't know, and it was frankly

23   confusing.  But it also shows a real disregard both for the

24   rules and for all of the Court's effort over the course of

25   three hearings in May and June to give him a roadmap

1    essentially of the way to press the claims.  And given that, he

2    made a choice to pursue conspiracy theories and the RICO claims

3    and move farther and farther away from the issues that had been

4    discussed at length in May and in June.

5         THE COURT:  Actually, there's one thing I haven't

6    stated today.  It will be in my written decision dismissing all

7    but Count 6 for qualified immunity or other reasons.  Every

8    single claim against the defendants individually in both the

9    existing complaint and the most recent proposed revised

10   complaint is for money damages and only for money damages.  I

11   rechecked all of that today.  And is that the way you read it

12   as well?

13        MR. MITCHELL:  It is, yeah.

14        THE COURT:  So that's the point, and there's not a

15   violation of clearly established law, so the defendants,

16   including, in my analysis, NASED is as an organization entitled

17   to qualified immunity, which doesn't necessarily mean it would

18   be entitled to Eleventh Amendment immunity.

19        MR. MITCHELL:  Although I would appreciate the

20   opportunity to --

21        THE COURT:  Of course, of course.

22        MR. MITCHELL:  -- briefing --

23        THE COURT:  Of course.  I probably shouldn't have even

24   said that.  But I'll write about this when I can.  But anyway,

25   keep going.  This is helpful.

1          MR. MITCHELL:  And I do appreciate the efforts the

2     Court has made to narrow the complaint down to the

3     noninflammatory allegations and the claims that we have

4     discussed at length, our legal claims and not conspiracy-type

5     claims.

6          But the other piece to this is what's really a unique

7     prejudice that has been the result of what is months of conduct

8     that Mr. Hornstine just discussed about generally disregarding

9     rules, confusing the record, making all sorts of outlandish

10    allegations against real people at every opportunity.  And my

11    clients have been unable to vindicate their rights and their

12    names, and it results in real world prejudice because these are

13    highly charged issues in this climate.

14         And when this is publicized, you know, Ms. Cohen has

15    been characterized as some sort of racketeering -- you know, if

16    you read through the proposed amended complaint, it really is

17    outrageous some of the things that are said without any basis.

18    And that has resulted in real threats.

19         Just since last Thursday, I think there have been two

20    separate reports to the FBI by NASED for things that come in

21    either over Twitter or directly to NASED that contain very,

22    very thinly veiled threats, having to put these in an affidavit

23    to the Court if they would want them, these have arisen

24    after --

25         THE COURT:  Well, I think if you want me to rely on

1   that, it will have to be in an affidavit.  Then we'll have to

2   see if it's disputed.  And in a lawyerly way, you're using

3   lawyerly language.  It's less lurid than some of the

4   plaintiff's, but you say the claims are outlandish.  Whether or

5   not they're meritorious is what this case should be about.

6           Putting aside, you know, labels as you've discerned, I

7   think embedded in this case are some serious issues.  They're

8   in an unusual context, which is the reason that there's

9   qualified immunity.  But the heart of the case, the kernel of

10  the case is whether there's been a violation of the First

11  Amendment because of either coercion or perhaps more likely

12  allegedly close collaboration between election officials,

13  whatever the motive is, and Twitter, which, for many purposes,

14  is a private entity but would be subject to the First Amendment

15  if it was working sufficiently closely with government

16  officials to essentially have been an agent and doing something

17  the government couldn't direct.  So ideally that would have

18  been the focus of this case in the last nine months.  And if I

19  didn't dismiss it, there would be discovery to determine -- and

20  the plaintiff does keep finding things out that add to the mix

21  of information on the issue.  I haven't been able to decide

22  whether the case should be dismissed based on Eleventh

23  Amendment immunity or anything else.  And as I described in May

24  and again somewhat in June, that's a complicated issue.

25          MR. MITCHELL:  Your Honor, we would be happy to

1    address those issues on a motion to dismiss and have a response

2    to those and have been trying for months.

3              THE COURT:  I know, and if I don't dismiss the case as

4    a sanction, and the way this is developing, including

5    Mr. Esper's absence, there may be parallel tracks.  I may take

6    this dismissal as a sanction under advisement until the record

7    gets more complete and have you brief -- have you get a new

8    complaint in the next couple of days and then file a motion to

9    dismiss addressing the Eleventh Amendment issues that I

10   discussed on May 21 and subsequently I may in an order remind

11   you of, and then we'll see if we even need the August 25

12   hearing.

13             If the case gets dismissed, that won't be necessary.

14   If the case doesn't get dismissed, it will be, and we'll have

15   the hearing on the schedule that's important to the defendants

16   and important to my managing my docket.  Go ahead.

17             MR. MITCHELL:  And I'll just add that, you know, the

18   reason that I was articulating the challenges and some of the

19   prejudice that is unique in this is just to emphasize that, you

20   know, it has not simply been cost and time, although it

21   certainly has been that, in terms of both the violation of this

22   order but the long history before it.

23             And it's the notion that even as of yesterday, right,

24   when we've had sanctions motions, requests for information

25   about the issue with respect to the legal memorandum, we get

1    another affidavit, you know, that just goes on and on and on

2    for pages and contains even more of this stuff.  And it's an

3    obstinate conduct that just has not complied with basic

4    obligations.  And the fact that it has happened despite

5    warnings about sanctions and even as recently as last night

6    suggests that more than an award of fees would be appropriate,

7    and that, you know, dismissal is, in this case, the right

8    result.

9         THE COURT:  Here.  Two things.  One, I'm ordering that

10   if the NASED defendants, I'll call them, or the Galvin

11   defendants want to supplement the factual record with regard to

12   sanctions to provide information concerning threats or alleged

13   threats or whatever, I'm ordering that you do that by 12:00 on

14   Friday, which will be the 6th.

15        MR. MITCHELL:  Understood.

16        THE COURT:  I prefer to have it tomorrow if it's

17   possible, but I want to give you enough time to think about it

18   and do it carefully.

19        MR. MITCHELL:  Thank you.  There are some

20   sensitivities presented, some of it may be more appropriate

21   under seal.

22        THE COURT:  If you think there's a proper basis to

23   impound it under Rule 7.2, you may do that.  But based on what

24   I know now, not ex parte.  You'd have to serve it on

25   Mr. Cornell --

```
 1              MR. MITCHELL:  Correct, yes.
 2              THE COURT:  -- as well as the other parties.  And that
 3         may be -- and I'll authorize you to file it under seal if you
 4         think there's a proper basis with a redacted version for the
 5         public record.  But anything I take under seal should be
 6         considered only temporarily under seal, because then I'll have
 7         to consider the sort of what I call the Standard Financial
 8         Management factors.
 9              It's a 1986 case in the First Circuit about the
10         presumption of public access, but in cases, many cases there
11         are privacy concerns and other concerns that can outweigh the
12         common law presumption of public access to documents under
13         which judicial decisions are made.
14              Another one is Kravetz, which is a criminal case, but
15         it's got a nice discussion of what some of the countervailing
16         considerations will be.  And I've written on this repeatedly
17         and recently.  Anyway, this is helpful.  Go ahead.
18              MR. MITCHELL:  And I understand the challenges with
19         documents filed under seal, and to the extent there's a way to
20         avoid it, I will, and I also want to make clear that I need to
21         talk to my client to make sure that this doesn't create other
22         concerns.  And if we're not going to file one and know that
23         before Friday, I'll inform the Court.
24              THE COURT:  Okay.  Well, that's a good refinement.
25         I'm ordering that you either file it by noon on Friday or file
```

 1    a statement that you don't wish to supplement the record.

 2              MR. MITCHELL:  Certainly.

 3              THE COURT:  This is the same of course for the

 4    Attorney General -- I mean the Galvin defendants.

 5              MR. MITCHELL:  And I think that the basis for

 6    sanctions has been laid out.  I think the Court certainly has

 7    the authority to do it, the discretion to do it.

 8              I can tell you, with respect to your questions as to

 9    time, I spent approximately 20 hours as well responding to this

10    as of yesterday.  I do have time sort of entries, and to the

11    extent further granularity is required, I can do that on an

12    ex-parte basis.  You know, my sort of standard rate is 475 an

13    hour.  I can tell you that for NASED it's an extreme discount,

14    given that there are the issues in the case and they're a

15    nonprofit but --

16              THE COURT:  475 is what you charge NASED?

17              MR. MITCHELL:  No, that's not what I charge NASED.

18    NASED gets an extremely -- it's the lowest rate in my 15-year

19    career that I've charged anyone.

20              THE COURT:  What do you charge NASED?

21              MR. MITCHELL:  It's 250.

22              THE COURT:  And I don't know that it would be ex

23    parte.  I think I should order you and the Attorney General to

24    file an affidavit with your time and what you propose is a

25    reasonable rate.  And I don't think you're necessarily limited

1    to what you charge NASED, but that may be some evidence of

2    what's reasonable, although you've provided a discount.

3    There --

4              MR. MITCHELL:  I have --

5              THE COURT:  -- organizations that don't charge

6    anything.  You know, they get what is the rate in the

7    community.  If you want to know about attorneys' fees, you can

8    read my February 27, 2020 decision in *Arkansas Teachers*.

9              MR. MITCHELL:  I am familiar --

10             THE COURT:  Too bad that you've had to do that.  All

11   right.  This is very helpful.  Is there more?

12             MR. MITCHELL:  Unless the Court has questions, I think

13   the gist of the argument has been presented.

14             THE COURT:  I don't think so.  Let me take a very

15   short break, five minutes for the court reporter and myself

16   before I hear from the plaintiff with regard to sanctions.

17             And in this five minutes, Dr. Ayyadurai should find

18   Mr. Esper, because his absence is impeding the progress of

19   this.  Okay?  Court is in recess, say, until 5:00.

20             (Recess, 4:52 p.m. - 5:00 p.m.)

21             THE COURT:  Everybody who is not a lawyer should be on

22   mute.  Because I'm hearing somebody.  Ms. Loret, are we ready

23   to proceed?

24             COURTROOM CLERK:  Yes, Your Honor.

25             THE COURT:  Dr. Ayyadurai, did you reach Mr. Esper?

1          MR. AYYADURAI:  Yes.  He said he's going to be

2     directly communicating to the Court, Your Honor.

3          THE COURT:  No.  Is he joining the conference?

4          MR. AYYADURAI:  I asked him to join.  He said he's

5     going to be directly communicating something to Ms. Loret.

6     That's what he told me.  I asked him to join, yes.

7          THE COURT:  Okay.  Because that's not consistent with

8     my order.  But if necessary, I'll issue an order.  Since he's

9     working in concert with you, he's subject to my orders, so

10    we'll have to hear from him another time if we don't hear from

11    him today.

12         Okay.  Mr. Cornell, would you like to speak to the

13    issue of sanctions?

14         MR. CORNELL:  So my understanding from Your Honor's

15    order of July, I believe it was the 16th, was that the issue of

16    sanctions was going to be premised upon Dr. Ayyadurai's

17    supposed cause -- that he supposedly caused your June 16

18    scheduling order not to be met, and that's what the sanctions

19    were about.  That's my understanding.

20         THE COURT:  This is a useful observation.  That was my

21    intention on July 16, and you should address that.  The

22    question I raised about who wrote the July 22 memorandum is

23    new.  And as a practical matter, it's 5:00 Eastern Daylight

24    Time, and Mr. Esper is not on the line, your client failed to

25    cause him to join at 2:00, although it may have been beyond his

control.  And to the extent that implicit in your observation is that you ought to have notice of an issue before I act on it, that's my approach to things.

Although I'm extremely busy, my present intention is, because it's relevant, to do what's necessary to get the information I need to make a decision as to whether there's any sanctionable conduct relating to the preparation of the memorandum, but not at the expense of that briefing schedule I explained to you earlier.

So you can at least start by addressing, you know, whether the failure to obey my order by making filings on July 15 is sanctionable, and if I conclude it is, what the most appropriate sanction is, and then I think we may, since we're here and since your client and to some extent you addressed this issue in the nonpublic session, I think I'll give you each an opportunity to preliminarily address the issue of the memorandum and go from there.  Otherwise, I might unseal that discussion.  I have to figure out which way to deal with it.

But go ahead, why don't you address the issues that were raised by my July 16 order.

COURTROOM CLERK:  Your Honor, excuse me.

THE COURT:  Excuse me.

COURTROOM CLERK:  I don't mean to interrupt, but I did receive an email from Mr. Esper, if Your Honor would like me to read it?

1        THE COURT:  Please do.

2        COURTROOM CLERK:  "Ms. Loret, I received your Zoom

3   invitation.  Please convey the following to the Court and the

4   parties:  Apparently, this morning the Court issued an order

5   that all persons who assisted on plaintiff's legal memorandum

6   attend and potentially give sworn testimony.  To be clear, I

7   did not write plaintiff's legal memorandum.  Plaintiff did.  My

8   understanding is that plaintiff has informed the Court of this

9   fact.  However, I cannot attend today's hearing.  I am not

10  counsel of record, and I'm not a practicing lawyer in

11  Massachusetts and thus cannot appear in the case.  I am also

12  not a material witness.  Any knowledge I might have of

13  communications between me and plaintiff would be protected by

14  plaintiff's lawyer-client privilege.  Signed, Dilan Esper."

15       THE COURT:  That's fine.  We'll make that part of the

16  record, and I'll issue another order for Mr. Esper.  And the

17  attorney-client privilege, as I discussed with the plaintiff in

18  the closed session, is the plaintiff's.  He has, in my view,

19  waived that privilege.  And Mr. Esper is a material witness.

20  He's not appearing, being asked to appear as a lawyer.  He's a

21  fact witness.

22       So while this is further disruption of my busy docket,

23  he'll get an order.  And if he doesn't obey it, he'll be

24  subject to contempt.  While I'm thinking of it, I'm ordering

25  the parties to order the transcript of today's proceedings, the

1    sealed portion and this portion, on an expedited basis.

2           Mr. Cornell, go ahead.

3           MR. CORNELL:  Yes.  So since the issue of sanctions is

4    limited to your July 16 memorandum, I take it then that --

5           THE COURT:  In the first instance.  But go ahead,

6    address that.  As I just said a few minute ago, I may want you

7    and your client to reiterate what you said to me about the memo

8    in the private session.  Go ahead.

9           MR. CORNELL:  Okay.  But to the issue of what the

10   defendants were supposed to be speaking about, 90 percent of

11   what they had to say was irrelevant because they spoke to items

12   such as the outlandishness of the claims, what was contained in

13   the complaint.  That is not what the Court's concern was about.

14   The Court's concern was about Dr. Ayyadurai's supposed

15   causation of the failure to meet the scheduling order.

16          And on that note, I just want to say, as a lawyer, and

17   I would think that most lawyers would join me, most serious

18   issues in the case only come to a crisis point in the final

19   week before filing.  I mean, that's the way business is

20   routinely done.

21          And by putting this sort of in terrorem notion of

22   sanctions into Dr. Ayyadurai's decision that the case was going

23   in a different direction than what he, the author of the case,

24   wanted it to, I mean, you know, in the end, the plaintiff -- it

25   is the plaintiff's case, and he should have the right to the

1    counsel of his choice.

2         THE COURT:  And I think most lawyers and your clients

3    should have known that they don't have the right to arrogate to

4    themselves what the Court's schedule is going to be, and your

5    client, under seal, was told on July 9 by Mr. Cooper what

6    claims Mr. Cooper would file and what claims Mr. Cooper

7    wouldn't file.  And I didn't get the motion to continue or to

8    expand the schedule in advance of the deadline.  I'll have to

9    check and see when you filed it, but I believe it was on the

10   15th.  If it wasn't, it was on the 14th.  And that's not the

11   way the world works.

12        Your client had notice of the importance of certain

13   issues in May, the value of having a lawyer, but whatever it

14   is, there's a reason that the local rules require leave of

15   court when matters are scheduled.  And I don't want to, by

16   listening silently to you, undermine what I've written before

17   and prompt you or your client to think that if you want relief

18   from a court order, you don't have to -- ask for it far enough

19   in advance and present good cause so if the Court denies the

20   request, you'll comply with the order.

21        And I usually -- well, I'm always reasonable with

22   regard to the way I respond to requests, but reasonableness

23   includes considering the defendants' interests and considering

24   my strong interest in managing my docket.  Go ahead.

25        MR. CORNELL:  I think if you have a July 9 email from

1    Todd & Weld, kind of laying out an ultimatum, that gives the

2    plaintiff I think like three or four days to decide, you know,

3    sort of the crisis point in the case.  I mean, I don't think

4    that's unseemly, let alone sanctionable.

5         THE COURT:  What's sanctionable is disobeying, causing

6    disobedience of a court order and disobeying a court order.

7    And I mean, I assume you've read -- if you haven't, you

8    should -- the transcripts from May 20 and 21 and from June 15 I

9    believe it is.  Because I laid out the serious issues and

10   emphasized, and you know this, the importance that any

11   allegations that are made, yet another proposed amended

12   complaint, and any other submission, comply with the

13   requirements of Rule 11, including Rule 11(b).  So anyway, go

14   ahead.

15        MR. CORNELL:  Yes, okay.

16        THE COURT:  And essentially the schedule I set was set

17   in consultation with Todd & Weld.  The plaintiff was on the

18   line.  And the issues on which there are disagreement are

19   exactly issues I essentially identified or anticipated,

20   expected would be worked out.  Go ahead.

21        MR. CORNELL:  So I mean, so the certainty of the issue

22   is, what was Dr. Ayyadurai to do faced with a few days left to

23   maneuver?  And yes, you know, Your Honor had laid out the case.

24   But, you know, Dr. Ayyadurai, who I would request that the

25   Court hear from him on this issue, felt that he had no choice

 1    and no time in which to maneuver.  Can Dr. Ayyadurai speak to
 2    this?
 3         THE COURT:  Well, why don't you finish, at least
 4    subject to hearing from him.
 5         MR. CORNELL:  Okay.  Why don't I finish.  So that's as
 6    far as the issue itself.  As to the sanctions, you've heard
 7    from the state this court has, you know, made national note on
 8    its issue of phantom attorney billing, and the state asked you
 9    for attorneys' fees on my supposed phantom motion to compel.
10    I've made no such motion to compel.  I don't know what those
11    fees would be charged for.
12         THE COURT:  Motion to compel?
13         MR. CORNELL:  Yes, that's what Mr. Hornstine told the
14    Court.
15         MR. HORNSTINE:  Your Honor, if I may interject.  It
16    was pointed out to me during the recess I said "motion to
17    compel."  I misspoke.  I meant to say "motion to continue," and
18    I apologize for any confusion.
19         THE COURT:  Thank you for that clarification.
20         MR. CORNELL:  I'm sorry.  So I think that on the issue
21    of the amount of sanctions themselves, I would ask the Court to
22    reserve, you know, so that we can actually examine what it is
23    that's at issue.
24         THE COURT:  You mean how many hours and what the
25    reasonable rate would be?

```
 1                MR. CORNELL:  Yes.

 2                THE COURT:  And you should confer on that.  Are you

 3      charging your client?

 4                MR. CORNELL:  I am.

 5                THE COURT:  How much?

 6                MR. CORNELL:  450 an hour.

 7                THE COURT:  So it's very likely I would choose that as

 8      a reasonable rate for the other attorneys.  So talk about it.

 9      And you're not agreeing that I should sanction them, but you

10      can discuss the reasonableness of the hours and what a rate

11      would be and what I ought to award, and maybe they'll agree to

12      less, but you're not agreeing that there should be a sanction.

13                MR. CORNELL:  No.  I was simply -- the Court moved on

14      from there what the sanction should be, and I'm disagreeing

15      with that as well.

16                THE COURT:  What's that?

17                MR. CORNELL:  Just simply, when you heard from

18      defendants, you moved from whether sanctions should be imposed

19      to what the actual sanctions should be, and I was simply

20      disagreeing with that.

21                THE COURT:  Well, I assume it's your position there

22      should be no sanction.

23                MR. CORNELL:  Absolutely, absolutely, yes.

24                THE COURT:  But this has to be in the context, was

25      there a substantial justification.
```

 1            MR. CORNELL:  Right, exactly.

 2            THE COURT:  All right.  Ordinarily if your client

 3    wanted to provide any evidence on this issue, he'd be

 4    questioned under oath and subject to cross-examination.  So I

 5    think at a minimum I should put him under oath and maybe let

 6    you ask him some open-ended question.  And then the defendants

 7    will have a chance to ask some questions, and I may have some.

 8    But hopefully it will elicit the pertinent part of what we

 9    discussed earlier.

10            And I mean, this is a fluid situation since he did

11    waive any attorney-client privilege that he might have had with

12    regard to discussions with Mr. Esper.  I think it might be

13    valuable to get that reiterated for the public record.  And,

14    you know, he wanted to tell me, and he wasn't asserting a Fifth

15    Amendment right, so I believe since this is the same

16    proceeding, he's waived any Fifth Amendment right he may have

17    had.  And when you waive the attorney-client privilege, that's

18    permanent, not per proceeding or limited to a proceeding.

19            So would the clerk please administer the oath to Dr.

20    Ayyadurai.

21                    SHIVA AYYADURAI, SWORN

22            THE COURT:  Okay.  Mr. Cornell, would you like to put

23    the first question to the plaintiff, please.

24            MR. CORNELL:  Yes.

25    EXAMINATION BY MR. CORNELL:

1    Q.   Dr. Ayyadurai, could you describe your decision tree

2    leading up to your decision to dismiss counsel.

3    A.   Yes.  The decision tree was based on the fact that this

4    case, this lawsuit, as the Court knows, has been discovering

5    material fact in an evolutionary process.

6         As we know, on October 30, we discovered that the Twitter

7    partnership portal was created, which the defendants concealed

8    to this Court.  Then on May 19, I submitted playbooks to this

9    Court which showed that the defendants were working in concert

10   to violate the First Amendment.  And then on June 29, I

11   discovered the Long Fuse report which confirms that I was being

12   surveilled, blacklisted, by the enterprise created by these

13   defendants who so want to seal it.

14        So on July 13 -- and by the way, I don't remember myself

15   availing myself of attorney-client privileges, Your Honor.  But

16   to be clear, it was on July 13 I documented very honestly, ex

17   parte, under seal, pro se, as a plaintiff, I thought that was

18   completely under seal, and I wrote you a very detailed memo --

19             THE COURT:  I'm sorry.  On July 13?

20             MR. AYYADURAI:  Yes, on July 13 is the first time I

21   received a version.

22             THE COURT:  I'm sorry.  Did you file something on July

23   13, or are you talking about something you filed --

24             MR. AYYADURAI:  You said July 9, that I asserted

25   something.  On July 13, 72 hours before the 15th, was the first

1    time I received a version of the complaint.  And that

2    complaint, that was a time that I am told that the RICO civil

3    complaints must be dropped, and it was basically, "Drop all the

4    claims or drop us."  I chose to drop my attorneys, and I have

5    every right to do that.

6         Because what has evolved in this case over the last

7    nine months is a clear recognition that these defendants have

8    worked together to create an infrastructure to silence the

9    speech of every American.

10        And as a U.S. Senate candidate -- let me bring this

11   back to the point.  I was running for United States Senate in

12   the United States of America, which still has the First

13   Amendment, and these people conspired against me, and they

14   created that infrastructure which is confirmed in the Long Fuse

15   report that is out in the public domain right here.

16        And I, using my skills as a systems engineer, put

17   together a diagram with the help of volunteers, not with the

18   help of any lawyers.  Every line in that diagram is publicly

19   available.  Every picture is publicly available for everyone in

20   the world to see.  It is a course I used to teach at MIT called

21   systems visualization.  I put that diagram together, I

22   submitted it to the Court in a complaint I solely wrote in a

23   memorandum of law I solely wrote.

24        The boon that these defendants have right now is the

25   fact that I terminated my relationship with my attorney.  My

1    attorney, Tim Cornell, in a conferral with Mr. Mitchell and

2    Hornstine made it very clear:  Please give me more time.  They

3    had no issue with extension.  They said, "We'll give you the

4    six weeks, provided you drop the monetary damages claim."  They

5    were negotiating with us.  They had no issue with extending up

6    to six weeks.  And I want to make that very clear.

7           So they stand here today whining about one week when

8    the reality is that they do not want the Long Fuse report out

9    there.  They do not want the infrastructure that this lawsuit

10   has uncovered, this Court has uncovered, which shows that what

11   is going on in the United States is beyond belief.  The reason

12   my parents came to this country --

13          THE COURT:  Okay.  Stop.  Now, when you --

14          MR. AYYADURAI:  So --

15          THE COURT:  Stop.  Do you hear me?

16          MR. AYYADURAI:  Yeah.

17          THE COURT:  Just one minute.  I think in fairness to

18   the defendants who will get a chance to question you about this

19   and make certain arguments, just so the factual record is

20   clear, in docket number 162, under seal, the affidavit that you

21   filed on July 20, 2021, in paragraph 17, you told me you had a

22   meeting with Mr. Cooper or at Mr. Cooper's office so you could

23   explain to Mr. Cooper and the team all the salient points.

24          And then in paragraph 18 you said, "Immediately after

25   that meeting, Mr. Cooper and his team declared that there was

no way I could support monetary damages claims against the
individual defendants.  I asked Mr. Cooper if he had done the
extensive case law research necessary prior to arriving at this
conclusion.  Mr. Cooper assured me that he had."

Paragraph 19.  "Based on this assurance, I tentatively
agreed that they could revise the complaint to include only the
official capacities provided they sent me the case law."
Bolded and underlined.

"However, within minutes of my leaving that meeting,
Mr. Cooper and his team emailed defendants' lawyers that I had
dropped all monetary claims against the individuals.  They did
not inform me that they were sending this email, nor had I
agreed to drop the claims without reviewing the case law.
Mr. Cooper's team then forwarded to me that email as a fait
accompli after the defendants had already been informed."

So that's why I said that it's my understanding that
you knew on July 9, before July 15, that I had admonished the
lawyers and that all filings had to have a reasonable basis in
fact and law under Rule 11 and that I had tentatively concluded
that the defendants would be entitled to qualified immunity,
something I have now concluded and will explain.  It's
something you'll get a chance to write.

That didn't eliminate -- that doesn't eliminate,
unless something else does, your right to claim that Twitter
and Galvin and NASED collaborated to a sufficient extent to

1    make Twitter a state actor for First Amendment purposes.  And I

2    think you know that.  I've been saying it repeatedly.  I've

3    been trying to get this case focused on what you ardently

4    argued you're primarily concerned about.

5           But in any event -- and these are just statements that

6    Mr. Cooper hasn't responded to, and the fact that I'm putting

7    them in the public record doesn't mean they're correct.  It

8    just means that I think the defendants are entitled to know

9    what you said on the point.

10          Do you have another question, Mr. Cornell?

11          MR. AYYADURAI:  I didn't finish the timeline that

12   Mr. Cornell asked for, Your Honor, so it's accurate for the

13   record.

14          THE COURT:  But here, I'll tell you something.  Just

15   take a deep breath.  Give me factual information.  When you go

16   beyond what the question asks, for example, telling me about

17   being born in India, it has nothing to do with this issue, and

18   I'm going to require that we do this in an entirely

19   conventional way; that Mr. Cornell, who is your lawyer, not ask

20   leading questions but ask questions that put the defendants on

21   notice so they can object if they think the answer is not

22   relevant or it's otherwise objectionable.  Do you want to --

23          MR. AYYADURAI:  I'll tell you -- I'm sorry.

24          THE COURT:  Go ahead.  Within those limitations, do

25   you want to say more about --

 1          MR. AYYADURAI:  Yes, Your Honor.

 2          THE COURT:  -- leading up to terminating Todd & Weld?

 3     And, you know, you've told me you knew that would delay the

 4     timeline.  And the defendants are going to argue, because it's

 5     true, you've just said it, they agreed not to oppose an

 6     extension, they know it's up to me, the parties can't alter a

 7     court order by agreement, if the claims against the individuals

 8     would not be included in a revised complaint because that's

 9     been their concern consistently.  But go ahead.

10          MR. AYYADURAI:  Your Honor, my position has been it's

11     for this Court to decide, not even me or my lawyers, and that's

12     why I did not drop my claims.

13          THE COURT:  All right.

14          MR. AYYADURAI:  On July 13 --

15          THE COURT:  Let me just stop you on that.  I don't

16     know how many times I need to repeat this.  Neither a lawyer

17     nor you is entitled under Federal Rule of Civil Procedure 11(b)

18     to make a claim unless the lawyer in good faith believes

19     there's an adequate factual and legal basis.

20          If your lawyers, experienced lawyers agreed with my

21     tentative view that they could not properly make an argument

22     that the defendants are not protected by qualified immunity, no

23     matter how ardently you would like them to make that argument,

24     they can't ethically make it.  But go ahead.

25          MR. AYYADURAI:  Your Honor, I never asked that of my

1    lawyers for the record.  Let's be clear.  I asked the lawyers

2    to produce me the memorandum of law.  I never got that until

3    after I fired my lawyers.  Let me state that again for the

4    fact.  This is a fact.  I am a scientist.  I'm an engineer.

5              THE COURT:  Stop.

6              MR. AYYADURAI:  I live by the law.

7              THE COURT:  You said that, you said that.

8              MR. AYYADURAI:  I asked the attorneys for the

9    memorandum of law.  In fact, on the record, Mr. Esper contacted

10   Mr. Cooper and said, "Please do the research before you drop

11   any claims."  It was after I terminated them, then I got a

12   draft, a draft, which was a garbage draft.  Excuse my language.

13             I'm not a lawyer, but I can tell you it was

14   incomplete, and it was done after I terminated them.

15   Throughout my entire interaction, I wanted to see the case law.

16   I have a right to that.

17             So I agree with you.  I never got that because it was

18   a priori decided that these are the claims that would be

19   accepted and not -- without providing the case law.  As I

20   understood the reason -- as a pro se person, I filed everything

21   on time.  I have not breached any of the rules of this court.

22             THE COURT:  Okay.  This is a different point.  Maybe

23   Mr. Cornell would like to ask you about it.  It can be relevant

24   to the issue of sanctions, but it's not responsive to what he

25   asked you.  Mr. Cornell, do you have another question?

```
 1   BY MR. CORNELL:
 2   Q.   Just to focus on my original question, though, so when it
 3   came time when you had to decide what to do, to fire counsel or
 4   go with their streamlined strategy, what were the alternatives
 5   that you felt you had in place?
 6   A.   I never wanted to -- the ultimatum was given to me:  Drop
 7   us or drop these claims.  It was an ultimatum given to me on
 8   July 13 -- on July 12, and I chose to drop my lawyers.
 9   Q.   So Judge Wolf has July 9 --
10   A.   July 9 is not the point.  July 9 we had a conversation
11   about qualified immunity, and I said, "Produce me the case
12   law."  The attorneys, as I put factually, truthfully, they
13   proactively sent, without my authorization, without producing
14   any case law -- to this date, I have not gotten any case law.
15   Q.   Okay.  So until the final week, you didn't have enough
16   information on which to make a decision?
17           THE COURT:  Excuse me.
18   A.   July 13 is when I first heard they wanted to drop the RICO
19   claims, which I was adamant about keeping.  That's the first
20   time I heard that, Tim, that they wanted to drop them.  They
21   weren't going to include them.  And, you know, "Go with this.
22   My way or the highway."  It was unfortunate.
23       That was on July 13, 72 hours before.  They gave me no
24   choice.  They drew the line in the sand.  From the discoveries
25   I made with the Long Fuse report and everything, on principle I
```

1    was not going to let the defendants get away because there is a

2    civil RICO conspiracy that was utilized against me.  It is an

3    enterprise.  Ms. Cohen is part of that enterprise.

4              THE COURT:  That's not --

5              MR. CORNELL:  I have no further questions.

6              THE COURT:  Let me ask you this.  On July 22, I

7    believe it is, Dr. Ayyadurai, you filed a proposed revised

8    complaint, correct?  You signed it; is that right?

9              MR. AYYADURAI:  Yes, Your Honor.

10             THE COURT:  And does that include the claims that you

11   hoped Todd & Weld would make?

12             MR. AYYADURAI:  Yes, Your Honor.

13             THE COURT:  Okay.  All the claims you hoped they would

14   make?

15             MR. AYYADURAI:  All the claims that I hoped they would

16   make, along with the appropriate memorandum of law.

17             THE COURT:  And I've read that, particularly the

18   pertinent part several times, including today.  All the claims

19   seek only money damages as relief against the defendants

20   individually in every count, except Count 6, which seeks

21   injunctive relief against Secretary Galvin.  Did I read the

22   revised complaint correctly?

23             MR. AYYADURAI:  Yes, you did, Your Honor.

24             THE COURT:  And the complaint that's pending now with

25   regard to the claims against the defendants individually, which

```
 1    include a RICO claim and a RICO conspiracy claim, the only

 2    relief requested is money damages.  Is that correct?

 3              MR. AYYADURAI:  In the civil RICO, you're absolutely

 4    right, Your Honor, yes.

 5              THE COURT:  Well, with regard to all of the claims,

 6    except Count 6, the relief that's sought is money damages

 7    against the named defendants individually, correct?

 8              MR. AYYADURAI:  Yes.

 9              THE COURT:  Okay.  Would defense counsel -- or Mr.

10    Cornell, do you have any further questions on this line?

11              MR. CORNELL:  Not on this line, I do not.

12              MR. AYYADURAI:  Your Honor, I would like to just make

13    one point.

14              THE COURT:  Well, you're supposed to answer questions.

15    What does the point relate to?

16              MR. AYYADURAI:  The point relates to the lie that

17    Mr. Hornstine just made about the caption in this case.

18              THE COURT:  Excuse me.  We'll get to that separately.

19    Okay?

20              MR. AYYADURAI:  Yes.

21              THE COURT:  Mr. Hornstine, with regard to the

22    testimony we've heard so far, would you like to cross-examine

23    him?

24              MR. HORNSTINE:  Your Honor, before proceeding, I'd

25    like to reiterate my request that the affidavits that were
```

1    filed under seal be unsealed in light of this testimony.  I'm

2    certainly happy to proceed today, but in light of what appears

3    to be a waiver of any attorney-client privilege, I don't know

4    how I can do a credible and thorough job on behalf of my client

5    with a cross-examination in the absence of that.

6         THE COURT:  And we still have Mr. Cooper, I assume?

7         MR. COOPER:  We do, Your Honor.

8         THE COURT:  Would you like to express your immediate

9    reaction to that request, which may not have to be your

10   eventual reaction?

11        MR. COOPER:  Your Honor, for the reasons previously

12   stated, I think it frankly is in my former client's best

13   interests that all of the affidavits remain under seal.  And as

14   I said, I have a number of concerns with the -- I don't believe

15   I'm subject to the attorney-client privilege anymore, but I

16   should stop here and ask Dr. Shiva whether he asserts it before

17   I say anything else.

18        MR. AYYADURAI:  Yes, Howard, I completely assert my

19   attorney-client privilege.  I've never waived it.  I also agree

20   with you --

21        THE COURT:  Well, when you testify voluntarily about

22   your communications with your lawyer, you waive the privilege.

23   And for some reason you nevertheless refuse to answer relevant

24   questions on cross-examination.  One remedy is for the Court,

25   me, to strike your testimony.

1           All of this unfortunately distracts from the issue

2     you've raised and I think is at the heart of your concerns and

3     engaged my attention in why I thought you would benefit, I

4     think you would benefit, from being represented by counsel, and

5     that is whether the Eleventh Amendment bars this case and

6     whether Twitter -- two issues.  Whether Twitter can be made a

7     party and required to litigate in Massachusetts.  But when you

8     voluntarily discuss your communications with Mr. Cooper, you've

9     waived your privilege with regard to that.  That's the law.

10          MR. HORNSTINE:  And Your Honor, leaving aside just

11    getting access to the documents that were filed under seal,

12    that those should be unsealed, the testimony or the argument

13    that was made earlier today should be unsealed, and to the

14    extent there's any ambiguity at all, this Court should or at

15    least is empowered to ask for the emails between Todd & Weld

16    and plaintiff or Mr. Esper and plaintiff.  And I for one would

17    be curious to see the metadata that underlies the document that

18    ultimately becomes --

19          THE COURT:  That's a different issue.

20          MR. HORNSTINE:  It will very quickly resolve --

21          THE COURT:  You've made the request.  I'll think about

22    it.  But let's go a little further.

23          MR. CORNELL:  Can I just --

24          THE COURT:  Okay --

25          MR. CORNELL:  -- quickly add to Mr. Cooper's --

1          THE COURT:  Yes, go ahead.

2          MR. CORNELL:  Knowing what I know about what is under

3  seal and what was discussed in camera and knowing what was

4  discussed in public, I don't believe that any of the defendants

5  are at -- they know exactly what the issues are.  They're at no

6  hardship.  And I don't think any kind of unsealing is justified

7  on that basis.

8          THE COURT:  All right.  This is not going to be the

9  end of the inquiries, and I really, as long as I haven't

10  dismissed the case, I'm going to establish a schedule that will

11  permit me to conduct the August 25 hearings if the case isn't

12  dismissed.

13          But there is the issue of whether Dr. Ayyadurai wrote

14  the July 22 memorandum of law that he signed and was filed by

15  you on his behalf on CM/ECF, and that was discussed in the

16  closed session.  I explained to him that he might have a Fifth

17  Amendment privilege, and he told me that he didn't want to

18  assert a Fifth Amendment privilege, and he discussed the

19  preparation, and he didn't assert any attorney-client

20  privilege.

21          And this is, although not something that was or could

22  be known when I issued my July 16 order as it relates to a

23  document filed on July 22, it should have been filed on July

24  15, according to my orders, I'm inclined to have you ask Dr.

25  Ayyadurai about who wrote that document.

 1          If you think there's some privilege, tell me, and then

 2     that will be part of the public record -- well, some of this is

 3     on the public record because he's filed several affidavits, and

 4     then we'll see where we go from there.  Because I think

 5     Mr. Hornstine doesn't want to ask any questions about what

 6     we've heard so far until we hear that, and I'll leave that

 7     open.

 8          But Mr. Cornell, do you want to ask Mr. Ayyadurai

 9     about the preparation of the July 22 memorandum of law that he

10     signed?

11          MR. AYYADURAI:  Where is Mr. Cornell?

12          THE COURT:  That's a very good question.

13          He's reconnecting I think.  Mr. Cornell, it looks like

14     you got disconnected for a bit.  Did you hear me ask whether

15     you -- in view of the fact that Dr. Ayyadurai said he didn't

16     want to assert a Fifth Amendment privilege and testified and

17     didn't assert any attorney-client privilege in the closed

18     session, I think it would be helpful to the progress of this,

19     because while it's not an issue that was raised in my July 16

20     order, it couldn't be because it relates to a memorandum filed

21     on July 22 that should have been filed on July 15, would you

22     like to ask him, basically cover what was covered in the closed

23     session concerning the preparation of that memorandum, the

24     draft of that memorandum, and then that may be subject to some

25     questions from defense counsel.  That may be as far as we can

1    get today.

2            MR. CORNELL:  Okay.  I'm sorry, I'm doing this from my

3    iPhone so that it will be more stable, so I can't see Dr.

4    Ayyadurai.  I can only see you, but it's okay.

5            THE COURT:  I think you might see him in a minute.  I

6    don't know if you can put it on speaker view, but then you'll

7    see him, if you can.

8    BY MR. CORNELL:

9    Q.   Dr. Ayyadurai, did you write the memo in question?

10   A.   Yes, Tim, I wrote it.  I authored the memo in question,

11   memorandum of law.  In fact, when I authored it, I changed it

12   to Cambria font because you had suggested Cambria was a font to

13   use, and I put the line there, which I had never done before,

14   because it looked more professional.  And that is what I did,

15   yes.  I'm also learning how to make my things more

16   professional.  I can learn.  I don't stay at one level.

17   Q.   Okay, okay, okay.  To what extent was your work edited by

18   others?

19   A.   I have two of the three people here.  I read it out to

20   Ms. Jeffalone, and she would read it because we have lots of

21   people who are very interested, that it can be reasonably read

22   by other people, so I read it out loud at night, in the

23   morning, 6:00 a.m., and they would give me feedback.  Same

24   thing to my assistant Mr. Medlar.  And at the last moments

25   which we had to file, Mr. Esper gave me his feedback, which I

1    incorporated.  That's it.  No one authored it but me, period,

2    which may be hard to believe for attorneys.

3              MR. CORNELL:  Okay.  I have no further questions.

4              MR. AYYADURAI:  Thank you.

5              THE COURT:  And do defendants want to ask any

6    questions on what we've heard so far?

7              MR. HORNSTINE:  Your Honor, just so I am clear, the

8    Court is asking me to ask questions concerning docket 166 and

9    that's it?  Again, I'm mindful of the time.

10             THE COURT:  No, no.  166 is the memorandum of law in

11   support of plaintiff's claims that we've been discussing.

12             MR. HORNSTINE:  Correct.

13             THE COURT:  You could ask more questions, but why

14   don't you start with that, if you want to ask any questions at

15   all right now.  And it's not going to be -- it's not speak now

16   or forever hold your peace, but I'd like to lay the foundation

17   for wherever we're going.

18             MR. HORNSTINE:  Sure, I appreciate that.  Again, I'm

19   both mindful of the time, and I know the Court is mindful of my

20   request to have the information unsealed.  And again to --

21             THE COURT:  Well, you have all the information with

22   regard to the memorandum of law that was filed because that I

23   had filed publicly.  I thought, in fairness, you should know

24   about the discrepancy between what Mr. Cornell wrote and what

25   the plaintiff wrote in his affidavits yesterday and now today,

1    so that's all public, or the pertinent parts of Mr. Cornell I

2    believe are public.

3          MR. HORNSTINE:  All right.  I'll have to take the

4    Court's word for it.

5          THE COURT:  Well, look, if you want -- and it is ten

6    of 6:00, but we're into this, Dr. Ayyadurai, tell us -- who is

7    Mr. Esper?

8          MR. AYYADURAI:  Mr. Esper is an attorney that works at

9    Harder LLP.  I have known Harder LLP, and I've known Dilan when

10   I did the case --

11         THE COURT:  And when did you first -- did he serve as

12   one of your attorneys in this case?

13         MR. AYYADURAI:  No, he has not been an attorney of

14   record.  After you, Your Honor, which is on the record, said I

15   should get an attorney, I spoke to Mr. Cornell, and I also

16   called up Charles Harder who is a friend of mine.  And I've

17   known him for many years, and I said, "Charles, can you be

18   ready because we may need to do depositions and discovery

19   because the judge wants to go on an accelerated rate in

20   California, and can you be ready and available to do that?"  So

21   they were on deck.

22         THE COURT:  Okay.  But I know that Mr. Esper didn't

23   file an appearance, but did you feel that he was one of your

24   attorneys in connection with this case?

25         MR. AYYADURAI:  Well, he's been advising me on -- I

```
 1    didn't see him as an attorney in this case.  He's just been
 2    more of an adviser.  But I wanted to get them ready in case --
 3    as I understood, this case was going to move very fast,
 4    particularly for depositions against Twitter on the West Coast.
 5              THE COURT:  And when did you first speak to Mr. Esper
 6    about this case?
 7              MR. AYYADURAI:  Well, I think it's on the record.
 8    Shortly after you told me to talk to Mr. Cooper on May -- I
 9    forget the date -- immediately that morning, and then I had a
10    meeting with -- I mean, I don't know -- I had a meeting with --
11    and it's on the record because we filed, Mr. Cooper filed a
12    letter that we were exploring him as my attorney as well as
13    Harder LLP.  So it was around that time.  When did our hearing
14    end?
15              THE COURT:  About May 21.
16              MR. AYYADURAI:  It was late May.
17              THE COURT:  Then I issued an order, because you told
18    me about Mr. Harder and Mr. Cooper, that if they were going to
19    represent you, they had to file an appearance by a particular
20    date.
21              MR. AYYADURAI:  Yes.
22              THE COURT:  And only Todd & Weld filed an appearance.
23    So tell me, us, please, about the preparation of the memorandum
24    of law that you signed on July 22 and that Mr. Cornell filed on
25    CM/ECF for you.
```

1            MR. AYYADURAI:  I prepared that memorandum of law

2    based on the notes.  If you go look at that memorandum of law,

3    it is directly from the notes I gave on May 21 on forum

4    selection and all the four issues.  I put it together.  I wrote

5    it.  That's what I did.

6            THE COURT:  What did you write it on?

7            MR. AYYADURAI:  I wrote it in --

8            THE COURT:  On your computer?

9            MR. AYYADURAI:  Yeah, on the computer.

10            THE COURT:  And did anybody else write any or all of

11    it?

12            MR. AYYADURAI:  No.  I wrote all of it.  I did read it

13    out loud.  I have Ms. Jeffalone if you want to speak to her,

14    Mr. Medlar here, and at the very last minute or minutes I

15    wanted Mr. Esper to review it.

16            THE COURT:  How did you communicate with him?

17            MR. AYYADURAI:  Over the phone and also

18    electronically.  We didn't have time to incorporate his

19    feedback, frankly.

20            THE COURT:  And I said to you in the closed session

21    that, having read your submissions since about last October,

22    this one stood out because it seemed to be written in a much

23    more lawyerlike way than anything you've submitted to me before

24    and since.  And that raised in my mind, before I saw what

25    Mr. Cornell said in his affidavit or independent of what

 1   Mr. Cornell said in his affidavit, the question about whether
 2   you had actually written it.  Why is the tone and literary
 3   style different in this one?
 4           MR. AYYADURAI:  Well, first of all, let me explain.  I
 5   actually am not -- I actually learn, Your Honor, and I asked
 6   Mr. Cornell, "How come your things look so beautiful?  What is
 7   the font you use?"  He said, "Change it to Cambria."
 8           THE COURT:  I'm not talking about --
 9           MR. AYYADURAI:  No, no.  Because Mr. Hornstine brought
10   that up.  He said it looks different.  Then I learned how to do
11   the introduction.  I also study things.  I'm not in stasis,
12   Your Honor.  In nine months, maybe I'll go to Harvard Law
13   School and I'll also become a lawyer one day, but I have also
14   learned.  So yes, I frankly take it as a compliment.
15           And more importantly, I actually thought there were
16   many errors in my thing.  It was done literally with two days'
17   notice.  So if you're saying it's a great job and it's
18   different, I take it as a great compliment.
19           THE COURT:  Excuse me.  I didn't say it was a great
20   job.  I said it was different.
21           MR. AYYADURAI:  It is different.
22           THE COURT:  Stop.  But it's in a more helpful style.
23   "Style" meaning style of writing, not font or format.
24           Now, Mr. Cornell filed an affidavit that said, as I
25   wrote in my August 3 and 4 orders, 178 and 182, that the

1    memorandum of law filed on July 22, 2021, docket number 166,

2    quote, "was written by a law firm in California that did not

3    put its name on the memorandum.  See docket number 169

4    Paragraph 5, ex parte and under seal."

5           Did you orally or in writing, including in an email,

6    tell Mr. Cornell that the memorandum was written by a law firm

7    in California?

8           MR. AYYADURAI:  Never, never.  Mr. Cornell was

9    mistaken, and it was inadvertent.  And you can ask Mr. Cornell

10   directly.  Mr. Cornell was scrambling on vacation.  He was

11   filing all sorts of things, affidavits, oppositions.  He wrote

12   the opposition to qualified immunity.  You can ask Mr. Cornell.

13   It's unfortunate, but what he wrote is mistaken, and it's

14   inadvertent.

15          THE COURT:  Okay.

16          MR. AYYADURAI:  And I'm being --

17          THE COURT:  Although, having testified about this, you

18   may have waived any privilege that you would otherwise have, do

19   you have any objection to Mr. Cornell providing to the Court

20   and the defendants the emails that you sent him that may have

21   caused him to be confused on this issue?

22          MR. AYYADURAI:  It is up to Mr. Cornell, but I still

23   want to protect my attorney-client privileges on principle.

24   But I'm telling you, you've also heard from Mr. Esper.  I wrote

25   that, and you can -- I'll repeat it.

1           THE COURT:  Excuse me.  Neither the defendants nor I

2     are required, when you say something -- first of all, I told

3     you this before.  When you testify about what would otherwise

4     be a privileged communication, you waive the privilege.  And

5     then this usually happens in a criminal case, you know,

6     somebody testifies on direct examination and then refuses on

7     Fifth Amendment grounds to answer relevant questions on

8     cross-examination.  One remedy and a frequent remedy is to

9     strike the testimony.

10          So both in the closed session and now again publicly,

11    without objection, you said what happened.  If it has to be

12    litigated, I expect I'm going find you have no attorney-client

13    privilege.  And I would really like to get this case focused,

14    if I don't dismiss it.  And I do have a preference for cases

15    being decided on the merits, but in my understanding from what

16    was said in the closed session is that Mr. Cornell has some

17    emails that prompted him to write that, even if he now knows or

18    thinks it's mistaken.  Is that right, Mr. Cornell?

19          MR. CORNELL:  Yes, but I'd like to emphasize the part

20    that I now know that I was mistaken.  I was mistaken.  The

21    information I had was based on earlier in the development and

22    not in the actual production.  I wasn't privy to it, and I was

23    simply mistaken.

24          THE COURT:  But when you wrote that the memo of law

25    was written by a law firm in California that did not put its

```
 1   name on the memorandum, were you basing that on a written

 2   communication from the plaintiff?

 3            MR. CORNELL:  I was but as --

 4            THE COURT:  Excuse me, I can't hear you.

 5            MR. CORNELL:  I was mistaken.  Sorry, can you hear me?

 6   Yes, that was based upon a written communication, but it was --

 7   it's misleading and it's a mistake and I apologize.

 8            THE COURT:  What did the email say that caused you to

 9   make the mistake?

10            MR. CORNELL:  Just a moment.  My internet is not

11   working.  It just says -- it's just -- and this is why I would

12   not like defense counsel to necessarily read it.  It's a work

13   schedule, who is going to do what, who was going to produce

14   what -- (technical difficulty)

15            THE COURT:  We're having trouble hearing you now.  Go

16   ahead.  Can you try to say it again.

17            MR. CORNELL:  Did you say you had trouble hearing

18   that?

19            THE COURT:  Yes.  I didn't hear what you said.

20            MR. CORNELL:  Okay.  What I wrote in the affidavit was

21   based upon a -- (technical difficulty) -- detail from earlier

22   who was going to be doing what, but it didn't turn out --

23   (technical difficulty)

24            THE COURT:  Well, now we have technological problems,

25   which means --
```

1          MR. HORNSTINE:  Your Honor, if I may?

2          THE COURT:  Go ahead.

3          MR. HORNSTINE:  Again, going to back to what I

4     suggested earlier, there's an easy way to figure this out.

5     Attorney-client privilege has been waived.  There can be no

6     doubt about that.  Let's see the email traffic between

7     plaintiff and Mr. Cornell.  Let's see the email traffic between

8     plaintiff and Mr. Esper.  Let's see the email traffic wherein

9     plaintiff says that he got the memorandum of law sent to him

10    and that it was an incomplete form.  These are all readily

11    ascertainable things.  We should ascertain them.

12         THE COURT:  Sure.  Here.  Make your request in

13    writing.  It's now 6:15 p.m.  Make your request in writing.

14    Can you do that by about noon tomorrow?

15         MR. HORNSTINE:  Yes, Your Honor.

16         THE COURT:  And if that's going to be opposed -- and

17    confer, confer.

18         MR. HORNSTINE:  May I ask with whom should I confer

19    with, Mr. Cornell?

20         THE COURT:  You should confer with Mr. Cornell.

21         MR. HORNSTINE:  Fine.

22         THE COURT:  He represents the plaintiff.

23         MR. HORNSTINE:  Do I need to confer with Mr. Esper who

24    plaintiff considers an adviser in this, or is it just Cornell?

25    I want to be perfectly --

1          THE COURT:  I would say confer with Mr. Cornell.

2          MR. HORNSTINE:  Very good.

3          THE COURT:  And Mr. Esper, if he reads the transcript

4     of this and understands the attorney-client privilege, which I

5     expect he does, I'm confident he does, will realize that if

6     there was an attorney-client privilege -- and there could be

7     even if he hadn't filed an appearance -- it's been waived,

8     voluntarily waived.

9          And I have a question, and whenever I have reasonable

10    cause to have a question about the honesty of representations

11    made to me, I've got a duty to protect the integrity of the

12    judicial proceeding.  So I raised the question, and it was

13    raised by the contradiction.

14         The defendants say there's an answer.  Mr. Cornell,

15    think about all of this, and we may be able to cut through it

16    if you share the documents without a court order and you

17    explain, you know, amplify which you've cryptically said caused

18    the misunderstanding.  And maybe we can just move on or resolve

19    this, whether there's sanctionable conduct here, in an

20    efficient way.  If not, we can litigate attorney-client

21    privilege, but it's not going to take a long time.  And I'm not

22    a bit pleased with Mr. Esper's failure to appear, at all, but I

23    think there's a good chance we'll meet Mr. Esper.  Maybe he'll

24    be here next week.

25         So let's go step by step.  And I am doing this, I have

```
 1    to reserve judgment on whether to sanction the plaintiff and,

 2    if so, what the sanction should be, including whether the case

 3    should be dismissed, but I'm not today dismissing the case.  So

 4    I'm not deciding that I won't dismiss the case as a sanction.

 5    I continue to be determined to have this case further prepared

 6    so I can conduct those hearings August 25, 26, 27.  I'm

 7    ordering as we've discussed --

 8              MR. AYYADURAI:  Your Honor, I have an email that I'd

 9    like to read.

10              THE COURT:  You know what you can do?  Now you're

11    done.  You're not being asked any questions.  Listen to me.

12    Listen to me.  Talk to Mr. Cornell.  If you've got emails,

13    don't just read one.  Talk to Mr. Cornell.  Let's say let's cut

14    through this, we have an explanation.  Give them the emails

15    because I've waived the attorney-client privilege, now that I

16    understand it, and he can explain it to you further, I expect.

17    Give him the emails and let's get past this.

18              You want to litigate the Eleventh Amendment issue.

19    You want to make a plausible claim that the Eleventh Amendment

20    doesn't bar this case.  Now I'm going to explain to you one

21    more time what you need to do to try to do that.  Okay?  So

22    listen.

23              This will be memorialized, but I'm ordering that

24    Mr. Cornell file, consistent with his obligations under Rule

25    11(a) and (b), among other things, a revised amended complaint
```

1    that includes only Count 6, the request for injunctive relief

2    against Galvin and only seeks to add Twitter as a party.  If

3    you read the transcripts from May 31, June 15, you'll see that

4    I've laid out the framework that is applicable.  The defendants

5    have made -- in fact, you have it essentially in the memos you

6    filed, the right Eleventh Amendment standard.

7         One of my colleagues -- you cite another District of

8    Massachusetts case.  And there have to be allegations, not just

9    that the plaintiff's First Amendment rights were violated.

10   This is my understanding of the law right now.  If you want to

11   try to persuade me it's incorrect, you can.  But to fit within

12   the exception of *Ex Parte Young*, it has to be alleged not just

13   that there was a previous violation of the plaintiff's First

14   Amendment rights that resulted from government officials

15   coercing with Twitter or conspiring with Twitter or

16   collaborating closely with Twitter, so Twitter is treated like

17   a state actor, but not only that that occurred in the past and

18   there's a continuing harm, Dr. Shiva still doesn't have his

19   Twitter account as far as I know, but that that coercion,

20   conspiracy or collaboration is continuing to this day and will

21   continue into the future.

22        The defendants have made, and Mr. Hornstine clarified

23   this in the filing that was made after the May 21 hearing, I

24   think on June 1, that the defendants make two challenges to the

25   Court's jurisdiction because the Eleventh Amendment is a

1    jurisdictional issue.  One is a sufficiency challenge.

2         The sufficiency challenge, as I understand it, the

3    question is does the complaint on its face state a plausible

4    claim that there is a continuing violation of the First

5    Amendment in effect by Twitter acting as a government agent.

6         There is also a factual challenge.  And with regard to

7    the factual challenge, that's subject to a different standard.

8    It's a 12(b)(1) standard.  And I pointed out footnote 3 in the

9    First Circuit's *Valentin* decision, the standard discussed by

10   the First Circuit in *Kerns* and other cases, including the

11   Supreme Court in *Bell v. Hood* as I recall.  And there, if the

12   basis for the factual challenge is intertwined with the merits

13   of the case, which I tentatively perceived if there was a

14   plausible claim it could or would be, then some discovery is

15   appropriate.  And I believe, according to those cases, I then

16   conduct a proceeding to determine whether the exception to *Ex*

17   *Parte Young* applies.

18        There's one other issue that I think I didn't raise.

19   The one other way -- and I lay this out because I want to make

20   legally correct decisions.  I'm not deciding a moot court

21   competition who is a better lawyer, but what are the merits of

22   the case.

23        Just one second.  What the plaintiff has alleged is

24   that Galvin, through his agents, employees and NASED,

25   complained to Twitter about the plaintiff, and Twitter

1    initially closed the account.  But if they're not complaining

2    anymore, and that's the complaint, not that there's some

3    ongoing collaboration, coercion, the case might be moot.

4         But courts have held that where a state actor halts

5    allegedly unlawful action but provides no guaranty that this

6    moratorium will be permanent, the Eleventh Amendment does not

7    necessarily deprive a court of jurisdiction to issue injunctive

8    relief prescribing the challenged state action.  The Seventh

9    Circuit said that in *Vickery*, 100 F.3d, 1334, 1347-48.  And

10   there's another case, *K.P. v. LeBlanc*, 729 F.3d 427, 439, a

11   Fifth Circuit case.

12        "The *Ex Parte Young* exception will apply in such

13   circumstances unless the threat of recurrence is too remote or

14   speculative to plausibly allege the existence of an ongoing

15   violation of federal law," according to the Fourth Circuit in

16   *Allen*, 895 F.3d 337, 354-55.  So those, depending on the

17   allegations, that line of cases might have some pertinence.

18        So Mr. Cornell, look at the transcripts, look at the

19   orders I've issued that reference this issue, look at the

20   Attorney General's June 1 brief.  If you want -- and I've just

21   explained to you what I think you have to do to survive a

22   motion to dismiss the one remaining case, one remaining claim,

23   Count 6.

24        With regard to Twitter and whether it's a necessary or

25   indispensable party, there are going to be some issues, and

1   some of them are factual that I'm interested in.  I'm trying to

2   think how to succinctly state this.  Twitter argues that

3   there's a forum selection clause in its terms of use that the

4   plaintiff agreed to that require that it be sued in federal or

5   state court in San Francisco essentially and therefore it

6   cannot be joined as a party in this case.

7        I've wanted to consider whether it's a necessary party

8   since the ultimate relief the plaintiff is seeking is the

9   restoration of its Twitter account.  It might not be a

10  necessary party, although one that I could join permissibly but

11  for the forum selection clause possibly.  It may be not

12  necessary, I said previously, because if the plaintiff just

13  sues Galvin in his official capacity and then proves a

14  violation of the First Amendment because Twitter was working so

15  closely with Galvin and NASED that it should be deemed a state

16  actor for First Amendment purposes, I would issue an injunction

17  if there was a threat of a continuing violation, if the

18  plaintiff didn't get his Twitter account back, and it would run

19  to Galvin and everybody acting in concert with him, which would

20  include Twitter.

21       So on the other hand, I might -- if they're a

22  necessary party but they can't be joined, ordinarily the case

23  would be dismissed.  However, there is authority, cases like

24  *Bremen* and *Atlantic Marine*, two Supreme Court cases, *Atlantic*

25  *Marine* is 571 U.S. 49, 64.  I don't have *Bremen* at my

1    fingertips.  But ultimately the question becomes, if Twitter

2    were necessary and could not be sued ordinarily in

3    Massachusetts, would the plaintiff be deprived of his day in

4    court.

5          In other words, if he brought a lawsuit against

6    Twitter in California, could Galvin be joined as a party?  Is

7    there personal jurisdiction over Galvin in California?  And is

8    there personal jurisdiction over NASED in California with

9    regard to this case?  And if not, or for some other reason, is

10   the plaintiff effectively denied an opportunity to so litigate

11   his claims if Twitter is not made a party here.

12         So that's an issue of the parties with regard to

13   Twitter being in the case.  There's also a subsidiary issue.

14   If Galvin is protected by the Eleventh Amendment, if *Ex Parte*

15   *Young* does not apply, could there nevertheless be a suit

16   against Twitter, and does Twitter have Eleventh Amendment

17   immunity.  I think it would probably not be arguing that it

18   does because it's not claiming to be a state actor, but it's

19   claiming it's not a state actor.  Then there are some other

20   issues, like Section 230, Twitter's own First Amendment rights.

21         But basically I'll issue an order on this.  If there's

22   going to be an amended complaint filed on the 9th consistent

23   with the requirements of the Rule 11(b) among other things and

24   no distracting impertinent immaterial allegations, then the

25   defendants -- it would be best, from my perspective, if the

1   defendants could file their motions to dismiss by Friday the

2   13th, but I might give you until the 20th.

3          MS. ELLSWORTH:  Your Honor, this is Felicia Ellsworth

4   for Twitter.  We certainly would appreciate until the 20th, if

5   that could work with Your Honor's schedule.  Once we have

6   something to shoot at --

7          THE COURT:  All right, the 20th.  And then the

8   plaintiff is going to have to -- no, you would -- I misspoke.

9   You would have either until the 13th or the 16th, Friday or

10  Monday.  Whose weekend is going to get wrecked?

11         MS. ELLSWORTH:  Your Honor, we'll save your weekend if

12  that's all right.

13         THE COURT:  My weekend is going to be lost anyway.

14  All right.  The 16th.  The plaintiff is going to have to

15  respond by the 23rd, and that might mean that we start on the

16  26th rather than the 25th.  I want you to leave for me the

17  25th, 26th and 27th.  All right.

18         It's now 6:30.  Let me briefly go into the breakout

19  room with my staff.  Actually, here.  Just one second.  I'm

20  just going to talk to my law clerk.  We don't have to go in the

21  breakout room.  I'll be back momentarily.

22         (Recess, 6:32 p.m. - 6:34 p.m.)

23         THE COURT:  Let me do this.  Mr. Cornell, I think

24  ordinarily I'd require that you file a memorandum of law with

25  the amended complaint addressing these issues.  But I don't

 1   issue orders, as you realize, that I don't intend to enforce.
 2   And these are complex legal issues.
 3         So I thought I'd wait and let you respond to the
 4   motion to dismiss, although you need to be --
 5         (Phone interruption)  Hold on a second.  Do you want
 6   to file a memo in support of, you know, why the allegations are
 7   sufficient, why, if there's a factual challenge, which there
 8   is, they're intertwined with the amended complaint, or do you
 9   want to just respond to the motion to dismiss?
10         Mr. Cornell, are you still there?
11         MR. CORNELL:  I'm sorry.  I was on mute.  Can you hear
12   me?
13         THE COURT:  Yes.
14         MR. CORNELL:  Yeah.  I would absolutely prefer to
15   respond in the motion to dismiss.  If you wanted the complaint
16   in the next few days, it would be --
17         THE COURT:  Right.  Okay.  I'm going to put it that
18   way.  But you better not wait for the motion to dismiss.  This
19   is --
20         MR. CORNELL:  Oh, yes.
21         THE COURT:  This is state-of-the-art constitutional
22   law.  I've tried to lay out the framework as I understand it
23   and have developed it, and there won't probably be time for a
24   reply unless I read this and put the hearing off a couple of
25   days, which would be difficult for me to do.

1           So you all should know what I think are the

2    significant issues.  If I've missed something, you will tell

3    me, but you want to be sure you address what I've raised.

4           All right.  As I said earlier, you must order the

5    transcript on an expedited schedule, and I believe I asked that

6    an excerpt of it be prepared on an expedited basis, so the

7    excerpt first.  And I've got a heavy schedule in the next

8    couple of days, but you'll get orders memorializing these oral

9    orders from me.

10          MR. CORNELL:  Will there --

11          THE COURT:  What's that?

12          MR. CORNELL:  I'm sorry, I didn't mean to -- will

13   there also be a memorandum on the dismissal of the other

14   claims?

15          THE COURT:  There will be.

16          MR. CORNELL:  Okay.

17          THE COURT:  There will be.  All right.  Is there

18   anything further before we thank the tireless court reporter

19   and my staff?

20          All right.  We will be in recess.  But if the court

21   reporter and my staff will stay on, I'll go into a breakout

22   room to talk very briefly.  Court is in recess.

23          (Adjourned, 6:28 p.m.)

24

25

CERTIFICATE OF OFFICIAL REPORTER

I, Kelly Mortellite, Registered Merit Reporter and Certified Realtime Reporter, in and for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter to the best of my skill and ability.

Dated this 9th day of August, 2021.


/s/ Kelly Mortellite

_____

Kelly Mortellite, RMR, CRR

Official Court Reporter